on topographic maps. The name was changed in 1973 to 'National Geodetic Vertical Datum of 1929' to avoid the implication that the datum is mean sea level; the datum itself was left unchanged." ("Manual of Photogrammetry, 4th Edition," American Society of Photogrammetry, 1980)

"Mean Sea Level: ... arrived at from readings ... at 26 gaging stations ... The elevation of the sea differs from station to station depending on local influences of the tide ... Therefore, to provide a common reference for elevations throughout North America, it was necessary to adopt a 'mean sea level.' The [1929] adjustment ... incorporated long-term from the 26 tidal gagging stations; hence it was related to mean sea level. In fact, the network of benchmarks with their resulting adjusted elevations defined the mean sea level datum. It was called the 'National Geodetic Vertical Datum of 1929 (NGVD29) ... Throughout the years after 1929, the NGVD29 deteriorated somewhat due to changes in sea level and shifting of the earth's crust ... The [North American Vertical Datum of 1988] adjustment shifted the position of mean sea level somewhat, and thus resulted in changes to the elevations of all benchmarks in the vertical network ... [references Figure showing differences between NGVD29 and NAVD88]" ("Elementary Surveying, 9th Edition," Wolf & Brinker1994)

From the above examples, it is apparent that many in the engineering community would (and did) continue to reasonably conclude after 1973 that geodetic datums referenced to NGVD29 were equivalent to mean sea level. Only the last example from Wolf & Brinker most completely details the nonequivalence. The impact is that many flood control and hurricane protection projects were designed and constructed under the assumption that NGVD29 closely approximated mean sea level when in fact it may have differed by as much as one foot in places. This misinterpretation continues to the present--even with the revised NAVD88 which has absolutely no relationship to a local sea level surface.

## Corps Policy Guidance on the Redefined NAVD88 Geodetic Datum

In January 1994 HQUSACE issued an Engineer Technical Letter to the field entitled "Conversion to the North American Vertical Datum of 1988" (ETL 1110-1-152, 1 Jan 94). This document was intended to provide "technical guidance and implementation procedures for the conversion from the National Geodetic Vertical Datum of 1929 (NGVD29) to the North American Vertical Datum of 1988 (NAVD88)." This guidance letter stated, in part, that:

"The Federal Geodetic Control Subcommittee (FGCS) of the Federal Geographic Data Committee (FGDC) has affirmed that NAVD88 shall be the official vertical reference datum for the U.S. The FGDC has prescribed that all surveying and mapping activities performed or financed by the Federal Government make every effort to begin an orderly transition to NAVD88, where practicable and feasible. Both tidal and non-tidal low water reference planes and datums are affected by the change to NAVD88. ... Elevations of reference points/datums along the various inland waterway systems will also be impacted by the change in datums. ... The transition to NAVD88 may have considerable impact on Corps projects, including maps, drawings, and other spatial data products representing those projects. However, once completed, the transition will result in a more accurate vertical reference datum that has removed leveling errors, accounts for subsidence, and other changes in elevation."

The Technical Letter also contained specific actions that should be taken regarding the datum conversion:

EXHIBIT
tabbies
1



This is a preliminary report subject to revision; it does not contain final conclusions of the United States Army Corps of Engineers.

- USACE commands should begin the orderly transition to NAVD88. Procedural guidance for performing this conversion is given in Appendix A [to the Technical Letter].
- The conversion to NAVD88 should be accomplished on a project-by-project basis. The relationship of all project datums to both NGVD29 and NAVD88 will be clearly noted on all drawings, charts, maps, and elevation data files.
- In accordance with Section 24 of WRDA 92, when elevations are referred to a tidal reference plane in coastal waters of the U.S., Mean Lower Low Water (MLLW) shall be used as the vertical datum. Tidal BMs should be tied to NAVD88 instead of NGVD29 where NAVD88 data is available. Tidal datums shall be established in accordance with the procedures outlined in EM 1110-2-1003.
- Other hydraulic-based reference planes established by USACE for the various inland waterways, reservoirs, and pools between control structures should continue to be used for consistency; however, they should also be connected with the NAVD88 where practicable and feasible.
- In project areas where local municipal or sanitary jurisdictions have established their own vertical reference planes, every attempt should be made to obtain the relationship between that local datum and NGVD29 and/or NAVD88; and clearly note this relationship on all drawings, charts, maps, and elevation data files.

A complete copy of this 1994 Technical Letter is included Technical Appendix 34 to this Volume. This ETL was subsequently incorporated into various engineering manuals—e.g., EM 1110-1-1004 and EM 1110-1-1005.

The redefinition of the geodetic datum from NGVD29 to NAVD88 in the early 1990s did not necessarily eliminate the misconception that a geodetic datum represented a local sea level surface. A typical example where NAVD88 is equated to mean sea level is contained in the 2005 ACSE-NSF Hurricane Katrina Levee Performance Report, as follows.

