# In the United States Court of Federal Claims

No. 05-1119L
Filed: March 29, 2007
**TO BE PUBLISHED**

| | |
|---|---|
| ROCCO TOMMASEO, THOMAS TOMMASEO, ROCKY AND CARLO, INC., STEVEN BORDELON, husband of, CYNTHIA BORDELON and, STEVE'S MOBILE HOME & R.V. REPAIR, INC., Plaintiffs, v. THE UNITED STATES, Defendant. | Concise and Direct Pleading, RCFC 8(e), 12(e), 15(a); Just Compensation Clause, U.S. CONST. amend. V; Motion *In Limine*; Motion to Dismiss, RCFC 12(b)(1); Ripeness; Standing; Subject Matter Jurisdiction. |

**F. Gerald Maples**, New Orleans, Louisiana, counsel for Plaintiffs.

**Fred Russell Disheroon**, United States Department of Justice, Environment and Natural Resources Division, counsel for Defendant.

## MEMORANDUM OPINION AND ORDER

**BRADEN, *Judge*.**

The Mississippi River Gulf Outlet ("MRGO") is a 76-mile, man-made navigation channel that runs from the Gulf of Mexico to the Port of New Orleans. Plaintiffs have filed a class action for compensation alleged to be due, because of the taking of their property during Hurricane Katrina and subsequent storms, as a result of the construction, continued operation, maintenance, and dredging of the MRGO by the United States Army Corps of Engineers ("Government"). The threshold issue is whether the United States Court of Federal Claims has jurisdiction to adjudicate their claims.

The United States Court of Appeals for the Federal Circuit has observed that the "distinction between jurisdiction and the failure to state or prove a claim for relief" often has been confused. *See Fisher* v. *United States*, 402 F.3d 1167, 1171-72 (Fed. Cir. 2006) (*en banc*) ("In Tucker Act jurisprudence, . . . this neat division between jurisdiction and merits has not proved to be so neat. In these cases, involving suits against the United States for money damages, the question of the

court's jurisdictional grant blends with the merits of the claim. This mixture has been a source of confusion for litigants and a struggle for the courts."). As discussed herein, the Government's October 4, 2006 Motion to Dismiss manifests this confusion.

## I. RELEVANT FACTS.[1]

The MRGO is a federal navigation project designed and maintained by the Government. *See* First Am. Compl. ¶ 4. This federal project was authorized in 1956 to provide deep water vessels direct access between the Gulf of New Mexico and the Port of New Orleans for commercial and national defense purposes. *Id*. Construction began in 1958 and was completed in 1968. *See* Gov't Mot. Dis. at 3. The MRGO is 76 miles long and originally was authorized with a surface width of 650 feet, a bottom width of 500 feet, and a depth of 36 feet. First Am. Compl. ¶ 5. The MRGO is bordered on the east by Lake Borgne and on the west by marshland that lies between the MRGO and St. Bernard Parish. *Id*.; Gov't Mot. Dis. at 3.

The First Amended Complaint alleges that the MRGO is now significantly wider than the initial authorized size, *i.e.*, up to three times as wide in some areas. *See* First Am. Compl. ¶¶ 5-9. This increase in the width allegedly has occurred for two reasons. First, "the surface width [of the MRGO] was wider than the bottom width creating [a situation where] wake and wave action [from ships traveling along] the channel . . . continue[] eroding and widening [of the channel]" *Id*. ¶ 6. Second, the MRGO allows salt water from the Gulf of Mexico to flow into marshlands bordering St. Bernard Parish, damaging the wetlands that serve as a natural buffer against hurricane winds and storm surge: "[t]he wetland loss and deterioration from the MRGO . . . allowed for expanded tidal amplitude and duration, increasing the flooding risk to interior portions of St. Bernard Parish and Orleans Parish and further providing a direct line of access for hurricane-related storm surge to reach St. Bernard and Orleans Parishes." *Id*. ¶¶ 7, 8. Furthermore, Plaintiffs allege that where the MRGO merges with the Gulf Intracoastal Waterway, a "funnel" has been created that effectively causes storm surge from "any tropical storm or hurricane which passes in the vicinity of the MR-GO . . . into St. Bernard Parish and the Lower Ninth Ward, flooding those lands time and time again." Pl. Resp. at 7.

