Exhibit 1 To Motion To Compel And For Imposition of Fees and Expenses

Notice of Rule 30(b)(6) Deposition with Rule 30(b)(5) Request for Production of Documents

EXHIBIT
tabbies
1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| ROCCO TOMMASEO, et al.<br>Plaintiffs<br>V.<br>THE UNITED STATES<br>Defendant | 1:05-cv-1119 SGB<br>Hon. Susan G. Braden |

**NOTICE OF RULE 30(b)(6) DEPOSITION WITH RULE 30(b)(5) REQUEST FOR PRODUCTION OF DOCUMENTS**

NOW INTO COURT, through undersigned counsel, come Plaintiffs Rocco Tommaseo, *et al.*, who hereby provide notice that they will conduct the deposition of Defendant The United States of America, through whichever agencies or representatives Defendant deems appropriate to respond to this Notice, with said deposition to be conducted at the offices of the United States Army Corps of Engineers, New Orleans Division, located at 7400 Leake Avenue, New Orleans, Louisiana. This Deposition will commence at 9:30 a.m. on 12 June 2007 and will continue until completed, in accordance with the dictates of Rule 30(d) of the Rules of the United States Court of Federal Claims. At the time of the taking of this deposition, the Defendant is required to produce witnesses, those witnesses being the persons most knowledgeable as to the following topics, issues and areas of inquiry:

1. In Defendant's answer and in its responses to the written discovery currently of record, the Defendant repeatedly claims that the above captioned action is untimely, and the statute of limitations at issue, 28 U.S.C. § 2501, which has been

held by this Court to have a 6 year look back from the date of filing, resulting in a "start" date of 17 October 1999.[1] Consequently, the Plaintiffs who sustained damage (for the first time mentioned in the Complaint currently of record in the case *sub judice*, on 29 August 2005) ask that the Defendant provide a recitation of each and every fact upon which it bases the contention that this matter is barred by the statute of limitations; that Defendant identify all witnesses from whom they have obtained such information; that Defendant identify how, when and where it obtained such information, including who was present; and also that Defendant identify and produce any and all documentary evidence or other tangible evidence upon which Defendant bases the aforementioned conclusions that the statute of limitations has run against these Plaintiffs for the damages alleged in the Complaint currently of record. Plaintiffs specifically direct the deponent's attention to the Court's analysis of this issue which is set forth in Exhibit 1.

2. We request all information from the 2002 Task Force (initially organized by the United States Environmental Protection Agency, but ultimately staffed and operated by the United States Army Corps of Engineers) which examined the effects of the MR-GO with respect to the destruction of wetlands, increased storm surge and other issues which placed the property of these Plaintiffs at great risk of repetitive flooding events, exemplars being that flooding occasioned by Hurricanes Katrina and Rita in 2005, and other weather events, both before and after calendar year 2005, which in fact prove that St. Bernard Parish is, as a direct result of the continued expansion of the MR-GO, and attendant activities of the

---

[1] The Court's ruling in this case of 29 March 2007, Rec. Doc. 39, is attached to this Notice as Exhibit 1 for ease of reference.

United States Army Corps of Engineers, including dredging which was conducted well into the Summer of 2005, subject to such takings. We request production of appropriate witnesses to apprise us of the mandate of that task force, what work was undertaken, what studies were conducted, and what findings, recommendations, and conclusions were ultimately issued with respect to these precise issues. We would also like to now what, if anything, was done to address the increased storm surge and flooding risks identified. We also have the same inquiries with respect to the issues raised in the 7 August 2001 United States Army Corps of Engineers' Notice attached as Exhibit 2.

3. In November 2004 the United States Army Corps of Engineers reported on its Louisiana Coastal Area Ecosystem Restoration Study (a copy of the Executive Summary is attached hereto as Exhibit 3 for ease of reference). Throughout the reporting pursuant to this study, the MR-GO is identified as the number one item which needed attention to attempt to ameliorate the threat to the land at issue in this litigation. We ask that Defendants produce appropriate representatives to testify as to the specifics of the threat of repetitive flood events attendant to the MR-GO and its expansive hydrological features as noted during the studies which gave rise to the 2004 report, and specifically with respect to identification of flood events attendant to the MR-GO's expansion and dredging activities related to the MR-GO which were mentioned in the aforementioned report. One of the specific areas of inquiry here is if the United States Army Corps of Engineers, the Department of the Interior, or any other agency or division of the Defendant, was of the opinion that the situation in respect of the MR-GO had "stabilized" by the

time of the release of the Ecosystem Restoration Study report in 2004. We want full testimony in that regard, as well as all evidence examined, in reaching whatever conclusions the Defendant claims to have reached or not reached, with respect to "stabilization" by 2004 *vel non.*

4. Attached as Exhibit 4 is a publication dated 23 March 2007 from Volume 315 of *Science*. In this peer reviewed scientific journal article, much is noted regarding the Army Corps of Engineers' analysis of the hazards posed to coastal Louisiana by the MR-GO, so we want the persons most knowledgeable to appear and testify as to, even as of today, the Defendant opines that the conditions resulting in the takings occasioned by the MR-GO have yet "stabilized." We want full testimonial and documentary responses in this regard.

5. We want a complete recitation of all the dredging activities conducted by the Defendant from 17 October 1999 through the present date in the MR-GO.[2]

6. We want to know the identity of the vessels and companies involved in the dredging activity, and a full exposition of how the dredging activity occurring during the aforementioned period deepened, widened, and otherwise modified the hydrology of the MR-GO, increasing the likelihood of the inundation of the Plaintiffs' lands in the event of a tropical cyclone or other related weather event passing through, over or near the MR-GO.

7. Please identify all studies commissioned by the United States of America or any of its agencies, including, without limitation, the United States Department of the Interior, the Environmental Protection Agency, the United States Army Corps of

[2] Plaintiffs have learned that the Army Corps of Engineers' document production during 2006 was not complete. That will be addressed in a subsequent Motion.

Engineers and the Department of Justice, including specification of all reports, memoranda and other documents which were generated as a result of such studies or other analysis, with respect to flood events in St. Bernard Parish which occurred as a result of tropical cyclonic storms. The period of this request is from 17 October 1999 through the present date. In identifying all such studies, reports, memoranda and related analysis, please provide the following information:

a) All persons involved in each such study, as well as the agency for whom each such person worked, and a complete recitation of that individual's job duties, each such person's job title and a specification of the mandate, including the origin of the mandate, for the work undertaken by each such person.

b) With respect to the studies, etc. aforementioned, please provide an identification of the Executive Order, Congressional directive, Department of Justice mandate or other empowering resolution requested with respect to the formation of each such group, along with identification of the enabling documents and the names of the specific study groups, task forces or other confabs, as well as the purpose of each such study.

c) With respect to each such study, we would like a full recitation of the findings of each, including a specification of the task force or other groups or individuals undertaking such analysis.

d) With respect to any and all recommendations made by such groups pursuant to their studies and other work, we would like to know what action was taken, which recommendations were specifically implemented

versus which recommendations were not implemented, and a full explanation of why or why not.

e) With respect to the aforementioned studies and analysis, we request full details of all funding, on a study by study basis.

f) We want to know which individual or individuals were the ultimate decision makers with respect to implementation *vel non* of the recommendations in respect of the decisions regarding design, construction, dredging, maintenance and consideration of closure of the MR-GO (to the extent that any of these matters were discussed by the aforementioned study groups and task forces).

g) We would like to know if there was any oversight in the form of expert triangulation with respect to the conclusions and recommendations of these individuals and groups.

8. With respect to the construction of the MR-GO, its design, its maintenance, its dredging, and all decisions touching upon this federal project, we ask for identification and specification of all legislation, executive orders, federal regulations, memoranda of understanding, advisory memoranda and other statutes, laws and regulations which authorized the activity undertaken by the federal government in respect of the MR-GO forward of 17 October 1999.

9. Please provide a full recitation of the tropical cyclonic storms which caused flooding in St. Bernard Parish via the MR-GO from 17 October 1999 through the present.

