Exhibit 6 To Motion To Compel And For Imposition of Fees and Expenses
Transcript of Testimony of Michelle C. Daigle (June 12, 2007)

EXHIBIT
6

# Transcript of the Testimony of

# Michelle C. Daigle

**Date taken: June 12, 2007**

**Rocco Tommaseo, et al v. The United States**

**Professional Shorthand Reporters, Inc.**
**Phone:** 504-529-5255
**Fax:** 504-529-5257
**Email:** reporters@psrdocs.com
**Internet:** www.psrdocs.com

IN THE UNITED STATES COURT
OF FEDERAL CLAIMS

ROCCO TOMMASEO, et al.
Plaintiffs.
1:05-cv-1119 SGB

VERSUS

Hon. Susan G. Braden

THE UNITED STATES
Defendant

30(b(5) and 30(b(6) Deposition of THE UNITED STATES OF AMERICA, through its designated representative, MICHELLE C. DAIGLE, Acting Operations Manager, Operations Division, CEMVN-OD-G, P.O. Box 60267, New Orleans, Louisiana 70160-0267, taken in the offices of the United States Army Corps of Engineers, New Orleans Division, 7400 Leake Avenue, New Orleans, Louisiana, on Tuesday, the 12th day of June, 2007.

APPEARANCES:

F. GERALD MAPLES, P.A.
(By: Stephen M. Wiles, Esq.
and Carlos A. Zelaya, II, Esq.)
902 Julia Street
New Orleans, Louisiana 70113
ATTORNEYS FOR PLAINTIFFS

U.S. DEPARTMENT OF JUSTICE
Environmental & Natural Resources Division
(By: Fred R. Disheroon, Esq. and
Mark T. Romley, Esq.)
601 "D" Street, N.W., Room 3022
Washington, D.C. 20004
ATTORNEYS FOR DEFENDANT

Page 1

ALSO PRESENT:
JENNIFER A. LABOURDETTE, ESQ.
GEOFF WEBSTER
NICK MARZONI

REPORTED BY:
JAMES T. BRADLE
CERTIFIED COURT REPORTER

* * *

EXAMINATION INDEX

Page
EXAMINATION BY MR. WILES .......... 6

* * *

INDEX OF EXHIBITS

Page
Exhibit No. 1 .................... 15
Notice of Rule 30(b)(6) Deposition with Rule 30(b)(5) Request for Production of Documents with attached exhibits
Exhibit No. 2 .................... 17
Notice of Rule 30(b)(6) Deposition with Rule 30(b)(5) Request for Production of Documents dated April 17, 2007
Exhibit No. 3 .................... 18
Document with information regarding the dredge WHEELER

Page 2

Exhibit No. 4 .................... 19
Letter from Fred R. Disheroon to Stephen M. Wiles dated April 24, 2007
Exhibit No. 5 .................... 30
United States' Document Production Protocol - In Re: Katrina Canal Breaches Consolidated Litigation
Exhibit No. 6 .................... 42
First Amended Class Action Complaint
Exhibit No. 7 .................... 42
Answer of the United States
Exhibit No. 8 .................... 104
U.S. Army Corps of Engineers News Release dated September 24, 2004, entitled "Three dredges sent to restore depth in Mississippi River-Gulf Outlet"
Exhibit No. 9 .................... 105
U.S. Army Corps of Engineers Ecosystem Restoration Study dated November, 2004
Exhibit No. 10 .................. 111
Article from Science magazine dated March 23, 2007, entitled "Restoration of the Mississippi Delta: Lessons from Hurricanes Katrina and Rita"
Exhibit No. 11 .................. 116

Page 3

Map of the Mississippi River-Gulf Outlet with markings made during the deposition
Exhibit No. 12 .................. 128
Map of the Mississippi River-Gulf Outlet with markings made during the deposition
Exhibit No. 13 .................. 143
Handwritten diagram

Page 4

STIPULATION

It is stipulated and agreed by and between counsel for the parties hereto that the deposition of the aforementioned witness is hereby being taken for all purposes allowed under the Federal Rules of Civil Procedure, in accordance with law, pursuant to notice;

That the formalities of reading and signing are specifically not waived;

That the formalities of sealing, certification and filing are specifically waived;

That all objections, save those as to the form of the question and the responsiveness of the answer, are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence.

* * * *

JAMES T. BRADLE, Certified Court Reporter in and for the State of Louisiana, officiated in administering the oath to the witness.

Page 5

MICHELLE C. DAIGLE,

after having been first duly sworn by the above-mentioned court reporter, did testify as follows:

EXAMINATION BY MR. WILES:

Q Would you state your name and your business and residence address for the record, please.
A Michelle Daigle. My business address is the U.S. Army Corps of Engineers, P.O. Box 60267, New Orleans, Louisiana, 70160.
Q And what's your physical address here in case someone needed to serve you with a subpoena?
A 7400 Leake Avenue, L-E-A-K-E, and that's 70116, I believe.
Q All right. And home?
A 342 Walter Road, W-A-L-T-E-R, Road, River Ridge, Louisiana, 70123.
Q Okay. And who is your current employer?
A The U.S. Army Corps of Engineers.
Q And what's your position?
A I'm operations manager for MR-GO.

Page 6

Q Now, what falls within your bailiwick?
A I'm responsible for the operations and maintenance of the waterway for the MR-GO as well as I have several other channels that are under my responsibility, but that's the only deep draft waterway.
Q What are those other bodies of water?
A Barataria Bay Waterway, Bayou Segnette, Bayou Rigaud, Bayou Lafourche, Houma Navigation Canal, and then I have some smaller waterways in the vicinity of MR-GO, several smaller waterways as well.
Q Which would be?
A Bayou Eloi, Bayou La Loutre, Yscloskey. I think that pretty much covers it.
Q So your authority extends all the way to the very end of St. Bernard Parish, right?
A Right.
Q Okay.
A I have to look at a map, but, I mean, we have other managers.

Page 7

Q But they have them in this office?
A Oh, yes.
Q All right.
A So the other managers share responsibilities for various waterways, like the Mississippi River and other smaller waterways.
Q Right. Now, on this map right here on the table, your ambit of authority goes further, like off the map here (indicating), correct?
A Well, the MR-GO is included here, yes, and it continues on. I have a project map.
Q Yes, that would be great, just as a point of reference.
A (Handing).
Q Is this the identical map that's in the IPET report?
A I'm not sure. The IPET report is over 1,000 pages.
Q Would you show, if you could, would you draw for me on here, and we can use a pink marker, since it's not a color that's on here, and just show me, if you

Page 8

would, generally what your geographic authority covers.
A Okay. This is my only map like this. Can I draw it in pencil? They don't make these books anymore.
MR. DISHEROON:
Do you want to get someone to make a copy of it?
THE WITNESS:
Oh, that would be good.
MR. WILES:
Yes, that would be great.
MS. LABOURDETTE:
It's going to be in black and white.
MR. DISHEROON:
Black and white would be fine.
EXAMINATION BY MR. WILES:
Q While we're doing that, would you tell me what your educational background is and work history before you came here?
A I have a Bachelor of Science Degree in civil engineering from LSU. I graduated in 1985.
Q Okay.

Page 9

A And I have been working at the Corps of Engineers for -- it will be 18 years this December.
Q Okay.
A And I also worked in New York for Singstad, Hurka & Associates.
Q Say that again.
A Singstad, Hurka & Associates.
Q All right.
A Then I moved to Washington, D.C., and I worked for Michael T. Rose, a developer, and for Michael Baker. They're an engineering firm.
Q Okay. So you had a bachelor science in what particular engineering discipline?
A Civil engineering.
Q Okay. And that was LSU in 1985, correct?
A Yes.
Q All right. And you have been with the Corps since when?
A 1989.
Q Okay. When you first came to work for the Corps in 1989, did you learn that

Page 10

there was some controversy or consternation as to the MR-GO as far as the residents of St. Bernard Parish were concerned?
A No. In 1989, I was in cost engineering.
Q In what?
A In cost engineering, so I wasn't familiar with the MR-GO.
Q All right. When was the first time you learned in your work at the Corps that there was some sort of dispute as to whether it was a good idea or a bad idea as far as the residents of St. Bernard Parish are concerned?
A I guess I became aware of the MR-GO when I started working in dredging function, and that was around '99, I believe, '99 or 2000.
Q Okay.
A And I worked on plans and specs, including plans and specs for the MR-GO.
Q All right. Now, you called it dredging function. Tell me, did you have a titular change?
A Yes.

Page 11

Q Okay. And tell me from what to what. And what I would like to know is what you were before this '89, '90 job change, and then what your new title was.
A I was civil engineer in cost engineering in engineering division, and then I -- Oh, then I went to hydraulics in engineering division, and then after that, I went to dredging function.
Q That's what it's called, dredging function?
A Right. And that's in operations division, what I am currently in now.
Q Do you still have the same title now that you had, I guess, in '89 or '90 when you went to work for dredging function?
A No. Now I'm the operations manager for MR-GO. That's my title.
Q Okay.
A That has been since 2006.
Q All right. When in 2006?
A January.
Q Okay. And in the 15 years before that, what was your title? Did you have the same title or did you have a progression of

Page 12

titles?
A Well, I was civil engineer in cost engineering, and I was hydraulic engineer in hydraulics, and back to civil engineer in dredging function.
Q So I guess when you began your dredging function work around '89 or '90, you were simply referred to as a civil engineer?
A Right. That wasn't dredging function. That was cost engineering.
Q Okay. And when you were imported into the dredging function portion of this operation, what was your exact title?
A Civil engineer.
Q Okay.
A And then lead civil engineer.
Q Okay. And were you the lead civil engineer when Katrina hit, for example?
A Yes.
Q Okay. And who was your direct supervisor at that time?
A Casey Clark.
Q Is that a man or a woman?
A A man.

