**MOTION AND INCORPORATED MEMORANDUM**

**EXHIBIT 3**

IN THE UNITED STATES COURT
OF FEDERAL CLAIMS

ROCCO TOMMASEO, ET AL

1:05-CV-1119 SGB

VERSUS

THE UNITED STATES

Deposition of BRAD ROBIN, 8007 East St. Bernard Highway, St. Bernard, Louisiana 70085, taken in the offices of F. Gerald Maples, P.A., 902 Julia Street, New Orleans, Louisiana 70113, on Friday, the 24th of August, 2007.

APPEARANCES:

F. GERALD MAPLES, P.A.
(By: Carlos A. Zelaya, II, Esq. and
Stephen M. Wiles, Esq.)
902 Julia Street
New Orleans, Louisiana 70113
ATTORNEYS FOR PLAINTIFFS

U.S. DEPARTMENT OF JUSTICE
Environment & Natural Resources Division
(By: Fred R. Disheroon, Esq.)
Post Office Box 7397
Washington, D.C. 20044-7397

ATTORNEYS FOR DEFENDANTS

APPEARANCES CONTINUED:

ALSO PRESENT:

Michael Caracciola, Videographer

REPORTED BY:

GRETCHEN ALEXANDER, CCR, RPR

CERTIFIED COURT REPORTER

* * *

EXAMINATION INDEX


| | Page |
|---|---|
| EXAMINATION BY MR. ZELAYA ......... | 10 |
| EXAMINATION BY MR. DISHEROON ...... | 83 |
| EXAMINATION BY MR. ZELAYA ......... | 89 |


* * *

INDEX OF EXHIBITS


| | Page |
|---|---|
| Exhibit No. 1 .................... | 35 |
| FEMA Louisiana Hurricane Katrina Surge Inundation and Advisory Base Flood Elevation Map Panel Index, St. Bernard Parish | |
| Exhibit No. 2 .................... | 42 |
| FEMA Map No. LA-BB40 | |
| Exhibit No. 3 .................... | 44 |
| FEMA Map No. LA-AA40 | |

Exhibit No. 4 .................... 46
FEMA Map No. LA-AA41
Exhibit No. 5 .................... 47
FEMA Map No. LA-AA42
Exhibit No. 6 .................... 48
FEMA Map No. LA-Z40
Exhibit No. 7 .................... 48
FEMA Map No. LA-Z41
Exhibit No. 8 .................... 48
FEMA Map No. LA-Z42
Exhibit No. 9 .................... 49
FEMA Map No. LA-Z43
Exhibit No. 10 ................... 49
FEMA Map No. LA-Z44
Exhibit No. 11 ................... 49
FEMA Map No. LA-Z44
Exhibit No. 12 ................... 50
FEMA Map No. LA-Y42
Exhibit No. 13 ................... 50
FEMA Map No. LA-X41
Exhibit No. 14 ................... 51
FEMA Map No. LA-X45
Exhibit No. 15 ................... 51
FEMA Map No. LA-BB36

Exhibit No. 16 .................. 51
FEMA Map No. LA-Z37
Exhibit No. 17 .................. 51
FEMA Map No. LA-Z38
Exhibit No. 18 .................. 52
FEMA Map No. LA-Z39
Exhibit No. 19 .................. 52
FEMA Map No. LA-AA37
Exhibit No. 20 .................. 52
FEMA Map No. LA-AA38
Exhibit No. 21 .................. 52
FEMA Map No. LA-AA39
Exhibit No. 22 .................. 52
FEMA Map No. LA-BB37
Exhibit No. 23 .................. 52
FEMA Map No. LA-BB37
Exhibit No. 24 .................. 52
FEMA Map No. LA-BB38
Exhibit No. 25 .................. 52
FEMA Map No. LA-BB39
Exhibit No. 26 .................. 52
FEMA Map No. LA-CC39
Exhibit No. 27 .................. 53
FEMA Map No. LA-CC38

Exhibit No. 28 .................. 53
FEMA Map No. LA-CC37
Exhibit No. 29 .................. 53
FEMA Map No. LA-CC36
Exhibit No. 30 .................. 53
FEMA Map No. LA-CC34
Exhibit No. 31 .................. 53
FEMA Map No. LA-CC33
Exhibit No. 32 .................. 53
FEMA Map No. LA-DD37
Exhibit No. 33 .................. 53
FEMA Map No. LA-DD36
Exhibit No. 34 .................. 53
FEMA Map No. LA-DD35
Exhibit No. 35 .................. 53
FEMA Map No. LA-DD34
Exhibit No. 36 .................. 53
FEMA Map No. LA-DD33
Exhibit No. 37 .................. 60
St. Bernard Parish Clerk of Court property transfer document No. 441064
Exhibit No. 38 .................. 62
St. Bernard Parish Clerk of Court property transfer document No. 441067

Exhibit No. 39 .................. 64
St. Bernard Parish Clerk of Court property transfer document No. 441070
Exhibit No. 40 .................. 65
St. Bernard Parish Clerk of Court property transfer document No. 441073
Exhibit No. 41 .................. 67
St. Bernard Parish property sale document
Exhibit No. 42 .................. 69
Tax Assessor's Office printout for 2324 Florissant
Exhibit No. 43 .................. 70
Tax Assessor's Office printout for 8007 E. St. Bernard Hwy.
Exhibit No. 44 .................. 71
Tax Assessor's Office printout for 2324 Florissant
Exhibit No. 45 .................. 71
Tax Assessor's Office printout for 2324 Florissant
Exhibit No. 46 .................. 71
Tax Assessor's Office printout for 2324 Florissant

Exhibit No. 47 .................. 72
Tax Assessor's Office printout for 2324
Florissant
Exhibit No. 48 .................. 72
Act of Sale and Assumption, Vic Molero
Seafood, Inc. to Brad Robin, et als

S T I P U L A T I O N

It is stipulated and agreed by and between counsel for the parties hereto that the deposition of the aforementioned witness is hereby being taken for all purposes allowed under the Federal Rules of Civil Procedure, in accordance with law, pursuant to notice;

That the formalities of reading and signing are specifically not waived;

That the formalities of sealing, certification and filing are specifically waived;

That all objections, save those as to the form of the question and the responsiveness of the answer, are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence.

* * * *

GRETCHEN ALEXANDER, Certified Court Reporter in and for the State of Louisiana, officiated in administering the oath to the witness.

* * * *

THE VIDEOGRAPHER:

Today is the 23rd day of August, 2007. The time is approximately 10:23 a.m. This is the videotaped deposition of Mr. Brad Robin taken at the offices of Gerald Maples located at 902 Julia Street, New Orleans, Louisiana, case entitled Rocco Tommaseo versus United States -- et al -- versus United States in the United States Court of Federal Claims, Cause No. 1:05-CV-1119SGB.

Will counsel please identify themselves and which party they represent.

MR. ZELAYA:

Carlos Zelaya and Stephen Wiles on behalf of the plaintiffs.

MR. DISHEROON:

And Fred Disheroon on behalf of the United States.

MR. ZELAYA:

And a correction, at the beginning you indicated today is the 23rd. However, I believe today is the 24th of August.

THE VIDEOGRAPHER:

Sorry. It is.
Would you swear the witness, please.

BRAD ROBIN,

after having been first duly sworn by the above-mentioned court reporter, did testify as follows:

EXAMINATION BY MR. ZELAYA:

Q Good morning, Mr. Robin. This is Carlos Zelaya. Would you please give us your full name and address for the record.
A Brad L. Robin, 8007 East St. Bernard, St. Bernard, Louisiana 70085.
Q And where is that address relative to the city of New Orleans or Chalmette, Louisiana?
A South, 30 miles south. It's a little town called Poydras.
Q And by way of background, Mr. Robin, how long have you lived in St. Bernard Parish?
A All my life.
Q What do you do professionally?
A I'm a commercial fisherman, a seafood dealer, processor.