> It should be noted that a number of different datums have been used as elevation references throughout the historic development of the New Orleans regional levee systems, and this situation is further complicated by ongoing subsidence in the region. This investigation has not yet had time to adequately resolve differences between different datums, so all elevations stated in this preliminary report should be regarded as somewhat approximate, and should be taken as referring approximately to elevation with respect to NAVD88 or "mean sea level" in the region. (ASCE-NSF Preliminary Report on the Performance of the New Orleans Levee Systems in Hurricane Katrina on August 29, 2005 dated 2 Nov 05, Section 1-4)

### New Orleans District Policy Memorandum on Geodetic Datum Readjustments

In 1985 the New Orleans District issued the following proposed policy regarding periodic NGS readjustments to benchmark elevations. This particular memorandum (copied in entirety below) apparently was in response to changes or readjustments in benchmark elevations ca 1983, followed by another NGS elevation readjustment shortly thereafter. The (Lower) Mississippi Valley Division approved the proposed policy by 1st Indorsement on 19 Sep 85—see Technical Appendix 30 to this Volume (1985 New Orleans District Policy on NGS Benchmarks).



This is a preliminary report subject to revision; it does not contain final conclusions of the United States Army Corps of Engineers.

LMNED-S 7 August 1985

SUBJECT: NGS Benchmarks

TO: Commander, Lower Mississippi Valley Division
ATTN: LMVED.

1. Reference is made to the following:

a. LMNED letter 2 November 1984 to LMVED, subject supra.

b. LMVED letter dated 5 March 1985 to RA John D. Bossler, subject: Adjustments to NGS Benchmarks.

c. John D. Bossler letter to LMVD dated 29 March 1985 in response to reference b above.

d. LMVED-TS letter dated 12 April 1985 to LMNED-S subject: Adjustments to NGS Benchmarks.

e. LMVED letter dated 1 May 1985 to LMNED-S subject: Adjustments to NGS Benchmarks, and 1st End thereto.

2. In essence, it is the position of NGS as set forth in reference c above that the current (1983) benchmark elevations are correct, but that they cannot be used in conjunction with earlier values to derive estimates of subsidence which are necessarily valid even in order of magnitude. Thus we are left with a problem of setting project grades to provide the level of protection authorized. The problem is particularly acute on projects which are partially complete, in that, if we adopt the new benchmark elevations for construction without altering design flowlines, we ensure that those projects will provide inconsistent levels of protection; with the previously constructed portions offering lower levels of protection than those to be constructed in the future. At the same time, it would hardly be prudent, based on what we now know about benchmark elevations, to embark on a program of wholesale raising of previous construction to conform to the latest elevations. This is particularly true in situations in which design flowlines are primarily a function of discharge with tide level having little effect, and in tidal cases where increases in grade can only be achieved through demolition and reconstruction.

3. The problem extends as well to our stream gaging network since the gages which comprise that a network are ordinarily adjusted to conform to the latest information published by NGS. As an example, consider the Carrollton gage, which is typical of gages at and below New Orleans. It has been raised about 0.6 foot since 1952 (1983 data have not yet been applied) with the result that the reading of the staff now corresponds to a reading 0.6 foot lower on the 1952 staff. Application of the 1983 data would result in raising the staff another half-foot or a total increase of over 1 foot.

4. The problem is exacerbated by the information, recently received, that the 1983 data have been superseded by the results of releveling done in the New Orleans area at the request of local officials. New elevations for benchmarks in Jefferson, St. Bernard, Plaquemines, and Orleans Parishes have been published which, in most instances, represent significant upward revisions of the 1983 data. Additional results of the releveling are being processed and it seems reasonable to expect that they will reflect the same upward trends. The overall significance of these changes in the light of the repeated and ringing affirmations of confidence in the 1983 data which appear in NOAA's letter of 29 March 1985 is not easy to assess, but it does further weaken the case for imputing, which any reasonable confidence, hard physical significance to the changes in benchmark elevations. Yet the data promulgated by NOAA, given their presumed primacy in deciding where the earth's crust is in the vertical plane, cannot be ignored.

5. While the NGS program (cadastre) for evaluation subsidence may well produce data relevant to our problem (and for this reason alone, we would be well advised to support it) that program offers little if utility in the foreseeable future. Thus we must select a course of action without material assistance from NGS.

6. Despite the absence of firm implications to be drawn from changing benchmark data, we believe that a clearly defined policy should be derived concerning the use of benchmark data in our various activities. Accordingly, we propose the following actions:



This is a preliminary report subject to revision; it does not contain final conclusions of the United States Army Corps of Engineers.

a. All gages will be set to conform to the latest available benchmark information published by NGS. Since both the gage information and the NGS data are widely disseminated, to do otherwise would be to court public confusion.

b. Modification of projects which have been completed will not be considered. The level of precision in the current data, and the practical difficulty and cost of changing such projects combine to mandate this course of action at least for the foreseeable future.

c. The main stem features of the MR&T project, such as MRL and Atchafalaya Basin, will be constructed utilizing the latest pre-1983 benchmark elevations. The grade requirements for these features are driven primarily by discharge and since subsidence presumably affects both bed and banks, required levee heights should be little affected by it. Thus, a shift to the new, lower benchmarks would result in the construction of levees higher than required to provide the authorization level of protection. There may be some problem with this approach at the lower (gulfward) ends of the system where tide becomes an increasingly important factor, and we plan to give that continuing consideration.