On August 29, 2005, Hurricane Katrina landed on the southeastern Gulf Coast near New Orleans, causing "catastrophic damage." *See* Gov't Mot. Dis. Ex. E at 1 (RICHARD D. KNABB ET AL., NAT'L HURRICANE CENTER, TROPICAL CYCLONE REPORT HURRICANE KATRINA (2005)). The National Hurricane Center ("NHC") reported that Hurricane Katrina generated a "massive storm surge" that reached "15 to 19 feet . . . in eastern New Orleans [and] St. Bernard Parish" and peaked at 27.8 feet along the Mississippi Gulf Coast. *Id*. at 9. This storm surge was so large that it "severely strained the levee system in the New Orleans area. . . . [and] overtopped large sections of

---

[1] The relevant facts recited herein were derived from: Plaintiffs' January 13, 2006 First Amended Class Action Complaint ("First Am. Compl."); Defendant's October 4, 2006 Motion to Dismiss ("Gov't Mot. Dis.") and Exhibit E thereto ("Gov't Mot. Dis Ex E"); and Plaintiffs' November 2, 2006 Response ("Pl. Resp.").

the levees east of New Orleans, in Orleans Parish and St. Bernard Parish[.]" *Id*. The resulting flood devastated St. Bernard Parish. *Id*. at 9-11; First Am. Compl. ¶ 11.

Plaintiffs are resident property owners in St. Bernard or Orleans Parishes or are Louisiana corporations with a principal place of business in St. Bernard Parish. *See* First Am. Compl. ¶¶ 2, 10. The First Amended Complaint alleges that Plaintiffs suffered "massive flooding and destruction of [their] property" by Hurricane Katrina, and that, "but for the creation and maintenance of the MRGO by the United States, the flooding and devastation of Plaintiffs' property would not have occurred." *Id*. ¶¶ 11-13. After Hurricane Katrina, Plaintiff's property has been subjected to repeated flooding, even during minor weather events, because of the wetland loss associated with the MRGO. *Id*. ¶¶ 22-24.

## II. PROCEDURAL HISTORY.

On October 17, 2005, Plaintiffs filed a class action in the United States Court of Federal Claims, alleging that the Government deprived Plaintiffs of their property in violation of the Just Compensation Clause of the Fifth Amendment to the United States Constitution ("Just Compensation Clause"). On October 24, 2005, Plaintiffs filed a Disclosure Statement pursuant to RCFC Rule 7.1.

On January 13, 2006, a First Amended Complaint was filed that included three Counts. *See* First Am. Compl. ¶¶ 15-29. On January 17, 2006, the Government filed an Answer. On March 7, 2006, the parties filed a Joint Preliminary Status Report. On March 17, 2006 and July 18, 2006, the court convened telephone status conferences. On July 18, 2006, the court issued a Scheduling Order requiring any dispositive motions to be filed on or before September 18, 2006.

On August 16, 2006, Plaintiffs filed a Motion to Compel Discovery Responses, together with five exhibits. On September 5, 2006, the Government filed a Response. On September 7, 2006, Plaintiffs filed a Reply. On September 7, 2006, the court convened a hearing to consider Plaintiffs' August 16, 2006 Motion to Compel. On September 8, 2006, the court entered an Order, denying Plaintiffs' August 16, 2006 Motion to Compel, as premature, and directing the Government to file any motion to dismiss by September 30, 2006. On October 2, 2006 the Government filed a Motion for an Enlargement of Time, which the court granted.

On October 4, 2006, the Government filed a Motion to Dismiss, pursuant to RCFC 12(b)(1), together with five supporting exhibits. On November 2, 2006, Plaintiffs filed a Motion *In Limine* to exclude those exhibits. On November 2, 2006, Plaintiffs filed a Declaration of Counsel in opposition of Government's October 4, 2006 Motion to Dismiss. On that same date Plaintiffs filed a Statement of Contested Material Facts in opposition to the Government's Motion to Dismiss, as well as a Response to the Government's October 4, 2006 Motion to Dismiss. On November 20, 2006, the Government filed a Reply to Plaintiffs' November 2, 2006 Response and a Response to Plaintiffs' November 2, 2006 Motion *In Limine*. On December 6, 2006, Plaintiffs filed a Reply to the Government's November 20, 2006 Response.