10. With respect to the aforementioned weather events Defendant is going to identify, please provide testimony as to the following:

a) identify what remedial action was taken by the United States of America or any of its agencies to prevent the MR-GO from repeating these flood events in respect of future tropical cyclonic storms;

b) please identify all studies, task forces, commissions, committees and any other group or individual analyses of each event which was undertaken in an attempt to prevent the flooding from recurring;

c) please specify all reports, memoranda, documents and other writings which were created, and indicate all persons involved in the creation of these reports; and

d) please advise if any recommendations were made to prevent such flood events in the future, and if so, whether they were implemented or not. In the event that recommendations were not implemented, please provide a full explanation of why they were not implemented and specify the ultimate decision makers in respect of each refusal to implement these potentially mitigating recommendations.

11. To the extent that you acted through contractors or vendors to design, build, construct, dredge, maintain, survey, analyze for the safety of the residents of St. Bernard Parish, study the effects of wetlands erosion arising out of the MR-GO, and create, build and maintain the locks, please identify each such contractor, vendor and specify the full details of each such contract, including a specification of the work to be performed, bid specifications, contract specifications,

documented acceptance of the work, your inspection of the work prior to acceptance, and all other matters touching upon your hiring of third parties to perform these services. The period of this request is from 17 October 1999 through the present.

12. Please identify all lobbyists who were involved in the efforts to keep the MR-GO open after it was apparent that it was responsible for tragic flood events in both St. Bernard Parish and Orleans Parish, and identify all government employees and elected officials who had contact with the lobbyists regarding these matters. The period of this request is from 17 October 1999 to the present date.

13. Please identify all flood events in St. Bernard Parish which involved flood waters from the MR-GO which resulted in the declaration of a federal emergency or a federal disaster, from 17 October 1999 to the present date. In respect of each such emergency or disaster declaration, we want full details, including the date of each such declaration, whether they were exclusively federal declarations or if they were also – known to you – state and/or local declarations of emergency or disaster, and we want a full recitation of the deployment of all United States Coast Guard, United States military, FEMA, and other disaster management agencies of the United States who were involved in assisting the victims of these disasters.

14. Please specify, by the names of the claimants, identification of Form 95s which have been filed, lawsuits which have been filed, administrative proceedings or other court proceedings, any and all suits, demands or claims which you have received, since the opening of the MR-GO to the present, with respect to residents of St. Bernard Parish who claim to have suffered damage as a result of flooding

emanating from the MR-GO. The period of this report is from 17 October 1999 through the present.

15. In the late 1950's, the Department of the Interior issued various memoranda which discussed the negative impact on the wetlands of St. Bernard Parish which would arise out of the construction and maintenance of the MR-GO. Please identify all persons involved in the studies and analyses which resulted in the creation of these memoranda, the persons to whom said memoranda were directed, state the conclusions set forth in these memoranda, and state what action, if any, you took to heed the warnings which were contained in these memoranda.

16. Attached as Exhibit 6 is the article styled *Implications of Global Climate Change and Energy Cost and Availability for the Restoration of the Mississippi Delta*, Ecological Engineering 24 (2005) 253-265 (Day, J.). Given the constant increase in RSLR (relative-sea-level-rise) attributed to both Global Warming and the MR-GO project as it affects and impacts the Louisiana Coastal Area (as defined in the referenced and attached study—which includes the length of the MR-GO and the lands which are the subject of this takings litigation), plaintiffs request production of the persons most knowledgeable for interrogation as to: a) If it is the position of the defendant that the effects of the continued existence, dredging, operation, maintenance and processes attendant to the MR-GO have yet "stabilized" as respects the probability of increased frequency and magnitude of flood and flowage events over the properties at issue in this litigation; b) If it is the position of the defendant that the processes noted in the referenced article and other peer reviewed scientific journals with respect to increases in SST (Sea Surface

Temperature) in the Gulf of Mexico, when added to the RSLR in this hydrologically and geographically relevant area, continue to increase the instances of takings, by way of permanent flooding, dereliction, temporary inundation or servitudes of flowage over the lands of these plaintiffs; c) We request a full exposition of this, as well as the bases for such conclusions—whatever they may be--is requested to be provided by the representatives of the defendant who are the persons most knowledgeable as to these issues; d) Plus a full disclosure of all studies, data, testing, prior testimony, writings, reports, documentation and evidence in respect of these issues. By way of temporal limitation upon these inquiries, we employ the date of 17 October 1999 as the start date for your response, but through the present date – especially in light of the continued flood events which are documented by declarations currently filed of record in this case.

And now, pursuant to Rule 30(b)(5) of the Rules of the United States Court of Federal Claims, Plaintiffs request that the following documents, records, studies and other items of tangible evidence be produced at the time of the taking of the Rule 30(b)(5) Deposition noticed *supra*, with appropriate persons to authenticate, identify and explain each of the following documents:

**RULE 30(b)(5) REQUEST FOR PRODUCTION OF DOCUMENTS**

1. We want production of each and every document, study, writing, testing result or other of any sort upon which the Defendant basis its claims that the MR-GO project had "stabilized" prior to 17 October 1999 (specifically as it relates to that of the Plaintiffs).

2. Attached hereto as Exhibit 5 is correspondence of Stephen Wiles to Fred Disheroon dated 12 April 2007 regarding supplementation of previously filed written discovery to address the statute of limitations issues extant in this litigation. We request production of all materials examined by the Government further to this request for supplementation.

3. In Defendant's answer and in its responses to the written discovery currently of record, the Defendant repeatedly claims that the above captioned action is untimely, and the statute of limitations at issue, 28 U.S.C. § 2501, which has been held by this Court to have a 6 year look back from the date of filing, 17 October 1999. Consequently, the Plaintiffs who sustained damage (for the first time mentioned in the Complaint currently of record in the case *sub judice*, on 29 August 2005) ask that the Defendant produce all documentation and evidence upon which it bases the contention that this matter is barred by the statute of limitations; that Defendant produce documents which identify how, when and where it obtained such information, including who was present; and also that Defendant produce any and all documentary evidence or other tangible evidence upon which Defendant bases the aforementioned conclusions that the statute of limitations has run against these Plaintiffs for the damages alleged in the Complaint currently of record.

4. We request production of all documentation from the 2002 Task Force (initially organized by the United States Environmental Protection Agency, but ultimately staffed and operated by the United States Army Corps of Engineers) which examined the effects of the MR-GO with respect to the destruction of wetlands,

increased storm surge and other issues which placed the property of these Plaintiffs at great risk of repetitive flooding events, exemplars being that flooding occasioned by Hurricanes Katrina and Rita in 2005, and other weather events, both before and after calendar year 2005, which in fact proves that St. Bernard Parish is, as a direct result of the continued expansion of the MR-GO, and attendant activities of the United States Army Corps of Engineers, including dredging which was conducted well into the Summer of 2005 at a greater risk of flooding. We request production of all documents indicating the mandate of that task force, what work was undertaken, what studies were conducted, and what findings, recommendations, and conclusions were ultimately issued with respect to these precise issues. We also request production of all documents which indicate if anything was done to address the increased storm surge and flooding risks identified. We also have the same request for production with respect to the issues raised in the 7 August 2001 United States Army Corps of Engineers' Notice attached as Exhibit 2.

5. In November 2004 the United States Army Corps of Engineers reported on its Louisiana Coastal Area Ecosystem Restoration Study (a copy of the Executive Summary is attached hereto as Exhibit 3 for ease of reference). Throughout the reporting pursuant to this study, the MR-GO is identified as the number one item which needed attention to attempt to ameliorate the threat to the land at issue in this litigation. We ask that Defendants produce all documentation which deals with the specifics of the threat of repetitive flood events attendant to the MR-GO and its expansive hydrological features as noted during the studies which gave

rise to the 2004 report, and specifically with respect to identification of flood events attendant to the MR-GO's expansion and dredging activities related to the MR-GO which were mentioned in the aforementioned report. We specifically and further seek production of all documents which indicate if the United States Army Corps of Engineers, the Department of the Interior, or any other agency or division of the Defendant in this litigation, was of the opinion that the situation in respect of the MR-GO had "stabilized" by the time of the release of the Ecosystem Restoration Study report in 2004.