Page 13

Q Does he still work here?
A Yes.
Q What does Mr. Clark do now?
A He's leading dredging function.
Q All right. Have you ever given a deposition before?
A Yes.
Q Okay. If you would, tell me approximately how many.
A One.
Q One. Okay. That will make it easy.
A That's easy.
Q So previously on L.A. Law, what was your deposition about?
A It was about a crane, a Kostmayer crane.
Q And was there a property loss or something?
A Yes.
Q Okay. Can you tell me about that briefly?
A A crane was being transported through the Atchafalaya River, and apparently, I think part of the crane was

Page 14

elevated or something and hit the bridge and it went into the waterway.
Q Now, did you testify as an expert witness?
A No.
Q Just a fact witness. Okay. Have you ever written any expert reports for litigation?
A No.
Q Have you ever testified in court?
A No.
Q All right. And have you ever testified in an administrative hearing?
A I don't think so.
Q All right. An arbitration?
A No.
Q What I would like to do for housekeeping is I will go ahead and attach a copy of the notice as Exhibit 1, and I will ask you if you have seen this before?
A I think so. Is that the same as this? Yes.
Q Yes, this notice is complete with the exhibits. Have you seen the complete Notice of Deposition before just now?

Page 15

A I don't think I saw everything.
Q Okay.
A I mean, you all might have e-mailed it to me, but I haven't seen it.
Q Let me ask you this. When did you first know you were going to be the deponent pursuant to this 30(b)(6) Notice?
A I guess a couple of weeks ago.
Q Okay. What materials have you reviewed to prepare you for your deposition here today?
A This (indicating). I went through this (indicating).
Q All right. So you have just handed me what appears to be -- Yes, this is an older copy of the notice. We changed the date.
Mr. Disheroon, you remember that?
MR. DISHEROON:
Yes.
EXAMINATION BY MR. WILES:
Q This is the notice that was issued on 17 April, 2007, and is this how you received it, just like this?
A That's what we looked at

Page 16

yesterday. It was e-mailed to me.
Q Okay. But, I mean, there weren't any other pages, right?
A I mean, there might have been more attached to it, but I don't think I -- I didn't see this whole thing (indicating), so I must not have printed out all of the attachments.
Q So you have not seen the 30(b)(6) Deposition Notice for the deposition here today, is that correct, which is Exhibit 1?
A This (indicating)?
Q No, it's different.
A Okay. Well, when we met yesterday, you know, I looked at a few of the documents, but I didn't really go through them.
Q Just so the record is clear, I'm going to mark as Exhibit 2 the 17 April, 2007 notice sans exhibits, which was provided to me by the witness.
What else did you look at to prepare for your deposition?
A Well, I don't know. I found the project map, because I thought you all might



be interested in that.
Q Was that the map we just had before?
A Yes.
Q Okay. The one that's being copied, right?
A Right.
Q All right. What else?
A And my assistant did some research, just because there were some questions, some contracting questions, so I got some information together on one of our dredges.
Q And that's that sheet of paper?
A Yes.
Q I'm going to just go ahead and mark it now, and then we will come back to it.
A Okay.
Q We will mark this as Exhibit 3.
And there's a letter in front of you. Did you review that in preparation for your deposition?
A I think this was given to me yesterday, but I didn't go through it.



MR. DISHEROON:
What letter is that?
THE WITNESS:
I think you all gave that to me yesterday.
MR. DISHEROON:
Oh, yes.
THE WITNESS:
But I haven't gone through it.
EXAMINATION BY MR. WILES:
Q Okay. I will just mark it as Exhibit 4, just so we're complete. And just for the record, this is the 24 April, 2007 file copy of a letter from Mr. Disheroon to myself.
All right. So you have not been provided with a complete copy of the 30(b)(6) Deposition Notice and the 30(b)(5) document request, which I have attached as Exhibit 1; is that correct?
A Well, like I said, it was e-mailed to me, so I'm not sure if it was the whole document, exactly which version it was.
Q Well, where did No. 2 come from?
A This came yesterday in our



meeting.
Q And was it given to you by someone?
A Yes.
Q By who?
A Well, I think from Fred, I believe. I don't know. Or maybe Jennifer. I'm not sure.
Q All right. And as you sit here -- Well, let me just ask you a question. Do you even know what's being asked for in this notice, Exhibit 1?
MR. DISHEROON:
I'm sorry. What was the question?
EXAMINATION BY MR. WILES:
Q My question is this: As you sit here right now, are you even aware of what we seek to learn by way of Exhibit 1?
A I think so. I mean, these questions, the questions that were asked in this document (indicating)?
Q And you're pointing out Exhibit 2?
A Yes.
Q All right. And here's the problem, is that there are references to

exhibits in the areas of inquiry, you know, the delineation of the topics that are set forth in the full and complete copy of the notice, and I'm entitled to have the person most knowledgeable testify as to the areas of inquiry set forth in the notice, and what I'm hearing from you is that you haven't even read the exhibits, which are the basis of many of the questions; is that correct?

MR. DISHEROON:

Excuse me. For the record, Mr. Wiles, I sent you a letter indicating the areas of which this witness would speak, and they do not constitute everything in your notice, and we have indicated to you in a number of instances that we do not propose to provide a witness.

So she is here to speak to those areas that she has knowledge of or that are under her responsibility. She's not here to address most of the documents, but you're free to ask her what she knows about them.

MR. WILES:

Okay. Let's have an agreement. I appreciate your explanation, but let's have



an agreement going forward that we don't have any speaking or coaching objections of the witness. Is that okay?

MR. DISHEROON:

No, it's not okay.

MR. WILES:

All right.

MR. DISHEROON:

I'm not trying to coach the witness. I am stating the position of the government and disagreeing with your statement of what you're entitled to.

MR. WILES:

Read my question back, Jim, would you, please.

(Whereupon, the court reporter read back the requested testimony as follows:

THE COURT REPORTER:

Question: "All right. And here's the problem, is that there are references to exhibits in the areas of inquiry, you know, the delineation of the topics that are set forth in the full and complete copy of the notice, and I'm entitled to have the person most knowledgeable testify as to the areas



of inquiry set forth in the notice, and what I'm hearing from you is that you haven't even read the exhibits, which are the basis of many of the questions; is that correct?"

EXAMINATION BY MR. WILES:

Q So you can answer my question.

MR. DISHEROON:

Do you want time to look through the exhibits?

THE WITNESS:

Yes. Can I look through them?

EXAMINATION BY MR. WILES:

Q Yes, ma'am, please do.

A (Reviewing documents).

Okay. I saw those exhibits yesterday. I have not read through them.

Q Where did that copy of those exhibits go, the ones you looked at yesterday? I would like to have them.

A I think Fred has them.

Q Okay. Could you get them for me, please?

MR. DISHEROON:

They're my copies. They're identical to the ones you have there.



MR. WILES:

Well, I would like to see what the witness looked at, so I can make sure that she has, in fact, seen these things. I mean, you will let me look at them, won't you, Mr. Disheroon?

MR. DISHEROON:

I will state for the record they are simply copies that I have of your exhibits. They are no different. For example, here is Exhibit 5. There is Exhibit 3. I gave her copies of nearly all of those documents.

MR. WILES:

Okay. "Nearly all."

MR. DISHEROON:

I don't believe we discussed Exhibit 3 with her, because that's not germane to her testimony, and that's your e-mail to me regarding other discovery.

MR. WILES:

But I'm entitled to see what documents the witness reviewed.

MR. DISHEROON:

She told you she looked at all of

those yesterday.
EXAMINATION BY MR. WILES:
Q All right. As you sit here right now, can you swear you saw every one of these documents yesterday?
A I saw them. I'm not sure about that e-mail that Fred is talking about. I'm not sure if I saw the e-mail.
Q Okay.
MR. DISHEROON:
And the e-mail is Exhibit 5.
EXAMINATION BY MR. WILES:
Q I hate to be laborious about this, and I may come over there, so we can go through these together, so it will be a little bit quicker.
A Okay.
Q All right. Exhibit No. 1 is Judge Braden's opinion of 29 March, 2007. Have you seen that?
A Okay. I'm not sure if I saw that. I don't remember going through that.
Q Just so the record is clear, Jim, these are exhibits to the notice, which is Exhibit 1.

Page 25

All right. Exhibit 2, this is a Department of Defense notice dated 7 August, 2001. Have you seen this?
A I saw that.
Q Okay. Exhibit 3 is the November, 2004 Louisiana Coastal Area Ecosystem Restoration Study. Did you look at that yesterday?
A Yes.
Q Okay. Great. Exhibit 4, have you seen this? And this is the 23 March, 2007 article from Science?
A Yes.
Q Okay. Had you seen that before yesterday?
A No.
Q Okay. And Exhibit 5 is the e-mail from me to Mr. Disheroon. Did you look at that or just skip it?
A I don't think I did. I don't remember talking about that.
Q All right. Exhibit 6, again, it's an article, I believe this is from Science as well, and have you seen this one?
A Yes.