Q And what type of commercial fishing do you engage in?
A Right now is strictly oysters, but I've done oysters, fish, shrimp, crabs, everything.
Q And in the course of working as a commercial fisherman, what waters have you engaged in fishing in?
A St. Bernard, Orleans, St. Bernard, Plaquemines.
Q Are you familiar with the waterways of St. Bernard Parish?
A Yes, sir.
Q Now, by way of your personal background, are you married?
A Yes, sir.
Q Do you have any children?
A Yes, sir.
Q How many?
A I have two, a little boy -- son, 25; daughter, 15.
Q And does your son work with you in the commercial fishing operation?
A Yes. He went to college and got a degree and came back, and he's got his own

vessel and works under us.
Q And is this a family-type business?
A Fourth generation fishing, third generation in the business.
Q Are you familiar with what I will refer to as the MRGO, but I'm going to use that nomenclature to refer to the Mississippi River Gulf Outlet?
A Yes, very familiar.
Q And is that something that you've been aware of and use to travel in and out the waterways of St. Bernard Parish?
A Yes, sir.
Q By way of background, can you describe for us what the MRGO looked like when you were younger?
A When --
MR. DISHEROON:
Object to the time. If you could give a little more specific reference.
MR. ZELAYA:
I'm going to let Mr. Robin give us the time frame.
EXAMINATION BY MR. ZELAYA:

Q But give us just the history of what you observed or knew the MRGO to be when you were --

A In the beginning, in the early -- in the mid '60s when it was finished, I mean, I was a young kid, but I remember us pulling the cypress trees and that out of there when it was dug, and it was fairly -- within 500 feet.

Q And the 500-foot reference you're making, what is that describing?

A From one end to the other where the beacons were, where the beacons were.

Q And your point of reference, referring to beacons?

MR. DISHEROON:

To be clear, he said from one end to the other.

Do you mean laterally?

THE WITNESS:

Width.

MR. DISHEROON:

Across?

THE WITNESS:

Width, across.

MR. DISHEROON:
Thank you.
EXAMINATION BY MR. ZELAYA:
Q And what beacons are you referring to?
A The starboard and the port, the green and red that's going down the Mississippi Gulf Outlet.
Q And are those the beacons near Shell Beach?
A Yes.
Q And where is Shell Beach relative to where you worked in lower St. Bernard?
A Probably a mile away, now less than that, because in the beginning before when Shell Beach was along the lake and when they -- we used to drive to the lake, and when -- well, I never drove, but I drove with my family to the lake, and then they cut the channel.
They moved the people from the lake, Shell Beach to Yscloskey and moved it in closer. So you're looking -- now it's probably only a half a mile from my business.

Q Okay. With regard to the condition of the MRGO in more recent times, and for the reference, I'm going to say from 2000 forward -- has there been a change in the width that you described as being 500 feet in the '60s?

A Substantial. I mean, it's -- Shell Beach, 2,000 feet.

Q And that's -- again, you're referring to shore to shore of the width of the --

A The width, 2,000 feet.

Q Now, did that come about, the change in the width of the MRGO, did that come about suddenly or was it gradual over time?

A It's gradually. It's gradually changing steady.

Q Okay. Now, would you also describe for me going back to the period of time in the late '60s, early '70s what type of vegetation or marshland existed in lower St. Bernard? And I'm referring to Yscloskey, Shell Beach, and that area.

A They had a lot of cypress trees, a

lot of big oak trees, willow trees that was around in the swamp and in the -- we call the marsh. When we were kids riding four-wheelers and stuff back in those areas, and where we could have, now there's nothing, but it's marshland. It's swamp now.

The hills, what we called hills, was the levees that were built when they dug the canals and stuff like that and the vege -- the trees grew on top of that. All was green and pretty, shady. Now that's gone too.

Q Okay. Were you familiar with the existence of cypress swamps or marshes along Paris Road in Chalmette?

A Yes.

Q And did that exist in terms of having swamp -- strike that -- in terms of having cypress trees and marsh grasses along St. Bernard during the period of the late '60s and early '70s?

A Yes.

Q And how is that area today?

A It's dead. There's no -- there's

no -- the remains of the cypress trees are there, the stumps and that, but there's no more vegetation up there. There's no -- there's no trees, no green grass, nothing.

Q Now, those changes that you've described from the period of the late '60s through today with regards to the trees, the cypress trees, the marsh grasses, again, is that something that happened suddenly or was it gradual over time?

A Gradually.

Q Okay. Now, in the course of your work as an oyster fisherman, are you familiar with water salinity?

A Yes.

Q And have you observed changes in terms of the water salinity in connection with the MRGO?

A Yes. In the business we do, producing oysters, you got to watch the -- oysters is an animal that can't have both of each. It's got to have a mixture of fresh and salt.

And when they -- it destroyed some of our grounds on the outside by putting it

too salty. The salinity went up too high, and it just -- we had to change, reroute how we worked.

Q And again, is that something -- those changes in the salinity levels, was that something that was sudden or something that occurred gradually over time?

A Gradually.

Q Okay. With regards to flooding -- and I'm going to use that term -- and the time reference rather, going from 2000 until today, have you observed occasions when there's been flooding in St. Bernard Parish?

A Yes.

Q Now, is there a point of reference in time or by an event when you've noticed an increase in the frequency of flooding?

A Before in the lower part of St. Bernard we would need a hurricane to get water on our property or our land or our parking lot where our building and facility was.

Now we watch the northeast winds, strong winds. If we have a wind for two or three days, we have a problem. We have to

start to get our vehicles out and some of the equipment before the road starts to flood.

And that's something we have never -- in the time have never seen except for a disturbance, something in the Gulf.

Q Okay. Were you familiar with the passage of Hurricane Katrina?

A Yes.

Q And would you tell us what precautions or steps you took prior to the passage of Hurricane Katrina, and then what did you do personally in connection with the passage of Hurricane Katrina?

A We prepared to -- for Hurricane Katrina we took all our vessels and brought them into a harbor into -- which is in the middle of Violet. It's a canal, Violet Canal.

It has a set of locks with the levee on one side, and the levee -- there's levees on both sides, but that's the harbor we have in the St. Bernard area where there's still some trees, vegeta -- trees that are still in that one little slip.

And that's where we bring all our big boats, all our boats in there. And then we take our 18-wheelers and everything else and bring them into a little higher part of St. Bernard levee, which is the middle of Judge Perez, prepare for stuff like that.

Q Okay. Did you observe flooding upon the passage of Hurricane Katrina?

A I've never seen nothing as devastating as that as far as flooding. My home in St. Bernard is the highest part of St. Bernard. And the statistics, when the crevasse was broke, they built a ridge, a ridge of oak trees, and my home is on that ridge.

And I had 29 inches of water in my home in St. Bernard, and that's -- and it's the history of -- the town of St. Bernard never had water.

Q I'm going to give you another point of reference. Do you recall the passage of a hurricane in 2002 by the name of Hurricane Lili?

A Yes.

Q And do you recall where the center

of Hurricane Lili came aground?
A I -- when a hurricane hits the Gulf, we really -- we monitor kind of because our livelihood and our life is in jeopardy with stuff like that.
But we watched it closely, and it turned in and went into more of Intracoastal City, I think, towards way down west where it turned in.
But the water in Yscloskey, I've never had my building, my facility where I had my processing plant, I've never had water in my building, and I had water on top of it for Lili.
Q And on top of what?
A My slab in my building, by my building.
Q And how high was that slab?
A You're looking at probably 6 foot above the road.
Q You testified earlier that in the past it used to require a hurricane event striking our area for there to get water on the road and on your property, and that has changed. Did that change occur after the

passage of Hurricane Lili?

A I've noticed more and more, more and more water coming in now than ever before, you know. We never had the problem -- like I said before, we never had a problem with water.

You know, we live in a low area, but we've never had water except for a hurricane. Now, since Lili and since that we -- my opinion, we're sinking. We are -- we're having water, a lot, occasionally.

Q And when you have water, you said it's not just the passage of a hurricane now. What type of weather events bring the water that you've described?

A The northeast wind comes in. You know, where our facility is and where our campsite where our home was where I was born and raised, my backyard was a field. It was a field.