d. Off-main stem projects of the MR&T which are under construction or will be constructed in the future will use the latest benchmark data published by NGS at the time construction is/was started. The need for revision will be considered as construction proceeds.

e. All O&M dredging will use the latest available benchmark data published by NGS prior to the 1983 data. A change to the new data would mean that the depth of dredging in Southwest Pass, for example, would be lowered by about 1 foot. Given the perennial commotion by navigation interests, and considering the intensity of it this past year, such a course of action will be ill advised to say the least.

f. Hurricane protection projects which are partially complete will use the NGS benchmarks current at the time of construction of the first increment of the project. To shift to the later NGS data without altering the heights of previously constructed portions would make "fuseplugs" of those portions and thus impose a gratuitous servitude on the lands and facilities they protect. And altering previously constructed works would not be practicable.

g. New hurricane protection projects will be constructed using the latest available NGS benchmark data.

h. We plan to respond affirmatively to NOAA's invitation to participate in this "cadastre" program to better evaluate subsidence. Based on NOAA's estimates, the total costs would be $2.0 million in the first year, $525 thousand in the second year, and $345 thousand annually thereafter. Our participation would be in the form of membership on technical study groups and providing data. We do not, at this time, anticipate providing any direct funding.

7. Approval of the course of action set forth in paragraph 6 is recommended.

FOR THE COMMANDER; Chief, Engineering Division
Encls

The above memorandum appears to spell out a policy for resetting water level gages to agree with periodic NGS datum (NGVD29) readjustments. This might imply, in coastal areas, that the gages are being adjusted to correspond to some water level reference.

More significantly, the policy memorandum recommends not updating navigation dredging datums with the new NGS readjustments. It also recommends that hurricane protection projects "use the NGS benchmarks current at the time of construction of the first increment of the project." This might explain why some projects continued to use superseded benchmark elevations for design and construction. The rationale for such an approach is difficult to determine at this later point in time; however, it does appear to stem from some degree of exacerbation with the ever-changing NGS benchmark readjustments. The memorandum does note a need to get a better handle on evaluating subsidence in the region.



This is a preliminary report subject to revision; it does not contain final conclusions of the United States Army Corps of Engineers.

The above 1985 policy was superseded by an updated New Orleans District policy letter dated 26 Oct 00. This revised policy was endorsed by the Division by memorandum dated 31 Jan 01—see memorandum in the Technical Appendix 30 to this Volume (1985 New Orleans District Policy on NGS Benchmarks). The new policy emphasized that the 1985 datum policy had become "untenable" and was "causing great confusion," and that the District would henceforth focus efforts on updating to the new NAVD88 datum supplemented by CORS observations to monitor subsidence.

Subsequently, a 20 Dec 02 "Vertical Datum Policy" memorandum was issued by the New Orleans District Engineering Division that stated all gage and protection structure elevations should be referenced to NAVD88. This memorandum emphasized that "assigned benchmark elevations represent a 'snapshot' and may change on future contracts depending on benchmark movement … Engineers must use sound engineering judgment in employing the NAVD88 datum, recognizing that projects have already been designed and/or constructed using the NGVD29 datum against various epochs and that projects may require a significant number of years from conception to completion, and therefore allowances must be made for vertical movement." The subsequent implementation of a time-dependent vertical datum concept in October 2005 further reinforces this District policy.

Since the early 2000s, the New Orleans District's Engineering Division was actively involved with, and contributed funding to, the NGS and the Louisiana Spatial Reference Center (LSRC) in varied efforts to update the vertical control datum in Southeastern Louisiana.

These events are further detailed in the following section.

**Historical Event Timeline on use of Geodetic Vertical Datums in USACE/New Orleans District**

1929 – The United States uses mean sea level (MSL) at 26 tide station locations around the country, including the Gulf Coast, to establish the Sea Level Datum of 1929 (SLD29).

1956 – Corps asks the U.S. Coast & Geodetic Survey (USC&GS, now NGS) about their changing of benchmark elevations in New Orleans. (See Technical Appendix 40)

1958 – USC&GS, now NGS, notifies the Corps of subsidence and vertical datum problems in New Orleans, noting there has been almost 3 feet of subsidence in the Houston-Galveston area and that no benchmark be trusted to be absolutely stable due to changes in the earth's crust. (See Technical Appendix 40)

1973 – The United States renames its SLD29 to NGVD29, noting that is was a close approximation of MSL in 1929 near the 26 tide stations held fixed, but no longer due to subsidence and other factors. *"In order to avoid such apparent confusion and the costly errors that may result through failure to consider local sea level when engineering projects are undertaken, it is proposed to change the present name of the vertical control datum from the "Sea Level Datum of 1929" to the "National Geodetic Vertical Datum of 1929."* (See Technical Appendix 40)



This is a preliminary report subject to revision; it does not contain final conclusions of the United States Army Corps of Engineers.