On January 27, 2007, Plaintiffs filed an *Ex Parte* Motion for Leave to File a Supplemental Memorandum in Opposition to the Government's Motion to Dismiss and proposed Supplemental Memorandum with four exhibits. On February 2, 2007, the Government filed an Opposition. On February 7, 2007, the court issued an Order granting Plaintiffs' January 27, 2007 *Ex Parte* Motion for Leave to File a Supplemental Memorandum. On February 21, 2007, Plaintiffs filed a Supplemental Memorandum in Opposition to Defendant's Motion to Dismiss.

## III. DISCUSSION.

### A. Jurisdiction.

The Tucker Act, 28 U.S.C. § 1491(a)(1), authorizes the United States Court of Federal Claims to render judgment and money damages on any claim against the United States based on the United States Constitution, an Act of Congress, a regulation of an executive department, or an express or implied contract with the United States. *See United States* v. *Mitchell*, 463 U.S. 206, 212-18 (1983); *see also United States* v. *Testan*, 424 U.S. 392, 397-98 (1976). The United States Supreme Court, however, has held that the Tucker Act does not create any substantive right for money damages. *See Mitchell*, 463 U.S. at 216; *see also Testan*, 424 U.S. at 398. Therefore, a plaintiff must identify and plead an independent contractual relationship, constitutional provision, federal statute, and/or executive agency regulation that provides a substantive right to money damages in order for the court to have jurisdiction. *See Khan* v. *United States,* 201 F.3d 1375, 1377 (Fed. Cir. 2000).

In determining whether the United States Court of Federal Claims has jurisdiction over a claim, the United States Court of Appeals for the Federal Circuit has instructed that "the trial court at the outset shall determine . . . whether the Constitutional provision, statute, or regulation is one that is money-mandating. If the court's conclusion is that the Constitutional provision, statute, or regulation meets the money-mandating test, the court shall declare it has jurisdiction over the cause, and shall then proceed with the case in the normal course." *Fisher* v. *United States*, 402 F.3d 1167, 1173 (Fed. Cir. 2005) (*en banc*).

### B. Standard of Review – RCFC 12(b)(1).

A motion to dismiss may be brought to challenge the court's subject matter jurisdiction at any time. *See* RCFC 12(b)(1). In order to establish subject matter jurisdiction, Plaintiffs must show that they have a "nonfrivolous" claim founded upon a Constitutional provision, statute, or regulation. *See Steel Co.* v. *Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) ("Dismissal for lack of subject-matter jurisdiction . . . is proper only when the claim is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy.'" (quoting *Oneida Indian Nation of N.Y.* v. *County of Oneida*, 414 U.S. 661, 666 (1974))).

**C. The Court's Resolution Of The Government's October 4, 2006 Motion To Dismiss, Pursuant To RCFC 12(b)(1).**

**1. The Court Has Jurisdiction To Adjudicate Claims Alleged In The First Amended Complaint.**

The United States Court of Appeals for the Federal Circuit has instructed the trial court to "entertain and decide the jurisdictional and merits test in . . . a single step. The single step would be one in which the trial court determines both the question of whether the [source of law] provides the predicate for its jurisdiction, and lays to rest for purposes of the case before it the question of whether the [source of law] on its merits provides a money-mandating remedy." *Fisher*, 402 F.3d at 1173.

In this case, the First Amended Complaint properly invokes the court's subject matter jurisdiction, as it states: "This is a claim seeking compensation from the United States for the taking of private property for public use pursuant to Amendment V of the U.S. Constitution." First Am. Compl. ¶ 1; *see also Moden* v. *United States*, 404 F.3d 1335, 1341 (Fed. Cir. 2005) ("Thus, to the extent [Plaintiffs] have a nonfrivolous takings claim founded upon the Fifth Amendment, jurisdiction under the Tucker Act is proper."); *Murray* v. *United States*, 817 F.2d 1580, 1583 (Fed. Cir. 1987) ("[T]he 'just compensation' required by the Fifth Amendment has long been recognized to confer upon property owners whose property has been taken for public use the right to recover money damages from the government.").