6. We want full production of all records which indicate all dredging activity conducted by the Defendant or its contractors in the MR-GO from 17 October 1999 through the present date.
7. We want documentation of the identity of the vessels and companies involved in the dredging activity, in the MR-GO from 17 October 1999 though present date.
8. Please produce all studies commissioned by the United States of America or any of the following agencies: the United States Department of the Interior, the Environmental Protection Agency, the United States Army Corps of Engineers and the Department of Justice, specifically production of all reports, memoranda and other documents which were generated as a result of such studies or other analyses, with respect to flood events in St. Bernard Parish which occurred as a result of tropical cyclonic storms.
9. With respect to the construction of the MR-GO, its design, its maintenance, its dredging, and all decisions touching upon this federal project, we ask for production of copies of all legislation, executive orders, federal regulations,

memoranda of understanding, advisory memoranda and other statutes, laws and regulations which authorized the activity undertaken by the federal government in respect of the MR-GO forward of 17 October 1999.

10. Please provide full documentation of all tropical cyclonic storms which traversed or affected St. Bernard Parish from 17 October 1999 through the present.

11. To the extent that you acted through contractors or vendors to design, build, construct, dredge, maintain, survey, analyze for the safety of the residents of St. Bernard Parish, study the effects of wetlands erosion arising out of the MR-GO, and create, build and maintain the locks, please produce all documents which identify each such contractor, vendor and the full details of each such contract, including specification of the work to be performed, bid specifications, contract specifications, documented acceptance of the work, your inspection of the work prior to acceptance and all other matters touching upon your hiring of third parties to perform these services. The period of this request is from 17 October 1999 through the present.

12. Please produce financial records of all lobbyists who were involved in the efforts to keep the MR-GO open even after it was apparent that it was responsible for tragic flood events in both St. Bernard Parish and Orleans Parish, and produce identifying all government employees and elected officials who had contact with these lobbyists regarding these matters. The period of this request is from 17 October 1999 to the present date.

13. Please produce all documents which identify all flood events in St. Bernard Parish which involved flood waters which resulted in the declaration of a federal

emergency or a federal disaster, from 17 October 1999 to the present date. In respect of each such emergency or disaster declaration, we want full documentation demonstrating the date of each such declaration, whether they were exclusively federal declarations or if they were also state and/or local declarations of emergency or disaster, and we want full documentation of the deployment of all United States Coast Guard, United States military, FEMA, and other disaster management agencies of the United States who were involved in assisting the victims of these disasters.

14. Please produce all Form 95s which have been filed, lawsuits which have been filed, administrative proceedings or other court proceedings, any and all suits, demands or claims which you have received, since the opening of the MR-GO to the present, with respect to residents of St. Bernard Parish who claim to have suffered damage as a result of flooding emanating from the MR-GO.

15. Please produce all Department of the Interior issued memoranda which discuss the negative impact on the wetlands of St. Bernard Parish which would arise out of the construction and maintenance of the MR-GO. Please identify all persons involved in the studies and analysis which resulted in the creation of these memoranda, the persons to whom said memoranda were directed, state the conclusions set forth in these memoranda, and state what action, if any, you took to heed the warnings which were contained in these memoranda.

16. Please provide a privilege log for any documents or evidence to which you lodge a privilege objection in response to this Notice.

17. Please produce all documents reflecting or referring to any communications between you and any lay witnesses identified in your response to the Interrogatories propounded to you in this case, including any statements, email, tapes, memoranda, test results, surveys, reports, correspondence, notes or other items regarding your activities in respect of the MR-GO from 17 October 1999 though the present.

18. Attached as Exhibit 6 is the article styled *Implications of Global Climate Change and Energy Cost and Availability for the Restoration of the Mississippi Delta*, Ecological Engineering 24 (2005) 253-265 (Day, J.). Given the constant increase in RSLR (relative-sea-level-rise) attributed to both Global Warming and the MR-GO project as it affects and impacts the Louisiana Coastal Area (as defined in the referenced and attached study—which includes the length of the MR-GO and the lands which are the subject of this takings litigation), plaintiffs request production of all documents which indicate (a) if it is the position of the defendant that the effects of the continued existence, dredging, operation, maintenance and processes attendant to the MR-GO have yet "stabilized" as respects the probability of increased frequency and magnitude of flood and flowage events over the properties at issue in this litigation; b) If it is the position of the defendant that the processes noted in the referenced article and other peer reviewed scientific journals with respect to increases in SST (Sea Surface Temperature) in the Gulf of Mexico, when added to the RSLR in this hydrologically and geographically relevant area, continue to increase the instances of takings, by way of permanent flooding, dereliction, temporary inundation or servitudes of

flowage over the lands of these plaintiffs; and c) Full production of all studies, data, testing, prior testimony, writings, reports, documentation and evidence in respect of these issues. By way of temporal limitation upon these inquiries, we employ the date of 17 October 1999 as the start date for your response, but through the present date – especially in light of the continued flood events which are documented by declarations currently filed of record in this case.

s/Stephen M. Wiles
F. Gerald Maples T.A. (LA# 25960)
Stephen M. Wiles (LA# 17865)
Carlos A. Zelaya, II (LA# 22900)
F. GERALD MAPLES, P.A.
902 Julia Street
New Orleans, LA 70113
Telephone: (504) 569-8732
Facsimile: (504) 525-6932

-and-

J. Wayne Mumphrey (LA# 9824)
MUMPHREY LAW FIRM, LLC
One Canal Place
365 Canal Street, Sute 2280
New Orleans, LA 70130
Telephone: (504) 569-0661
Facsimile: (504) 569-0665

-and-

John H. Musser, IV (LA# 9863)
201 St. Charles Avenue; Suite 2500
New Orleans, LA 70170
Telephone: (504) 599-5964
Facsimile: (504) 566-7185

**CERTIFICATE OF SERVICE**

I hereby certify that by filing the foregoing pleading via the ECF for the Court of Federal Claims, a copy of the above and foregoing will be served by e-mail to Fred Russell Disheroon (fred.disheroon@usdoj.gov) this 1st day of May, 2007.

s/Stephen M. Wiles
Stephen M. Wiles

# In the United States Court of Federal Claims

No. 05-1119L
Filed: March 29, 2007
**TO BE PUBLISHED**

| | |
|---|---|
| ROCCO TOMMASEO, THOMAS TOMMASEO, ROCKY AND CARLO, INC., STEVEN BORDELON, husband of, CYNTHIA BORDELON and, STEVE'S MOBILE HOME & R.V. REPAIR, INC., Plaintiffs, v. THE UNITED STATES, Defendant. | Concise and Direct Pleading, RCFC 8(e), 12(e), 15(a); Just Compensation Clause, U.S. CONST. amend. V; Motion *In Limine*; Motion to Dismiss, RCFC 12(b)(1); Ripeness; Standing; Subject Matter Jurisdiction. |

**F. Gerald Maples**, New Orleans, Louisiana, counsel for Plaintiffs.

**Fred Russell Disheroon**, United States Department of Justice, Environment and Natural Resources Division, counsel for Defendant.

**MEMORANDUM OPINION AND ORDER**

**BRADEN, *Judge*.**

The Mississippi River Gulf Outlet ("MRGO") is a 76-mile, man-made navigation channel that runs from the Gulf of Mexico to the Port of New Orleans. Plaintiffs have filed a class action for compensation alleged to be due, because of the taking of their property during Hurricane Katrina and subsequent storms, as a result of the construction, continued operation, maintenance, and dredging of the MRGO by the United States Army Corps of Engineers ("Government"). The threshold issue is whether the United States Court of Federal Claims has jurisdiction to adjudicate their claims.

The United States Court of Appeals for the Federal Circuit has observed that the "distinction between jurisdiction and the failure to state or prove a claim for relief" often has been confused. *See Fisher* v. *United States*, 402 F.3d 1167, 1171-72 (Fed. Cir. 2006) (*en banc*) ("In Tucker Act jurisprudence, . . . this neat division between jurisdiction and merits has not proved to be so neat. In these cases, involving suits against the United States for money damages, the question of the

EXHIBIT
1

court's jurisdictional grant blends with the merits of the claim. This mixture has been a source of confusion for litigants and a struggle for the courts."). As discussed herein, the Government's October 4, 2006 Motion to Dismiss manifests this confusion.