Page 26

Q Okay. Had you seen that before yesterday?
A No.
Q In preparation for your testimony here today, have you looked at any other documents other than those we just went through?
A No.
Q All right.
MR. DISHEROON:
Those are just copies.
MR. WILES:
Okay. I was trying to figure out which one was the original.
MR. DISHEROON:
She still has the original.
THE WITNESS:
I have it.
EXAMINATION BY MR. WILES:
Q All right. Good. What I'm going to do is, if you would, please turn to Page 10 of Exhibit 1.
A (Reviewing document).
Q Have you read it?
A The whole page?

Page 27

Q Just item 1 at the bottom?
A Yes.
Q Okay. And here we want documents, we have asked that the Corps produce these documents along with persons to authenticate, identify and explain these documents. Do you have any documents responsive to item 1 of the Rule 30(b)(5) document request that you're going to produce to me today?
A No. I really don't know what you're looking for in that.
Q Okay. My question is, simply, do you have documents to produce to me today, which that's what this notice requires the Corps to do, and I'm asking, do you have documents that you're going to produce pursuant to item 1 today?
A No.
Q Okay. Why not?
MR. DISHEROON:
For the record, let me state what I stated earlier, that as a consequence of a court order in another case against the United States in the United States District

Page 28

Court for the Eastern District of Louisiana, nearly all of the documents that would be properly subject to discovery have been placed in a repository under the control of the -- I don't know who has control of it. We provided counsel with the document production protocol order that was issued in this case. If you would like, we can make this an exhibit.

MR. WILES:

Issued in this case?

MR. DISHEROON:

In this case that I'm referring to.

MR. WILES:

Right. So you mean issued in some tort litigation in District Court here in New Orleans?

MR. DISHEROON:

Right. And the original of all of those documents have now been placed in that repository and we do not have them available to provide to you, but we are willing to make arrangements to allow you to obtain access to those documents.

Page 29

MR. WILES:

All right.

MR. DISHEROON:

Should you so desire. That's subject, you know, to the rules set forth in that document protocol.

MR. WILES:

All right. Let's move on. I'm going to identify that as Exhibit 5.

And which is it, Mr. Disheroon, is it all or almost all, because you said both?

MR. DISHEROON:

As far as I know, it's all.

MR. WILES:

Okay.

MR. DISHEROON:

I was qualifying it, because you have asked for some things here that we have objected to.

MR. WILES:

Well, sure, and I understand that.

MR. DISHEROON:

That may not even exist, as far as I know.

MR. WILES:

Page 30

Before I walked in here today, did you tell me that I wasn't going to get any document production pursuant to my 30(b)(5) notice?

MR. DISHEROON:

Are you asking me the question?

MR. WILES:

Yes, sir.

MR. DISHEROON:

I'm not being deposed.

MR. WILES:

You know what the truth is, though, don't you? You know the truth is that you did not tell me that?

MR. DISHEROON:

I stated in my letter to you that we would produce documents at depositions, not necessarily this one, that are within the scope of the matters we have agreed to provide a witness for. And as far as I knew at that time, we could provide you some documents. We cannot do that at this time. So I think you were on notice with our position, but that clearly we're not intending to provide you documents with

Page 31

regard to matters that we objected to.

MR. WILES:

I can't believe I'm doing this. Exhibit 4 is the 24 April, 2007 letter of Mr. Disheroon to me. In the penultimate paragraph, it says, "In response to your requests for production of documents under Rule 30(b)(5), we will produce documents at such depositions that are within the scope of matters we have agreed to provide a witness therefor."

All right. So in writing, you told me you were going to produce exhibits for me at the deposition, you know, the ones to which you do not have objection, and today I walk in and I get the Heisman when it comes to my request for documents.

MR. DISHEROON:

Well, for the record, I only yesterday learned that the documents were not available.

MR. WILES:

So you hadn't even looked until yesterday to see? This is plenty clear on the record.

Page 32

Mr. Disheroon, just so the record is clear, because I'm obviously going to have to reserve rights here, the basis for your refusing to produce anything today is Exhibit 5, correct?

MR. DISHEROON:

I'm saying it's not a refusal to produce it. It's an inability to produce them today, but we are willing to make arrangements so you can have access to those documents. We're not refusing to produce them. We simply can't provide them to you today.

MR. WILES:

What's the impediment to you producing them?

MR. DISHEROON:

I don't have them. I don't have access to them. They're under the control of the Court.

MR. WILES:

And they won't let you take them out, make copies of them? Have they been placed under lock and key?

MR. DISHEROON:

Page 33

Mr. Wiles, let's just go ahead and see if there are any documents that would be relevant to this request.

MR. WILES:

Yes, sir, I understand.

MR. DISHEROON:

You're assuming there are a lot of documents. We are primarily relying on this witness' personal knowledge to respond to those portions of your requests, not documentary evidence, so at this point we really don't know of anything that we need to produce for you other than we provided you with the map that she brought with her, and she's prepared to discuss the matters primarily relating to MR-GO and its physical configuration. During the deposition, if there's a particular document you need, you ask for it, we will do our best to get it for you.

MR. WILES:

Okay.

MR. DISHEROON:

But that's the best I can do. I'm sorry.

Page 34

MR. WILES:

All right. Well, we're here on a live notice and I'm going to go forward. And just so the record is clear, I mean, there's no court order that says you can't give me documents, is there?

MR. DISHEROON:

You have the court order. You see what it says.

MR. WILES:

Well, this is simply a proposal, by the way.

MR. DISHEROON:

To my understanding, it has been approved and they have already done it.

MR. WILES:

And that's not in our case, correct?

MR. DISHEROON:

It's a related case involving the same, precise subject matter. It's only a tort case as opposed to a takings case, but it is a challenge to the MR-GO project, so they have all of the MR-GO files.

MR. WILES:

Page 35

Are you telling me that as of today, the United States Army Corps of Engineers no longer has any documents responsive to my 30(b)(5) request?

MR. DISHEROON:

They have them. They're in that repository.

MR. WILES:

Which is where?

THE WITNESS:

On Poydras.

MS. LABOURDETTE:

Texaco Center, Suite 1175.

MR. DISHEROON:

If there are particular documents that you need, we're under no real time constraints here. The Court has indicated, you know, we're going to be doing discovery, practically nothing for discovery for the next few months. She's not going to take further action.

If there are further documents that are identified, we will make every effort to get them and produce them for you if they're not objectionable.

Page 36

MR. WILES:
That's not acceptable, but you and I, we're not going to belabor the point, Mr. Disheroon.
MR. DISHEROON:
That's the best we can do today.
MR. WILES:
All right.
EXAMINATION BY MR. WILES:
Q As you sit here today as a representative of the United States in this case, do you have a single piece of paper that proves that the MR-GO project had stabilized prior to 17 October, 1999?
A No.
Q Okay. As you sit here today, do you have a single piece of paper responsive to item 2 of the 30(b)(5) document request?
MR. DISHEROON:
What page is that on?
MR. WILES:
11, Mr. Disheroon.
EXAMINATION BY MR. WILES:
Q And the question is to you, ma'am.
A (Reviewing document). Okay. So

Page 37

you're asking for what in this sentence?
Q I'm asking you, as you sit here today, do you have a single piece of paper in response to item 2 to produce to me?
A Then I would need to look at this correspondence then, Exhibit 5.
Q Okay.
MR. DISHEROON:
Let's be clear. Your question is whether she has physically with her today these documents? Not whether such documents exist, but whether she has them with her; is that correct?
MR. WILES:
No, that's not what I said.
MR. DISHEROON:
Well, then, let's make your question clear.
MR. WILES:
My question is clear. And here's the problem, Mr. Disheroon. I mean, I'm here. I'm entitled to depose a witness who is the most knowledgeable as to the delineated topics, and I'm also entitled to have documents produced so we can have an

Page 38

informed discussion about these things, and I received no motion for protective order, you know, you and I had worked out a gentlemen's agreement to the things where you had objections, we would take the deposition, and then see if we still had problems once we were finished. Is that correct? And what I get today, without any notice, is a complete stonewall.
MR. DISHEROON:
No, you're not getting a complete stonewall. We have indicated there are documents. They're just not here. But there still remains the question of whether any of these documents are really relevant to or responsive to this request. There are certain assumptions that you are making that to our mind are not valid assumptions.
My suggestion is that you ask the witness about her personal knowledge, and to the extent that it's based on documents, what documents those are, and if those are in the repository, we will make them available to you. We simply can't do it today. But your statement that these

Page 39

documents do not exist is clearly wrong. It's just that she simply does not have them.
EXAMINATION BY MR. WILES:
Q Have you made any effort whatsoever to gather the documents requested in the 30(b)(5) notice?
A No.
Q All right. Are you aware of anyone at the United States Army Corps of Engineers making any efforts to gather the documents requested in my 30(b)(5) request?
A No. Everything is in the repository.
Q So if I walked down the hall here, I won't find a single piece of paper that's responsive to any of this? You all emptied out the Corps's offices?
A We tried our best.
Q Okay.
A I mean, that's what we were requested to do.
Q All right. As you sit here today, do you have any documents responsive to topic three which prove that the claims

Page 40

extant in this lawsuit are barred by the statute of limitations, which is 28 U.S.C. Section 2501?
A I don't understand what you're asking me.
Q I will have him read it back.
A I don't think I will understand it if he reads it back.
MR. WILES:
Well, let's take a shot at the title then.
(Whereupon, the court reporter read back the requested testimony as follows:
THE COURT REPORTER:
Question: "All right. As you sit here today, do you have any documents responsive to topic three which prove that the claims extant in this lawsuit are barred by the statute of limitations, which is 28 U.S.C. Section 2501?"
EXAMINATION BY MR. WILES:
Q It's a "yes" or "no" answer.
A No.
Q And just so the record is clear, when I talk about "this lawsuit," I'm