When I was a kid we played baseball. My father and them used to play baseball, and we used to ride cars in this field through the hills and the little levees in the back side.

Now, a northeast wind, that's a lagoon. It's water. It's nothing but water. That's never been -- you know, I mean, it's amazing -- it's amazing now you look at that.

Before I used to be able to take my boat to go recreation fishing and watch the canals. Now I don't -- I just about can go. With a northeast wind, I can almost leave my backyard and go fishing across the marsh.

Q And you're talking about the backyard of what property?

A 2324 Yscloskey. Now it's 2324 Florissant Highway. But as a kid, that's where we used to play, trap on those back ridges. Now you can't even ride a four-wheeler back there.

Q You've also described the area, and where the MRGO is you've made reference to some beacons. Today, where are those beacons relative to the shore?

A Well, before we used to run -- before when we'd run our boats, we'd run down the beacons. Now we run outside the

beacons. We run in between the shore and the beacons with maybe 1,000, no less than 500 feet some places. We'd run on the inside from the beacon to the bank.

Q And those beacons, again, those used to be --

A Those beacons were on land when it was built.

Q And you're referring to the construction of the MRGO?

A Correct.

Q And that period of time was the late '60s?

A Yes. And the beacons are still in the same place.

Q And that change has been the widening of the width of the MRGO that you described earlier from 500 feet?

A That's correct, from 500 feet to -- I would say go as far as 2,500 feet.

Q Okay. Now, going back to the passage of Hurricane Katrina, you've described the water associated with that. Was there also water associated with the passage of Hurricane Rita?

A Yes. We had, I would say, 8 to 10 feet on the bottom in the lower part of St. Bernard.

Q And again, did that impact your property?

A Yes. Paris Road -- I left for Rita to come in to go to Mississippi. And my boats, we brought them from Violet Canal to Paris Road, and they had to pull my boats off the dock at Paris Road.

I would say the water come up at Paris Road -- to get my boats into the dock, it came up 5 feet. A crew boat pulled them off for us.

Q Now, prior to the passages of hurricanes Katrina and Rita, which were in 2005, do you recall the passage of Hurricane Ivan in 2004?

A Yes.

Q And tell us what types of observations you made in connection with the passage of that hurricane in terms of the water.

A The water, like I said, when a hurricane hits the Gulf, we prepare

everything and bring -- at all our facilities and what we can, load up everything in our 18-wheelers and help anybody else that needs to load, and we run them to high water -- high ground.

And because now it takes -- it don't take much to get 4 foot of water in Yscloskey, roadwise, and it don't have to be a direct hit. And that's what's really scary about the situation now.

Q Do you recall other tropical storms or hurricane events from the passage of Lili through the passage of Hurricane Katrina?

A Yes.

Q Which other ones do you recall?

A I mean, namewise, I don't know. Everyone that came in -- and I think one year we had three of them that come that we had to leave the town -- you know, town of Yscloskey three times, all the way up into January we left.

And I don't know the year -- I don't know the names of them. The ones that recall me more is Lili, you know, and Ivan

recall me. But before that, everyone else gave us a devastation.

But I do know now of Hurricane Katrina, the hills in these canals that we'd run out to our oyster grounds and stuff like that, when I went out there after the hurricane and checked our grounds, the ridges that the trees left, I was amazed to see there was no more ridges for Katrina.

And I'm -- and they were high, high enough to slow down water. But now there's no more ridges and no more trees. Marsh.

Q Mr. Robin, you've described the property that you and your family owned where you operate your business on Yscloskey Highway, now Florissant Highway?

A Yes, sir.

Q What is the address for the business?

A The address -- the physical address of the business is 2328 Florissant Highway.

Q And do you and your family own other property in that immediate area?

A We own several, several properties in that area.

Q What properties are those? Just give us the addresses, please.

A We own 23 -- 2316, 2320, 2324, 2328, 2325. That's all different addresses, which is -- comes up to maybe eight lots in the Yscloskey, one area where we have campsites that -- recreational people.

My business is on five lots, 2328, which has -- had an icehouse, processing plant, fuel dock, unloading dock, stuff like that on it, which is not there.

Have -- in Hopedale I have eight lots, and I can't think of the address of it.

We lost all of our paperwork for the hurricane. We lost everything, but -- and we're trying to reestablish the address that it have there, and we're having a little difficulty with the courthouse because they lost everything too.

Q I understand that. I'm familiar with that.

The properties that you've

described, are those held in -- by you and your family either individually or through various companies?

A Correct.

Q And what are the names of the companies?

A I have Robin Seafood. I have Yscloskey -- Robin's Holding -- Capital Robin Holding, Yscloskey Development 1, Yscloskey Development 2, Yscloskey Development 3, Yscloskey Development 4.

I have property under Don Robin, Brad Robin that's in Yscloskey that's not -- that's not -- I think you might have some of it there.

I have property in Delacroix Island, another eight lots in Delacroix Island that don't have an address. That's -- your lots are normally 50 by 150 or 50 by 450, and they're all waterfront lots.

Q Are all of these properties now susceptible to the repeat flooding that you've described that occurs on a regular basis after the passage of Hurricane Lili?

A Correct. And we also have our residence in St. Bernard.

Q And you've described those as being in Poydras, correct?

A Mine's is in Poydras. Don's is in Poydras, and Edward Robin's is Kenner -- no, Kenilworth, Kenilworth.

MR. ZELAYA:

I have a map that may just help give us some reference. And, Mr. Disheroon, if you'd like to take a look at that, that will help certainly give you some perspective so you can make reference to these little townships we've described.

EXAMINATION BY MR. ZELAYA:

Q I'm going to show this to you, Mr. Robin. Take a look at that. Give yourself a moment to familiarize yourself with the appropriate landmarks.

A Okay.

Q If you would, just mark the areas where your properties are located that you've just described.

A Well --

Q And I think you made reference to

Kenilworth and you made reference to Poydras. You can just circle those names if they're already on the map.

A On this map, and it's very true, the town we call Yscloskey is Alluvial City. It's not Yscloskey -- it's Yscloskey, but on this map it's Alluvial City.

And if you look under a GPS system of the St. Bernard Parish, it is Alluvial City where my business and that -- I own in there, and Yscloskey, Hopedale.

Q And just so the record's clear, what you're saying is Alluvial City and Yscloskey represent the same location, correct?

A It's the same location. It's -- you blink, and you pass two of them.

Q Okay. Thank you, Mr. Robin.

MR. ZELAYA:

Mr. Disheroon, just so you can have reference as well, I'm going to show you what Mr. Robin has marked as Hopedale, Alluvial City, which is also known as Yscloskey, coming further toward the city. This is Kenilworth, and then this way here

is Poydras.

EXAMINATION BY MR. ZELAYA:

Q And just, Mr. Robin, I know having some familiarity with this, you've also marked a property close to Delacroix?

A Correct.

Q And that's also a place where you and your family own property, correct?

A Correct.

Q With regards to the properties in Alluvial City, are those the properties that are immediately adjacent to each other?

A Yes. 23 -- 2316 to 2328 is adjacent to one another, and then you skip a little space, and you jump into 23 -- 2428.

Q And those properties are held by your businesses, Robin Seafood Company and the Robin Yscloskey Development entities, correct?

A Correct.

Q And do you also own any property near Big Mar Lake?

A We have -- we had 1,000 acres that we had a lease on that we got an option to buy with that the railroad announced,

500 acres.

Q And if you could -- I don't think you've marked on the map yet -- would you mark that property as well.

A I see the Big Mar, but I don't see Braithwaite. It's located in Braithwaite. I don't see it on that -- I see Poydras, but I don't see Braithwaite.

Q Okay. If you don't mind, will you just put that mark. Just write in the word Braithwaite. That way we'll know which one you're referring to.

A Okay.

Q What is the condition of that land that you've just identified near Braithwaite?

A The -- it was the trees and that -- the vegetable and the trees is -- we have a hunting land, and the trees and that was just unbelievable, the oak trees and the trees that was in that area.