The First Amended Complaint, however, does not allege when the named Plaintiffs became property owners in the St. Bernard or Orleans Parishes, an essential fact to establish standing. *See Dow* v. *United States*, 357 U.S. 17, 20-21 (1958) (holding that a plaintiff seeking just compensation for a taking under the Fifth Amendment must be the owner of the property at the time of the taking); *Cavin* v. *United States*, 956 F.2d 1131, 1134 (Fed. Cir. 1992) ("Without undisputed ownership of the [] property [at issue] at the time of the takings, [plaintiffs] cannot maintain a suit alleging that the Government took their property without just compensation." (citing *Dow*, 357 U.S. at 20-21)); *Lacey* v. *United States*, 595 F.2d 614 (Ct. Cl. 1979) ("The person entitled to compensation for a taking of property by the Government is the owner of the property at the time of the taking." (citation omitted)). Accordingly, the court will afford the named Plaintiffs[2] leave to further amend to satisfy this jurisdictional requisite. *See* RCFC 15(a) ("a party may amend the party's pleading once as a matter of course before a responsive pleading is served . . . Otherwise a party may amend the party's pleading only by leave of the court . . . [to] be freely given when justice so requires").

[2] The court, at this juncture, takes no position on whether this is an appropriate case to be certified as a class action. *See* RCFC 23(a).

### 2. The Court Has Determined That Count II Is Not Ripe For Adjudication.

"Count II - Temporary Taking of Property" alleges that "only in the event that the MRGO is closed and plaintiffs' real property can be redeveloped in the future, plaintiffs have been deprived of the use, occupancy, and enjoyment of their real property for the indefinite future and have suffered a temporary taking of their real property." First Am. Compl. ¶ 19. Since the MRGO is not closed, Count II is not ripe for adjudication. *See Abbott Laboratories* v. *Gardner*, 387 U.S. 136, 148-49 (1967) ("The 'basic rationale' of ripeness is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements[.]") Accordingly, Count II is dismissed, without prejudice.

### 3. It Is Premature For The Court To Conduct The *Ridge Line* Inquiry.

The United States Supreme Court has stated that an inverse condemnation occurs where the federal government condemns property, without conducting an eminent domain proceeding. *See Agins* v. *City of Tiburon*, 447 U.S. 255, 258 n.2 (1980) ("Inverse condemnation should be distinguished from eminent domain. Eminent domain refers to a legal proceeding in which a government asserts its authority to condemn property. Inverse condemnation is 'a shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted.'") (quoting *United States* v. *Clarke*, 445 U.S. 253, 257 (1980)); *see also Moden*, 404 F.3d at 1342 ("Inverse condemnation is the cause of action against the government to recover the value of property taken where the government has not exercised the power of eminent domain." (citation omitted)).

The United States Court of Appeals for the Federal Circuit has recognized that "'[i]nverse condemnation law is tied to, and parallels, tort law.'" *Ridge Line Inc.* v. *United States*, 346 F. 3d 1346, 1355 (Fed. Cir. 2003) ("*Ridge Line*") (citing 9 PATRICK J. ROHAN & MELVIN A RESKIN, NICHOLS ON EMINENT DOMAIN § 34.03[1] (3d ed. 1980 & Supp. 2002)). Thus, when the Government challenges this court's jurisdiction over a plaintiff's inverse condemnation claim, arguing that it is merely a tort and therefore outside this court's jurisdiction, the Federal Circuit requires that the trial court conduct a "two-part inquiry" to determine whether the alleged inverse condemnation claim is subject to the requirements of the Just Compensation Clause and within the court's jurisdiction. *See Ridge Line* 346 F.3d at 1355.