## I. RELEVANT FACTS.[1]

The MRGO is a federal navigation project designed and maintained by the Government. *See* First Am. Compl. ¶ 4. This federal project was authorized in 1956 to provide deep water vessels direct access between the Gulf of New Mexico and the Port of New Orleans for commercial and national defense purposes. *Id.* Construction began in 1958 and was completed in 1968. *See* Gov't Mot. Dis. at 3. The MRGO is 76 miles long and originally was authorized with a surface width of 650 feet, a bottom width of 500 feet, and a depth of 36 feet. First Am. Compl. ¶ 5. The MRGO is bordered on the east by Lake Borgne and on the west by marshland that lies between the MRGO and St. Bernard Parish. *Id.*; Gov't Mot. Dis. at 3.

The First Amended Complaint alleges that the MRGO is now significantly wider than the initial authorized size, *i.e.*, up to three times as wide in some areas. *See* First Am. Compl. ¶¶ 5-9. This increase in the width allegedly has occurred for two reasons. First, "the surface width [of the MRGO] was wider than the bottom width creating [a situation where] wake and wave action [from ships traveling along] the channel . . . continue[] eroding and widening [of the channel]" *Id.* ¶ 6. Second, the MRGO allows salt water from the Gulf of Mexico to flow into marshlands bordering St. Bernard Parish, damaging the wetlands that serve as a natural buffer against hurricane winds and storm surge: "[t]he wetland loss and deterioration from the MRGO . . . allowed for expanded tidal amplitude and duration, increasing the flooding risk to interior portions of St. Bernard Parish and Orleans Parish and further providing a direct line of access for hurricane-related storm surge to reach St. Bernard and Orleans Parishes." *Id.* ¶¶ 7, 8. Furthermore, Plaintiffs allege that where the MRGO merges with the Gulf Intracoastal Waterway, a "funnel" has been created that effectively causes storm surge from "any tropical storm or hurricane which passes in the vicinity of the MR-GO . . . into St. Bernard Parish and the Lower Ninth Ward, flooding those lands time and time again." Pl. Resp. at 7.

On August 29, 2005, Hurricane Katrina landed on the southeastern Gulf Coast near New Orleans, causing "catastrophic damage." *See* Gov't Mot. Dis. Ex. E at 1 (RICHARD D. KNABB ET AL., NAT'L HURRICANE CENTER, TROPICAL CYCLONE REPORT HURRICANE KATRINA (2005)). The National Hurricane Center ("NHC") reported that Hurricane Katrina generated a "massive storm surge" that reached "15 to 19 feet . . . in eastern New Orleans [and] St. Bernard Parish" and peaked at 27.8 feet along the Mississippi Gulf Coast. *Id.* at 9. This storm surge was so large that it "severely strained the levee system in the New Orleans area. . . . [and] overtopped large sections of

---

[1] The relevant facts recited herein were derived from: Plaintiffs' January 13, 2006 First Amended Class Action Complaint ("First Am. Compl."); Defendant's October 4, 2006 Motion to Dismiss ("Gov't Mot. Dis.") and Exhibit E thereto ("Gov't Mot. Dis Ex E"); and Plaintiffs' November 2, 2006 Response ("Pl. Resp.").

the levees east of New Orleans, in Orleans Parish and St. Bernard Parish[.]" *Id.* The resulting flood devastated St. Bernard Parish. *Id.* at 9-11; First Am. Compl. ¶ 11.

Plaintiffs are resident property owners in St. Bernard or Orleans Parishes or are Louisiana corporations with a principal place of business in St. Bernard Parish. *See* First Am. Compl. ¶¶ 2, 10. The First Amended Complaint alleges that Plaintiffs suffered "massive flooding and destruction of [their] property" by Hurricane Katrina, and that, "but for the creation and maintenance of the MRGO by the United States, the flooding and devastation of Plaintiffs' property would not have occurred." *Id.* ¶¶ 11-13. After Hurricane Katrina, Plaintiff's property has been subjected to repeated flooding, even during minor weather events, because of the wetland loss associated with the MRGO. *Id.* ¶¶ 22-24.

## II. PROCEDURAL HISTORY.

On October 17, 2005, Plaintiffs filed a class action in the United States Court of Federal Claims, alleging that the Government deprived Plaintiffs of their property in violation of the Just Compensation Clause of the Fifth Amendment to the United States Constitution ("Just Compensation Clause"). On October 24, 2005, Plaintiffs filed a Disclosure Statement pursuant to RCFC Rule 7.1.

On January 13, 2006, a First Amended Complaint was filed that included three Counts. *See* First Am. Compl. ¶¶ 15-29. On January 17, 2006, the Government filed an Answer. On March 7, 2006, the parties filed a Joint Preliminary Status Report. On March 17, 2006 and July 18, 2006, the court convened telephone status conferences. On July 18, 2006, the court issued a Scheduling Order requiring any dispositive motions to be filed on or before September 18, 2006.

On August 16, 2006, Plaintiffs filed a Motion to Compel Discovery Responses, together with five exhibits. On September 5, 2006, the Government filed a Response. On September 7, 2006, Plaintiffs filed a Reply. On September 7, 2006, the court convened a hearing to consider Plaintiffs' August 16, 2006 Motion to Compel. On September 8, 2006, the court entered an Order, denying Plaintiffs' August 16, 2006 Motion to Compel, as premature, and directing the Government to file any motion to dismiss by September 30, 2006. On October 2, 2006 the Government filed a Motion for an Enlargement of Time, which the court granted.

On October 4, 2006, the Government filed a Motion to Dismiss, pursuant to RCFC 12(b)(1), together with five supporting exhibits. On November 2, 2006, Plaintiffs filed a Motion *In Limine* to exclude those exhibits. On November 2, 2006, Plaintiffs filed a Declaration of Counsel in opposition of Government's October 4, 2006 Motion to Dismiss. On that same date Plaintiffs filed a Statement of Contested Material Facts in opposition to the Government's Motion to Dismiss, as well as a Response to the Government's October 4, 2006 Motion to Dismiss. On November 20, 2006, the Government filed a Reply to Plaintiffs' November 2, 2006 Response and a Response to Plaintiffs' November 2, 2006 Motion *In Limine*. On December 6, 2006, Plaintiffs filed a Reply to the Government's November 20, 2006 Response.

On January 27, 2007, Plaintiffs filed an *Ex Parte* Motion for Leave to File a Supplemental Memorandum in Opposition to the Government's Motion to Dismiss and proposed Supplemental Memorandum with four exhibits. On February 2, 2007, the Government filed an Opposition. On February 7, 2007, the court issued an Order granting Plaintiffs' January 27, 2007 *Ex Parte* Motion for Leave to File a Supplemental Memorandum. On February 21, 2007, Plaintiffs filed a Supplemental Memorandum in Opposition to Defendant's Motion to Dismiss.

## III. DISCUSSION.

### A. Jurisdiction.

The Tucker Act, 28 U.S.C. § 1491(a)(1), authorizes the United States Court of Federal Claims to render judgment and money damages on any claim against the United States based on the United States Constitution, an Act of Congress, a regulation of an executive department, or an express or implied contract with the United States. *See United States* v. *Mitchell*, 463 U.S. 206, 212-18 (1983); *see also United States* v. *Testan*, 424 U.S. 392, 397-98 (1976). The United States Supreme Court, however, has held that the Tucker Act does not create any substantive right for money damages. *See Mitchell*, 463 U.S. at 216; *see also Testan*, 424 U.S. at 398. Therefore, a plaintiff must identify and plead an independent contractual relationship, constitutional provision, federal statute, and/or executive agency regulation that provides a substantive right to money damages in order for the court to have jurisdiction. *See Khan* v. *United States*, 201 F.3d 1375, 1377 (Fed. Cir. 2000).

In determining whether the United States Court of Federal Claims has jurisdiction over a claim, the United States Court of Appeals for the Federal Circuit has instructed that "the trial court at the outset shall determine . . . whether the Constitutional provision, statute, or regulation is one that is money-mandating. If the court's conclusion is that the Constitutional provision, statute, or regulation meets the money-mandating test, the court shall declare it has jurisdiction over the cause, and shall then proceed with the case in the normal course." *Fisher* v. *United States*, 402 F.3d 1167, 1173 (Fed. Cir. 2005) (*en banc*).