Page 41

attaching the first amended class action complaint as Exhibit 6. Have you seen this, this lawsuit?
A (Reviewing document). I don't think I have seen this.
Q All right. And I'm going to hand you what is Exhibit 7, which is the answer of the United States to this lawsuit, which is Exhibit 6, and ask you if you have seen this before? And I have a question for you with respect to Page 3, but take your time.
A (Reviewing document). I have not seen it.
Q All right. Do you see on the third page, where it says, and I will come read it verbatim for you, it says, "Plaintiffs' claim is barred by the applicable statute of limitations 28 U.S.C. Section 2501"? That's a six-year statute of limitations. What documents do you know of that support that?
MR. DISHEROON:
I'm going to just for the record object to the extent that what you are basically asking her is a legal conclusion,

Page 42

because this is basically a legal argument. She is here to provide factual information, not to respond to legal theories or legal arguments.
EXAMINATION BY MR. WILES:
Q You can answer my question.
A I don't understand what you're saying.
Q All right. As you sit here today, do you know of one single piece of paper, one item of evidence which indicates that this lawsuit is barred by the statute of limitations? That is why we're taking this deposition today.
A I feel like that's a legal question and I don't --
Q Well, it's not a legal question if I ask you, are you aware of a single fact which would indicate to you as a layperson that this lawsuit is time barred?
A Oh, do I know that it's time barred? Yes.
Q You know it's time barred?
A Isn't that what this is about? All I know is that we could only go back to

Page 43

1999.
Q Well, can you explain to me what your understanding is?
A That anything before 1999 is not relevant to this case.
Q All right. So what I'm asking you is, have you seen any piece of paper, any document that indicates to you that this lawsuit should have been brought before 17 October, 1999? And if so, bring it to me.
A No.
Q Okay. What I'm going to ask you to do is we're going to stay on Page 11, but I want you to please look at Exhibit 2 to Exhibit 1. That's that 2002 task force.
MR. DISHEROON:
I will object to that. She's not here to testify with regard to that. I believe we objected to it. And she has no personal knowledge regarding the subject matter of our discussion.
MR. WILES:
I'm going to make my record. All right.
EXAMINATION BY MR. WILES:

Page 44

Q Before 7 August, 2002, you were already assigned to the dredging function operations of the Corps, correct?
A Correct.
Q All right. And is it a fair statement that the vast majority of the dredging that you oversaw was in the MR-GO?
A No.
Q All right. Where was most of it done?
A Most of it was in the Mississippi River.
Q Okay. Did you oversee dredging functions, you know, with respect to the MR-GO back in 2000 when you first came into the dredging function division?
A No.
Q None whatsoever?
A I oversaw some contracts, but we didn't do the bulk of the contracts for the MR-GO.
Q All right. So look at Exhibit 2. Have you ever seen that before today, Exhibit 2 to Exhibit 1?
A I thought he objected.

Page 45

Q No, he's not the judge.
A I thought we already talked about that.
MR. DISHEROON:
Yes, she has already answered that question. When you went through the documents, she said she had seen it.
EXAMINATION BY MR. WILES:
Q Have you ever used that in your work here, Exhibit 2?
A Have I ever used that?
MR. DISHEROON:
Could you clarify what you mean by that? Do you mean this notice?
THE WITNESS:
I wouldn't produce a document like this. But I understand what it's for.
EXAMINATION BY MR. WILES:
Q Right. I didn't ask you if you produced it. Is it something that you would employ in any fashion in your work?
MR. DISHEROON:
This particular document?
MR. WILES:
Right on.

Page 46

THE WITNESS:
This is not my -- This is an environmental function that would be done in another office.
EXAMINATION BY MR. WILES:
Q Okay. So what's the answer to the question?
A "No."
Q Okay. Who is the person most knowledgeable at the United States Army Corps of Engineers to testify with respect to this document as well as topic two of the 30(b)(6) Notice?
A Topic two on Page 2?
Q Yes, ma'am.
A I would say Sue Hawes.
Q Who?
A Sue Hawes.
Q How do you spell her name?
A H-A-W-E-S.
Q And is she an employee of the Corps?
A Yes.
Q And what's her job title?
A I don't know exactly what it is,

Page 47

but she's in the environmental group.
Q Is she officed here?
A Yes.
MR. WILES:
Okay. Now, Mr. Disheroon, what I would like to do is I will continue with this witness to find areas where she does have knowledge, but with respect to item 2, she's obviously not the person most knowledgeable, and so I would request that Ms. Hawes come in later on in the day to answer the material.
MR. DISHEROON:
I'm not sure she's available today, but I will state for the record your questions are still very unclear. This witness may be able to provide you with certain information which would dispense with the need for any of this discussion.
MR. WILES:
Well, she just told me she doesn't know anything about it.
MR. DISHEROON:
No, the way you framed your question, you were asking her about this

Page 48

notice. I mean, if you want to know what resulted from this notice, I think she could tell you the answer to that. But she had nothing to do with it.

MR. WILES:

Well, I'm going to reserve my rights to depose Ms. Hawes with respect to item 2 of the 30(b)(6) Notice and item 4 of the 30(b)(5) document request.

MR. DISHEROON:

All right. But let me just state to you for the record that this proposed notice did not ever lead to the production of any document and this proposal was subsequently abandoned. That's what you will find out. But there is no product from it that would be germane to this case, and that's what Ms. Hawes would tell you. But if you want to have her deposition, we will try to schedule it at a later time, but it won't be today.

MR. WILES:

And you have actually not asked her if she's available today, have you?

MR. DISHEROON:

Page 49

We did try to speak with her yesterday and she was not available.

EXAMINATION BY MR. WILES:

Q All right. So let's go to item 5, which is Page 12, if you would, please. This is item 5 of the 30(b)(5) request. And I would ask you to review Exhibit 3 back here.

MR. DISHEROON:

Item 5 is your e-mail?

MR. WILES:

Sir?

MR. DISHEROON:

Item 5 is your e-mail?

MR. WILES:

No. 30(b)(5) document request No. 5.

MR. DISHEROON:

Okay.

MR. WILES:

And Exhibit 3 matches up with that one, Mr. Disheroon.

MR. DISHEROON:

Okay. Just for the record, with regard to this --

Page 50

MR. WILES:

Wait. What's with all these speaking objections?

MR. DISHEROON:

Because of the manner in which you're asking these questions, it's just necessary to protect the position of the government. I need to clarify a position.

I just wanted to state that we have previously provided you with regard to documents with all of the contracts for dredging activities covered during that period of time, so there's no need to produce them again today, and you have acknowledged that. But go ahead and ask her your questions.

MR. WILES:

Well, that has nothing to do with this. I'm talking about -- And you're probably looking on the wrong page, Mr. Disheroon, so I forgive you.

If you look at Page 12 of the notice, which is the 30(b)(5) document production request, all right, I'm asking her about Exhibit 3, which matches up with

Page 51

that.

EXAMINATION BY MR. WILES:

Q Okay. Have you looked at Exhibit 3 to refresh yourself?

A Yes.

MR. WILES:

Was that it, Mr. Disheroon?

MR. DISHEROON:

Okay. I beg your pardon. I was looking at your request.

MR. WILES:

All right. No problem. I will do it to you at one time. I will be on the wrong page, too.

MR. DISHEROON:

Okay.

EXAMINATION BY MR. WILES:

Q The first time you saw this document was not today, right?

A Right.

Q Okay. Now, did you have any involvement in the work that went into the preparation of this report?

A No.

Q Okay. If I wanted to know, if I

Page 52

wanted to speak to the person most knowledgeable about the document request No. 5 and the Exhibit 3 which matches up with that, okay, and which is topic three of the 30(b)(6) Deposition Notice, who should I speak to?
A Probably Troy Constance.
Q Okay. Can you spell that? Troy?
A Troy.
Q Okay. Constance. Okay. And does he work for the Corps?
A Yes.
Q Does he work here?
A Yes.
Q I'm sure he's unavailable, right? Okay. And what's his position?
A He is in the environmental section. I don't know exactly what his position is. He's in project management.
Q Do you know what his background is in terms of, like, is he an engineer?
A Yes, he's an engineer.
Q All right. Do you know which particular discipline?
A He's got a hydraulic background.