And now I would say 30 percent of the trees are laid down, and we tried to dig a pit or tried to dig a pond in there. And before the hurricane we had a survey that it

was -- if I ain't mistaken, it was done. It was 80 percent dry and 20 percent wet, and now it turned.

Q Okay. And which hurricane are you referring to?

A Katrina and Rita, both.

Q And that's when that change occurred from 80 percent dry to --

A Yes.

Q -- 80 percent wet --

A Right.

Q -- is that correct?

A Because that land there, water came in and stood the longest for Katrina and then right after came in, and water stood another seven days for Rita.

Q How long did the water stand for the passage of Hurricane Katrina?

A I'd say it stood seven days or so.

MR. ZELAYA:

In connection with Mr. Robin's testimony, I would like to offer this exhibit as Exhibit 1.

If you don't mind, I'd like to take maybe a five-minute break just to look

at these maps.

THE VIDEOGRAPHER:

Off the record at 10:55 a.m.

(Recess taken.)

THE VIDEOGRAPHER:

Back on the record at 10:59 a.m.

MR. ZELAYA:

Mr. Disheroon, I have a series of additional maps which also contain aerial satellite-type photographs I'm going to show to Mr. Robin, but I want to give you the opportunity to look at them first. And if you don't mind, just keep them in order because they are sequential.

MR. DISHEROON:

Do you have a copy for me?

MR. ZELAYA:

I believe we do.

Do you have a copy made yet?

MR. WILES:

Of these, an extra copy, no, I hadn't. I can get you a -- can make you a copy right now.

MR. DISHEROON:

Yes.

MR. WILES:

Sure enough.

MR. DISHEROON:

Well, you can make it later if you want. You don't need to interrupt the deposition.

MR. WILES:

We're going to attach them as exhibits.

MR. DISHEROON:

Well, I'd like to --

MR. WILES:

Sure. I mean, I'll get you -- if you want another copy, I'll be happy to do that.

MR. DISHEROON:

Go ahead.

MR. ZELAYA:

Why don't we just do that real quick.

MR. WILES:

Yeah.

EXAMINATION BY MR. ZELAYA:

Q Mr. Robin, I'm going to -- while Mr. Wiles is making those photocopies, I'm

going to have you look at these maps, and you're going to have to look at each one because they have different reference points that you may recognize.

But as you go through them, if you see and can depict with marking where you own property or where your family owns property, that's what I'm going to ask you to do in this exercise.

A Okay.

MR. ZELAYA:

You can go off the record.

THE VIDEOGRAPHER:

Yeah. Let's do that. Off the record at 11:01 a.m.

(Discussion off the record.)

THE VIDEOGRAPHER:

Back on the record at 11:03 a.m.

EXAMINATION BY MR. ZELAYA:

Q Mr. Robin, as I explained, I've given you a series of maps. Take a look at them, and when you find one that depicts an area where you own property, please mark it.

A These are really ...

MR. DISHEROON:

And note for the record that on the front you see a little box down here.

THE WITNESS:

Okay.

MR. DISHEROON:

And it's got a little square, so it indicates to you that's the location that's depicted on the map, if that helps any.

THE WITNESS:

Carlos, can I ask you if y'all got any cheating glasses?

MR. WILES:

I forgot mine. I was wondering where your glasses were. I forgot mine.

MR. ZELAYA:

We'll see if we can round up some glasses for you.

THE WITNESS:

Because I tell you what, now you're getting into a hard --

MR. WILES:

You get Ms. Carol's. There you go. You're cute.

THE WITNESS:

Oh, yeah. Those are mine.

I'm going to say in -- we are -- mostly our property -- I'm looking at Lake Borgne, and mostly our property is probably around a mile from the Lake Borgne, the curve of the Lake Borgne, and that's what -- seeing that.

MR. WILES:

So there weren't anything on that one?

THE WITNESS:

Yeah. The water hit. Yeah. And this square, this brown square is probably in the middle of my property. The water hit on that.

Let's say this much: For the hurricanes, all of my property had -- was flooded with water in the lower part of St. Bernard. Every bit of it had water.

EXAMINATION BY MR. ZELAYA:

Q So not just your property, everyone's property?

A Everyone's property. The property by my building -- the property by my building had -- my building is -- had

10-foot ceilings. My icehouse was on top of that. I'm saying 15 foot above the road, and I had 3 foot of water in the top of my building.

Q Okay.

A So I'm looking at 25 feet of water in Yscloskey. So every bit of property I had in Yscloskey was flooded.

Q Okay. And that's with the passage of Hurricane Katrina, correct?

A That's correct.

Q With regards to the time period from the passage of Hurricane Lili forward, has each of your pieces of property been subject to the repeat flooding or water that you've described that comes with, not just the hurricane, but with the northeaster winds or other weather?

A Rita, we had -- I'm going to say when we went down there to check, I would say we had 8 foot of water down in Yscloskey.

The other properties down there, with a northeast wind, in Yscloskey, we got a foot of water on the surface of our

property. The only thing stops the water from the surface of the property is the road where it holds the barrier now that it's a little higher since they came in, and then it covers the road.

So every part of Yscloskey, when you come to a northeast wind, we're having water.

Q Okay. I'm going to go through these maps with you again very quickly.

A Okay.

Q The first one -- and let's just keep them in order.

A All right.

Q If you notice at the top portion of the map it refers to Shell Beach Bayou on the upper left part.

A Correct.

Q And then does the map also depict the MRGO?

A Correct.

Q Okay. And what area is that, generally speaking?

A That's the lower part of St. Bernard, Yscloskey, Shell Beach, and

then in the area here where we go, we run out to the lake.

Q And which lake are you referring to?

A Lake Borgne.

MR. DISHEROON:

Excuse me. Could I ask you to identify the map number you're referring to so the record's clear?

MR. WILES:

Well, let's just mark this one as Exhibit 2.

MR. DISHEROON:

Well, each one of them has a map number on it.

MR. WILES:

Right. We'll call it Exhibit 2, and that will be that.

MR. DISHEROON:

For the whole -- for the composite exhibit or that one?

MR. WILES:

That piece of paper is going to be Exhibit 2.

MR. DISHEROON:

Okay.

MR. WILES:

We'll mark them separately, Mr. Disheroon.

MR. DISHEROON:

I don't see Shell Beach anywhere.

MR. ZELAYA:

Right up here at the top, Shell Beach Bayou.

MR. DISHEROON:

Okay. Thank you.

EXAMINATION BY MR. ZELAYA:

Q Does that photograph depict any areas where you or your family own property?

A Yes.

Q Okay. Where is that? If you would mark on that map, please.

A In -- on the lower map I'm showing where I can describe it. This area right here is where we have our property.

Q Okay. Let's go to the next one then.

MR. DISHEROON:

I don't see where it is.

THE WITNESS:

See over by the X.

MR. WILES:

There's a blue ink mark.

MR. ZELAYA:

He's referring to the grid at the bottom lower left portion of this page.

MR. DISHEROON:

He didn't mark it on here.

MR. ZELAYA:

He did not mark it at the top, no.

MR. DISHEROON:

Can you do that?

THE WITNESS:

I can't detect with the water where exactly my property is there.

MR. WILES:

On the big one?

THE WITNESS:

On the big map, you know.

MR. ZELAYA:

I think one of the further exhibits, as we go through these, Mr. Disheroon, you'll be able to see that.

So the next one, which we'll mark as Exhibit 3.

MR. DISHEROON:

That was LA-AA40.

EXAMINATION BY MR. ZELAYA:

Q Mr. Robin, if you can't locate a section on the larger portion at the top, just we'll move on to the next one.

A Okay. Do you have another map that I could reference to on these things that's something a little different that I -- I'm confused about these areas here from the Mississippi out.

MR. WILES:

You want the big?

THE WITNESS:

Yeah, the big map for me.

MR. WILES:

I'll bring the big one.

MR. ZELAYA:

We have a large map here, Mr. Disheroon, which we'll use for reference. You can take a look at it. It depicts portions of southeast Louisiana, and particularly the area of lower St. Bernard.