The first part of the *Ridge Line* inquiry requires the plaintiff to establish either that the federal government "intends to invade a protected property interest *or* the asserted invasion is the 'direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action.'" *Id*. (quoting *Columbia Basin Orchard* v. *United States*, 132 F.Supp. 707, 709 (Ct. Cl. 1955) (emphasis added)). Second, the plaintiff must establish that the invasion "appropriate[s] a benefit to the government at the expense of the property owner, *or* at least preempt[s] the owner's right to enjoy his property for an extended period of time, rather than merely inflict an injury that reduces its value." *Id*. (emphasis added) (citations omitted); *see also Banks* v. *United States*, 69 Fed. Cl. 206, 212-13 (2006) ("To establish a takings claim here, plaintiffs

must show that . . . the [Government's] activities . . . were the likely cause of the [damage to plaintiffs'] property and that the resulting [] damage was foreseeable." (internal citation omitted)). Because this inquiry is fact based, however, it is conducted after discovery, either on a motion for summary judgment or following trial. *See Moden* v. *United States*, 404 F.3d 1335, 1341-45 (Fed. Cir. 2006) (applying the *Ridge Line* inquiry at the summary judgment stage, after determining the United States Court of Federal Claims had jurisdiction over the Just Compensation claim); *Ridge Line,* 346 F.3d at 1355-59 (remanding to the trial court to conduct the *Ridge Line* inquiry after trial); *Banks*, 69 Fed. Cl. 206, 212-14 (2006) (*Ridge Line* inquiry made at summary judgment stage); *cf. Vaizburd* v. *United States*, 384 F.3d 1278, 1283 (Fed. Cir 2004) (*Ridge Line* inquiry recognized but not conducted after trial, because the Government conceded that sand accretion at issue "amounted to a taking").

**4. Plaintiffs Are Ordered To Show Cause Why Counts I And III, As Pled, Are Not Barred By The Statute Of Limitations.**

The construction of the MRGO was completed in 1968. *See* First Am. Compl. ¶ 4. Therefore, to the extent that Counts I[3] and III[4] allege a claim for Just Compensation based on the "creation" of the MRGO, the court orders Plaintiffs to show why those claims should not be dismissed, since "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition therein is filed within six years after such claim first accrues." *See* 28 U.S.C. § 2501.

The United States Supreme Court has considered a Just Compensation case that is instructive to Plaintiffs' theory and pleadings. In 1937, the Government completed a dam to improve the navigability of a river in West Virginia. *See United States* v. *Dickinson*, 331 U.S. 745, 746 (1947). Subsequently, the river rose and reached a level in September 1938 that caused the permanent flooding of the land owner's property. *Id*. at 746-47. The Government argued that the last day from when the statute of limitations should run was May 30, 1937, when the dam was fully operational and the property at issue partially was submerged for the first time. *Id*. at 747. The property owners did not own the land on May 30, 1937, but filed suit on April 1, 1943. *Id*. The Government did not initiate "appropriate proceedings," *i.e.*, condemnation proceedings, that would establish a date certain

---

[3] "Count I - Permanent Taking of Property" alleges that: "As a natural and direct result of the creation of the MRGO and the continued operation, maintenance, and dredging thereof, the plaintiff's have been deprived of the use, occupancy, and enjoyment of their real property and the improvements thereon thereby resulting in a permanent taking of their property for public use." First Am. Compl. ¶ 16.

[4] "Count III - Permanent Taking of Flowage Easement" alleges, in relevant part that: "The flooding of plaintiff's property is recurring and is necessarily incident to and an inevitable consequence of the creation and maintenance of the MRGO [whereby] the United States has created a flowage easement on plaintiffs' property thereby resulting in a permanent taking of plaintiffs' property for a public purpose." First Am. Compl. ¶¶ 24-25.

for starting the statute of limitations. *Id*. To determine the date on which the land owner's claim arose, the Supreme Court first defined a "taking" in the context of the Just Compensation Clause: "Property is taken in the constitutional sense when inroads are made upon an owner's use of it to an extent that, as between private parties, a servitude has been acquired either by agreement in course of time." *Id*. at 748. Then, the Court held that the cause of action for a taking by a "continuing process of physical events" does not arise "until the situation becomes stabilized." *Id*. at 749. As the Court explained:

> The source of the entire claim-the overflow due to rises in the level of the river-is not a single event; *it is continuous*. And as there is nothing in reason, so there is nothing in legal doctrine, to preclude the law from meeting such a process *by postponing suit until the situation becomes stabilized*. An owner of land flooded by the Government would not unnaturally postpone bringing a suit against the Government for the flooding *until the consequences of inundation* have so manifested themselves that a final account may be struck.
>
> When dealing with a problem which arises under such diverse circumstances procedural rigidities should be avoided. All that we are here holding is that when the Government chooses not to condemn land but to bring about a taking by a *continuing process of physical events*, the owner is not required to resort either to piecemeal or to premature litigation to ascertain the just compensation for what is really 'taken.'