### B. Standard of Review – RCFC 12(b)(1).

A motion to dismiss may be brought to challenge the court's subject matter jurisdiction at any time. *See* RCFC 12(b)(1). In order to establish subject matter jurisdiction, Plaintiffs must show that they have a "nonfrivolous" claim founded upon a Constitutional provision, statute, or regulation. *See Steel Co.* v. *Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) ("Dismissal for lack of subject-matter jurisdiction . . . is proper only when the claim is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy.'" (quoting *Oneida Indian Nation of N.Y.* v. *County of Oneida*, 414 U.S. 661, 666 (1974))).

### C. The Court's Resolution Of The Government's October 4, 2006 Motion To Dismiss, Pursuant To RCFC 12(b)(1).

#### 1. The Court Has Jurisdiction To Adjudicate Claims Alleged In The First Amended Complaint.

The United States Court of Appeals for the Federal Circuit has instructed the trial court to "entertain and decide the jurisdictional and merits test in . . . a single step. The single step would be one in which the trial court determines both the question of whether the [source of law] provides the predicate for its jurisdiction, and lays to rest for purposes of the case before it the question of whether the [source of law] on its merits provides a money-mandating remedy." *Fisher*, 402 F.3d at 1173.

In this case, the First Amended Complaint properly invokes the court's subject matter jurisdiction, as it states: "This is a claim seeking compensation from the United States for the taking of private property for public use pursuant to Amendment V of the U.S. Constitution." First Am. Compl. ¶ 1; *see also Moden* v. *United States*, 404 F.3d 1335, 1341 (Fed. Cir. 2005) ("Thus, to the extent [Plaintiffs] have a nonfrivolous takings claim founded upon the Fifth Amendment, jurisdiction under the Tucker Act is proper."); *Murray* v. *United States*, 817 F.2d 1580, 1583 (Fed. Cir. 1987) ("[T]he 'just compensation' required by the Fifth Amendment has long been recognized to confer upon property owners whose property has been taken for public use the right to recover money damages from the government.").

The First Amended Complaint, however, does not allege when the named Plaintiffs became property owners in the St. Bernard or Orleans Parishes, an essential fact to establish standing. *See Dow* v. *United States*, 357 U.S. 17, 20-21 (1958) (holding that a plaintiff seeking just compensation for a taking under the Fifth Amendment must be the owner of the property at the time of the taking); *Cavin* v. *United States*, 956 F.2d 1131, 1134 (Fed. Cir. 1992) ("Without undisputed ownership of the [] property [at issue] at the time of the takings, [plaintiffs] cannot maintain a suit alleging that the Government took their property without just compensation." (citing *Dow*, 357 U.S. at 20-21)); *Lacey* v. *United States*, 595 F.2d 614 (Ct. Cl. 1979) ("The person entitled to compensation for a taking of property by the Government is the owner of the property at the time of the taking." (citation omitted)). Accordingly, the court will afford the named Plaintiffs[2] leave to further amend to satisfy this jurisdictional requisite. *See* RCFC 15(a) ("a party may amend the party's pleading once as a matter of course before a responsive pleading is served . . . Otherwise a party may amend the party's pleading only by leave of the court . . . [to] be freely given when justice so requires").

---

[2] The court, at this juncture, takes no position on whether this is an appropriate case to be certified as a class action. *See* RCFC 23(a).

**2. The Court Has Determined That Count II Is Not Ripe For Adjudication.**

"Count II - Temporary Taking of Property" alleges that "only in the event that the MRGO is closed and plaintiffs' real property can be redeveloped in the future, plaintiffs have been deprived of the use, occupancy, and enjoyment of their real property for the indefinite future and have suffered a temporary taking of their real property." First Am. Compl. ¶ 19. Since the MRGO is not closed, Count II is not ripe for adjudication. *See Abbott Laboratories* v. *Gardner*, 387 U.S. 136, 148-49 (1967) ("The 'basic rationale' of ripeness is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements[.]") Accordingly, Count II is dismissed, without prejudice.

**3. It Is Premature For The Court To Conduct The *Ridge Line* Inquiry.**

The United States Supreme Court has stated that an inverse condemnation occurs where the federal government condemns property, without conducting an eminent domain proceeding. *See Agins* v. *City of Tiburon*, 447 U.S. 255, 258 n.2 (1980) ("Inverse condemnation should be distinguished from eminent domain. Eminent domain refers to a legal proceeding in which a government asserts its authority to condemn property. Inverse condemnation is 'a shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted.'") (quoting *United States* v. *Clarke*, 445 U.S. 253, 257 (1980)); *see also Moden*, 404 F.3d at 1342 ("Inverse condemnation is the cause of action against the government to recover the value of property taken where the government has not exercised the power of eminent domain." (citation omitted)).

The United States Court of Appeals for the Federal Circuit has recognized that "'[i]nverse condemnation law is tied to, and parallels, tort law.'" *Ridge Line Inc.* v. *United States*, 346 F. 3d 1346, 1355 (Fed. Cir. 2003) ("*Ridge Line*") (citing 9 PATRICK J. ROHAN & MELVIN A RESKIN, NICHOLS ON EMINENT DOMAIN § 34.03[1] (3d ed. 1980 & Supp. 2002)). Thus, when the Government challenges this court's jurisdiction over a plaintiff's inverse condemnation claim, arguing that it is merely a tort and therefore outside this court's jurisdiction, the Federal Circuit requires that the trial court conduct a "two-part inquiry" to determine whether the alleged inverse condemnation claim is subject to the requirements of the Just Compensation Clause and within the court's jurisdiction. *See Ridge Line* 346 F.3d at 1355.

The first part of the *Ridge Line* inquiry requires the plaintiff to establish either that the federal government "intends to invade a protected property interest *or* the asserted invasion is the 'direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action.'" *Id.* (quoting *Columbia Basin Orchard* v. *United States*, 132 F.Supp. 707, 709 (Ct. Cl. 1955) (emphasis added)). Second, the plaintiff must establish that the invasion "appropriate[s] a benefit to the government at the expense of the property owner, *or* at least preempt[s] the owner's right to enjoy his property for an extended period of time, rather than merely inflict an injury that reduces its value." *Id.* (emphasis added) (citations omitted); *see also Banks* v. *United States*, 69 Fed. Cl. 206, 212-13 (2006) ("To establish a takings claim here, plaintiffs

must show that . . . the [Government's] activities . . . were the likely cause of the [damage to plaintiffs'] property and that the resulting [] damage was foreseeable." (internal citation omitted)). Because this inquiry is fact based, however, it is conducted after discovery, either on a motion for summary judgment or following trial. *See Moden* v. *United States*, 404 F.3d 1335, 1341-45 (Fed. Cir. 2006) (applying the *Ridge Line* inquiry at the summary judgment stage, after determining the United States Court of Federal Claims had jurisdiction over the Just Compensation claim); *Ridge Line*, 346 F.3d at 1355-59 (remanding to the trial court to conduct the *Ridge Line* inquiry after trial); *Banks*, 69 Fed. Cl. 206, 212-14 (2006) (*Ridge Line* inquiry made at summary judgment stage); *cf. Vaizburd* v. *United States*, 384 F.3d 1278, 1283 (Fed. Cir 2004) (*Ridge Line* inquiry recognized but not conducted after trial, because the Government conceded that sand accretion at issue "amounted to a taking").

### 4. Plaintiffs Are Ordered To Show Cause Why Counts I And III, As Pled, Are Not Barred By The Statute Of Limitations.

The construction of the MRGO was completed in 1968. *See* First Am. Compl. ¶ 4. Therefore, to the extent that Counts I[3] and III[4] allege a claim for Just Compensation based on the "creation" of the MRGO, the court orders Plaintiffs to show why those claims should not be dismissed, since "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition therein is filed within six years after such claim first accrues." *See* 28 U.S.C. § 2501.