Page 53

Q All right. So if I wanted to get the information regarding topic three of the 30(b)(6) Notice and topic five of the 30(b)(5) document request, which matches up with our Exhibit 3, Troy is my man, right?
A Yes.
MR. WILES:
Mr. Disheroon, will you see about producing him today?
MR. DISHEROON:
No. If you will read our letter, we objected to providing any witness with regard to this. We said we would provide you with information regarding the status, and we're willing to do that, but not through a witness.
MR. WILES:
You state in your letter that you will provide me with a witness, presumably today, because that's why we all came here, to provide me with information regarding the current status of the study?
MR. DISHEROON:
No, that's not what it says.
MR. WILES:

Page 54

That's not what it says?
MR. DISHEROON:
No.
MR. WILES:
Okay.
MR. DISHEROON:
It says we will not provide a witness. It says we will provide you with information.
MR. WILES:
Okay. Provide it to me, please.
MR. DISHEROON:
The study has been abandoned. It was not completed. It was overtaken by events.
MR. WILES:
Right. But I don't want to talk to a lawyer. I would like to talk to a person that was involved in it.
MR. DISHEROON:
That's fine.
MR. WILES:
I do that all day.
MR. DISHEROON:
We can find out very quickly that

Page 55

that particular study is no longer going on and never resulted in any products.
MR. WILES:
So Troy could tell me that, right?
MR. DISHEROON:
He could tell you that, but we're not going to provide a witness for that purpose. We don't think your request is legitimate.
MR. WILES:
Okay.
MR. DISHEROON:
And we objected to it.
MR. WILES:
And I reserve my rights on that one as well.
MR. DISHEROON:
All right.
EXAMINATION BY MR. WILES:
Q If you would, please, turn to Page 13. Item 6. And here, as you can see, we want the dredging activity conducted by the Corps, you know, like with the WHEELER or through its contractors in the MR-GO from 17 October, 1999 through the present date.

Page 56

Do you have documents for me today on that?
A No. I did bring the WHEELER information.
Q And that's what we marked as Exhibit 3, right?
A Right. And the other contracting information is going to be with the other documents.
Q Okay.
MR. DISHEROON:
But we have already provided that to you.
MR. WILES:
Oh, not all of them. I found from other sources that my production was incomplete.
MR. DISHEROON:
Well, you have alleged it's incomplete. We have no idea what you're talking about.
EXAMINATION BY MR. WILES:
Q Let me ask you about Exhibit 3. Is this something you wrote in your hand?
A No, my assistant.
Q Who is named?

Page 57

A Jane Brown.
Q Okay. And Jane works here?
A Yes.
Q Okay. That was a stupid question if she's your assistant. Okay. Now, tell me what you were putting together for me, if you will. Please explain that for me.
A This is the historical dredging information from our WHEELER, which is a government dredge.
Q Right. It's the one that the Corps actually owns and operates, right?
A Right. From 1999 through the most recent contract in 2005.
Q Okay. Now, am I to assume that all of that dredging that you have listed on Exhibit 3 is the activity of the WHEELER in the MR-GO?
A Right.
Q Okay. Why is there no dollar amount for 2004?
A She said she couldn't find it. It wasn't available.
Q All right. Do you know if that was an emergency appropriation post

Page 58

Hurricane Ivan?
A I don't think so. Well, it's hard to tell.
Q Well, Ivan was in 2004, right?
A Right.
Q And did it silt in the MR-GO?
A Yes.
Q All right. I mean, it was closed for awhile, wasn't it?
A Right. But I'm not sure if they have different funding sources. You will have your regular funding and emergency funding, so I don't know what the funding source was.
Q All right. I mean, what records would you go to to find out what that dollar amount was?
A Probably consulting the people that are in charge of the WHEELER, which they're in the operations division.
Q Now, counsel opposite said to me earlier in this deposition that all the records are in court, so did your assistant go to court to look at those records and get those numbers?

Page 59

A No, she went to what we call the brown book, which shows all dredging for everything, every project.
Q The brown book is here?
A Yes.
MR. WILES:
All right. I'm just walking into the side of a door again, but would you be so kind as to let us look at the brown book today and question this witness about it? Because she is the operations manager for the dredging function division. That's certainly within her bailiwick. She's here. We're all here. And dredging, as you know, Mr. Disheroon, is one of the big issues.
MR. DISHEROON:
I understand.
Is that agreeable or not that he could look at the brown book?
MR. WILES:
And we could do it after a break later on.
THE WITNESS:
Yes.
MR. DISHEROON:

Page 60

How big is it?
THE WITNESS:
It's not that big. It's just like a binder.
MR. DISHEROON:
Okay.
MR. WILES:
Okay. We will get to that later this afternoon. Okay. Thank you. I appreciate that. I was just about to refuse to ever buy you a drink.
MR. DISHEROON:
Mr. Wiles, I have indicated to you if you could ask her specifically about questions and identify something, we will try to get it for you. I'm just handicapped by hauling all the records off. And again, the real question is whether these documents are germane to your request. Anyway, go ahead.
EXAMINATION BY MR. WILES:
Q No. 7 of the 30(b)(5) document request, here we want to see documentation regarding the identity of the vessels and companies involved in the dredging in the

Page 61

MR-GO from 17 October, 1999 through the present date. Is that going to be in the brown book?
A The companies will. Probably not the vessel. Well, maybe. I don't know if the dredges are indicated or not.
Q Okay.
A But definitely the companies should be in there.
Q The wise man right next to Carlos can figure that out. That's great. So that would be in this same brown book?
A Yes.
Q All right. Document request No. 8. Okay. And my question for you is, one, do you have any documents to produce for me here today pursuant to request No. 8? And that's a "yes" or a "no."
MR. DISHEROON:
For the record, the witness is not here, and we objected to your request, to speak with regard to, other than her responsibilities for maintenance of MR-GO, to speak regarding flood events. That's not part of her work and she's not here to

Page 62

describe those.
MR. WILES:
Read back my question, Jim, and answer it, please.
(Whereupon, the court reporter read back the requested testimony as follows:
THE COURT REPORTER:
Question: "All right. Document request No. 8. Okay. And my question for you is, one, do you have any documents to produce for me here today pursuant to request No. 8? And that's a 'yes' or a 'no.'"
MR. DISHEROON:
Go ahead.
THE WITNESS:
No.
EXAMINATION BY MR. WILES:
Q Okay. Have you looked for any?
A No.
Q Okay. Have you directed anyone to look for any?
A No.
Q If you look at, you know, topic eight of the document request and topic

Page 63

seven of the 30(b)(6) Notice -- Take your time and read No. 7.
A That's the one you just asked me about?
Q Right. No. 8, that's the one on Page 12, so you have read that, right?
A Right.
Q And then if you turn to Page 4.
A What on Page 12 do you want me to read?
Q Read item 8, the one we just talked about, and I asked you if you had anything.
A On Page 13?
Q Yes, ma'am. Sorry. Right. So item 8, you read that?
A Yes.
Q Okay. And I would ask you to turn to Page 4 and read topic seven of the 30(b)(6) Notice, and tell me when you're finished with that.
A (Reviewing document).
Q Have you finished reading No. 7?
A Yes.
Q All right. Now, limiting my

Page 64

inquiry to persons at the Corps, are you the person most knowledgeable as to topic seven?
A No.
Q Who would be? If you wanted to find out these things, whose door would you go knock on?
A I would say Nancy Powell.
Q Okay. And Nancy works here in this office?
A Yes.
Q Okay. What's her position?
A She's the chief of hydraulics branch in engineering division.
MR. WILES:
All right. I'm just going to take a fly, Mr. Disheroon. Can we talk to Ms. Powell today?
MR. DISHEROON:
No. You will notice I have objected to that.
MR. WILES:
We will reserve on that as well. Okay.
MR. DISHEROON:
Okay.

Page 65

EXAMINATION BY MR. WILES:
Q All right. Let's go back to Page 13, if you will. All right. Do you have any documents to produce for me here today responsive to request nine?
A No.
Q Have you looked for them?
A No.
Q If you wanted to go find -- Have you asked anybody else to look for them?
A No.
Q If you wanted to go find documents responsive to No. 9 here in the office, who would you go talk to?
A Nancy Powell.
MR. WILES:
Okay. And just for the record, Mr. Disheroon --
MR. DISHEROON:
If you want to go off the record here a second.
MR. WILES:
Sure, if you would like to.
(Discussion off the record.)
MR. WILES:

Page 66

Let's go back on.
EXAMINATION BY MR. WILES:
Q If we go to Page 14 now, please. I guess we're probably there. All right. Document request 10, do you have documentation to produce for me regarding request No. 10?
A No.
Q Have you looked for same?
A No.
Q Have you directed anyone to look for same?
A No.
Q All right. If you will be so kind as to turn to Page 6 and look at item 9 at the bottom of Page 6. Do you have any knowledge of that topic, topic nine of the 30(b)(6) Notice?
A No.
Q If you wanted to find that information here at the Corps, who would you go talk to?
A Nancy Powell.
Q Okay. Since you have been involved in the dredging function -- Can I

Page 67

call it the dredging function division? Would that be accurate?
A No, it's operations division.
Q All right.
A Dredging function was a part of operations division I worked in before I became the manager.
Q All right. So it's operations, but your bailiwick is dredging, correct?
A Yes.
Q All right. Do you know who Mr. Boe is, B-O-E?
A Richard Boe?
Q Yes.
A Yes.
Q Who is he?
A He is in project management in the environmental group.
Q Here in New Orleans?
A Yes.
Q Officed here?
A Yes.
Q Okay. Do you, in fact, know that Mr. Boe is the author of that Exhibit 2 that we were talking about before?