MR. WILES:

I'll let you keep it right here,

Brad, so you can use it. Okay?

THE WITNESS:

The reason why I'm saying that, because I'm not familiar with the new canal on this -- that, never seen.

EXAMINATION BY MR. ZELAYA:

Q Okay.

A But I'm very familiar with Stump Lagoon where I had my leases, all the rest of these canals to separate through what's going on.

Q And when you refer to the leases near Stump Lagoon, you're referring to oyster leases, correct?

A Oyster leases, all my oyster leases in that marshland, which is -- I'm going to say on this little map here where the square is, to circle the square, brown square, is where all my property is.

MR. ZELAYA:

Okay. This is Exhibit 4, Mr. Disheroon, if you'd like to take a look. He marked, again, the lower left portion of the map just on the small grid.

EXAMINATION BY MR. ZELAYA:

Q And, Mr. Robin, just so -- for your reference, the lower grid at the bottom left of each map is a depiction of what's blown up at the top portion of the map.

A Okay. Good. I'm going to say right where the orange markings are on that is where we have property.

Q Okay. And again, you're referring to the lower left-hand corner of the map with the quadrant?

A Yes, sir.

MR. ZELAYA:

Mr. Disheroon, he's marked an X.

MR. DISHEROON:

On the little map down here?

MR. ZELAYA:

Yes.

MR. DISHEROON:

Nothing on the big map. Could you ask him what property it is?

EXAMINATION BY MR. ZELAYA:

Q With regard to this Exhibit No. 5 where you've marked the X in the lower left-hand corner --

A I would say that's in Poydras.

Q That's Poydras you're referring to?
A Yeah, in Poydras.
Q And that would be your personal residence?
A Correct.
Q This is No. 6, and you did not make any markings --
A No.
Q -- on this one, correct?
A Correct.
Q No. 7, no markings, correct?
A No.
Q Mr. Robin?
A Yes, no markings.
This one here on Highway -- on Florissant Highway, this is close to our business where it is.
Q Okay. This I've marked as No. 8, and you've drawn a square --
A Right.
Q -- on the larger map toward the right side in the lower portion?
A Correct.
MR. ZELAYA:

Mr. Disheroon, can you see that mark?

THE WITNESS:

This here, the little square, that's where -- that's in Yscloskey, Alluvial City, where my business is.

EXAMINATION BY MR. ZELAYA:

Q And this one's No. 9. You've made an indication, again, on the large map?

A Right. I squared Yscloskey Road, is where about my business is, and then Citrus Street is some lots. I squared that, some lots that I have back in that area.

Q And you've made a mark depicting -- I see Yscloskey Road, and then another mark to the other side. It looks like it's between the words Citrus and Proctors Landing?

A That is correct.

Q Okay. And the business you're referring to, is that Robin Seafood Company?

A Yes. And this one here's the same, on Citrus.

Q This is No. 11. Again, you've made a mark just to the side of the word

Citrus?
A Uh-huh.
Q Does that refer to the same property as --
A Yes.
Q -- indicated on No. 10?
A Yes, same.
MR. ZELAYA:
Mr. Disheroon.
EXAMINATION BY MR. ZELAYA:
Q No marks on No. 12 --
A No.
Q -- correct, Mr. Robin?
A No marks. Delacroix Island and Delacroix Island Road, I put a square right past Jacks Canal Road.
Q And which property does that refer to?
A That's referred to as Delacroix Island. Eight lots I have in Delacroix Island.
Q This is No. 13, and you've made a mark right adjacent to Delacroix Highway, correct?
A Correct.

None.

Q There's no mark on No. 14, correct?

A Correct.

None.

Q Nothing on No. 15, correct?

A Correct.

Here between Newton Boulevard and Massicot Road I put a square. That's where my residence and my brother's residence is, Don.

MR. ZELAYA:

Okay. This is No. 16. The mark is at the top toward the center, Mr. Disheroon, right off of Highway 46.

MR. DISHEROON:

And that's his residence?

MR. ZELAYA:

Yes, sir.

THE WITNESS:

None on that.

EXAMINATION BY MR. ZELAYA:

Q Nothing on No. 17, correct, Mr. Robin?

A Nothing.

Nothing on that.
Q Nothing on No. 18?
A Nothing on 18.
Nothing on it.
Q This is No. 19. No marks, correct?
A Correct.
Nothing on that one.
Q This is No. 20, no marks.
A Nothing on that one.
Q No. 21, no marks.
MR. DISHEROON:
That's 21?
THE WITNESS:
Nothing on this one.
EXAMINATION BY MR. ZELAYA:
Q That's 22 with no marks.
A Nothing on that one.
Q This is No. 23, nothing.
A Nothing on that one.
Q Nothing on 24.
A Nothing on that one.
Nothing on that one.
Q Nothing on 25 or 26.
A Nothing on it.

Q Nothing on 27.
A Nothing on that one.
Q 28, no marks.
A Nothing on that one.
Q 29, no marks.
A Nothing on it.
Q This is No. 30, no marks.
A Nothing on that.
Q No. 31, no marks.
A Nothing on that one.
Q No. 32, nothing.
A Nothing on that.
Q This is No. 33, nothing.
A Nothing on that one.
Q No. 34, no marks.
A No.
No.
Q Finally, No. 35 and 36, no marks.
Mr. Robin, I'm going to refer you now to one of the exhibits you marked. This is No. 8 where you depicted a little box along Florissant Highway.
MR. WILES:
Does that help?
THE WITNESS:

Uh-huh.

EXAMINATION BY MR. ZELAYA:

Q And which property are you referring to by the marking you've placed on No. 8?

A That would be where our business and then where our campsite is on Florissant Highway.

Q And the business, again, is Robin Seafood Company, Inc.?

A Correct, and Yscloskey Development or Robin Capital Holding.

Q And when you refer to Robin Yscloskey Development, there are four entities numbered 1 through 4, correct?

A Correct.

Q And those are limited liability companies?

A Yes.

Q And who owns each of the limited liability companies? They all share common ownership. Isn't that correct?

A Correct, Edward Robin, Edward J. Robin, Jr.

Q Is that your brother?

A That's my brother, which is known as Pete. Don Robin.

Q Another brother?

A Yes, which is another brother. And myself, Brad Robin, are owners, which are the four -- or the three partners of all businesses.

Q So is that the same ownership structure for Robin Seafood Company as well?

A Correct.

Q And are those properties that you've delineated on Exhibit 8 subject to the repeat recurrent flooding that has been occurring since the passage of Hurricane Lili?

A Yes.

Q And when that repeat flooding occurs, does it interfere with your use of the property?

A We have to evacuate the property and take everything, precautions to leave to protect what we have and get out of there for -- until the water recedes or goes down.

Q And does that occur on each such occasion that you've described?

A Yes.
Q I'm going to show you what you've marked on Exhibit No. 9. Does that depict the same properties that we've just discussed as depicted on Exhibit 8?
A Correct.
Q On Exhibit 10, you've made two markings. Which properties are those?
A That's Yscloskey. In this picture I'm seeing here something now. I made a mistake with that. I do not own that piece on Yscloskey Road. I own the Citrus thing, so can I --
Q Yes.
A -- take that off? Just put an X on it or --
Q Put an X if you do not own that.
A I do not. I own the Citrus Street. Now looking at it better, where Yscloskey Highway goes into Shell Beach, I don't own that bayou front there.
MR. WILES:
Just so the record is clear, you drew a big zero on it, right?
THE WITNESS:

That's correct.

MR. WILES:

Okay.

THE WITNESS:

And my square is still on Citrus Street.

MR. WILES:

Right.

EXAMINATION BY MR. ZELAYA:

Q And what is the property on Citrus Street?

A It consists of 16 or so lots.

Q And what is the ownership of those lots? Is that you individually --

A It's --

Q -- or with your family members?

A It's myself, Brad, and Don Robin.

Q And again, are these properties subject to the repeat flooding events that you've described forward of the passage of Hurricane Lili?