*Id*. (emphasis added).

In this case, if Plaintiffs' takings theory is premised on the *creation* of the MRGO, to satisfy the statute of limitations, Plaintiffs would have to establish that the effects from the "creation" of the MRGO were not "stabilized" until on or after October 17, 1999, *i.e.*, six years prior to filing the October 17, 2005 Complaint. If Plaintiffs' theory is premised on the expansion of the MRGO by "continued operation, maintenance, and dredging," to satisfy the statute of limitations, Plaintiffs would have to establish that the "situation" created by these activities was not "stabilized" until on or after October 17, 1999.[5] Assuming that Plaintiffs can satisfy the statute of limitations, their choice

---

[5] Plaintiffs First Amended Complaint does not state concise or clear allegations. *See e.g., compare* First Am. Compl. ¶ 12 ("[The] flooding was a direct, natural or probable result of the *creation* of the MRGO *and the continued operation, maintenance,* and *dredging* thereof[.]") (emphasis added), *with id.* ¶ 13 ("[B]ut for the *creation and maintenance* . . . the flooding . . . would not have occurred.") (emphasis added), *with id*. at ¶ 24 ("The flooding . . . is . . . an inevitable consequence of the *creation and maintenance* of the MRGO.") (emphasis added), *with id*. at Prayer ¶ (a) ("[P]roperty was taken . . . through *the construction and continued operation, maintenance and dredging*[.]"). *See* RCFC 8(e), 12(e), 15(a). When Plaintiffs respond to the court's Show Cause Order, Plaintiffs should further amend their complaint not only to state the required facts to establish standing, but also to state facts sufficient to identify their takings theory in a concise and clear manner, so that the court can properly resolve the statute of limitations issue.

of theory necessarily will define the scope of discovery and direct the court's subsequent *Ridge Line* inquiry.

**D. The Court's Resolution Of Plaintiffs' November 8, 2006 Motion *In Limine*.**

The Government's October 4, 2006 Motion to Dismiss had five supporting exhibits attached.[6] *See* Gov't Mot. Dis. Ex. A-E. On November 2, 2006, Plaintiffs filed a Motion *In Limine* to exclude these exhibits. First, Plaintiffs argue that the exhibits are not admissible under the Federal Rules of Evidence ("Fed. R. Evid."). *See* Pl. Mot. *In Limine* at 3. The Government responds that Exhibits A-D, were not offered as evidence, "but as demonstrative exhibits intended to help the Court better understand the facts surrounding this case." Gov't Resp. Pl. Mot. *In Limine* at 7. Accordingly, Plaintiffs' November 2, 2006 Motion *In Limine*, with respect to Exhibits A-D, is denied.

As for Exhibit E, the Government argues that it is admissible, as a public record, pursuant to Fed. R. Evid. 803(8) and Fed. R. Evid. 902(5). Exhibit E, is a Tropical Cyclone Report on Hurricane Katrina, prepared by the National Hurricane Center, a component of the National Weather Center, that prepares Tropical Cyclone Reports for all depressions, storms, and hurricanes. *See* National Hurricane Center, 2005 Atlantic Hurricane Season, *available at* http://www.nhc.noaa.gov/2005atlan.shtml (last visited March 29, 2007). The NHC's Tropical Cyclone Reports "contain comprehensive information on each tropical cyclone, including synoptic history, meteorological statistics, casualties and damages, and the post-analysis best track[.]" *Id.* Plaintiffs seek to exclude this document from the record, because it was updated after original publication and the "process of updating adds to the sense that Exhibit E would not be covered by a hearsay exception (such as the 'public records and reports' exception of 803(8))." Pl. Mot. *In Limine* at 12; *see also* Gov't Mot. Dis. Ex. E at 1 (indicating that the report originally was issued on "20 December 2005" and "[u]pdated [on] 10 August 2006 for tropical wave history, storm surge, tornadoes, surface observations, fatalities, and damage cost estimates"). In addition, Plaintiffs argue that this Report was not properly authenticated. *Id.*