The United States Supreme Court has considered a Just Compensation case that is instructive to Plaintiffs' theory and pleadings. In 1937, the Government completed a dam to improve the navigability of a river in West Virginia. *See United States* v. *Dickinson*, 331 U.S. 745, 746 (1947). Subsequently, the river rose and reached a level in September 1938 that caused the permanent flooding of the land owner's property. *Id.* at 746-47. The Government argued that the last day from when the statute of limitations should run was May 30, 1937, when the dam was fully operational and the property at issue partially was submerged for the first time. *Id.* at 747. The property owners did not own the land on May 30, 1937, but filed suit on April 1, 1943. *Id.* The Government did not initiate "appropriate proceedings," *i.e.*, condemnation proceedings, that would establish a date certain

---

[3] "Count I - Permanent Taking of Property" alleges that: "As a natural and direct result of the creation of the MRGO and the continued operation, maintenance, and dredging thereof, the plaintiff's have been deprived of the use, occupancy, and enjoyment of their real property and the improvements thereon thereby resulting in a permanent taking of their property for public use." First Am. Compl. ¶ 16.

[4] "Count III - Permanent Taking of Flowage Easement" alleges, in relevant part that: "The flooding of plaintiff's property is recurring and is necessarily incident to and an inevitable consequence of the creation and maintenance of the MRGO [whereby] the United States has created a flowage easement on plaintiffs' property thereby resulting in a permanent taking of plaintiffs' property for a public purpose." First Am. Compl. ¶¶ 24-25.

for starting the statute of limitations. *Id.* To determine the date on which the land owner's claim arose, the Supreme Court first defined a "taking" in the context of the Just Compensation Clause: "Property is taken in the constitutional sense when inroads are made upon an owner's use of it to an extent that, as between private parties, a servitude has been acquired either by agreement in course of time." *Id.* at 748. Then, the Court held that the cause of action for a taking by a "continuing process of physical events" does not arise "until the situation becomes stabilized." *Id.* at 749. As the Court explained:

> The source of the entire claim-the overflow due to rises in the level of the river-is not a single event; *it is continuous.* And as there is nothing in reason, so there is nothing in legal doctrine, to preclude the law from meeting such a process *by postponing suit until the situation becomes stabilized.* An owner of land flooded by the Government would not unnaturally postpone bringing a suit against the Government for the flooding *until the consequences of inundation* have so manifested themselves that a final account may be struck.
>
> When dealing with a problem which arises under such diverse circumstances procedural rigidities should be avoided. All that we are here holding is that when the Government chooses not to condemn land but to bring about a taking by a *continuing process of physical events*, the owner is not required to resort either to piecemeal or to premature litigation to ascertain the just compensation for what is really 'taken.'

*Id.* (emphasis added).

In this case, if Plaintiffs' takings theory is premised on the *creation* of the MRGO, to satisfy the statute of limitations, Plaintiffs would have to establish that the effects from the "creation" of the MRGO were not "stabilized" until on or after October 17, 1999, *i.e.*, six years prior to filing the October 17, 2005 Complaint. If Plaintiffs' theory is premised on the expansion of the MRGO by "continued operation, maintenance, and dredging," to satisfy the statute of limitations, Plaintiffs would have to establish that the "situation" created by these activities was not "stabilized" until on or after October 17, 1999.[5] Assuming that Plaintiffs can satisfy the statute of limitations, their choice

[5] Plaintiffs First Amended Complaint does not state concise or clear allegations. *See e.g., compare* First Am. Compl. ¶ 12 ("[The] flooding was a direct, natural or probable result of the *creation* of the MRGO *and the continued operation, maintenance,* and *dredging* thereof[.]") (emphasis added), *with id.* ¶ 13 ("[B]ut for the *creation and maintenance* . . . the flooding . . . would not have occurred.") (emphasis added), *with id.* at ¶ 24 ("The flooding . . . is . . . an inevitable consequence of the *creation and maintenance* of the MRGO.") (emphasis added), *with id.* at Prayer ¶ (a) ("[P]roperty was taken . . . through *the construction and continued operation, maintenance and dredging*[.]"). *See* RCFC 8(e), 12(e), 15(a). When Plaintiffs respond to the court's Show Cause Order, Plaintiffs should further amend their complaint not only to state the required facts to establish standing, but also to state facts sufficient to identify their takings theory in a concise and clear manner, so that the court can properly resolve the statute of limitations issue.

of theory necessarily will define the scope of discovery and direct the court's subsequent *Ridge Line* inquiry.

### D. The Court's Resolution Of Plaintiffs' November 8, 2006 Motion *In Limine*.

The Government's October 4, 2006 Motion to Dismiss had five supporting exhibits attached.[6] *See* Gov't Mot. Dis. Ex. A-E. On November 2, 2006, Plaintiffs filed a Motion *In Limine* to exclude these exhibits. First, Plaintiffs argue that the exhibits are not admissible under the Federal Rules of Evidence ("Fed. R. Evid."). *See* Pl. Mot. *In Limine* at 3. The Government responds that Exhibits A-D, were not offered as evidence, "but as demonstrative exhibits intended to help the Court better understand the facts surrounding this case." Gov't Resp. Pl. Mot. *In Limine* at 7. Accordingly, Plaintiffs' November 2, 2006 Motion *In Limine*, with respect to Exhibits A-D, is denied.

As for Exhibit E, the Government argues that it is admissible, as a public record, pursuant to Fed. R. Evid. 803(8) and Fed. R. Evid. 902(5). Exhibit E, is a Tropical Cyclone Report on Hurricane Katrina, prepared by the National Hurricane Center, a component of the National Weather Center, that prepares Tropical Cyclone Reports for all depressions, storms, and hurricanes. *See* National Hurricane Center, 2005 Atlantic Hurricane Season, *available at* http://www.nhc.noaa.gov/2005atlan.shtml (last visited March 29, 2007). The NHC's Tropical Cyclone Reports "contain comprehensive information on each tropical cyclone, including synoptic history, meteorological statistics, casualties and damages, and the post-analysis best track[.]" *Id.* Plaintiffs seek to exclude this document from the record, because it was updated after original publication and the "process of updating adds to the sense that Exhibit E would not be covered by a hearsay exception (such as the 'public records and reports' exception of 803(8))." Pl. Mot. *In Limine* at 12; *see also* Gov't Mot. Dis. Ex. E at 1 (indicating that the report originally was issued on "20 December 2005" and "[u]pdated [on] 10 August 2006 for tropical wave history, storm surge, tornadoes, surface observations, fatalities, and damage cost estimates"). In addition, Plaintiffs argue that this Report was not properly authenticated. *Id.*

---

[6] The five exhibits attached to the Government's October 4, 2006 Motion to Dismiss are: Exhibit A is a map, "New Orleans Elevation by neighborhood with major roads" apparently prepared by the Greater New Orleans Community Data Center; Exhibit B is the "Fiscal Year 2005, Annual Report of the Army of Civil Works Activities," prepared by the Army Corps of Engineers; Exhibit C is "Note on the Influence of the Mississippi River Gulf Outlet on Hurricane Induced Storm Surge in New Orleans and Vicinity," prepared by Joannes Westerink, Department of Civil Engineering and Geological Sciences, University of Notre Dame, Bruce Ebersole, Coastal and Hydraulics Laboratory, U.S. Army Engineering Research and Development Center, and Harley Winer, New Orleans District, U.S. Army Corps of Engineers; Exhibit D is "The Direct Impact of the MRGO on Hurricane Storm Surge," prepared by the URS Corporation for the State of Louisiana, Department of Natural Resources; and Exhibit E is "Tropical Cyclone Report Hurricane Katrine 23-30 August 2005," prepared by the National Hurricane Center, a part of the National Oceanic and Atmospheric Administration.

The Government responds that Exhibit E "sets forth [the NHC's] factual findings relating to Hurricane Katrina[] and that this document is admissible under Fed. R. Evid. 803(8)(C)."[7] *See* Gov't Resp. Pl. Mot. *In Limine* at 11. In addition, the document is self-authenticating, pursuant to Fed. R. Evid. 902(5)[8] as a "publication[] purporting to be issued by a public authority[.]" *Id.*

The Tropical Cyclone Report contains the NHC's factual findings related to Hurricane Katrina and includes a detailed summary of the meteorological data gathered by the agency in the course of tracking the storm. *See* Gov't Mot. Dis. Ex. E at 1-13. The Report provides an overview of Hurricane Katrina and the storm surge at issue in this case. *Id.* at 9. Given the scope of Hurricane Katrina and the damage associated with the storm, it is not surprising that the NHC updated factual findings as improved data became available. Because this Report contains "factual findings resulting from an investigation made pursuant to authority granted by law," the Tropical Cyclone Report is admissible under Fed. R. Evid. 803(8)(C). *See Complaint of Munyun*, 143 F.R.D. 560, 566 (D.N.J. 1992) (holding that weather reports by the National Weather Service are admissible under Fed. R. Evid. 803(8)(C) as "trustworthy reports of weather conditions"). In addition, as a public agency publication, the Report is self-authenticating. *See* FED. R. EVID. 902(5).