Page 68

A I didn't know that.
MR. WILES:
Since he is the author of that, Mr. Disheroon, may we speak to Mr. Boe today?
MR. DISHEROON:
No.
MR. WILES:
Okay. We will reserve our rights on that as well.
MR. DISHEROON:
Now, you're asking for today. I'm saying no, not today.
MR. WILES:
Are you saying tomorrow?
MR. DISHEROON:
No, I'm not saying anything beyond that. We won't produce him today.
MR. WILES:
A boy can only dream.
EXAMINATION BY MR. WILES:
Q All right. Let's go back to Page 14. We got this process down.
A Yes.
Q All right. Well, let me ask you a



question before you go to that. Since you're in charge of -- You know, you're the operations manager for dredging in the MR-GO; is that a fair statement?
A Yes.
Q All right. When you would have tropical cyclonic storms that would pass through the area, would that be a silting problem that would be something you would have to react to?
A Normally. It depends on the storm, the direction.
Q Okay.
A But, yes.
Q I don't mean like if one hits the east coast. I'm talking about storms that pass in close enough proximity to the MR-GO to cause silting problems, that would be something that you would have to be involved with with fixing that situation, correct?
A Like are you saying right now or just generally speaking in theory?
Q Let's say today.
A Today? I couldn't do anything about it because of the situation with the



MR-GO.
Q Now, what is the situation with the MR-GO?
A Right now we're not being funded to dredge it. Congress isn't funding us to dredge it.
Q Why not?
A Because of, I guess, the pending actions with the study to close the MR-GO.
Q Has there been a decision made by Congress to close the MR-GO?
A No.
Q All right. You said there's a study ongoing. Who's doing that?
A Greg Miller.
Q Okay. Now, who is Mr. Miller?
A He's the project manager for the study.
Q Okay. A Corps of Engineers employee?
A Yes.
Q Officed here?
A Yes.
MR. WILES:
Not today, right, Mr. Disheroon?



MR. DISHEROON:
Not today.
MR. WILES:
Okay.
EXAMINATION BY MR. WILES:
Q And you have been in the operations, the dredging section of the operations division since right around 2000, right?
A Right.
Q The study that -- Mr. Miller, was that his name?
MR. ZELAYA:
Yes, Greg Miller.
EXAMINATION BY MR. WILES:
Q The study that Mr. Miller is running point on, when did that begin?
A It began after Katrina.
Q Okay. Why?
A Because Congress allowed funding for a study, authorized a study.
Q Okay. But you as an operations person, you know, in the dredging division, what was your understanding in your job as to what was to be studied and why this study

was taking place?
A What was to be studied? Just, I guess, the MR-GO, the navigation effects on the MR-GO. And why? Because Congress authorized us to do it.
Q I mean, this is your job, that you deal with the dredging of the MR-GO as part of your work in the operations division, correct?
A Correct.
Q All right. Now, did you have no understanding at all as to why Congress wanted to look at this or did you have some understanding? And if so, please tell me what it is.
MR. DISHEROON:
For the record, let me object, because it's not possible for this witness within her personal knowledge to speak to what Congress wanted or did. She can only speak to what Congress said to the extent that she's aware of it.
MR. WILES:
I will have Jim read the question back.

Page 73

(Whereupon, the court reporter read back the requested testimony as follows:
THE COURT REPORTER:
Question: "All right. Now, did you have no understanding at all as to why Congress wanted to look at this or did you have some understanding? And if so, please tell me what it is."
EXAMINATION BY MR. WILES:
Q In the course of your work, take Congress out of it, you know, except for the fact that Congress wanted a study, okay, please explain to me exactly what they wanted studied.
A Okay. They wanted a study of the effects to navigation, the possibility of closing the MR-GO, how would that affect navigation, what would it do to the ecosystem, how would you close it.
Q And have you been helping Greg Miller with this project?
A I have been providing information to him.
Q Okay. So this obviously started sometime after 29 August, 2005. Do you

Page 74

remember when you guys started working on this?
A Well, it was when it was authorized under, I believe -- I'm not sure if it was the third or fourth supplemental in 2006.
Q Third or fourth supplemental what?
A Congressional appropriation.
Q All right. So early 2006, late 2006?
A It was early 2006. Probably about March, I believe.
Q Yes, because that's getting close to vacation time for Congress. Okay.
MR. ZELAYA:
For purposes of clarification, are you talking fiscal year 2006 or annual 2006?
THE WITNESS:
Annual 2006. And it was allocated in fiscal year 2006.
MR. WILES:
That's a D.C. boy asking that.
EXAMINATION BY MR. WILES:
Q And who else is on that task -- Well, I will call it a working group. Who

Page 75

else is on that working group besides you and Greg?
A They have someone in the engineering division. Do you want names?
Q Sure.
A Okay.
Q We want the names.
A Rick Broussard, Sue Hawes.
Q H-A-W-E-S?
A Yes. Angie Minton.
Q M-I-N-T-O-N?
A Yes.
MR. ZELAYA:
What was the first name?
MR. WILES:
Rick Broussard.
THE WITNESS:
Rick Broussard.
MR. ZELAYA:
No, of Mr. Minton. I'm sorry.
THE WITNESS:
Angie. Angela Minton, M-I-N-T-O-N. I think Bill Klein, K-L-E-I-N. I think Sean Mikel, M-I-K-E-L.
EXAMINATION BY MR. WILES:

Page 76

Q Who among those people are not engineers?
A Sue Hawes isn't an engineer. Greg Miller is not. Sean is not.
Q And Sue --
A Oh, Angie Minton is not.
Q Sue, Greg, Sean and Angie, what are their particular disciplines?
A They're biology, environmental types. I'm not sure about Angie.
Q All right. And you're working on this group, right?
A Right.
Q Okay. Are you examining the problems attendant to the MR-GO providing a pathway for storm surge?
MR. DISHEROON:
Object to the question.
MR. WILES:
On what basis?
MR. DISHEROON:
You're assuming facts not in evidence.
MR. WILES:
All right. Nobody made evidence

Page 77

yet, because the judge hasn't made any yet.
MR. DISHEROON:
I still object, and you're also assuming facts that are not supported.
EXAMINATION BY MR. WILES:
Q Well, let me just ask the question. Is this study group examining whether or not the MR-GO as it currently exists poses a threat of increased storm surge into St. Bernard Parish; yes or no?
A No.
Q Okay. Why not?
A That's not what we were authorized to do by Congress.
Q All right. Do you all have a specific mandate that was given to you?
A Yes.
Q And can you tell me, describe it for me, tell me what it is?
A It's in the Congressional appropriation for 2006, the third supplemental.
Q And you got a copy of that here, don't you?
A Yes.

Page 78

Q And I would assume Greg's working papers are here, right?
A Yes.
MR. WILES:
I would like to have those produced to me, because obviously --
MR. DISHEROON:
The Congressional authorization?
MR. WILES:
Sir?
MR. DISHEROON:
The Congressional authorization, that's what you want?
MR. WILES:
That and the working papers of the group pursuant to that.
MR. DISHEROON:
No. We will give you the authorization. That's a work still in progress. It's an internal Corps process. It is privileged and not made available to the public yet, and we will not give it to you. But we will provide you with the authorization for what they have been directed to do.

Page 79

MR. WILES:
Okay. Can we dispatch someone to get that for us?
MR. DISHEROON:
How easy would that be to do?
THE WITNESS:
That wouldn't be too hard.
MR. DISHEROON:
Do you have it?
MS. LABOURDETTE:
I don't have it. Should I ask Jane to get it?
MR. WILES:
Ask Greg.
THE WITNESS:
Jane could get her hands on it. Greg could.
MR. WILES:
Greg carries it around in his pocket.
THE WITNESS:
I think Greg could grab it.
MS. LABOURDETTE:
Okay.
MR. DISHEROON:

Page 80

Let's go off the record.
(Discussion off the record.)
MR. WILES:
Back on.
EXAMINATION BY MR. WILES:
Q What environmental issues are you examining?
MR. DISHEROON:
Again, I object to the use of the term "you."
EXAMINATION BY MR. WILES:
Q What environmental issues are the study group that you and I have defined so we can speak to each other, what environmental issues is this study group examining?
A I guess the effects of the MR-GO. It's really the effects of the closure, how that would affect the environment. It's just focused on the closure.
Q Is there any study on what the effects have been in recent years, so you will have a point of reference? You know, it's at situation "A," and if you're going to determine how the closure would affect

Page 81

it, you have to, you know, you want to learn how it's going to learn how it's going to change situation "A," right?
A Yes.
Q So that's part and parcel of your work, correct?
A Correct.
Q All right. Is the encroachment of waters with a higher saline content and its effect on wetlands, specifically the vegetation of wetlands, is that part and parcel of this current study?
A No. It's done around the closure and what effects that would have on the ecosystem.
Q Right. Are the plants, are the aquatic plants part of the ecosystem?
A Yes.
Q All right. Are you all ignoring those or are you studying those?
A I'm sure that's part of it. That's not my area of expertise.
Q Okay. That would be -- What was that lady's name?
A Sue Hawes.

Page 82

Q Right. Do you know what degrees Sue has? Is she a biologist?
A I'm not sure.
Q Is part of the study group's focus upon rebuilding the wetlands in the area of the MR-GO if it's closed?
A No.
Q Why not?
MR. DISHEROON:
Objection. That's not a proper question.
MR. WILES:
Well, she can answer.
MR. DISHEROON:
No, she can't answer. You're asking why Congress --
MR. WILES:
I'm not asking why Congress did anything. I just asked her, "Why not?"
MR. DISHEROON:
She's not an expert on that. Don't answer the question.
MR. WILES:
So you're instructing the witness not to answer a follow-up question?