A Yes.

Q And does that -- do those circumstances deprive you of the use of those properties?

A Correct.

Q I'm going to show you No. 11 where you've made a mark near Citrus as well.

A Yes, sir. That's the same properties, consist of 16 lots.

Q And again, when these properties are subject to these flooding events that you've described, you effectively cannot use that property?

A Correct.

Q It's a substantial deprivation of your use of that property?

A Correct. The property on -- between the addresses of 2316 and 2328, after the hurricane, I've probably put 20 loads of filling to get it up to put where I can put my -- the sites for my mobile homes right now.

Q And you had to incur expenses to accomplish that?

A Yes, sir.

Q Do you know how much that would have been?

A No, sir, because I dug the canal and got all the debris out of the canal and

put it in the filling.

Q How long did that take you, approximately?

A Well, about a two-week period. The property there now where our dock site is and where our campsite was where we do for offloading our facilities, when we built the property, it was a -- our boats come to line up to the dock, and the dock was 2 or 3 foot higher than the boats.

Now when the northeast wind comes, we got to build a partition to get to the boats. If not, wear boots, because the water comes in so high. That's the difference of what we have been noticing lately more than anything.

Q And have those circumstances diminished the value of your property?

A Yes. Yes. It diminishes, but it costs us -- it's going to cost us to build it back up to get to where it would be convenient for us to use continuously.

Q I'm going to show you another document, sir.

MR. ZELAYA:

Mr. Disheroon.

EXAMINATION BY MR. ZELAYA:

Q This is obtained from the Clerk's Office for the parish of St. Bernard. If you would take a look at this, Mr. Robin.

MR. WILES:

I've got a set for Brad.

MR. ZELAYA:

Okay.

MR. WILES:

You can keep that one there.

MR. ZELAYA:

Great. Do you have a set for Mr. Disheroon?

MR. WILES:

Uh-huh.

MR. DISHEROON:

It's okay.

EXAMINATION BY MR. ZELAYA:

Q Mr. Robin, referring to the first document, which I'll mark as No. 37, it reflects a transfer of property from Robin Capital Holdings, LLC to Robin Yscloskey Development No. 1, LLC, and this refers to the property bearing municipal address 2320

Florissant Highway.

A Right.

Q Is Robin Yscloskey Development No. 1 the LLC that you described earlier that is owned by you and your brothers, Don Robin and Edward Robin, Jr.?

A Yes.

Q And Robin Capital Holdings, LLC, is that another company owned by you and your family?

A Yes, sir.

Q And this property that you've described, is that one of the camps that you've referred to next to Robin Seafood Company?

A Yes, sir, was where the camps were.

Q Okay.

A Now, we -- now, we put mobile homes in each position of these lots.

Q And is this one of the properties that you had to put the fill on?

A Yes, sir.

Q And that's, again, one of the properties that's subject to the repeat

flooding that you've described forward of the passage of Hurricane Lili, correct?

A Correct. We had to put filling. And the driveways were cement, and we took and raised the driveways with asphalt. That way water wouldn't continuously stay in the driveways.

Q I'm going to show you another document. And if you'd turn to the next one, this is a transfer from, again, Robin Capital Holdings, LLC to Robin Yscloskey Development No. 2.

MR. WILES:

The last exhibit was No. 37.

EXAMINATION BY MR. ZELAYA:

Q This refers to 2324 Florissant Highway.

THE WITNESS:

Isn't that mine?

MR. WILES:

Huh?

THE WITNESS:

Isn't that mine, or this one?

MR. WILES:

No. That's a copy.

THE WITNESS:
All right. Okay. Okay.
EXAMINATION BY MR. ZELAYA:
Q Did you look at that document?
A Yes, sir.
Q And again, is this property adjacent to the first one we just described as 2320 Florissant Highway?
A That's correct. This 2324 is where I lived since I was five years old, this property here. That's where I was born and raised up until I moved out when I was 18 years old.
Q And again, that property is immediately adjacent to the others that you own through your family holdings, correct?
A Yes, sir.
Q And again, this property is also subject to the same repeat flooding events you described earlier?
A Yes, sir.
Q And again, when each of those events occurs, you're deprived of the use of that property, correct?
A Correct.

Q I'm going to show you the next document.

MR. WILES:

And that was 38. Okay.

EXAMINATION BY MR. ZELAYA:

Q This reflects a transfer from Robin Capital Holdings to Robin Yscloskey Development No. 3, again, both of which entities are owned by you and your family, correct?

A Correct.

Q And this one refers to 2316 Florissant Highway?

A Correct.

Q Would this also be adjacent to the two properties we just described?

A Yes, sir.

Q And again, subject to the same repeat flooding events, correct?

A Correct.

MR. WILES:

39.

EXAMINATION BY MR. ZELAYA:

Q The next document, again, a transfer from Robin Capital Holdings, LLC to

Robin Yscloskey Development No. 4 referring to 2328 Florissant Highway. Is that property also adjacent to the three we've just discussed?

A Yes, sir.

Q Is that one also subject to the same repeat flooding events we've talked about?

A Yes, sir. Each one of these properties that you described has the same amount -- well, not the same amount, but across the highway there's what they call a dock site where we keep boat sheds or accommodate for sports to come in.

The problem is when the parking lot's filled, it's a little inconvenient for a guy to walk into the water to get to his boat.

The dock site, it's just filling in more and more, which is lots that are not involved with that, but they are lots that are adjacent to it.

MR. WILES:

That's No. 40.

EXAMINATION BY MR. ZELAYA:

Q I'm going to ask you to do one more thing with regards to these Exhibits 37 through 40. The last page of each, do you see your signature on that document, sir?
A Yes, sir.
Q Do you see the signatures of your brothers?
A Edward Robin, Jr.; Don Robin.
Q You recognize those signatures as being those of your brothers?
A Yes, sir.
Q That's for No. 37?
A Yes, sir.
Q This is No. 38. Same question, just ask you to identify the signatures, your signature as well as those of your brothers.
A Yes, sir. Edward Robin, Don Robin, Brad Robin.
Q You recognize those, each of those signatures?
A Yes, sir.
Q Same with Document No. 39, do you see the same signatures on that document?
A Yes, sir. Edward Robin, Brad

Robin, Don Robin.

Q And finally the next one is No. 40. Same question, do you recognize the signatures of yourself as well as those of your brothers, Ed and Don?

A Edward Robin, Don Robin, and Brad Robin. I recognize all of them.

Q Okay. Thank you.

I'm going to show you another document, sir. This is a different transfer of property, and we obtained this also from the records of the St. Bernard Parish Tax Assessor.

This reflects a sale from Roland and Mary Lynn Alpha to Debra Kay Graham and others, including Brad Lee Robin, Sr. Do you recognize this document?

A Yes, sir.

Q And what is depicted in this document? Which property does this refer to?

A This is a property that's located in Yscloskey or Citrus Street and Hopedale Highway.

Q Is that the property that you

identified earlier on the map, on Map No. 10?

A Yes, sir.

Q Okay. And who owns that property?

A Myself; my wife; my brother, Don Robin; and his wife.

Q And how long have you owned that property?

A That property was -- that property was purchased before the hurricane, but due to the loss of everything, the process didn't come finished until after the hurricane, I think, on that piece of property.

The paperwork got lost by Federal Express, because the lady lived in Maryland, and it was -- we owned it way before the hurricane. It just didn't -- the paperwork didn't go. We had to process a year before the hurricane.

Q Did you have to basically reconstruct the paperwork from the original acquisition?

A Yes.

Q Okay. And that's what's reflected

on this document?

A That's what's reflected on the document.

Q But you did acquire this property prior to the passage of Hurricane Katrina, correct?

A It was signed maybe six months before the hurricane, and then the paperwork was lost.

MR. WILES:

Exhibit 41.

EXAMINATION BY MR. ZELAYA:

Q Next we have a printout from the Tax Assessor's Office describing the property at 2324 Florissant Highway. We've already reviewed that sale, correct?

A Correct.