---

[6] The five exhibits attached to the Government's October 4, 2006 Motion to Dismiss are: Exhibit A is a map, "New Orleans Elevation by neighborhood with major roads" apparently prepared by the Greater New Orleans Community Data Center; Exhibit B is the "Fiscal Year 2005, Annual Report of the Army of Civil Works Activities," prepared by the Army Corps of Engineers; Exhibit C is "Note on the Influence of the Mississippi River Gulf Outlet on Hurricane Induced Storm Surge in New Orleans and Vicinity," prepared by Joannes Westerink, Department of Civil Engineering and Geological Sciences, University of Notre Dame, Bruce Ebersole, Coastal and Hydraulics Laboratory, U.S. Army Engineering Research and Development Center, and Harley Winer, New Orleans District, U.S. Army Corps of Engineers; Exhibit D is "The Direct Impact of the MRGO on Hurricane Storm Surge," prepared by the URS Corporation for the State of Louisiana, Department of Natural Resources; and Exhibit E is "Tropical Cyclone Report Hurricane Katrine 23-30 August 2005," prepared by the National Hurricane Center, a part of the National Oceanic and Atmospheric Administration.

The Government responds that Exhibit E "sets forth [the NHC's] factual findings relating to Hurricane Katrina[] and that this document is admissible under Fed. R. Evid. 803(8)(C)."[7] *See* Gov't Resp. Pl. Mot. *In Limine* at 11. In addition, the document is self-authenticating, pursuant to Fed. R. Evid. 902(5)[8] as a "publication[] purporting to be issued by a public authority[.]" *Id.*

The Tropical Cyclone Report contains the NHC's factual findings related to Hurricane Katrina and includes a detailed summary of the meteorological data gathered by the agency in the course of tracking the storm. *See* Gov't Mot. Dis. Ex. E at 1-13. The Report provides an overview of Hurricane Katrina and the storm surge at issue in this case. *Id*. at 9. Given the scope of Hurricane Katrina and the damage associated with the storm, it is not surprising that the NHC updated factual findings as improved data became available. Because this Report contains "factual findings resulting from an investigation made pursuant to authority granted by law," the Tropical Cyclone Report is admissible under Fed. R. Evid. 803(8)(C). *See Complaint of Munyun*, 143 F.R.D. 560, 566 (D.N.J. 1992) (holding that weather reports by the National Weather Service are admissible under Fed. R. Evid. 803(8)(C) as "trustworthy reports of weather conditions"). In addition, as a public agency publication, the Report is self-authenticating. *See* FED. R. EVID. 902(5).

Accordingly, Plaintiff's November 2, 2005 Motion *In Limine* regarding Exhibit E is denied.

## IV. CONCLUSION.

The court has determined that it has jurisdiction to adjudicate the claims in Plaintiffs' January 13, 2006 First Amended Class Action Complaint, however, the named Plaintiffs are hereby ordered

---

[7] Fed. R. Evid. 803 provides, in relevant part:

> The following are not excluded by the hearsay rule, . . . (8) Public records and reports. Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth . . . (C) in civil actions and proceedings . . . factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

FED. R. EVID. 803(8)(C).

[8] Fed. R. Evid. 902(5) provides, in relevant part:

> Extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to the following . . . publications purporting to be issued by public authority.

FED. R. EVID. 902(5).

to further amend to allege sufficient facts of ownership of the properties at issue to establish standing.

Count II is not ripe for adjudication and is dismissed.

The Government's October 4, 2006 Motion to Dismiss concerning the *Ridge Line* inquiry is denied as premature, without prejudice, to being reasserted after discovery is completed either on a Motion for Summary Judgment or after trial.

Plaintiffs are ordered to show cause why Counts I and III, as pled, are not barred by the statute of limitations.

Plaintiffs' November 2, 2006 Motion *In Limine* is denied.

The court will convene a telephone status report on April 11, 2007 at 2:00 p.m. EST to establish a schedule for Plaintiffs to comply with this Order.

**IT IS SO ORDERED**.

**s/ Susan G. Braden**
**SUSAN G. BRADEN**
**Judge**