Accordingly, Plaintiff's November 2, 2005 Motion *In Limine* regarding Exhibit E is denied.

## IV. CONCLUSION.

The court has determined that it has jurisdiction to adjudicate the claims in Plaintiffs' January 13, 2006 First Amended Class Action Complaint, however, the named Plaintiffs are hereby ordered

---

[7] Fed. R. Evid. 803 provides, in relevant part:

> The following are not excluded by the hearsay rule, . . . (8) Public records and reports. Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth . . . (C) in civil actions and proceedings . . . factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

FED. R. EVID. 803(8)(C).

[8] Fed. R. Evid. 902(5) provides, in relevant part:

> Extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to the following . . . publications purporting to be issued by public authority.

FED. R. EVID. 902(5).

to further amend to allege sufficient facts of ownership of the properties at issue to establish standing.

Count II is not ripe for adjudication and is dismissed.

The Government's October 4, 2006 Motion to Dismiss concerning the *Ridge Line* inquiry is denied as premature, without prejudice, to being reasserted after discovery is completed either on a Motion for Summary Judgment or after trial.

Plaintiffs are ordered to show cause why Counts I and III, as pled, are not barred by the statute of limitations.

Plaintiffs' November 2, 2006 Motion *In Limine* is denied.

The court will convene a telephone status report on April 11, 2007 at 2:00 p.m. EST to establish a schedule for Plaintiffs to comply with this Order.

**IT IS SO ORDERED.**

**s/ Susan G. Braden**
**SUSAN G. BRADEN**
**Judge**

NOTICES

DEPARTMENT OF DEFENSE

Department of the Army, Corps of Engineers

Intent To Prepare a Draft Environmental Impact Statement (EIS) for the Mississippi River-Gulf Outlet (MR-GO), Louisiana, Reevaluation Study

Tuesday, August 7, 2001

*41212 AGENCY: U.S. Army Corps of Engineers, DoD.

ACTION: Notice of intent.

SUMMARY: The Mississippi River-Gulf Outlet (MR-GO) is a deep-draft navigation channel built to provide the tidewater dock facilities of the Port of New Orleans, Louisiana, with direct access to the Gulf of Mexico. Construction of the channel began in 1958 and an interim channel was opened in 1963. The channel was completed to authorized dimensions of 36 feet deep by 500 feet wide in 1968. The channel is currently used by container and bulk cargo ships, as well as other deep-draft vessels that utilize the docks along the Inner Harbor Navigation Canal and MR-GO in New Orleans. Many shallow-draft vessels also use the channel. The Corps of Engineers is evaluating modifications to the MR-GO project, with a focus on alternatives that would reduce channel dimensions. Improvements and relocations planned and currently occurring in the Port of New Orleans may reduce the need for the deep draft channel. Some environmental groups and segments of the public want the MR-GO closed or reduced in size for environmental reasons and to lessen the risk of flooding from hurricane storm surge.

FOR FURTHER INFORMATION CONTACT: Questions concerning the EIS should be addressed to Mr. Richard Boe at (504) 862-1505. Mr. Boe may also be reached at FAX number (504) 682-2572 or by E-mail at richard.e.boe@mvn02.usace.army.mil. Mr. Boe's address is U.S. Army Corps of Engineers, PM-RS, P.O. Box 60267, New Orleans, Louisiana 70160-0267.

SUPPLEMENTARY INFORMATION:

1. Authority. The MR-GO was authorized by the River and Harbor Act of 1956 (P.L. 84-455). The USACE has the authority to conduct reevaluation studies of authorized projects if a significant period of time has elapsed or conditions have changed significantly since a feasibility study was completed. Construction authorities imply the authority to undertake reevaluation studies.

2. Proposed Action. The proposed action is to reduce the controlling depth of the MR-GO. Economic analyses will be performed to determine the current and future needs for the channel by various draft vessels, and the costs and benefits of maintaining channels of various sizes.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 2

3. Alternatives. Channel depths of 12, 16, and 20 feet will be investigated. The current authorization provides for a 36-foot deep channel. Alternatives to be investigated include abandonment of channel dredging until a minimal controlling channel dimension is reached, whereupon channel maintenance would resume to maintain the new channel size. Also, structural features will be investigated to quickly reduce the controlling depth of the channel. These structures will be evaluated for their effectiveness in producing desirable effects on salinity levels and fish and wildlife habitats, especially tidal wetlands. The structures will also be evaluated for their effectiveness in reducing hurricane storm surge.

4. Scoping. Scoping is the process for determining the scope of alternatives and significant issues to be addressed in the EIS. For this study, a letter will be sent to all parties believes to have an interest in the study, requesting their input on alternatives and issues to be evaluated. The letter will also notify interested parties of a public scoping meeting that will be held in the local area. Notices will also be sent to local news media. All interested parties are invited to comment at this time, and anyone interested in this study should request to be included in the study mailing list.

A public scoping meeting will be held on August 30, 2001, at 7 pm. The meeting will be held in the St. Bernard Parish Council Meeting Room of the St. Bernard Parish Government Complex located at 8201 West Judge Perez Drive in Chalmette, Louisiana.

5. Significant Issues. The tentative list of resources and issues to be evaluated in the EIS includes tidal wetlands (marshes and swamps), aquatic resources, wildlife resources, essential fish habitat, water quality, air quality, threatened and endangered species, recreation resources, and cultural resources. Socioeconomic items to be evaluated in the EIS include navigation, flood protection, business and industrial activity, employment, land use, properly values, public/community facilities and services, tax revenues, population, community and regional growth, vehicular transportation, housing, community cohesion, and noise.

6. Environmental Consultation and Review. The U.S. Fish and Wildlife Service (USFWS) will be assisting in the documenting of existing conditions and assessment of effects of project alternatives through Fish and Wildlife Coordination Act consultation procedures. The USFWS will also provide a Fish and Wildlife Coordination Act report. Consultation will also be accomplished with the USFWS and the National Marine Fisheries Service concerning threatened and endangered species. The draft EIS or a notice of its availability will be distributed to all interested agencies, organizations, and individuals.

7. Estimated Date of Availability. Funding levels will dictate the date when the draft EIS is available. The earliest that the draft EIS may be expected to be available is mid-2002.

Luz D. Ortiz,

Army Federal Register Liaison Officer.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FR Doc. 01-19761 Filed 8-6-01; 8:45 am]

BILLING CODE 3710-84-M

66 FR 41212-01, 2001 WL 879963 (F.R.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

US Army Corps
of Engineers.
New Orleans District

Louisiana Coastal Area (LCA), Louisiana

# Ecosystem Restoration Study



November 2004
Final
Volume 1:
LCA Study - Main Report

EXHIBIT
3

## This Report Contains 4 Volumes

**You are here** →

**Volume 1:**
**LCA Study - Main Report**

**Volume 2:**
**Programmatic Environmental Impact Statement**

**Volume 3:**
**Public Comments and Responses**

**Volume 4:**
**Appendix A - Science and Technology Program**
**Appendix B - Historic and Projected Coastal Louisiana Land Changes: 1978-2050 (USGS)**
**Appendix C - Hydrodynamic and Ecological Modeling**
**Appendix D - Louisiana Gulf Shoreline Restoration Report**

If you have any questions, or require additional information, please contact Mr. Timothy Axtman; Project Manager, U.S. Army Corps of Engineers - New Orleans District; P. O. Box 60267, New Orleans, LA 70160-0267, (504) 862-1921, email: Timothy.J.Axtman@mvn02.usace.army.mil

Cover picture is a Live Oak tree on the eastern shoreline of Lake Salvador.
*Picture provided by Lane Lefort of the U.S. Army Corps of Engineers, New Orleans District.*