Page 83

MR. DISHEROON:
I'm instructing her not to answer the question you asked.
MR. WILES:
All right. I'm going to reserve my rights on that one as well.
EXAMINATION BY MR. WILES:
Q Who told you not to study that?
A Nobody.
Q Did the study group just decide they weren't going to study that on their own?
A No.
Q Okay. Does this make sense to you?
MR. DISHEROON:
Objection. Don't answer it.
EXAMINATION BY MR. WILES:
Q Why?
MR. DISHEROON:
Don't answer that either. Her personal opinions have no relevance in this case. You're asking her to make an assumption as to why something didn't happen. It's not a proper question. I ask

Page 84

you to move on to something else.
MR. WILES:
I'm asking her for her personal, you know --
MR. DISHEROON:
She's not here to provide her personal opinion on matters that are not within her area of responsibility, and you are way beyond that.
MR. WILES:
She's working on the project.
MR. DISHEROON:
On specific aspects of the project.
EXAMINATION BY MR. WILES:
Q Please tell me which specific aspects of this project you are working on and which ones you are not working on.
A I'm familiar with the channel, with the authorizations of the channel. I'm just providing navigation information.
Q Now, what do you mean, "providing navigation information"?
A Historical authorizations and just industry information.

Page 85

Q Are you talking about like usage?
A Yes.
Q Okay. Anything else?
A Just I provide information within the purview of my function as operations manager.
Q Right. As operations manager for the dredging function of the MR-GO, did the Corps do cross-section analyses throughout the channel?
A Do we do surveys?
Q Yes, ma'am.
A Yes.
Q Okay. And are you all still doing them?
A Yes.
Q Okay. Why are you all still doing them if you're not dredging?
A It's still an authorized waterway.
Q Okay. So what is the purpose of surveying it?
A We still have navigation.
Q Okay. You still have some vessel traffic, right?
A Yes.

Page 86

Q Are you still dredging it?
A No.
Q When did dredging cease in the MR-GO?
A There has been no dredging since before Katrina. Since Katrina.
Q All right. Like within a week or so before Katrina, something like that?
A It was probably pretty recent. I think the WHEELER was out there in 2005.
Q Okay. You were in the operations division, dredging function. I can't find a good way to say that. What would be an easy way for you and I to talk about that?
A Now? Now I'm manager.
Q Right. In 2002, do you recall there being problems with Hurricane Lili silting in the channel?
A I really wasn't involved with the MR-GO at the time.
Q All right. Well, in 2002, what dredging function were you involved in?
A I had the Atchafalaya River and Saltwater Barrier Sill and some other small projects.

Page 87

Q Do you remember Hurricane Lili causing problems with silting in the Atchafalaya River in 2002?
A No.
Q Let me go through some more of the documents for a minute. If we could, go to Page 14, please. All right. Do you have any documents responsive to item 11 for me today?
A No.
Q Who would be the person here at the Corps who could tell me about that?
A I'm sure you could find all that in the records that are held on Poydras in the Texaco building.
Q Who would be the person who could talk to me about this topic? If you wanted to know, who would you go ask?
A I mean, contracting division or construction division.
Q And the people in charge of those divisions are named what?
A Jim Barr is contracting and Bruce Terrell is construction.
Q Are they officed here?

Page 88

A Yes.
Q Okay.
A But these documents are not here right now.
Q You know that how? You went and looked for them?
A Well, because everybody had to produce their documents. I mean, we don't have -- We had contracts, we had old contracts that we kept, we maintained as well, and we sent them off.
Q Did you make copies of anything?
A No. We were told that we would get them back. We didn't make copies.
Q And to satisfy the obligations of the Corps to produce these documents at the time of this deposition, are you aware of anyone making any efforts to get these documents and bring them here?
MR. DISHEROON:
I object to your statement. We don't recognize any obligation on behalf of the Corps to produce them at this time. We have objected to most of these. In addition, we have explained to you that

Page 89

they're not currently available, but that we will make an effort to obtain them for you. So I object to your legal characterization.
MR. WILES:
That's not true. You could go over there and get them.
MR. DISHEROON:
My understanding is that you can't just go over there and get them. You have to have the appropriate access, but we will work with you to insure that you get it. People can't just walk in off the street and say, "Let me look at these documents." They're under court control or under someone's control.
MR. WILES:
And heaven forbid the people of the United States get to look at public documents in a public court of law. All right.
EXAMINATION BY MR. WILES:
Q If you would, turn to Page 7 and look at topic 11. If I wanted to speak to persons, the person most knowledgeable at Corps with respect to this topic, it would

Page 90

be those two fellows you just mentioned?
A Yes.
Q Jim Barr and Bruce Terrell; is that correct?
A Yes. And design documents would come out of the engineering chief, Walter Baumy.
Q How do you spell Walter's last name?
A B-A-U-M-Y.
Q He's officed here as well?
A Yes.
MR. WILES:
Not today, right, Mr. Disheroon? Just for the record, not today, right?
MR. DISHEROON:
Not today.
MR. WILES:
All right.
MR. DISHEROON:
Probably not ever.
EXAMINATION BY MR. WILES:
Q Do you have any documents responsive to the request for production No. 12, and that's on Page 14?

Page 91

A No.
Q All right. Do you have any documents responsive to the request numbered 13?
MR. DISHEROON:
Note for the record that we objected to this, because we don't think there's any relevance at all to this statute of limitations issue, which you're supposed to be limiting your question to, but you're obviously not.
MR. WILES:
Well, that's your interpretation. I have a very distinct reason for asking that related to 2501.
EXAMINATION BY MR. WILES:
Q Do you have any documents; yes or no, ma'am?
A No.
Q Did you look for them?
A No.
Q Did you ask anybody to look for them?
A No.
Q The same question with respect to

Page 92

No. 14. Do you have any documents? Did you ask anybody to look for them?
A No.
Q Okay. Document request 15, the same questions.
A No.
Q The same question with respect to --
MR. WILES:
So, Mr. Disheroon, 16, I guess, is directed to you. You made some sort of assertion of privilege, which wasn't clearly specified, but item 16 does ask for production of a privileged log with respect to documents which you are refusing to produce on the basis of privilege. Are you willing to voluntarily prepare a privilege log for me?
MR. DISHEROON:
No.
MR. WILES:
Okay.
MR. DISHEROON:
You asked us to do that. We have objected to that entire request.

Page 93

EXAMINATION BY MR. WILES:
Q Okay. Item 17, we're on Page 16 now. Do you have any documents responsive to 17?
MR. DISHEROON:
What page are you on?
MR. WILES:
16. 16, Mr. Disheroon.
THE WITNESS:
I don't understand that question.
EXAMINATION BY MR. WILES:
Q Do you have any documents responsive to that?
A I don't understand what they're looking for here.
Q Well, all I want to know is whether or not you have documents to produce for me pursuant to 17?
A Since I don't understand -- I mean, I don't --
Q Did you go look for documents responsive to No. 17?
A No. No.
Q Did you ask Mr. Disheroon to explain to you what No. 17 meant?

Page 94

A No.
Q You have done nothing, right?
A Right.
Q All right. 18, the same questions. Have you looked for any documents responsive to this, and if so, do you have them to produce to me today?
A I looked at that article, but I don't have anything to produce, no.
Q Okay. Let's go to the 30(b)(6) topics. All right. The first page. Tell me each and every fact of which you are aware which indicates that this case, Exhibit 6, is time barred. Just facts which would give rise to that.
A Exhibit 6?
Q That's the lawsuit. Yes, ma'am.
A So say that again. What is your question?
MR. WILES:
He will read it back for you.
(Whereupon, the court reporter read back the requested testimony as follows:
THE COURT REPORTER:
Question: "Okay. Let's go to the

Page 95

30(b)(6) topics. All right. The first page. Tell me each and every fact of which you are aware which indicates that this case, Exhibit 6, is time barred. Just facts which would give rise to that."
THE WITNESS:
Well, there were a lot of references to, I believe, 1999 to present.
EXAMINATION BY MR. WILES:
Q And?
A So that's how I knew it was time barred.
Q You think this case is time barred?
A I don't -- When you say "time barred," I think that it has something to do with -- It's focusing on everything from '99 to present. If that's what you mean by "time barred," that's kind of what I'm understanding that it's about.
Q All right. "Time barred" means we brought our lawsuit too late.
A Okay.
Q We filed our lawsuit six weeks after Hurricane Katrina.

Page 96

A All right.
Q All right. Are you aware of anything that indicates that we brought this lawsuit too late, any facts?
A That sounds like a legal question. How can I answer that?
Q I'm asking if you're aware of anything?
A No.
Q So you are not the person most knowledgeable as to topic one, correct?
A Correct.
Q All right. Who would be?
MR. DISHEROON:
Well, I will object to that. I will object to your question. She has the information regarding facts that will be adduced in court, but the way you're asking your question, you're not getting to those facts. You're just asking her "what facts"?
EXAMINATION BY MR. WILES:
Q What facts are you aware of that Mr. Disheroon is talking about?
A I don't know what you're saying. Can you change the question?

Page 97

Q Well, no. He just said you know some facts that you're not telling me. I'm asking you to tell me.
A About what?
Q About what we were just talking about, whether or not this case is time barred.
A I told you that sounds like a legal question.
Q All right. And you are speaking for the Corps today. You are their representative. You bind them by what you say. All right. As you sit here today, can you specify one fact which would indicate to you that this lawsuit was filed too late?
A I can't answer that question.
Q So is the answer "yes," you know some facts or "no," you don't?
A No, I don't know facts.
Q Okay. Topic two, which would be on Page 2. You already told me that you were aware that Hurricane Ivan was a problem with silting in the MR-GO, correct?
A Correct.
Q Are you aware that Hurricane Ivan

Page 98

flooded portions of St. Bernard Parish through the MR-GO?
A No.
Q All right. If I wanted to talk to the person at the Corps who could tell me that, who would it be?
MR. DISHEROON:
Objection. You're assuming facts not in evidence.
EXAMINATION BY MR. WILES:
Q You can answer my question.
A Do I have to answer?
Q Yes, you do.
MR. DISHEROON:
Well, if you understand the question. If you don't understand the question, tell him.
THE WITNESS:
Okay. Someone in hydraulics, so Nancy Powell.
EXAMINATION BY MR. WILES:
Q Was Hurricane Cindy in 2005 a silting problem in the MR-GO?
A I don't know.
Q Were you not working there then?