Q And that's the property that's now in the name of Robin Yscloskey Development No. 4. That's your family's LLC, correct?

A That's correct. That's two additional lots that are behind the campsite.

Q In what direction? Would that be away from Florissant Highway?

A Yes, back.

Q Okay. I'm not going to ask for a direction, a compass direction, because I think that will just probably confuse us more.

But basically those properties just depicted on this exhibit -- this document are behind the ones that you acquired where the camps were located, correct?

A Correct.

Q Okay.

MR. WILES:

Exhibit 42.

EXAMINATION BY MR. ZELAYA:

Q The next document refers to -- again, from the Tax Assessor's Office -- I believe you and your brothers are the owners. Do you recognize this one?

A That's the same documents that are reflected on Yscloskey Development.

Q Okay. Again, adjacent to the other camps we've been discussing?

A Correct.

MR. WILES:

43.

EXAMINATION BY MR. ZELAYA:

Q The next one is Robin Yscloskey Development No. 3, LLC. This reflects ownership of the same property we've been discussing?

A Correct.

Q Another adjacent lot?

A Correct.

MR. WILES:

44.

EXAMINATION BY MR. ZELAYA:

Q The next document, this is the printout for Robin Yscloskey Development No. 1. Again, is this the same series of camps that we've gone through?

A Correct.

MR. WILES:

45.

EXAMINATION BY MR. ZELAYA:

Q Next is Robin Yscloskey Development No. 2, 2324 Florissant Highway. Again, the camps we've been discussing?

A Correct.

MR. WILES:

46.

EXAMINATION BY MR. ZELAYA:

Q Robin Yscloskey Development No. 3, LLC, another tax roll printout. Again, refers to the same property we've been discussing?

A Correct.

MR. WILES:

47.

EXAMINATION BY MR. ZELAYA:

Q The next documents are an act of sale from Vic Molero Seafood, Inc., to a group including yourself, Brad Robin. Is that correct?

A That's correct.

Q What property is this, sir?

A That's the campsites of -- that we were talking about earlier. I think this is address 2320. I think that's what this would be deflected to, 2320.

MR. WILES:

48.

EXAMINATION BY MR. ZELAYA:

Q And again, just turning to the last page of No. 48, do you see and

recognize your signature on that document, sir?
A Yes, myself, Brad; my wife; my brother's wife, Sarah; and Don.
Q Your wife is --
A Debra.
Q -- Debra, correct?
A Correct.
Q Okay. Mr. Robin, in your profession as a commercial fisherman, you have a familiarity with the waterways of lower St. Bernard where you ply your trade. Isn't that correct?
A Yes, sir.
Q When you take your vessels out to engage in fishing, generally, what body of water do you traverse to head to your oyster leases?
A Generally, if we fish Lake Borgne, we take Yscloskey Canal, which is -- I guess we'll run through Yscloskey Canal, cross the Mississippi Gulf Outlet, hit Lake Borgne, fish that area.
Q And in the process of commercial oyster fishing and harvesting oysters,

briefly just describe the process of putting a dredge into the water, taking up the oysters, and what's involved with that.

A We have several thousand acres of oyster leases that we lease from the State of Louisiana, my family.

And we take a reef, we prepare it for our crop, which is the oysters. You start off as the same thing as a field of a farmer. We are farmers, but farmers of the sea.

And we go out there. We prepare our ground. We put things on it. And nowadays we have the wonderfulest thing in the world called GPS systems that we mark off our reefs. That's better.

Prior to that we'd go out there to have a surveyor just come out and survey our ground. Prepare our ground by putting seeds. Once we put seeds, then we do our preparation of catching it.

A judge -- I mean a dredge is consistent of -- the dredges on our boat are 22T, approximately weigh about 150 pounds. They're chain bags, and we drop them off the

side of our boat and turn it in a circle and pick up the boat -- pick up the dredge every five minutes.

And when you pick up a dredge, it goes on the table where you stand, and you cull them or you go through them and pick out what's good and what's bad. What's good is what you sack, and then the rest goes over.

So as you're working the product, you're actually putting back as much as you can as long as you preserve the product right, because you got small oysters you got to knock off, and that's your catch for your future. That's your future years coming in.

So you always got to keep cultivating oysters and moving them from one to the other. Some reefs we have don't grow, a marketable size, so we got to move those oysters, which we call seed to areas that are suitable for salinity where we got to watch the salinity where it changes.

When it comes into -- we bring it to an area that's suitable for the oysters to grow; current, and the salinity's right.

Q And how many years have you been engaged in this business?

A I've been out of school since '72. I've been doing it, been on my own since then. Prior to that I worked with my daddy as a kid, so ...

Q And in surveying your oyster leases, do you have occasion to use a pole to feel the reef bottoms?

A That's our tool, is a pole, is -- the way we find the reefs is feeling by a pole and finding out the areas where what we call head or surface of oysters. You can actually feel where the oysters come up and get a little bit of hill. A hill in the water in oysters terms is a head. You feel the hill and that.

Q And again, you've been engaging in that activity for pretty much your entire life?

A All my life.

Q Okay. Would it be fair to say then that you're familiar with the depths of the water in the bayous where you ply your trade?

A Very familiar.

Q And on average, what is the depth of the bayous where you harvest the oysters?

A In the -- the bayous averages probably 6 to 7 feet. You've got very few bayous that are over 8 feet of water. The normal body of water, like Lake Borgne and marsh areas, is about 6 feet, average, about 6 feet of water.

Q And again, you have a familiarity with Lake Borgne from doing the same commercial fishing activities, correct?

A All my life.

Q What is the depth of the Mississippi River Gulf Outlet?

A 40 feet.

Q So that's more than four times the depth of all the other surrounding waters, correct?

A Correct.

Q And again, today, the width of the MRGO from shore to shore is what?

A No less than 2,000 feet.

Q Again, based on your familiarity with harvesting oysters and commercial

fishing, you referred earlier to the saltwater and how that's changed since the MRGO has been in existence.
Has that saltwater that's been brought in, has it been brought in by the MRGO?
A Yes.
Q And has that saltwater movement over time come from lower St. Bernard further inland?
A Come from the Gulf in. All of it comes from the Gulf.
Q And that saltwater that's been brought in from the Gulf through the MRGO, has that had an impact on the cypress swamps?
A It also had impact on the oyster reefs.
Q Okay. And what kinds of impact did it have on the swamps?
A The vegetation is gone. All the trees, everything is gone. It's -- I mean, it's no longer there.
Q And what period of time has this taken place?

A I've noticed -- I mean, I guess now I awaken, is now since the last, Lili, that we notice that how much more it's been -- things has been gone, devastating.

Q And what things can you see today that's different than you could see, say, in 2000 in terms of vision?

A When -- I guess when -- the rude awakening to us is when we first got our camps or my father's FEMA trailer, when we first went down and started to get back into Yscloskey, and in the evening time at dark, when I turned and looked I guess out of the backyard of our place and seen lights that I'd never seen before.

And then at first I asked my father -- I said, "I've never seen those red lights or those beacons there before."

Then we realized that was the beacon from Bayou Terre Aux Boeufs in Black Bay. Seeing -- you're looking out at that, and you're seeing Delacroix Island right in our backyard where you never could see the lights from Delacroix Island, Caernarvon in Yscloskey.

Q How far is it from Yscloskey to Delacroix Island?

A Probably 6 miles as the crow flies straight, straight across the horizon; 10 miles or so by car.

Q And the distance from Yscloskey to Caernarvon?

A 12 miles.

Q And just so I understand you correctly, you're telling us that your vision used to be obscured by the marsh grass and the swamps and the trees?

A By the ridges and the trees, and that's from -- from my place to Caernarvon is gone. It's gone. From my place to Black Bay, the ridges are gone.

Before the hurricane, my icehouse was up in the air, like I said, 20 feet or so that you can get up there and walk. You can get up there and see the receipt to our places in the back where we fished at. Now we're actually looking at people fishing from our dock in those canals.