**LOUISIANA COASTAL AREA (LCA), LOUISIANA**

**ECOSYSTEM RESTORATION STUDY**

# EXECUTIVE SUMMARY

## PURPOSE

The accelerated loss of Louisiana's coastal wetlands has been ongoing since at least the early 1900s with commensurate deleterious effects on the ecosystem and possible future negative impacts to the economy of the region and the Nation. There have been several separate investigations of the problem and a number of projects constructed over the last 20 to 30 years that provide localized remedies. For example, the Coastal Wetlands Planning, Protection, and Restoration Act (CWPPRA) Program is an ongoing program comprised of relatively small projects to partially restore the coastal ecosystem. However, given the magnitude of Louisiana's coastal land losses and ecosystem degradation, it has become apparent that a systematic approach involving larger projects to restore natural geomorphic structures and processes, working in concert with smaller projects, will be required to effectively deal with a physical problem of such large proportions. Restoration strategies presented in the 1998 report entitled "Coast 2050: Toward a Sustainable Coastal Louisiana," which evolved into the Louisiana Coastal Area (LCA) 905(b) reconnaissance report, formed the basis for this broader-scale effort under the Louisiana Coastal Area Ecosystem Restoration Study (LCA Study).

The purpose of the LCA Study is to:

- Identify the most critical human and natural ecological needs of the coastal area;
- Present and evaluate conceptual alternatives for meeting the most critical needs;
- Identify the kinds of restoration features that could be implemented in the near-term (within 5 to 10 years) that address the most critical needs, and propose to address these needs through features that provide the highest return in net benefits per dollar of cost;
- Establish priorities among the identified near-term restoration features;
- Describe a process by which the identified priority near-term restoration features could be developed, approved, and implemented;
- Identify the key scientific uncertainties and engineering challenges facing the effort to protect and restore the ecosystem, and propose a strategy for resolving them;
- Identify, assess and, if appropriate, recommend feasibility studies that should be undertaken within the next 5 to 10 years to fully explore other potentially promising large-scale and long-term restoration concepts; and
- Present a strategy for addressing the long-term needs of coastal Louisiana restoration beyond the near-term focus of the Louisiana Coastal Area Ecosystem Restoration Plan (LCA Plan).

The goal of the LCA Plan is to reverse the current trend of degradation of the coastal ecosystem. The plan maximizes the use of restoration strategies that reintroduce historic flows of river water, nutrients, and sediment to coastal wetlands, and that maintain the structural integrity of the coastal ecosystem. Execution of the LCA Plan would make significant progress towards achieving and sustaining a coastal ecosystem that can support and protect the environment, economy, and culture of southern Louisiana and thus, contribute to the economy and well-being of the Nation. Benefits to and effects on existing infrastructure, including navigation, hurricane protection, flood control, land transportation works, agricultural lands, and oil and gas production and distribution facilities were considered in the formulation of coastal restoration plans.

Louisiana contains one of the largest expanses of coastal wetlands in the contiguous U.S., and accounts for 90 percent of the total coastal marsh loss occurring in the Nation. The coastal wetlands, built by the deltaic processes of the Mississippi River, contain an extraordinary diversity of habitats that range from narrow natural levee and beach ridges to expanses of forested swamps and freshwater, intermediate, brackish, and saline marshes. Taken as a whole, the unique habitats of upland areas and the Gulf of Mexico, with their hydrological connections to each other, and migratory routes of birds, fish, and other species, combine to place the coastal wetlands of Louisiana among the Nation's most productive and important natural assets. In human terms, these coastal wetlands have been a center for culturally diverse social development.

Approximately 70 percent of all waterfowl that migrate through the U.S. use the Mississippi and Central flyways. With over 5 million birds wintering in Louisiana, the Louisiana coastal wetlands are a crucial habitat to these birds, as well as to neotropical migratory songbirds and other avian species who use them as crucial stopover habitat. Additionally, coastal Louisiana provides crucial nesting habitat for many species of water birds, such as the endangered brown pelican. These economic and habitat values, which are protected and supported by the coastal wetlands of Louisiana, are significant on a National level.

Louisiana's coastal wetlands and barrier island systems enhance protection of an internationally significant commercial-industrial complex from the destructive forces of storm-driven waves and tides. A complex of deep-draft ports includes the Port of South Louisiana, which handles more tonnage than any other port in the Nation, and the most active segment of the Nation's Gulf Intracoastal Waterway (GIWW) (Waterborne Commerce Statistics Center (WCSC) 2002). In 2000, Louisiana led the Nation with production of 592 million barrels of oil and condensate (including the outer continental shelf (OCS)), valued at $17 billion, and was second in the Nation in natural gas production with $1.3 billion (excluding OCS and casing head gas) (Louisiana Department of Natural Resources (LDNR) 2003). In addition, nearly 34 percent of the Nation's natural gas supply and over 29 percent of the Nation's crude oil supply, moves through the state and is connected to nearly 50 percent of U.S. refining capacity (LDNR 2003b).

Additionally, coastal Louisiana is home to more than 2 million people, representing 46 percent of the state's population. When investments in facilities, supporting service activities, and the urban infrastructure are totaled, the capital investment in the Louisiana coastal area totals approximately $100 billion. Excluding Alaska, Louisiana produced the Nation's highest

commercial marine fish landings (about $343 million) excluding mollusk landings such as clams, oysters, and scallops (National Marine Fisheries Service (NMFS) 2003). Recent data from the U.S. Fish and Wildlife Service (USFWS) show expenditures on recreational fishing (trips and equipment) in Louisiana to be nearly $703 million, and hunting expenditures were $446 million for 2001 (USFWS 2002).

Since the 1930s coastal Louisiana has lost over 1.2 million acres of land (485,830 ha) (Barras et al. 2003; Barras et al. 1994; and Dunbar et al. 1992). As recently as the 1970s, the loss rate for Louisiana's coastal wetlands was as high as 25,200 acres per year (10,202 ha/year). The rate of loss from 1990 to 2000 was about 15,300 acres per year (6,194 ha/year), much of which was due to the residual effects of past human activity (Barras et al. 2003). It was estimated in 2000 that coastal Louisiana would continue to lose land at a rate of approximately 6,600 acres per year (2,672 ha/year) over the next 50 years. It is estimated that an additional net loss of 328,000 acres (132,794 ha) may occur by 2050, which is almost 10 percent of Louisiana's remaining coastal wetlands (Barras et al. 2003). The cumulative effects of human and natural activities in the coastal area have severely degraded the deltaic processes and shifted the coastal area from a condition of net land building to one of net land loss.

While many studies have been conducted to identify the major contributing factors (e.g., Boesch et al. 1994; Turner 1997; Penland et al. 2000), most studies agree that land loss and the degradation of the coastal ecosystem are the result of both natural and human induced factors, producing conditions where wetland vegetation can no longer survive and wetlands are lost. Establishing the relative contribution of natural and human-induced factors is difficult. In many cases, the changes in hydrologic and ecologic processes manifest gradually over decades and in large areas, while other effects occur over single days and impact relatively localized areas. For barrier shorelines, complex interactions between storm events, longshore sediment supply, coastal structures, and inlet dynamics contribute to the erosion and migration of beaches, islands, and cheniers.

The measurable increase in coastal land loss in the mid to late 20th century can be linked to human activities that have fundamentally altered the deltaic processes of the coast and limited the ability to rebuild or sustain it. In the Chenier Plain, human activities have fundamentally altered the hydrology of the area, which has impacted the long-term sustainability of the coastal ecosystems. Because of the magnitude and variety of these human-induced changes, and their interaction with natural landscape processes, all of the factors contributing to coastal land loss and ecosystem degradation must be viewed together to fully understand how Louisiana's coastal ecosystem shifted from the historical condition of net land gain to the current condition of net land loss.

The past and continued loss of Louisiana's coastal wetlands will significantly affect the ecology, society, and economy of the region and the Nation. The continued decline of the natural ecosystem will result in a decrease in various functions and values associated with wetlands, including corresponding diminished biological productivity and increased risk to critical habitat of Federally-listed threatened and endangered species. The capacity of the coastal wetlands to buffer storm surges from tropical storm events will diminish, which will increase the