Page 99

A I was not working for MR-GO. I wasn't the manager.
Q In June of 2005, what was your job? What were you focused on in your work here?
A I was in dredging function.
Q Right, right. And we can draw the circle and walk around it all day. I'm asking you, what exactly were you doing? Were you in charge of dredging function in Bayou La Loutre?
A No.
Q Of course not, right?
A Right.
Q Okay. Dredging function of what?
A Whatever projects were assigned to me. And I didn't work on the MR-GO in Hurricane Cindy, so I don't even know if there was a contract there. I didn't work on it.
Q But you did for Ivan in 2004, right?
A No.
Q Who did?
A I don't think so. Well, these

Page 100

contracts go out in engineering division as well, so we produce -- we usually put out contingency contracts.
Q "We" who, the dredging division?
A Dredging function, right.
Q And what is a contingency contract?
A That's a contract that we have advertised just in case it's needed.
Q Is there one right now pending somewhere like just in case it's needed?
A No, not for the MR-GO.
Q Okay. Why not? It's hurricane season.
A Because we're not funded for dredging.
Q Okay. So if the MR-GO gets silted in from a storm this summer, it's just going to stay that way?
A Unless Congress tells us otherwise or funds us otherwise.
Q All right. Are you aware of the flooding caused in St. Bernard Parish via the MR-GO from the passage of Hurricane Rita?

Page 101

MR. DISHEROON:
Objection to the assumptions in your question.
EXAMINATION BY MR. WILES:
Q You can answer it.
A No.
Q You're not the person most knowledgeable to answer topic two, are you?
A No.
Q All right. Who should I go talk to about that?
A Sue Hawes.
Q All right. What about Casey Clark?
A He's a dredging guy. He's chief of dredging function.
Q Okay. I mean, a lot of this is asking me about dredging, so Casey Clark would be able to help me, right?
A Well, he's only -- His jurisdiction is only in operations division, so he doesn't handle all the dredging contracts. We also do them in engineering division as well.
Q Does he know anything about the

Page 102

dredging that goes on?
A Yes.
Q All right. He's the head of dredging, right?
A But he's not the head of all the dredging that goes on in New Orleans district. Only what comes out of operations division.
Q Okay. And does MR-GO dredging come out of operations division?
A We do some contracts.
Q All right. Which other divisions do the balance of the MR-GO dredging operations?
A Engineering division.
Q All right. And who's that person there? Who's the head person in engineering that deals with dredging?
A Keith O'Cain.
Q How do you spell Keith's last name?
A O capital C-A-I-N.
Q He's officed here?
A Yes.
Q Look at topic three for me,

Page 103

please.
A (Reviewing document). Okay.
Q All right. Are you the person most knowledgeable to answer the inquiries here?
A No.
Q Who would that be?
A I guess Troy Constance.
Q Okay. I want to give you an exhibit that I'm going to mark as Exhibit 8, and it's a 24 September, 2004 U.S. Army Corps of Engineers News Release, which indicates that John Hall is the contact person. Okay. I ask you if you have seen this before?
A I haven't seen this before.
Q Now, doesn't that talk about the reopening of the MR-GO post Ivan?
A I didn't read the whole thing. Do you want me to?
Q Yes, I would love for you to. And tell me when you're finished.
A (Reviewing document). Okay.
Q Who is that contact person? Are you familiar with him?

Page 104

A You mean the author? John Hall? Yes.
Q What is John's job?
A He's in PAO.
Q PAO?
A Public affairs office.
Q All right. I give you a document, which I'm going to mark as Exhibit 9, and it was actually Exhibit 3 to the notice, and tell me if you had any involvement in that project.
A No.
Q Did you read it when it came out?
A No.
Q Why not?
A I haven't seen it. It was not provided to me.
Q As of 2004, when that report came out, were you aware of the fact that public officials and residents of St. Bernard Parish believed that the MR-GO was a threat to their safety?
MR. DISHEROON:
I object to the form of your question. She can answer it if she's able.

Page 105

THE WITNESS:
Can you say that again?
MR. WILES:
Jim can.
(Whereupon, the court reporter read back the requested testimony as follows:
THE COURT REPORTER:
Question: "As of 2004, when that report came out, were you aware of the fact that public officials and residents of St. Bernard Parish believed that the MR-GO was a threat to their safety?"
THE WITNESS:
The way that question is phrased, I have to say no.
EXAMINATION BY MR. WILES:
Q All right. Tell me what you understood at that time.
A I understood there was controversy. I don't think it was a blanket opinion, but I understood that there was controversy with the MR-GO.
Q All right. As of the time Exhibit 9 came out, were you aware that some public officials in St. Bernard Parish and some residents of St. Bernard Parish believed that the MR-GO posed a threat to their safety?
A Yes.
Q Are you aware of any activity undertaken by the Corps prior to 29 August, 2005 to address those concerns?
A Yes.
Q Tell me what they were.
A I just know that there were several reports and studies that I wasn't involved in.
Q All right. And what was being studied?
A I really wasn't involved in it, but just the MR-GO in general.
Q Was it this particular issue you and I are talking about right now, in other words, that some of these people thought it was a safety hazard?
A I don't know. I think it was more focused on ecosystem.
Q Well, I'm asking you what you know. You're an engineer. You're involved in the dredging of the MR-GO. All right. You are the operations manager for the MR-GO. Okay. Are you aware that salt water intrusion causes wetland loss in that area?
A Yes.
Q All right. Do you have an understanding of how much wetland loss has occurred in the portion of St. Bernard Parish traversed by the MR-GO since you were assigned to the dredging function division?
A That's only been a year to year and a half, so I'm not aware of what has occurred in that time.
Q So you had nothing to do with the MR-GO before Katrina?
A No, I worked on some of those contingency contracts before.
Q All right. And explain to me what a contingency contract is.
A It's a contract for hopper dredges and it's a rental contract. Generally, the Corps prefers to use a cubic yard contract. Engineering division produces those contracts. But we also have it as another tool, just another tool to use.
Q Right. And the contingency for

Page 108

what is kind of where I'm confused?
A It's just for the operations manager. You know, I would say usually, generally speaking, you would use a contingency contract when the quantities aren't well-defined or there's something with the scope of work that's not totally defined, so you would pay by the hour as opposed to paying by the cubic yard.
Q Is this just a problem with somebody not writing the contract right in the first instance, and the contingency things, are these remedial?
A No, it's just another way to issue, write a contract. It's just a different way to pay the contractor.
Q Okay. Is the term "contingency," is that just throwing me off?
A Well, we call it contingency because we might have several contracts advertised, ready for quick response, because the normal response is like it takes about 45 days to advertise a contract and everything. So we just have these ready to go in case, you know, something happens, you

Page 109

need to respond quickly.
Q And you have a lot of experience with that, right?
A Uh-huh (affirmative response).
Q Is that a "yes"?
A Yes.
Q Are you the person at the Corps of Engineers most knowledgeable to testify as to topic four of the notice? And we're on Page 4.
A (Reviewing document.) No, I wouldn't be.
Q Who would be?
A I guess Troy Constance.
Q Okay. Why do you say that?
A Well, it's dealing with coastal restoration.
Q Is the MR-GO a problem with coastal erosion?
A I don't -- No, not that I know of.
Q That's the first time you have ever heard of that?
A Well, you're talking about the coast, and it's an inland waterway.
Q Let's mark our little map here.

Page 110

Well, let me take care of this first. I'm going to give you Exhibit 10, which was attached to the Notice of 30(b)(6) Deposition, which you were supposed to see ahead of time, and that article discusses wetlands loss attributed to the MR-GO.
Are you telling me that in your job at the Corps in 18 years, you have never heard that the MR-GO is a cause of wetlands loss in Louisiana?
A Well, you just said coastal erosion, and plus this isn't my area of expertise.
Q That's not what I asked you. I'm asking you -- You're a smart, educated person. You're an engineer. I mean, is this news to you? Have you ever heard this before?
MR. DISHEROON:
Excuse me. Will you clarify what the "this" is? I have no idea what you're asking.
EXAMINATION BY MR. WILES:
Q That the MR-GO is contributory to wetlands loss in southeast Louisiana?

Page 111

A Well, that's a different question. So am I aware that it is?
Q Yes, ma'am.
A Yes.
Q All right. And are you similarly aware that that wetlands loss makes portions of St. Bernard Parish more susceptible to flooding from weather events?
A No. No. I mean, the studies are not in agreement on that.
Q Which studies are those? And I ask you to specify them for me.
A Well, in IPET, I understand that there have been models that are inconclusive as far as what the actual reduction of storm surge that wetlands play.
Q Now, IPET, that's a self-authored study by the Corps, correct?
MR. DISHEROON:
Objection.
EXAMINATION BY MR. WILES:
Q Right?
A I think it was several groups. I don't think it was just the Corps. I could be mistaken.

Page 112