Q To get to Yscloskey by car, there's really only one roadway to get down

there. Isn't that correct?
A There's two roads. There's Old St. Bernard Highway and Judge Perez Highway to get in. And then when you get into Yscloskey, there's one way in.
Q And what roadway is that?
A It's Florissant Highway.
Q Now, over the past seven years, from 2000 forward, have you observed a change in the trees and the vegetation along that highway?
A When -- another thing comes when we come up Judge Perez and make the turn from Highway -- from Florissant Highway, we get on Judge Perez, and there's a little loop in Reggio -- it's a little town, Reggio -- when you get up there, you can see the Mississippi River Bridge. You can see the high-rises. You can see all the lights in my time of traveling that road I've never seen.
Behind my brother's house in St. Bernard in Kenilworth, he's actually looking at the camps on Bayou Bienvenu out of his backyard. When -- you never -- in

town, never seen that, never seen that.

Q And has that destruction of marsh and swamp and trees been a result of the introduction of saltwater from the Gulf of Mexico through the MRGO?

MR. DISHEROON:

Objection. He's not qualified to give that opinion.

MR. ZELAYA:

He's got firsthand experience in his observations.

THE WITNESS:

It's all gone. It was there before, and it's not there now. And it's sinking.

MR. WILES:

Let's take a break.

MR. ZELAYA:

Take a break, please.

THE VIDEOGRAPHER:

Off the record at 12:08 p.m.

(Recess taken.)

THE VIDEOGRAPHER:

Back on the record at 12:19 p.m.

MR. ZELAYA:

Mr. Disheroon, I tender the witness.

Thank you, Mr. Robin.

EXAMINATION BY MR. DISHEROON:

Q Mr. Robin, what's your father's name?
A My father's name?
Q Yes, sir.
A Edward --
Q Edward?
A -- J. Robin, Sr.
Q Okay. He's the same gentleman that was -- gave a deposition earlier in this case. Is that right?
A Yes, sir.
Q And when you -- is he the one that started your business?
A Yes, sir.
Q And you've just continued it, you and your brothers?
A Yes, sir.
Q Okay. And you said initially you had a home in St. Bernard, but I think we've qualified that. You live in St. Bernard Parish?

A It's Poydras. My home is in Poydras.

Q It's now in Poydras?

A It goes from both addresses. It's St. Bernard, Louisiana, I put on my address, but the physical address is Poydras.

Q Okay.

MR. ZELAYA:

For your information --

EXAMINATION BY MR. DISHEROON:

Q And that's where you've --

MR. ZELAYA:

-- Mr. Disheroon --

EXAMINATION BY MR. DISHEROON:

Q -- marked it here on Exhibit 1 --

A Yes.

Q -- is Poydras?

A Yes, sir.

MR. ZELAYA:

Mr. Disheroon, St. Bernard refers to the parish, or county, if you will, and the various little townships are all within St. Bernard Parish.

EXAMINATION BY MR. DISHEROON:

Q And you said at your residence in

Poydras you had 29 inches of water in your house?
A Yes, sir.
Q After Katrina, Hurricane Katrina?
A Yes, sir.
Q How far is Poydras from the Mississippi River?
A Mile and a half.
Q And how far is it from Poydras to your work site at Yscloskey or Alluvial City that's depicted on here?
A 12 miles.
Q 12 miles. And you commute back and forth daily to work?
A Yes, sir.
Q You referred earlier to more frequent flooding that you're having. Was that at your residence or at Alluvial City or both?
A No, not at my residence. I'm in a hurricane protection plan. Yscloskey --
Q Yscloskey?
A -- Alluvial City.
Q Okay. And you spoke about northeast winds.

A Yes, sir.
Q When there were northeast winds, you'd get more water on your property?
A Yes, sir.
Q Okay. Now, to be clear, when you're saying northeast wind, does that mean a wind coming from the northeast?
A Yes, sir.
Q So on this map it would be coming in this general direction, from Lake Borgne south --
A No.
Q -- southeasterly?
A No, sir. It would be coming from the Gulf, coming up the channel.
Q South -- oh, this way?
A Yes, sir.
Q Okay. Is it only when they're southeasterly winds that you get flooding?
A Northeast wind, only northeast winds.
Q I'm sorry. Northeast?
A Yes, sir.
Q Northeast is this direction, right?

A No. The north -- where we take it is coming from the Gulf coming in.
Q But north is -- on this map is towards Lake Borgne, and east is this direction?
A No. The way I prefer -- the way I look at it, down from where I'm at, north is heading out -- south out and north coming -- I mean north and then east coming from this way, coming more from Florida.
The reason why I say -- why I say where the northeast winds, when the hurricane -- I mean when the Weather Channel says we got a northeast -- when northeast wind's coming, we got northeast winds coming for 10 miles an hour for -- and the next day we got a northeast wind coming for 10 miles an hour, that's when we know the weather -- the water is coming up.
Q And is that without regard to whether it's raining or not?
A Without regards to raining or not.
Q It's just wind-driven water?
A Wind-driven water. How I know it's -- how I know it's Gulf water, because

our product gets saltier. You get a
northeast wind, and the product always got a
better -- you got a more saltier taste into
it.
The only place the salt can come
from is the Gulf.
Q How about Lake Borgne?
A Lake Borgne is fresh. It's more
brackish.
Q Is it fresh or brackish?
A It's -- we call it a brackish
water.
Q It's connected to the Gulf, isn't
it?
A Way out, not in this part where my
oyster grounds are.
Q But it has physical connection?
A It has physical connections in the
St. Joe Channel, which is approximately
about 25 miles from where the area we're
talking about at.
Q You mentioned that the width
across where the Gulf Outlet Canal is has
widened?
A Yes.

Q And that you now drive or run your boats outside the markers?

A Yes, sir.

Q What's the draft on your boats?

A 5 feet.

Q 5 feet?

A The most, 5 feet. Anywhere from 2 to -- average, really 4 foot.

MR. DISHEROON:

Okay. That's all I have.

MR. WILES:

Okay. Thank you.

THE VIDEOGRAPHER:

You're done?

EXAMINATION BY MR. ZELAYA:

Q I have one quick question, Mr. Robin. Looking back to Exhibit No. 1, when you're describing a northeast wind, would you just put an arrow for the direction you're referring to, because I don't want to confuse that term with a compass versus what you're trying to describe.

A Correct. It's coming up the MRGO, coming to New Orleans, which is -- let's put

it this way.

It's coming from -- I guess you would say, as he says, the south coming in. But why the weatherman says we got a northeast wind, we got a tide coming in, but it is coming up the MRGO going from us to New Orleans.

Q So when you've used the term northeast wind, the direction that you're referring to is what you've just depicted as the arrow, correct?

A That is correct.

Q Put an "NE" there so we know what we're talking about.

A Because the waterways, northeast brings you high tide; northwest brings you low tide. And in the business I am, your tide is everything.

Q Sure.

A You have to -- you got to know where to navigate your boat, so you got to know what the current is on it. So tide is everything on our situation.

MR. ZELAYA:

Thank you, Mr. Robin.

Thank you, Mr. Disheroon.

THE VIDEOGRAPHER:

All right. Off the record at 12:28 p.m.

* * * *

WITNESS' CERTIFICATE

I have read or have had the foregoing testimony read to me and hereby certify that it is a true and correct transcription of my testimony with the exception of any attached corrections or changes.

______________________

(Witness' signature)

PLEASE INDICATE

( ) NO CORRECTIONS

( ) CORRECTIONS; ERRATA SHEET(S) ENCLOSED

REPORTER'S CERTIFICATE

I, Gretchen Alexander, Certified Court Reporter, do hereby certify that the above-named witness, after having been first duly sworn by me to testify to the truth, did testify as hereinabove set forth;

That the testimony was reported by me in shorthand and transcribed under my personal direction and supervision, and is a true and correct transcript, to the best of my ability and understanding;

That I am not of counsel, not related to counsel or the parties hereto, and not in any way interested in the outcome of this matter.

____________________________

GRETCHEN ALEXANDER, CCR, RPR

Certified Court Reporter