## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

_____
)
ST. BERNARD PARISH AND OTHER )
OWNERS OF REAL PROPERTY IN ST. )
BERNARD PARISH OR THE LOWER NINTH )
WARD OF THE CITY OF NEW ORLEANS, )
)
      Plaintiffs, )
)   No. 05-1119L
      v. )   Hon. Susan G. Braden
)
THE UNITED STATES OF AMERICA, )
)
      Defendant. )
_____)

### PLAINTIFFS' POST-TRIAL REPLY BRIEF

Charles J. Cooper
*Counsel of Record*

*Of Counsel:*

J. Wayne Mumphrey
Carlos A. Zelaya, II
MUMPHREY LAW FIRM, LLC
One Canal Place
365 Canal Street, Suite 2280
New Orleans, LA 70130
Telephone: (504) 569-0661
Facsimile: (504) 569-0665

COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C.  20036
Telephone: (202) 220-9600
Facsimile:  (202) 220-9601

*Of Counsel:*

John H. Musser, IV
201 St. Charles Avenue, Suite 2500
2500 New Orleans, LA 70170
Telephone: (504) 599-5964
Facsimile: (504) 566-7185

Michael W. Kirk
Vincent J. Colatriano
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C.  20036
Telephone: (202) 220-9600
Facsimile:  (202) 220-9601

Richard A. Tonry
Tonry and Ginart, LLC
2114 Paris Road
Chalmette, LA 70043
Phone: (504) 271-0471
Fax: (504) 271-6293

*Counsel for Plaintiffs*

May 18, 2012

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION ...................................................................................................................1

ARGUMENT ...........................................................................................................................3

I.     FLOODING ON PLAINTIFFS' PROPERTIES WAS THE DIRECT, NATURAL, AND PROBABLE RESULT OF THE MRGO. ....................................................................3

II.    THE MRGO CAUSED EXTENSIVE FLOODING ON PLAINTIFFS' PROPERTIES. ......................................................................................................................6

        A.    The MRGO Flooded Plaintiffs' Properties During Hurricane Katrina. ...................6

                1.    The Government's Criticisms of Plaintiffs' Wind Model Are Meritless. ...........................................................................................7

                        a.    Plaintiffs' Disclosure of Dr. Kemp's Wind Inputs Was Timely and Complete. .............................................................9

                        b.    The Government's Criticisms of the PBL Model Are Misplaced. .............................................................................10

                        c.    The Government Wildly Exaggerates the Significance of the Disputed Wind Adjustment. .................................................11

                2.    The Government's Criticisms of Plaintiffs' Wave Model Are Misleading. ......................................................................................12

                3.    Conveyance is Critical to the Extent of Flooding. .....................................15

        B.    Plaintiffs' Properties Inside the FPS Faced the Prospect of Inevitably Recurring Flooding. ...............................................................................................17

                1.    Katrina Shows that the MRGO Posed a Grave Threat to Plaintiffs' Properties Inside the FPS. .......................................................17

                2.    The Corps' Construction of the HSDRRS Shows that the Flooding the MRGO Caused During Katrina Was Not a One-Time Event. .............19

        C.    The MRGO Has Repeatedly Caused Flooding on Plaintiffs' Properties Outside the FPS. ..................................................................................................20

i

    1.      Nature of Proof Required.........................................................................20

    2.      Plaintiffs Presented Unrebutted Evidence that Flooding on Their Properties Outside the Levees Worsened as the MRGO's Environmental Effects Became More Pronounced....................................24

    3.      The MRGO Caused the Increased Flooding Plaintiffs Have Suffered.......25

          a.      Dr. Kemp Showed that the MRGO Caused Flooding by Changing the Area's Hydrology. ...............................................25

          b.      The MRGO Project Is By Far the Best Explanation for the Increased Flooding Plaintiffs Have Suffered. ....................30

III.    THE GOVERNMENT'S CONSTRUCTION, OPERATION, AND MAINTENANCE OF THE MRGO APPROPRIATED A PROPERTY INTEREST. ......35

    A.     The "Appropriation" Inquiry Focuses on the "Nature and Magnitude" of the Government Invasion....................................................................................35

    B.     Completion of the HSDRRS Does Not Relieve the Government of Liability to Pay Just Compensation for Property It Has Already Taken. .............................40

CONCLUSION..................................................................................................................42

## TABLE OF AUTHORITIES

**Cases**                                                                  **Page**

*Alost v. United States*, 73 Fed. Cl. 480 (2006).................................................................21, 22

*Ark. Game & Fish Comm'n v. United States*, 87 Fed. Cl. 594 (2009)........................21, 22, 23, 39

*Ark. Game & Fish Comm'n*, 637 F.3d 1366 (Fed. Cir. 2011) ................................................37, 41

*Ark. Game & Fish Comm'n v. United States*, 132 S. Ct. 1856 (2012) ....................................22, 39

*B Amusement Co. v. United States*, 148 Ct. Cl. 337 (1960).........................................................36

*Baird v. United States*, 5 Cl. Ct. 324 (1984) ..............................................................................38

*Banks v. United States*, 78 Fed. Cl. 603 (2007) .........................................................................30

*Barnes v. United States*, 210 Ct. Cl. 467 (1976).........................................................................5

*Cary v. United States*, 552 F.3d 1373 (Fed. Cir. 2009) .....................................................4, 5, 6, 38

*Cooper v. United States*, 37 Fed. Cl. 28 (1996)..........................................................................21

*Deseret Mgmt. Corp. v. United States*, 97 Fed. Cl. 272 (2011).....................................................9

*Dickinson v. United States*, 331 U.S. 745 (1947) ........................................................................40

*First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*,
    482 U.S. 304, 321 (1987)..............................................................................................2, 40, 42

*Fromme v. United States*, 188 Ct. Cl. 1112 (1969)............................................................36, 37, 38

*Hartwig v. United States*, 202 Ct. Cl. 801 (1973)................................................................37, 38

*Hendricks v. United States*, 14 Cl. Ct. 143 (1987)......................................................................22

*Herriman v. United States*, 8 Cl. Ct. 411 (1985) ........................................................................22

*In re Katrina Canal Breaches Consol. Litig.* (*Robinson I*),
    647 F. Supp. 2d 644 (E.D. La. 2009)................................................................1, 4, 6, 13, 31

*Leeth v. United States*, 22 Cl. Ct. 467 (1991) ............................................................................22

*Loesch v. United States*, 227 Ct. Cl. 34 (1981)..........................................................................22

*Moden v. United States*, 404 F.3d 1335 (Fed. Cir. 2005) ............................................................5

*Moore v. Associated Material & Supply Co.*, 948 P.2d 652 (Kan. 1997).....................................21

*National By-Products, Inc. v. United States*, 186 Ct. Cl. 546 (1969)..............................37, 41, 42

*Navajo Nation v. United States*, 631 F.3d 1268 (Fed. Cir. 2011)...................................................40

*Pumpelly v. Green Bay & Miss. Canal Co.*, 80 U.S. (13 Wall.) 166 (1871) .................................39

*Ridge Line, Inc. v. United States*, 346 F.3d 1346 (Fed. Cir. 2003)....................................1, 2, 5, 36

*Singleton v. United States*, 6 Cl. Ct. 156 (1984) ........................................................................38

*Skip Kirchdorfer, Inc. v. United States*, 6 F.3d 1573 (Fed. Cir. 1993) .........................................40

*St. Bernard Parish v. United States*, 88 Fed. Cl. 528 (2009)....................................................1, 4, 5

*State* ex rel. *Doner v. Zody*, 958 N.E. 2d 1235 (Ohio 2011)..........................................21

*Stockton v. United States*, 214 Ct. Cl. 506 (1977) .......................................................36

*Tarrant Reg. Water Dist. v. Gragg*, 43 S.W. 3d 609 (Tex. App. 2001) .......................................21

*Terrebonne Parish Police Jury v. Matherne*, 405 So. 2d 314 (La. 1981) ....................................38

*Turner v. United States*, 23 Cl. Ct. 447 (1991) ...........................................................22

*United States v. Causby*, 328 U.S. 256 (1946)..............................................................39

*United States v. Cress*, 243 U.S. 316 (1917) .................................................5, 38, 39

*United States v. Dickinson*, 331 U.S. 745 (1947) ...........................................................22

*United States v. Kansas City Life Ins. Co.*, 339 U.S. 799 (1950) ..................................22

*United States v. Lynah*, 188 U.S. 445 (1903)...........................................................22, 23

*Zoltek Corp. v. United States*, 71 Fed. Cl. 160 (2006)..................................................9

## Other

U.S. Brief in Opposition, *Ark. Game & Fish Comm'n v. United States*, No. 11-597,
    2012 WL 691652 (U.S. Mar. 1, 2012)............................................................40, 41

RESTATEMENT (SECOND) OF TORTS § 442B .................................................................5

RESTATEMENT (SECOND) OF TORTS § 448 ..................................................................4

## **INTRODUCTION**

The most notable thing about the Government's opening post-trial brief is how few of Plaintiffs' actual factual and legal arguments it contests.  Under the test the Federal Circuit articulated in *Ridge Line, Inc. v. United States*, 346 F.3d 1346 (Fed. Cir. 2003), Plaintiffs in this takings suit must show that the Government (1) foreseeably (2) caused (3) the appropriation of a property interest.  Although the Government argues that Plaintiffs have not satisfied any of these three elements, much of the evidence that supports Plaintiffs' claims is undisputed.

On foreseeability, the Government does not question the voluminous documentary evidence establishing that it knew that the MRGO threatened to massively flood Plaintiffs' properties, an inevitability that the Flood Protection System (FPS) did little to prevent.  Ignoring these facts, the Government asserts that Hurricane Katrina was an unforeseeable event that broke the chain of causation between the MRGO and flooding on Plaintiffs' properties.  This Court rejected a virtually identical argument three years ago, and it should do so again now.  *St. Bernard Parish v. United States*, 88 Fed. Cl. 528, 558 (2009).

On causation, the Government never addresses the issues that Judge Duval found to be dispositive in *Robinson*.  It does not defend its modelers' results-driven "scaling" of surge heights, their failure to accurately capture the timing of Katrina's peak surge, or their inability to explain how the St. Bernard Polder flooded as quickly as it did.  *See In re Katrina Canal Breaches Consol. Litig.* (*Robinson I*), 647 F. Supp. 2d 644, 689 (E.D. La. 2009).  What the Government does say about the modeling in *Robinson* is not only largely wrong, but is ultimately irrelevant.

The Government's causation arguments with respect to flooding outside the levees fare little better.  Plaintiffs' theory of causation for these properties rests on many of the same propo-

sitions that Judge Duval credited in *Robinson*: *i.e.*, that wetlands slow and diminish the movement of wind-driven water inland, that channels that convey large volumes of water promote flooding, and that the MRGO both destroyed wetlands and promoted conveyance.  While the Government is quick to criticize Plaintiffs' failure to develop a multi-million dollar model to demonstrate these facts, it is hard pressed to identify any real flaws in Plaintiffs' experts' analysis.

On appropriation, the Government argues that all Plaintiffs must, as a matter of law, demonstrate multiple actual instances of flooding to recover under the Takings Clause.  No case so holds, and the controlling *Ridge Line* appropriation test directs the Court to consider the "nature and magnitude" of the Government's actions.  346 F.3d at 1356.  The grave risk of flooding Plaintiffs endured for years and the near-total devastation they suffered during Katrina leaves little doubt that even for those Plaintiffs whose properties only flooded once, the nature and magnitude of the invasion at issue here rose to the level of a taking.

The Government also argues that it is not liable for flooding that the MRGO has caused in the past because the new Hurricane and Storm Damage Risk Reduction System (HSDRRS) will prevent flooding in the future.  But the Government's brief does not acknowledge, much less address, our contention, raised repeatedly in pretrial briefing and at trial, that even assuming that the HSDRRS protects Plaintiffs with properties inside the FPS from future flooding, Plaintiffs at a minimum are still entitled to recover just compensation for the temporary taking of a flowage easement.  It is well-settled that "no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective," *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 321

(1987), and it follows that no amount of prospective flood protection can relieve the Government of liability for floods it has already caused.

In short, Plaintiffs have established that the Government foreseeably flooded their land and thereby appropriated a property interest.  They are owed just compensation.

## ARGUMENT

### I.    FLOODING ON PLAINTIFFS' PROPERTIES WAS THE DIRECT, NATURAL, AND PROBABLE RESULT OF THE MRGO.

*Ridge Line* holds that even when the Government does not intend to take property, a plaintiff can establish a taking if an invasion of his property was the foreseeable result of authorized Government actions.  346 F.3d at 1355-56.  Plaintiffs' opening post-trial brief and findings of fact catalogue the extensive evidence, much of it from the Government's own documents, that demonstrates that the flooding the MRGO caused was not only foreseeable but actually foreseen by the Government.  The Government says little about the voluminous evidence establishing foreseeability, and so only a brief summary is necessary here.

The evidence establishes that long before the Government constructed the MRGO, it knew that healthy wetlands play a critical role in suppressing the inflow of wind-driven water. FOF ¶¶ 120-24.  The Government nevertheless cut the MRGO channel through the critical wetland buffer that once protected the St. Bernard Polder, FOF ¶¶ 128-29, and allowed the channel's unprotected banks to dramatically erode over time, FOF ¶¶ 130-31.  The Government predicted that the MRGO would channel salt water into these wetlands, causing additional land loss and making the surviving wetlands a less effective storm buffer by killing the swamp forests and degrading the marshes.  FOF ¶¶ 166-70.  And the Government also knew when it built the MRGO that it was altering the area's hydrology in a way that would funnel storm surge into the St. Ber-

nard Polder, a fact that experts both inside and outside the Government long worried would one day cause a catastrophe like the one that befell the polder during Katrina. FOF ¶¶ 190-204.

Of course, at least with respect to properties inside the levee system, the Government could have eliminated the flooding risk it created by building levees capable of repelling MRGO floodwaters. But the system the Government actually built was inadequate to this task in almost every conceivable way. The FPS levees were not designed to withstand storms of the magnitude the region frequently faces, FOF ¶¶ 234-48, they were built a foot or more lower than intended due to the use of an inaccurate vertical datum, FOF ¶¶ 251-59, and they were allowed to sink still further below their intended heights as soil beneath them laterally displaced into the MRGO, FOF ¶¶ 212-22, 271. Government documents establish these facts, and they remain largely unrebutted.

Rather than contesting the facts about a project Judge Duval called "a fifty-year exercise in ineptitude and gross economic and technological mismanagement," *Robinson I*, 647 F. Supp. 2d at 651 n.7, the Government, relying principally on the Federal Circuit's decision in *Cary v. United States*, 552 F.3d 1373 (Fed. Cir. 2009), argues that Hurricane Katrina broke the chain of causation between the MRGO and the flooding Plaintiffs have experienced. U.S. Br. 26-28. The Court suggested three years ago that the Government's reliance on *Cary* was misplaced, and it should so hold now. *See St. Bernard Parish*, 88 Fed. Cl. at 558. In *Cary*, the Federal Circuit found that a hunter who illegally started a fire that spread to the plaintiffs' properties broke the chain of causation between the Government's fire suppression policy and the plaintiffs' losses. 552 F.3d at 1378-81. *Cary* follows the traditional rule that the intentional conduct of a third party is normally a superseding cause. *See* RESTATEMENT (SECOND) OF TORTS § 448. That rule has no application to the natural and entirely foreseeable weather events during which the MRGO

flooded Plaintiffs' properties.  As this Court explained in its 2009 summary judgment decision, "the *Cary* court distinguished . . . an intervening cause created by a man-made fire from flooding cases 'where the landowners' property was inundated . . . from the runoff created by [the Government's] alternation of the area's storm drainage.' "  *St. Bernard Parish*, 88 Fed. Cl. at 558 (quoting *Cary*, 552 F.3d at 1380).

This reading of *Cary* is confirmed by the numerous cases that hold the Government liable under the Takings Clause for causing storm flooding.  In *Ridge Line*, for example, the Federal Circuit found that the Government could be liable for increasing storm runoff onto the plaintiff's land.  346 F.3d at 1346.  Nothing in *Ridge Line*'s lengthy explication of the legal standards that govern flooding cases suggests that storms are superseding events that relieve the Government of liability.  Indeed, such a rule could not be reconciled with cases that held the Government liable for flooding that occurred when a river was high, *United States v. Cress*, 243 U.S. 316 (1917), or when precipitation and snow melt were heavy, *Barnes v. United States*, 210 Ct. Cl. 467 (1976). These decisions leave no doubt that in flooding cases foreseeable bad weather (*e.g.*, a hurricane in the nation's most hurricane-prone region) is not a superseding cause.  *Cf.* Restatement (Second) of Torts § 442B cmt. B ("[A]ny harm which is in itself foreseeable, as to which the actor has created or increased the recognizable risk, is always 'proximate,' no matter how it is brought about, except where . . . it is not within the scope of the risk created by the original negligent conduct.").

Nor is there any merit to the Government's suggestion that, like the plaintiffs in *Cary*, Plaintiffs in this case run afoul of the *Moden* rule that the Government is only liable for losses that are the likely result of its actions.  U.S. Br. 26-27; *see Moden v. United States*, 404 F.3d 1335, 1343-44 (Fed. Cir. 2005).  Unlike the plaintiffs in *Cary*, who never alleged that a giant

conflagration was the probable result of the Government's fire suppression policy, *Cary*, 552 F.3d at 1378, Plaintiffs introduced evidence showing that the MRGO project made catastrophic flooding inside the inadequate levee system not only probable but essentially inevitable.  Numerous Government documents establish that the MRGO's destruction of the wetland buffer around Lake Borgne and its conveyance of water toward the St. Bernard Polder were both foreseeable and actually foreseen by the Government.  The Government's documents also show that it was long aware that the FPS was not up to the task of protecting properties inside the levees from the flooding the MRGO threatened.  In short, the evidence shows that it was only a matter of time before Plaintiffs' properties inside the levee system were catastrophically flooded.

## II.     THE MRGO CAUSED EXTENSIVE FLOODING ON PLAINTIFFS' PROPERTIES.

### A.  The MRGO Flooded Plaintiffs' Properties During Hurricane Katrina.

Before turning to the Government's arguments about what caused the Katrina disaster, it is important to note what the Government does not say.  The Government never suggests that Judge Duval was wrong when he found that the *Robinson* plaintiffs' model showed a remarkable fidelity to the known timing of Katrina's peak surge and that the Government modelers' results-driven "scaling" of surge heights, on the other hand, made their model unreliable.  *Robinson I*, 647 F. Supp. 2d at 689.  Nor does the Government explain how water could have filled the Central Wetlands Unit fast enough to overtop the Forty Arpent Levee at 8:30 a.m. if the Reach 2 levee did not breach until after it was overtopped at about 7:00 a.m.  *See* FOF ¶ 308; *Robinson I*, 647 F. Supp. 2d at 685-87.  Instead of addressing these dispositive issues, the Government's

brief contains a variety of misleading and often inaccurate criticisms of Plaintiffs' model. These arguments fail.[1]

### 1. The Government's Criticisms of Plaintiffs' Wind Model Are Meritless.

Of the approximately twenty pages the Government's brief spends criticizing the *Robinson* experts' modeling efforts, ten of them are devoted to wind. This focus on wind is notable because it represents a significant departure from the Government's trial strategy in *Robinson*, where it devoted relatively little attention to the plaintiffs' wind model. Dr. Resio attempted to paper over this shift by suggesting that the Government's experts did not realize that the plaintiffs had used the Planetary Boundary Layer (PBL) wind model until it was too late. Resio Written Testimony at 12. But this explanation is implausible given that one of the Government's experts in *Robinson*, Dr. Johannes Westerink, developed the version of ADCIRC the plaintiffs' experts used – a version of ADCIRC that always deploys the PBL model. Pls.' Opening Post-Trial Brief, Exhibit B ("Kemp Decl.") ¶ 6. The real explanation for the Government's shift in strategy is that it lost in *Robinson* because its model contradicted observed facts about the timing and height of Katrina's surge. *See* FOF ¶¶ 332-38. The Court should recognize the Government's focus on winds for what it is: an attempt to distract from the reasons Judge Duval credited the *Robinson* plaintiffs' model.

A diagram in Dr. Resio's testimony illustrates why the Government's focus on wind modeling is ultimately a red herring:

---

[1] Before enumerating its criticisms of the Plaintiffs' model, the Government's brief claims that "Dr. Kemp testified that each of these problems compromised the results of the plaintiffs' modeling in *Robinson*." U.S. Br. 47. As the absence of any citation in support of this claim anywhere in the Government's brief attests, Dr. Kemp made no such concessions.



**Figure 1** (taken from Resio Written Testimony at 12).

The choice of a wind model only matters insofar as it affects surge, conveyance, and waves (modeled by the plaintiffs' experts in *Robinson* using ADCIRC, FINEL, and SWAN, respectively).  In the case of Katrina, the Plaintiffs' model accurately reflected the timing of the storm's peak surge and the extent of flooding that occurred as a result.  Unlike the Government's model, the Plaintiffs' model produced hydrodynamically consistent surge and wave heights that did not need to be dramatically "scaled" – *i.e.*, artificially adjusted – to accurately reflect observed high water marks at the model's boundaries.  FOF ¶ 333.  Given these facts, the Court need not delve deeply into the particular details of wind modeling to conclude that the *Robinson* experts' overall model was accurate: observed facts bear out the model's results.

But even if this case turned on the details of the *Robinson* experts' wind model, Plaintiffs would still prevail.  As explained in detail below, the Government's various criticisms of the *Robinson* experts' wind modeling do not withstand scrutiny.

### a. Plaintiffs' Disclosure of Dr. Kemp's Wind Inputs Was Timely and Complete.

The Government argues that Dr. Kemp's testimony is inadmissible because Plaintiffs were too slow to disclose the wind inputs he used. U.S. Br. 42-45. The Court already rejected this argument when it denied the Government's pretrial motion in limine to exclude Dr. Kemp's testimony, and nothing in the Government's brief explains why a different result is appropriate now. The rules require that supplemental expert disclosures be "timely," RCFC 26(e), and Plaintiffs disclosed Dr. Kemp's wind inputs with enough time to allow Dr. Resio to criticize them in his written testimony before trial, *see* Resio Written Testimony at 13. In any event, the Government never suggests that it suffered prejudice of any kind because it did not receive the wind inputs sooner. Even if Plaintiffs' disclosure of the inputs were untimely, the absence of any prejudice to the Government would by itself be a sufficient basis for refusing to exclude the testimony of one of Plaintiffs' key witnesses. *See Deseret Mgmt. Corp. v. United States*, 97 Fed. Cl. 272, 275 (2011) (declining to exclude expert report where delayed disclosure was harmless); *Zoltek Corp. v. United States*, 71 Fed. Cl. 160, 168 (2006) ("[W]here there is no surprise or prejudice to the other party . . . exclusion of testimony or documents is unnecessary.").

Echoing Dr. Resio, the Government also suggests that the inputs Plaintiffs disclosed were incomplete. U.S. Br. 45. But as Dr. Kemp explained in his supplemental declaration, Plaintiffs disclosed all of the requested inputs, and the version of the PBL model he used internally calculates the additional parameters that Dr. Resio claimed were missing. Kemp Decl. As with all versions of the PBL model, Plaintiffs' version of the model works due to "the remarkable consistency and relative uniformity of hurricane circulations." Kemp Decl. ¶ 5 (quoting Greg J. Holland, James I. Belanger & Angela Fritz, *A Revised Model for Radical Profiles of Hurricane*

*Winds*, 138 MONTHLY WEATHER REV. 4393, 4393 (2010)).  Every PBL model internally calcu-lates hurricane statistics of one kind or another.

**b.  The Government's Criticisms of the PBL Model Are Misplaced.**

Plaintiffs' opening post-trial brief and proposed findings of fact explained at length why Dr. Resio's various criticisms of the PBL model are wrong, Pls.' Opening Post-Trial Br. 58-60; FOF ¶¶ 311-15, but two of those criticisms deserve additional attention here because the Gov-ernment's brief emphasizes them.

First, the Government suggests that the PBL model is unreliable and should not be used to depict hurricanes as they approach land.  U.S. Br. 47-48.  But the PBL model is widely used for this purpose by leading experts in the field, including many of the Government's own expert witnesses from *Robinson*.  Kemp Decl. ¶ 5; *see* Joannes Westerink, Bruce Ebersole & Harley Winer, *Note on the Influence of the Mississippi River Gulf Outlet on Hurricane Induced Storm Surge in New Orleans and Vicinity*, IPET Vol. IV, Appendix 6, (SPX 04), at IV-6-5, .pdf 912 (2007) ("We applied . . . wind and pressure fields derived from a Planetary Boundary Layer model to simulate the atmospheric forcing functions during the Katrina event.").  Indeed, Ap-pendix 8 of the IPET, to which Dr. Resio contributed, says that the PBL model did a "very good" job depicting Katrina's winds, IPET Vol. VIII, appendix 8 (SPX 08), at VIII-8-13, .pdf 474, and Dr. Resio testified in *Robinson* that there was only a "slight" difference between the parties' wind models, *Robinson* Tr. 2826:2-14 (Resio).  Simply put, Dr. Resio's broadside attack on the PBL model cannot be reconciled with the work of leading experts or his own prior statements.

Second, the Government's reliance on an article by V.J. Cardone and A.T. Cox that calls into question the use of PBL *forecasts* is misplaced because Dr. Kemp used a PBL *hindcast*.  As the Government's brief notes, the Cox and Cardone article suggests that the so-called "best

winds" approach favored by Dr. Resio is somewhat more accurate than a PBL forecast, some-times called a "real time" PBL model.  V.J. Cardone & A.T. Cox, *Tropical Cyclone Wind Field Forcing for Surge Models: Critical Issues and Sensitivities* (SPX 504), at .pdf 14.  In contrast, Cardone and Cox conclude that a PBL hindcast provides a "skillful" depiction of hurricane winds "even for a catastrophic event such as Katrina" and that the best winds approach performs little if any better.  *Id.*  Recognizing that he had incorrectly assumed that Dr. Kemp had used a PBL forecast, Dr. Resio seemed to acknowledge at trial that his earlier criticism is inapplicable to Plaintiffs' actual wind model.  Tr. 1014:25-1015:3 (Resio).

### c.   The Government Wildly Exaggerates the Significance of the Disputed Wind Adjustment.

Hurricane modelers adjust wind speeds in areas that have substantial emergent vegetation to reflect the fact that vegetation reduces wind's force on water.  Tr. 546:22-547:19 (Kemp) (not-ing consensus among experts that it is appropriate to reduce surface wind speeds to reflect pres-ence of emergent vegetation).  The *Robinson* experts made two such adjustments in their "no-MRGO" scenario: an eighty percent wind reduction in areas of cypress forest, and a fifteen per-cent reduction in fields of ten-foot bamboo-like reeds covering approximately two percent of the modeled area.  Tr. 281:14-22, 286:13-14 (Kemp).  In his written testimony, Dr. Resio argued that Dr. Kemp should have gradually eliminated the latter of these two adjustments as Katrina's peak surge submerged the reeds.[2]  Resio Written Testimony at 16.

The Government suggests that the adjustment at issue affected the entire "modeled area"

---

[2] It bears emphasis that neither Dr. Resio nor the Government's brief contests Dr. Kemp's more significant wind adjustment, the eighty percent reduction associated with cypress forest. Tr. 1025:6-7 (Resio) (acknowledging that wind reduction factor should be applied to areas with cypress trees throughout storm).  Cypress trees like those the MRGO destroyed grow to as much as 50 feet tall and therefore would have remained above the water's surface throughout the storm.

and "caused the wind speeds in the 'with-MRGO' scenario to be at least fifteen percent higher." U.S. Br. 50.  This is incorrect.  Dr. Kemp explained at trial that in fact the reed bed wind adjustment "*affects maybe 2 percent of the corridor of the area outside of the MRGO*," an area far too small for a fifteen percent wind adjustment to affect the model's overall results.  Tr. 281:17-22 (Kemp) (emphasis added); *see also id.* at 281:14-22, 286:13-14 (Kemp).  Notably, Dr. Resio did not dispute that this adjustment affected only a very small portion of the relevant study area.  Nor did he make any attempt to explain how such a small wind adjustment could have made more than a *de minimis* difference; indeed, he admitted during cross-examination that he was unsure whether accounting for submergence of the reed beds would have made any difference at all.  Tr. 1024:22, 1025:8-10 (Resio) (explaining that he only offered the criticism because he "couldn't get a feel for why there was such a difference in the waves").  Nothing in the record or the Government's brief gives the Court any reason to question Dr. Kemp's unrebutted testimony that the disputed wind adjustment is simply too small to matter.

### 2.   The Government's Criticisms of Plaintiffs' Wave Model Are Misleading.

The Government says that Dr. Johannes Vrijling, the *Robinson* plaintiffs' lead wave modeler, "acknowledged that the results of plaintiffs' wave modeling in *Robinson* overestimated waves."  U.S. Br. 51.  But what the Government neglects to mention is that the *Robinson* experts identified and corrected the problem the Government is referring to *long before trial*.  *See* Vrijling Declaration (Jan. 21, 2009) (SPX 488), at 16, 21; Input and Results SWAN Calculations (Mar. 23, 2009) (PX 2009).[3]  It was on the basis of *corrected* model runs that Dr. Vrijling testi-

---

[3] The Government's description of the problem with the preliminary version of Plaintiffs' wave model is inaccurate.  The Government claims that the *Robinson* experts "did not apply any bottom friction coefficient" in their preliminary model, U.S. Br. 52, but in fact they used "JON-SWAP" values to account for bottom friction, Vrijling Expert Report (July 9, 2008) (SPX 480),

fied and Judge Duval found that the MRGO dramatically increased the height and frequency of waves that attacked the Reach 2 levee during Katrina. *See Robinson* Tr. 931:8-21; 942:2-943:6; 993:21-994:2; 997:11-20 (Vrijling); *see also Robinson I*, 647 F. Supp. 2d at 682-83. And in any case, the adjustment at issue had only a modest impact on the modeled waves, leading Dr. Vrijling to explain that it "does not really affect any of our conclusions about the importance of the channel in amplifying waves or of the vegetation in diminishing them adjacent to the levees of the MRGO." Vrijling Declaration (SPX 488), at 18. The fact that an early version of Plaintiffs' wave model may not have properly accounted for variations in bottom friction is simply irrelevant to whether their corrected model is accurate.

The Government also argues that the *Robinson* experts' wave model should not have used a source term developed by Andre Westhuysen. *See* Andre J. van der Westhuysen, Marcel Zijlema & Jurjen A. Battjes, *Nonlinear Saturation-Based Whitecapping Dissipation in SWAN for Deep and Shallow Water*, 54 COASTAL ENGINEERING 151 (2007) (*Robinson* DX 1104). In *Robinson*, this was a point of difference between Dr. Resio and Dr. Vrijiling, a tenured professor at the Netherlands' leading technical university who is at least as eminent an expert in wave modeling as Dr. Resio. *See Robinson* Tr. 818:11-824:8 (discussing Dr. Vrijling's qualifications); Declaration of Johannes Vrijling (Sept. 17, 2007) (PX 39), at .pdf 61-70 (Dr. Vrijling's curriculum vitae).[4] Like Judge Duval, the Court need not resolve the somewhat arcane dispute over SWAN

---

at 12; *see also* Resio *Robinson* Expert Report (Dec. 21, 2008) (SPX 487), at 15. Although JON-SWAP values may not reflect *variations* in bottom friction, neither do they entirely ignore bottom friction as the Government implies. In any event, in the SWAN runs that were the basis for Dr. Vrijling's testimony at trial, the *Robinson* experts corrected this problem using "Collins" friction factors to account for different types of marsh in the relevant area. *Robinson* Tr. 932:8-16 (Vrijling).

[4] *See also* Tr. 999:23-1000:2 (Resio) ("[H]opefully five to ten years from now we will not be saying the Dutch are the best in the world in coastal engineering and coastal science and coastal planning.").

source terms because it does not matter: the *Robinson* experts also ran their wave model using Dr. Resio's preferred source term and still found that waves were three feet higher with the MRGO than they would have been without it.[5]  *See* Joint Declaration of Vrijling et al. (Jan. 21, 2009) (SPX 488), at 18, 21.

But in any case, Drs. Kemp and Vrijling have the better of the argument.  The Westhuysen source term was developed to address known flaws in the "default" term Dr. Resio prefers, Westhuysen et al., *supra*, at 151-52, and it has been shown to significantly improve SWAN's fidelity to observed wave characteristics, *id.* at 157-67.  Westhuysen et al. demonstrate that the default term that the Government advocates is only better over "very short dimensionless fetches," Westhuysen et al; *supra*, at 167, and, contrary to Dr. Resio's testimony, Dr. Kemp explained that the fetch at issue here is neither very short nor dimensionless, Tr. 553:22-23, 554:24-555:20 (Kemp).  Dr. Westhuysen's article bears out Dr. Kemp's views on this issue.  The problem Dr. Resio trumpets only occurred for waves originating very near the shoreline, Westhuysen et al., *supra*, at 160 (note location of FL25 in Figure 9), and even 1000 meters of fetch were enough to make the Westhuysen source term the better approach, *see id.* at 163, Figure 13(e); *id.* at 165-66. While Dr. Resio testified that waves in the MRGO during Katrina were clearly not depth limited, Tr. 1093:18-1094:1 (Resio), he does not dispute that they just as clearly were depth limited as they crossed Lake Borgne, a critical part of the relevant fetch.[6]

---

[5] The Government's brief is misleading on this point because it focuses on the amount by which waves grew as they crossed the channel rather than the difference in waves between scenarios with and without the MRGO.  U.S. Br. 55-56.  In every run of the *Robinson* experts' wave model, waves grew with the MRGO and dissipated without it.

[6] Notably, unlike the Government's wave results, the wave heights the *Robinson* experts derived using the Westhuysen source term compare favorably to wave heights predicted by the Corps' *Shore Protection Manual*, the Government's guidebook to coastal engineering during most of the FPS's lifetime.  *See* USACE, Shoreline Protection Manual (2d ed. 1975) (PX 1332),

### 3.  **Conveyance is Critical to the Extent of Flooding.**

Just as the Corps was long warned, the *Robinson* experts' model showed that the MRGO created a "funnel" that greatly increased the movement of flood water into the St. Bernard Polder.  Kemp Written Testimony at 171; FOF ¶¶ 294-300.  The Government's brief does not directly contest this finding but instead argues that "conveyance is not a proxy for flooding."  U.S. Br. 60.  But Dr. Kemp did not stop after documenting the MRGO funnel's conveyance capacity: he went on to calculate the volume of water that went over the levees during Katrina as a result. Kemp Written Testimony at 149-57.  These calculations establish the rather obvious link between conveyance and flooding that the Government says is missing.

Echoing Dr. Resio, the Government notes that "conveyance can increase without an increase in surge elevation" if "there is sufficient discharge out of a system." U.S. Br. 60.  That is true but beside the point.  The Katrina disaster plainly shows that the discharge of water into Lake Pontchartrain is inadequate to prevent flooding when the MRGO funnels large volumes of water toward the St. Bernard Polder.  And the Government is simply wrong when it implies that the *Robinson* experts' model did not account for this discharge: it was a feature of every scenario they examined.  *See* Kemp Written Testimony at 143 (noting especially high velocity of discharge into Lake Pontchartrain via the IHNC in the "Katrina-as-is" scenario); *see also id.* at 144-47.

---

at 3-49, .pdf 119 (predicting that 100 mph winds will increase wave height by between 2.5 and 3 feet across a 30-foot deep, 1500-foot long fetch).



**Figure 2.** This FINEL output for the "Katrina-as-is" scenario shows very high velocities in the portion of the IHNC that connects Reach 1 with Lake Pontchartrain. These high velocities underscore the fact that discharge into the lake was insufficient to prevent the MRGO funnel from also discharging over the levees and into the St. Bernard Polder (taken from Kemp Written Testimony at 145).

The Government also argues that conveyance does not cause flooding "if the final surge elevation does not surpass the height of the hurricane protection system." U.S. Br. 60. But conveyance can cause flooding without levee overtopping when, as happened during Katrina, it causes the levee to breach via front-side erosion. FOF ¶¶ 304-08. In any case, the FINEL model showed that even if the levees had held, Katrina's surge would have been high enough to overtop them, an event that, prior to completion of the HSDRRS, was likely to happen more than once every twenty years. Suhayda Written Testimony at 13-19; FOF ¶ 388-91. As Dr. Kemp explained, once a levee breaches or is overtopped, conveyance is critical to the extent of flooding that results. Like water pouring into an overflowing bathtub, storm surge stops rising and the factors that determine the extent of flooding are the duration and speed of the water's flow – *i.e.*, conveyance. Kemp Written Testimony at 169, 174-75; Tr. 299:14-25, 526:4-18 (Kemp).

The Government also suggests that Dr. Kemp's analysis of the funnel failed to isolate the effects of the MRGO, as opposed to other relevant man-made geographic features such as levees. U.S. Br. 59-60.  The Government is mistaken.  As Dr. Kemp explained in his written testimony, Scenario 2c of the *Robinson* experts' model (the "no-MRGO" scenario) included the levees and other man-made features in the area while restoring the surrounding wetlands to their pre-MRGO condition.  Kemp Written Testimony at 146-47.  The model predicted very little flooding in this scenario.

    **B.  Plaintiffs' Properties Inside the FPS Faced the Prospect of Inevitably Recurring Flooding.**

        **1.  Katrina Shows that the MRGO Posed a Grave Threat to Plaintiffs' Properties Inside the FPS.**

The Government argues that modeling from *Robinson* has little bearing on this case because Plaintiffs must show inevitably recurring flooding and "one cannot generalize from one storm to another."  U.S. Br. 56; *see also id.* at 42.  As Plaintiffs argue in their opening post-trial brief and at greater length below, the Government's reliance on the inevitably recurring standard is misplaced in a case like this one, where flooding of an enormous magnitude caused damage of a permanent character.  *See infra* 35-39; Pls.' Opening Post-Trial Br. 104-106.  But even if the Government's arguments about the applicable legal standard were correct, its suggestion that the Court ignore the most rigorous study of any storm in the region's history would still widely miss the mark.

As Dr. Resio admitted during cross-examination, hurricane scientists "can learn a lot from an example."  Tr. 1072:4-5 (Resio).  Even in a region that suffers major hurricanes as frequently as New Orleans, *see* FOF ¶¶ 241-43, the dataset from which experts must extrapolate their conclusions about storm return periods and storm dynamics remains relatively small.  In-

deed, it is ultimately from the existing handful of case studies that Dr. Resio's JPM-OS produces

a storm surge probability distribution for Greater New Orleans. *See* Donald T. Resio, *White Pa-*

*per on Estimating Hurricane Inundation Probabilities* (IPET Vol. VIII, appendix 8-2) (SPX 08),

at VIII-8-23, .pdf 484 (noting use of historical storm data to determine probability of JPM meth-

od's hypothetical storm parameters).  In short, Katrina is the best understood storm in the re-

gion's history, and it provides critical information that confirms the worst fears the Govern-

ment's own documents express about the MRGO.

       The Katrina case study is especially informative because it demonstrates not only that the

MRGO causes flooding in the St. Bernard Polder but also that *it can do so on a massive scale*.

Given how much flooding the MRGO caused during Katrina, it strains credulity for the Govern-

ment to suggest that in any lesser storm it would not have caused flooding as well.  The *Robin-*

*son* experts found that the MRGO was responsible for upwards of 90 percent of the water that

flooded St. Bernard Polder to depths of as much as 10 feet.  FOF ¶¶ 283, 288, 297-308.  Their

model showed that the MRGO caused the Reach 2 levee to substantially breach two hours before

Katrina's peak surge arrived, strongly suggesting that Katrina's unusually high peak surge was

not itself critical to the flooding the polder experienced.  FOF ¶¶ 282, 304.  The *Robinson* ex-

perts' model also showed that even if the IHNC floodwall had held, it would have been massive-

ly overtopped because of the MRGO.  Kemp Written Testimony at 167; FOF ¶¶ 299-301.  One

does not need a Ph.D. in coastal engineering to understand why it follows from these conclusions

that, even in a storm significantly weaker than Katrina, the MRGO, as it and the environment it

significantly degraded existed during the years preceding Katrina's landfall, would have caused

substantial flooding on Plaintiffs' properties.

Apart from suggesting that Katrina was an unusually large storm, nothing in the Government's brief or Dr. Resio's testimony gives any reason to doubt that the MRGO functioned as it would have during any hurricane.  Dr. Kemp's testimony shows that the basic hydrological features that contributed to the Katrina catastrophe, namely the MRGO funnel and its conveyance of storm surge into Reach 1, were at work during other storms as well.  Kemp Written Testimony at 254-58.  Though no doubt quite severe, Katrina was characteristic of the storms New Orleans frequently faces, FOF ¶ 243, and there is every reason to believe that, given the condition of the FPS in 2005, the MRGO would have caused extensive flooding inside the levees during even a much weaker storm.

## 2. The Corps' Construction of the HSDRRS Shows that the Flooding the MRGO Caused During Katrina Was Not a One-Time Event.

The strongest evidence that Plaintiffs' properties inside the levees faced the prospect of inevitably recurring flooding as a result of the MRGO is the Government's effort to remediate the risk of flooding after Katrina.  Although the Government's litigation position is that Katrina was a one-time event not likely to recur, it has spent more than $14 billion building the HSDRRS in preparation for another big storm.  FOF ¶ 368.  Among the projects' largest and most expensive components is a $1.1 billion surge barrier that plugs the MRGO funnel.  FOF ¶ 370.  If the MRGO's conveyance of water during Katrina was really the extraordinary event the Government suggests, it is difficult to understand how the storm justified such an extraordinary expenditure.

Dr. Suhayda's testimony confirms this analysis and uses the Government's own calculations to quantify the risk that properties inside the levees faced prior to construction of the HSDRRS.  He concluded that the design height of the HSDRRS implies that prior to Katrina the flood protection system in place would have failed on average more than once every twenty years.  Suhayda Written Testimony at 17-19.  Dr. Resio disputed these calculations, but, critical-

ly, his own testimony suggested that flooding was likely to recur about once every forty to sixty years.  Resio Written Testimony at 34; Tr. 1039:6-20 (Resio); FOF ¶ 395.  Both expert opinions point to the same conclusion: MRGO-caused flooding during Katrina was not a one-time event but would have inevitably recurred without a much more robust levee system.[7]

The Government also argues that Dr. Suhayda's testimony shows "that the flooding that occurred during Hurricane Katrina was due to inadequate levees."  U.S. Br. 65.  But the fact that with respect to properties behind the levees, the Government could have prevented the flooding its own MRGO-related activities caused by building an adequate flood protection system is of no help to the Government, whose own documents show that the system it built was utterly inadequate to prevent the flooding that the MRGO project made otherwise inevitable.  That the Government *could have* done something to avoid taking Plaintiffs' property surely does not relieve it of its constitutional obligation to pay just compensation for the property it took.

### C. The MRGO Has Repeatedly Caused Flooding on Plaintiffs' Properties Outside the FPS.

#### 1. Nature of Proof Required

Before addressing the Government's specific criticisms of the evidence showing that the MRGO has caused and continues to cause inevitably recurring flooding on Plaintiffs' properties

---

[7] The Government suggests that Dr. Suhayda admitted that it was "not possible" to make his "retroactive" calculation of the level of protection that the pre-Katrina FPS provided until 2011.  U.S. Br. 63.  The Government mischaracterizes Dr. Suhayda's testimony.  It is true that Dr. Suhayda testified that he decided to base his level of protection calculations on the Government's design analysis underlying its new HSDRRS.  Tr. 699:19-701:9 (Suhayda).  But he also made clear that an analysis of storm risks and probabilities could have been performed by the Corps prior to Katrina.  Tr. 700:13-14 (Suhayda) ("[T]hat study could have been done in the year 2000, for example.").  And he also made clear that virtually all of the information demonstrating that the pre-Katrina FPS provided a level of protection far below what the Corps publicly represented was known to the Corps long before Katrina.  *See, e.g.*, Tr. 824:3-12 (Suhayda) (SPH too weak); *id.* at 824:13-825:2 (vertical datum too low); *id.* at 825:3-9 (FPS never completed); *see also* Suhayda Written Testimony at 11-12 (describing the pre-Katrina system's known deficiencies).

outside the FPS, it is important to first examine two claims the Government makes about the nature of proof required.  First, the Government cites *Alost v. United States*, 73 Fed. Cl. 480 (2006), for the proposition that lay evidence is "entitled to little weight" in flooding cases.  U.S. Br. 38. In *Alost*, however, "the only evidence the plaintiffs presented with regard to the cause of the overflow flooding on their land was lay testimony" from witnesses, many of whom knew little about the history of flooding on the land at issue.  73 Fed. Cl. at 495.  *Alost* is plainly inapposite here, where Plaintiffs' principal evidence of causation comes from expert testimony and the Government's own documents.

In any event, the Government goes too far when it suggests that any use of lay testimony in a flooding case amounts to fallacious *post hoc ergo propter hoc* reasoning.  U.S. Br. 39-40. Unlike the lay witnesses in *Alost*, Plaintiffs' lay witnesses are intimately familiar with the history of flooding in the area and able to speak to the strong correlation between the environmental havoc wreaked by the MRGO and the increased flooding they have observed.  *See, e.g.*, Tr. 610:25-613:10, 647:17-648:11 (Robin); *id.* at 89:2-90:6, 109:6-20 (Estopinal); 30(b)(6) Deposition of Rod Willhoft (Oct. 20, 2010) at 29:21-30:19.  The Government is of course correct that correlation does not always prove causation, but changes in historic flooding patterns that coincide with the effects of the MRGO are unquestionably *evidence* of causation.[8]  At bottom, the Government's position is that the remarkable correlation between the environmental effects of

---

[8] Numerous courts have recognized this fact and given considerable weight to competent lay testimony on historic flooding patterns in takings cases.  *See, e.g.*, *Ark. Game & Fish Comm'n*, 87 Fed. Cl. 594, 626-27 (2009); *State* ex rel. *Doner v. Zody*, 958 N.E. 2d 1235, 1250-51 (Ohio 2011); *Tarrant Reg. Water Dist. v. Gragg*, 43 S.W. 3d 609, 618 (Tex. App. 2001) ("Credible lay testimony is relevant to causation" in flooding cases); *Moore v. Associated Material & Supply Co.*, 948 P.2d 652, 659 (Kan. 1997); *see also Cooper v. United States*, 37 Fed. Cl. 28, 41 n.19 (1996) (refusing to credit lay testimony offered but explaining that the court would have credited the testimony of "lay witnesses with firsthand, personal knowledge of the facts relating to causation").

the MRGO and increased flooding on Plaintiffs' properties is nothing more than a coincidence. The Court should not lose sight of the fact that it is deciding whether such a supposed coincidence is more or less likely than the Plaintiffs' theory of causation.

Second, the Government claims that Plaintiffs cannot demonstrate causation without conducting some type of hydrodynamic modeling – either by using a multimillion dollar super-computer or "idealized equations."  U.S. Br. 40.  Leaving aside the fact that Plaintiffs' experts used both computer modeling and idealized equations to demonstrate causation in this case (at least for properties inside the FPS), the Government's argument that modeling is the *sine qua non* of flooding causation has no basis in law or logic.

None of the cases the Government cites for the proposition that expert testimony is especially important in flooding cases suggest that expert *modeling* is required.  *Alost*, 73 Fed. Cl. at 495-96; *Leeth v. United States*, 22 Cl. Ct. 467 (1991); *Hendricks v. United States*, 14 Cl. Ct. 143, 149 (1987); *Herriman v. United States*, 8 Cl. Ct. 411, 420 (1985); *Loesch v. United States*, 227 Ct. Cl. 34, 44-53 (1981).  Indeed, this Court has in fact found takings in flooding cases where the plaintiff did not present any modeling evidence.  *See, e.g.*, *Ark. Game & Fish Comm'n v. United States*, 87 Fed. Cl. 594, 626-27 (2009), *rev'd on other grounds by* 648 F.3d 1377 (Fed. Cir. 2011), *cert. granted*, 132 S. Ct. 1856 (2012); *Turner v. United States*, 23 Cl. Ct. 447 (1991). These cases are hardly surprising given that the Supreme Court repeatedly found the Government liable for flooding under the Takings Clause long before modern modeling techniques existed.  *See, e.g.*, *United States v. Kansas City Life Ins. Co.*, 339 U.S. 799 (1950) (holding that a taking occurred where government action raised the water table and thereby invaded plaintiffs' land with percolating water); *United States v. Dickinson*, 331 U.S. 745 (1947) (finding that a taking occurred where government action raised river level and flooded plaintiffs' land); *United*

*States v. Lynah*, 188 U.S. 445 (1903) (government committed a taking when it built a dam that prevented plaintiff's land from draining).

Even today, some facts are more readily demonstrated by field observation and analysis than modeling. *See Ark. Game & Fish Comm'n*, 87 Fed. Cl. at 628 ("[T]he fact that the model was very reliable and more accurate than other simulation models and offered output that was far better than what you would typically expect from river modeling does not indicate that results from its use should be employed to displace actual observations." (internal quotation marks omitted)). For purposes of examining flooding outside the levees for this case, Dr. Kemp identified, among other things, the destruction of the wetland buffer between Plaintiffs' properties and Lake Borgne, Kemp Written Testimony at 236-37, and evidence of Bayou Yscloskey's increased capacity to convey water, *id.* at 238. He is also quite familiar with the area in question, and spoke with people with firsthand knowledge of the conditions under which flooding occurs. This evidence – which is essentially undisputed – demonstrates that the MRGO increased the volume of water that moves toward Plaintiffs' properties during non-storm wind events, a fact that sophisticated computer modeling was not needed to prove.

Finally, it should be noted that many of the criticisms that the Government levels against Plaintiffs' experts are equally applicable to the Government's expert, Dr. Britsch. Dr. Britsch did not perform any modeling to support his claim that MRGO-introduced salinity is not the primary cause of land loss in the wetlands that surround the channel. *See* Britsch Written Testimony at 20:19-23; Tr. 909:18-910:5 (Britsch). Nor did he identify any error rates associated with his land loss study, *see* Britsch Written Testimony at 19:3-20:18, or take any measurements or collect any data in support of his testimony that Delacroix's primary hydrological connection is with Breton Sound, *id.* at 30-31. Of course, Plaintiffs bear the burden of proving their case.

But the Government's reliance on Dr. Britsch's testimony suggests that not even it believes that the only knowable facts about flooding are those that can be proven with data inputted into an equation.

> **2.   Plaintiffs Presented Unrebutted Evidence that Flooding on Their Properties Outside the Levees Worsened as the MRGO's Environmental Effects Became More Pronounced.**

Plaintiffs' unrebutted testimony shows that flooding increased on their properties outside the levees as the environmental effects of the MRGO became more pronounced.  At trial, Plaintiff Brad Robin, who lived in the area prior to construction of the MRGO, Tr. 600:3-13, testified that his family's properties in Yscloskey now flood much more frequently and to greater depths than they did before.  Whereas around the time the MRGO was constructed a direct hit from a hurricane was required to cause substantial flooding, *id.* at 624:23-625:21, today even storms that make landfall far away flood these properties, *id.* at 625:22-629:5; *see also id.* at 634:11-640:12 (describing most recent storm-caused flooding in 2011 during Tropical Storm Lee); SPX 1053 (photographs of flooding during Tropical Storm Lee).  In addition, starting in around 2002, many of Plaintiffs' properties outside the levees began flooding whenever sustained winds of 15 to 20 miles per hour blow from the east.  Tr. 647:17-648:11 (Robin).  Notwithstanding the Government's suggestions to the contrary, U.S. Br. 67, Plaintiffs' testimony demonstrates a close correlation between the environmental effects of the MRGO and flooding on their properties outside the levees, Tr. 648:5-11 (Robin) ("We're having water on the roads much more than any time that was before, [and] [a]ny time we got water on the roads, we got water on our property."); *see also* Deposition of Tommoso Tommaseo (Oct. 18, 2010) at 61:4-8.

The Government complains that Plaintiffs "have not presented any evidence . . . describing a specific incident of flooding on any occasion not associated with storm conditions."  U.S.

Br. 35. But Mr. Robin described two specific non-storm flooding events in his February 9, 2009

declaration. Robin Decl. ¶¶ 9-10 (Feb. 9, 2009) (SPX 538). More importantly, however, even if

Plaintiffs had not enumerated "specific" instances of non-storm flooding, that fact would not

have any legal significance. Plaintiffs satisfied their evidentiary burden by testifying that they

have suffered flooding during non-storm wind events on numerous occasions in recent years. Tr.

647:17-22 (Robin); Deposition of Tommoso Tommaseo (Oct. 18, 2010) at 61:4-8; 30(b)(6) Dep-

osition of Rod Willhoft (Oct. 20, 2010) at 29:2-30:23.[9] The Government has not suggested that

this testimony was false, or otherwise attempted to dispute it in any way.

### 3. The MRGO Caused the Increased Flooding Plaintiffs Have Suffered.

#### a. Dr. Kemp Showed that the MRGO Caused Flooding by Changing the Area's Hydrology.

Dr. Kemp identified two phenomena that combine to cause flooding on Plaintiffs' proper-

ties outside the FPS levees. The first is a natural phenomenon: when a sustained east wind blows

across Lake Borgne's lengthy fetch, water levels rise on the lake's southern shore. Dr. Kemp

used gauge readings at Shell Beach and historic wind patterns to demonstrate this fact, Kemp

Written Testimony at 239, 250-51, and the Government does not appear to contest it. Instead,

the Government's brief makes much of the fact that Dr. Kemp testified that this phenomenon is

"unrelated to the MRGO." U.S. Br. 67; *see also* U.S. Br. 74-75. But neither he nor Plaintiffs

ever suggested otherwise. Elevated water levels along the southern edge of Lake Borgne during

certain wind events are a natural feature of the area's hydrology. But they are only the first ele-

ment in Plaintiffs' theory of causation.

---

[9] The PSSI property about which Mr. Willhoft testified is located inside the federal levees in the Central Wetlands Unit. Because it is outside the Forty Arpent Levee and is in close prox- imity to the MRGO, it experiences non-storm flooding much like the Robin and Tommaseo properties that are outside the federal levees. *See* FOF ¶ 50.

The second phenomenon responsible for flooding on Plaintiffs' properties, which Dr. Kemp testified the MRGO greatly enhanced, is the ease with which such elevated water levels move inland from Lake Borgne's southern shore. Kemp Written Testimony at 236-38. The MRGO significantly promoted the movement of wind-driven water inland by destroying much of the wetland buffer that once stood between Lake Borgne and Plaintiffs' properties. For example, several of the Robin Plaintiffs' Yscloskey properties are located less than a mile from Lake Borgne. Because of the MRGO, half of the wetland buffer that would otherwise protect these properties is now open water, and the wetlands that remain have badly degraded. *See* Kemp Written Testimony at 235-37; Tr. 611:23-613:10 (Robin) (describing gradual degradation of wetlands in this area). Given all that is known about the power of wetlands to resist the inflow of water, FOF ¶¶ 117-24, there can be little doubt that such substantial wetland losses increased flooding on Plaintiffs' properties outside the levees, *see* Suhayda Written Testimony at 26 (observing that the MRGO gives wind-driven water "unimpeded access . . . to unprotected property in St. Bernard Parish lying along [its] route").

Dr. Suhayda illustrated this point by calculating that a channel roughly the dimensions of the MRGO would convey approximately 13 times more water toward Plaintiffs' properties than would marshlands like those the MRGO replaced. Suhayda Written Testimony at 27 n.8. The Government complains that Dr. Suhayda did not use precise measurements of the MRGO's dimensions, U.S. Br. 70, but it ignores his larger point: a much greater volume of water is much closer to Plaintiffs' properties as a result of the MRGO. This water need only travel a short distance across degraded marsh to cause flooding on Plaintiffs' land.[10]

---

[10] The Government argues that Dr. Suhayda's calculation is inadmissible because it was not disclosed sooner. U.S. Br. 69 n.30. But Dr. Suhayda made this calculation in response to

Unfortunately, the MRGO's destruction of wetland buffer is not the only mechanism by which the channel promotes the movement of wind-driven water onto Plaintiffs' land.  The channel also caused natural streams that predate the MRGO to gradually expand and convey larger volumes of water toward Plaintiffs' properties outside the levees.  As Dr. Kemp demonstrated in his written testimony, Lake Borgne and Breton Sound are often out of phase, meaning that water is high in one of these bodies when it is low in the other.  Kemp Written Testimony at 238-39, 251-53.  The MRGO allowed water to move across this gradient via Bayou Yscloskey, the breach in the Lake Borgne land bridge, and the other hydrological connections between Lake Borgne and the MRGO.  In this way, the MRGO transformed Bayou Yscloskey and other minor streams in the area into "much more active tidal pass[es]" that gradually expanded and became capable of conveying larger volumes of water.  Kemp Written Testimony at 238; *see also* MRGO Ecosystem Restoration Study Draft Environmental Impact Statement (SPX 1154), at 2-50, .pdf 118 (noting that the MRGO caused "hydrologic[al] changes" in the area around Hopedale); FOF ¶ 350.

Dr. Kemp specifically documented Bayou Yscloskey's expansion by observing that a road that once followed the bayou, visible in Figure 2.13 of Dr. Kemp's written testimony, has now largely eroded into the water.  Kemp Written Testimony at 44-45.  Brad Robin, who grew up near Bayou Yscloskey and was familiar with the area prior to the MRGO's construction, Tr. 600:3-13 (Robin), confirmed Dr. Kemp's observations at trial, testifying that Bayou Yscloskey is wider today than it was before the MRGO was built, Tr. 610:25-611:5 (Robin). [11]  And the ex-

_____

criticisms in Dr. Resio's expert report, Resio Expert Report (DX 211), at 21-22, and in any case the Government has had a full and fair opportunity to respond to it.

[11] Mr. Robin testified at trial that today the hydrological connection between the MRGO and Bayou Yscloskey is so significant that when a deep-draft boat passes through the MRGO, it causes severe turbulence in the bayou as much as a mile further inland.  Tr. 605:19-606:23;

panded Bayou Yscloskey is by no means the only such hydrological connection for which the MRGO is responsible.  In recent years, the breach in the Lake Borgne land bridge has provided an additional connection between Lake Borgne and Plaintiffs' properties.  Kemp Written Testimony at 239-40; *see also* MRGO Wetland Creation and Shoreline Protection Draft Environmental Impact Statement (SPX 1103), at 4-61, .pdf 203 (observing that continued deterioration of the land bridge between the MRGO and Lake Borgne "could result in increased exposure of flood control structures and hurricane protection levees near Yscloskey and Hopedale . . . to greater storm surges").



**Figure 3.**  Dr. Kemp observed that the road that once followed Bayou Yscloskey, clearly visible in this 1961 photograph, has now largely eroded into the bayou (Kemp Written Testimony at 44, Figure 2.13).

611:6-11 (Robin); *see also* Memo from Frederic M. Chatry, USACE Engineering Division Chief (Mar. 3, 1983) (SPX 1086) (noting turbulence experienced in Bayou Yscloskey caused by ship wakes in the MRGO).

The Government contends that Dr. Kemp's analysis of Bayou Yscloskey's expansion is unreliable because he did not examine historic tidal gauge data. U.S. Br. 68. But the old gauge to which the Government refers is no longer maintained, making comparisons with water levels in more recent years impossible. *See* Tr. 446:21-447:3 (Kemp). In any event, such a comparison would not have been very revealing without concurrent wind data, which the Government has not demonstrated the old gauge ever collected.[12] Happily, no such data are needed to establish that Bayou Yscloskey more readily transmits water inland today than it did prior to construction of the MRGO. The bayou's documented expansion and the MRGO's function as a tidal pass between Lake Borgne and Breton Sound unequivocally establish this fact.[13]

The Government also asks why, if a project completed in 1968 is responsible for regularly flooding Plaintiffs' properties, this flooding did not begin in earnest until recently. U.S. Br. 70-71. The simple explanation is that the MRGO's environmental effects took decades to fully manifest themselves. What was originally a 650-foot wide channel gradually widened to more than 2000 feet in many places. FOF ¶ 130. The wetlands that surround Lake Borgne took decades to degrade to their present condition, FOF ¶¶ 161-65, Bayou Yscloskey expanded gradually, FOF ¶ 352, and the long-feared breach in the Lake Borgne land bridge occurred only recently, FOF ¶ 151. And notwithstanding the Government's claims to the contrary, U.S. Br. 77 n.31, Government documents establish that the rate of land loss associated with the MRGO accelerat-

---

[12] For similar reasons, Dr. Britsch's citation of historic water levels from this gauge reveals nothing about how the MRGO has changed the area's hydrology in more recent years. *See* Britsch Written Testimony at 29:1-7; U.S. Br. 74.

[13] The Government also criticizes Plaintiffs' experts for not examining historic flooding data. U.S. Br. 35-36. But the Government has not established that any such data exist, and at most they would only confirm that flooding in the area has increased in recent years – a fact competent lay testimony established at trial and that the Government has not attempted to directly refute. Tr. 647:17-648:11 (Robin); *id.* at 109:6-20 (Estopinal).

ed in later years.  MRGO Environmental Restoration Features (SPX 129), at MRGO 12, .pdf 362 ("The data indicates that land loss rates have accelerated since 1990 and that the rate of wetlands loss now exceeds the rates experienced in the area during the period of MRGO channel construction.").  These changes radically altered the area's hydrology, and it is hardly surprising that they brought with them the MRGO's worst flooding effects.

### b.  The MRGO Project Is By Far the Best Explanation for the Increased Flooding Plaintiffs Have Suffered.

The Government argues that other factors such as natural subsidence and private canals contributed to the flooding on Plaintiffs' properties outside the levees.  U.S. Br. 41, 71-77.  As Plaintiffs explained in their opening post-trial brief, this argument has little bearing on the liability phase of this litigation; as a matter of law, Plaintiffs are due just compensation for the MRGO's substantial contribution to flooding on their properties regardless of whether other factors also contribute to flooding.  *See Banks v. United States*, 78 Fed. Cl. 603, 656 (2007) (awarding just compensation where Corps was 30% responsible for erosion on plaintiffs' property); Pls.' Opening Post-Trial Br. 95-96.  In any event, none of the alternative explanations the Government posits could have caused the increased flooding Plaintiffs have experienced, and the Government is simply wrong when it asserts that Plaintiffs' experts ignored the alternatives it identifies.

Dr. Kemp's testimony demonstrated that natural subsidence occurs too slowly to have caused the increased flooding on Plaintiffs' land.  A delta's rate of natural subsidence depends on its age and the thickness of sedimentary soils scientists call the "interdistributary layer."  *See* Tr. 466:23-467:11 (Kemp); FOF ¶¶ 215-16.  Because the St. Bernard Delta is old and has a relatively thin interdistributary layer, its rate of natural subsidence is "fairly low when compared to other areas of coastal Louisiana."  Kemp Written Testimony at 240.  Given the modest amount of natu-

ral subsidence the delta experiences, Dr. Kemp concluded that subsidence cannot explain the dramatically increased flooding Plaintiffs suffered as the MRGO degraded the wetland buffer around Lake Borgne.[14]  *Id.*

A 1972 report on which Dr. Britsch relied confirms this conclusion, observing that natural subsidence occurs only "over a long time span" and is therefore "probably only of secondary importance" to environmental changes in the area. Coastal Environments, Inc., Environmental Baseline Study (Oct. 1972) (SPX 704), at 66-67; *see id.* at 72 ("The greatest impact upon the marsh-estuary unit has been the construction of the Intracoastal Waterway and the Mississippi River Gulf Outlet."); FOF ¶ 187.  Put simply, natural subsidence in the St. Bernard Delta occurs too slowly to cause the rapidly increasing rates of flooding Plaintiffs have experienced in recent years.  *See Robinson I*, 647 F. Supp. 2d at 661 ("The dynamics causing the widening of the MRGO and the marsh erosion of the north shore were only minimally affected by natural subsidence.").  In the face of this evidence, Dr. Britsch's unexplained assertion that natural subsidence is the primary cause of flooding on Plaintiffs' properties deserves little weight.  *See* FOF ¶ 186.

Dr. Britsch's land loss study does not suggest otherwise.  The Government's brief describes Dr. Britsch's study as "unrebutted," U.S. Br. 74, but the Government's own documents estimate that the MRGO was responsible for much more extensive wetland losses than Dr. Britsch found.  FOF ¶¶ 181-83.  This fact is hardly surprising given that Dr. Britsch made no attempt to account for wetlands destroyed by salt water that the MRGO introduced into the fragile

---

[14] The modest rate of natural subsidence in the St. Bernard Delta contrasts with the much more rapid subsidence wetlands immediately adjacent to the MRGO experience as a result of the lateral displacement of soil into the channel.  *See Robinson* Tr. 396 (Duncan FitzGerald) (explaining that the average annual rate of subsidence in the New Orleans region is 5 to 6 millimeters per year but that the average rate of subsidence along the MRGO is between 17.6 and 28.6 millimeters per year); FOF ¶ 214.  This subsidence is directly attributable to the MRGO and one of the mechanisms by which the channel causes flooding on Plaintiffs' properties.

ecosystem that surrounds Lake Borgne.  FOF ¶ 184.  Much like Dr. Britsch, the Government's

brief also ignores habitat change that the MRGO caused, even though Government witnesses

acknowledged that degraded, high salinity marshes are less effective surge buffers than healthy

freshwater marshes and tupelo forests.  FOF ¶¶ 122, 188-89.

In any case, even if Dr. Britsch's land loss analysis were more comprehensive, it would

not be very revealing.  By using a large study area Dr. Britsch was able to make the MRGO's

contribution to total land loss seem modest and the rate of land loss in the area seem low.  FOF

¶¶ 176-78.  But for present purposes, what matters most is wetland loss between Plaintiffs' prop-

erties and Lake Borgne – not the overall rate of land loss throughout the St. Bernard Delta.  As

Dr. Kemp demonstrated, the MRGO replaced a large fraction of the wetlands that once stood be-

tween Plaintiffs' properties and Lake Borgne with open water, Kemp Written Testimony at 237,

and it substantially degraded the wetlands that survived, *id.* at 113.

The Government also claims that Dr. Kemp failed to consider "the natural hydrology of

the area outside the levee system," U.S. Br. 73, but Dr. Kemp's entire analysis of flooding out-

side the levees was a study of how the MRGO changed the area's natural hydrology, Kemp Writ-

ten Testimony at 234-253.  The Government is on still weaker ground when it suggests that

Plaintiffs' properties outside the levees flood as a result of water moving inland from Breton

Sound via natural channels.  U.S. Br. 73-74.  In the first place, the Government never says how a

natural phenomenon that, if it exists at all, predates the MRGO could explain the increase in

flooding Plaintiffs have lately experienced.  Moreover, Dr. Britsch testified that the hydrology of

Breton Sound explains flooding only on the handful of Plaintiffs' properties near Delacroix, not,

as the Government implies, *all* of Plaintiffs' properties outside the levees.  Britsch Written Tes-

timony at 30-31.  If anything, Dr. Britsch's silence with respect to the hydrology of the non-

Delacroix properties suggests that he agreed with Dr. Kemp's analysis that these properties' primary hydrological connection is with the MRGO and Lake Borgne.  FOF ¶ 351.  Government documents contradict Dr. Britsch's testimony about the Delacroix properties,[15] and in any case that testimony is irrelevant to the vast majority of Plaintiffs' properties outside the levees.

Nor does some apparent imprecision in Plaintiff Brad Robin's testimony regarding the direction of winds that cause flooding on his properties help the Government.  Seizing upon Mr. Robin's deposition testimony suggesting that by "northeast" winds he means winds originating in the southeast, the Government suggests that all testimony by the Plaintiffs regarding flooding outside of the FPS confirms that any such flooding comes exclusively or principally from waters moving from Breton Sound and are thus not associated in any way with the MRGO.   U.S. Br. 73.  This argument fails for several reasons.  First, and significantly, the Government ignores that other witnesses confirmed that flooding is often associated with winds from the east and northeast.  *See* Deposition of Tommoso Tommaseo (Oct. 18, 2010) at 61:4-8  (describing "easterly" winds that flood Tommaseo property at Shell Beach); Deposition of Edward Robin, Jr. (Oct. 13, 2010) at 28:16-18, 35:1-4 (testifying that properties flood during "northeast" winds); *see also* 30(b)(6) Deposition of Rod Willhoft (Oct. 20, 2010) at 47:18-48:4 ("[A]ny small little wind that blows from an easterly direction, the water just continues to rise, and it rises much more rapidly.").  Moreover, even with respect to Brad Robin, the Government tells only part of the story.  While Mr. Robin did suggest, during a 2007 deposition, that by "northeast" winds he meant winds blowing from the southeast, Deposition of Brad Robin (Aug. 24, 2007) at 90:8-12; DX-1 (arrow depicting Robin's understanding of a "northeast" wind at Aug. 24, 2007 deposition); Tr.

---

[15] *See* MRGO Ecosystem Restoration Study – Draft Environmental Impact Statement (Dec. 2010) (SPX 1154), at 3-28, .pdf 229 (observing that the MRGO affected salinity levels as far away as Plaquemines Parish, which is even further to the southeast than Delacroix); FOF ¶ 180.

654:19-655:2 (discussing DX-1), the Government fails to mention that at his 2010 deposition,

Mr. Robin agreed  that "when we say a northeast wind, that means out of the northeast," Deposi-

tion of Brad Robin (Oct. 13, 2010) at 50:10-16.  But regardless of Mr. Robin's apparent impreci-

sion about his own understanding of certain meteorological terms, he has consistently testified

that his land floods when *weather reports* indicate sustained "northeast winds."  Tr. 646:10-12

("[W]hen you look at the weatherman, the weatherman says you got a northeast coming in 15 to

20 miles an hour . . . ."); Deposition of Brad Robin (Oct. 13, 2010) at 50:19-20 ("[I]f the weath-

erman says northeast, that's all I go by."); Deposition of Brad Robin (Aug. 24, 2007) at 90:4-5

(explaining that non-storm flooding occurs when "the weatherman says we got a northeast

wind").[16]  In any case, the critical point for purposes of Dr. Kemp's analysis is that Plaintiffs'

properties flood when the area experiences sustained winds generally from the east, which push

water from the Gulf of Mexico into Lake Borgne and thereby raise water levels in the MRGO.

Whether precisely from the northeast or the southeast, the easterly winds Mr. Robin and the oth-

er Plaintiffs described are consistent with Dr. Kemp's analysis.

 The Government is wrong again when it suggests in passing that Dr. Kemp failed to con-

sider whether private construction projects, man-made canals, and pipelines might explain the

increased flooding on Plaintiffs' land.  U.S. Br. 71.  As Dr. Kemp explained in his written testi-

mony, the MRGO is "by far the largest artificial channel in this area and contributes far more

significantly to land loss and flooding than other man-made canals."  Kemp Written Testimony

---

[16] In support of its contention that Mr. Robin testified that by "northeast" winds he meant winds originating from the "southeast," the Government relies in part on testimony from Mr. Robin's 2007 deposition, U.S. Br. 73, even though the Government did not include that portion of the deposition testimony in its motion to designate deposition testimony for purposes of trial. Given the Government's reliance on such undesignated deposition testimony as support for an argument that it did not raise in its pretrial briefing, Plaintiffs have, for the sake of completeness, cited to undesignated portions of Mr. Robin's and Mr. Willhoft's testimony regarding the direction of winds that cause flooding on certain properties.

at 240.  Nor is there any basis for the Government's suggestion that Hurricane Katrina caused the increased flooding on Plaintiffs' land by killing nearby trees and shrubs.  U.S. Br. 75-76.  Plaintiffs' unrebutted testimony established that flooding on many of their properties started *prior* to that storm.  *See, e.g.*, 30(b)(6) Deposition of Rod Willhoft (Oct. 20, 2010) at 29:21-30:23.  And although Hurricane Katrina was associated with modest wetland losses in the area, it is far more likely than not that even these losses are ultimately attributable to the MRGO, which made the wetlands more vulnerable by introducing high salinity water into the area.  *See* FOF ¶¶ 152-70.

### III.   THE GOVERNMENT'S CONSTRUCTION, OPERATION, AND MAINTENANCE OF THE MRGO APPROPRIATED A PROPERTY INTEREST.

#### A.   The "Appropriation" Inquiry Focuses on the "Nature and Magnitude" of the Government Invasion.

The Government argues that, as a matter of law, Plaintiffs cannot recover for flooding under the Takings Clause without proving that the MRGO has flooded their properties more than once.  U.S. Br. 29-34.  As an initial matter, it is important to note that the MRGO has indeed flooded many of the properties at issue in this case on multiple occasions.  A large number of Plaintiffs' properties inside the levees have flooded at least twice in recent years: during Katrina in August 2005 and again during Rita a month later.  Kemp Written Testimony Exhibit 8 (collecting historic flooding information on Plaintiffs' properties).  And as explained in greater detail above, the MRGO has repeatedly caused flooding on all of Plaintiffs' properties outside the levees.  *See supra* 20-30.

But even with respect to the subset of Plaintiffs' properties inside the FPS that the MRGO only flooded during Katrina, the Government's argument is misplaced.  Notably, the Government has yet to offer a principled rationale, whether grounded in Fifth Amendment doctrine or any other source of law, for the arbitrary, bright-line rule it advances, whereby a single

flood that eventually recedes can *never* amount to the appropriation of a property interest, re-gardless of the circumstances.  This is not surprising, for no such principled rationale exists.  The Federal Circuit's decisions make clear that the appropriation prong of the *Ridge Line* test distin-guishing torts from takings turns on "the nature and magnitude of the government action," and that the Government appropriates a property interest when it "preempt[s] the owners' right to enjoy his property for an extended period of time."  *Ridge Line*, 346 F.3d at 1356.  This test is clearly satisfied in a case like this one, where a public works project imposed on private land-owners a grave risk of flooding that was realized in the form of a massive flood that occupied properties for weeks, destroying homes and businesses, and in many cases preventing access for months.

Viewed in light of the controlling *Ridge Line* appropriation standard, the cases on which the Government relies do not impose a formalistic requirement of multiple flooding events but rather treat recurring flooding as one factor to consider when assessing the "nature and magni-tude" of the Government's interference with property rights.  Thus, while some decisions suggest that standing alone, "[o]ne flooding does not constitute a taking," *B Amusement Co. v. United States*, 148 Ct. Cl. 337, 341 (1960), all of the cases are entirely consistent with the proposition that one flood in conjunction with other considerations relevant to the "nature and magnitude" of the Government's invasion of property rights can establish a taking.[17]  Two additional considera-

---

[17] Incredibly, the Government's breathless assertion that "[w]ithout exception, this Court's controlling precedent requires evidence of more than one flood," U.S. Br. 30, is belied by *the very first case* the Government cites in support of this statement, *see Stockton v. United States*, 214 Ct. Cl. 506, 518 (1977) (finding taking in case involving single flood).  And on the very next page of its brief, U.S. Br. 31, the Government cites the statement, from *Fromme v. United States*, 188 Ct. Cl. 1112, 1119 (1969), rejecting a claim for a taking of a flowage ease-ment where there was no "*future prospect* of intermittent and frequent floodings" (emphasis add-ed).  Obviously, if multiple actual floods are always necessary for an appropriation to occur, the

tions are present here that entitle Plaintiffs whose properties have flooded only once to just compensation.

First, in contrast to the plaintiffs in cases like *Hartwig v. United States*, 202 Ct. Cl. 801 (1973), Plaintiffs have demonstrated that they faced a real and increasingly grave threat of flooding as a result of a permanent Government construction project.  Plaintiffs' experts and the Government's own documents establish that flooding during Katrina was not the result of an improbable confluence of factors unlikely to recur.  *See National By-Products, Inc. v. United States*, 186 Ct. Cl. 546 (1969); *B Amusement Co.*, 148 Ct. Cl. at 341.  Nor was it caused by Government actions that only fleetingly exposed Plaintiffs to an enhanced risk of flooding.  *See Ark. Game & Fish Comm'n*, 637 F.3d 1366 (Fed. Cir. 2011); *Hartwig*, 202 Ct. Cl. at 805-06 (flooding caused by Government decision not to release water from reservoirs sooner).  Rather, the risk the Government created with the MRGO and failed to mitigate with the FPS imposed a permanent encumbrance on Plaintiffs' land – a liability to intermittent and unnatural overflows that any prospective buyer would regard as equivalent to a flowage easement.  Even for properties that the MRGO has only flooded once, the Government's activities deprived Plaintiffs of their right to use and enjoy their land unburdened by an unnatural threat of flooding.  This fact goes to the "nature" of the Government's interference with Plaintiffs' property rights, and it distinguishes the present case from those the Government cites.  *See B Amusement Co.*, 148 Ct. Cl. at 342 (rejecting takings claim for single flood because plaintiffs failed to show that the flooding "will inevitably recur").[18]

---

court in *Fromme*, a case involving one historical instance of flooding, would have had no occasion to examine whether there was evidence of a "future prospect" of flooding.

[18] That a grave risk of flooding in conjunction with a single flood is properly treated as a taking rather than a tort is confirmed by the fact that tort law does not normally permit private parties to impose such risks on their neighbors.  For example, Louisiana law would enjoin a pri-

This case is also distinguishable from the flooding cases on which the Government relies because the MRGO caused flooding of much greater magnitude than the flooding at issue in cases like *Singleton v. United States*, 6 Cl. Ct. 156 (1984), *Baird v. United States*, 5 Cl. Ct. 324 (1984), and *Fromme v. United States*, 188 Ct. Cl. 1112 (1969).  Indeed, Plaintiffs' losses were much greater even than those of the plaintiff in *Hartwig*, whose farmland was covered with silt and whose fences and irrigation ditches were destroyed.  *Hartwig*, 202 Ct. Cl. at 804.  Anticipating this argument, the Government misleadingly quotes from the Supreme Court's decision in *United States v. Cress*, 243 U.S. 316 (1917).  *Cress* held that the economic value of land need not be completely destroyed for an owner to recover under the Takings Clause for Government-caused flooding.  It was in the context of clarifying that a plaintiff's losses need not be total that the *Cress* Court explained that "it is the character of the invasion, not the amount of damage resulting from it, *so long as the damage is substantial*, that determines the question whether it is a taking."  243 U.S. at 328 (emphasis added).  The Government's brief omits the Supreme Court's admonition that compensable damages under the Takings Clause must be "substantial," *see* U.S. Br. 32, and that phrase makes clear that the substantiality of injury is critical to the appropriation inquiry.  In any case, *Cress* is silent on the question of whether floodwater's occupation of land can ever be so "substantial" that it transforms the "character of the invasion," 243 U.S. at 328-29, and *Ridge Line* makes clear that flooding of sufficient "magnitude" is an appropriation.

The Government's reliance on *Cary*, a case about fire rather than water, is similarly unavailing.  552 F.3d 1373.  Unlike in this or any other flooding case, in *Cary* there was no allega-

---

vate party from imposing a flood risk equivalent to the risk the Government imposed on Plaintiffs through its construction and maintenance of the MRGO.  *See Terrebonne Parish Police Jury v. Matherne*, 405 So. 2d 314 (La. 1981).  It is precisely in such situations, where tort law would enjoin a private party from interfering with property rights but the Government (which usually cannot be enjoined) is allowed to proceed, that the Government appropriates a property interest.

tion that the Government acquired an "easement of any sort, or any other property through the fire." *Id.* at 1380.  While the *Cary* plaintiffs failed to allege "that the invasion . . . appropriated any benefit to the government," *id.*, Plaintiffs here seek just compensation for the taking of a flowage easement, a venerable property interest long recognized as compensable under the Takings Clause, *see Cress*, 243 U.S. at 329.  Also unlike this case, in *Cary* the fire did not prevent the plaintiffs from "enjoy[ing] their property . . . for an extended period of time" because once the fire was extinguished it no longer "prevent[ed] . . . the landowners [from] reoccupy[ing] their property." *Id.* at 1380.  In contrast to the fire that quickly swept through the land at issue in *Cary*, MRGO-caused flooding occupied Plaintiffs' land for weeks, and in many cases prevented access for months.  For these reasons, the *Cary* court's analysis does not provide much insight into the appropriation inquiry the Court must undertake here.

Nor does the fact that Plaintiffs continue to use their properties despite the risk of flooding relieve the Government of liability under the Takings Clause.  *See* U.S. Br. 33-34.  The Supreme Court's cases have long made clear that government-caused flooding need not completely prevent land's use to be a taking.  *Cress*, 243 U.S. 316; *see also, e.g.*, *United States v. Causby*, 328 U.S. 256, 262 (1946) (finding taking of avigation easement even though frequent airplane overflights did not completely prevent land's use); *Pumpelly v. Green Bay & Miss. Canal Co.*, 80 U.S. (13 Wall.) 166, 177 (1871); *Ark. Game & Fish Comm'n*, 87 Fed. Cl. 594, 620 (2009), *rev'd*, 648 F.3d 1377 (Fed. Cir. 2011), *cert. granted*, 132 S. Ct. 1856 (2012) (finding a taking where plaintiff continued to use property because flooding "effectively deprived [it] of its right to *full* enjoyment of its property" (emphasis added)).

**B. Completion of the HSDRRS Does Not Relieve the Government of Liability to Pay Just Compensation for Property It Has Already Taken.**

The Government also argues that its substantial completion of the new HSDRRS relieves it of liability for the overflow and destruction of property that the MRGO has caused in the past. U.S. Br. 57-59.  There are reasons to doubt the Government's claims that the HSDRRS will protect Plaintiffs' properties inside the levees from future MRGO-caused flooding, FOF ¶¶ 379-82, but the Government is wrong even if one takes those representations at face value.

First, as Plaintiffs explained in their opening post-trial brief, many of their properties are located *outside* the levee system, where the HSDRRS provides no protection.  Pls.' Opening Post-Trial Br. 107-08.  Dr. Kemp testified that if anything, the new system will make matters worse for these properties by redirecting onto them water that would have overtopped the old FPS.  Kemp Written Testimony at 242-53.  The Government surely cannot escape liability for its repeated flooding of one parcel by preventing future flooding on another.

With respect to properties inside the levee system, the Government's position cannot be reconciled with the well-settled rule in takings law that "no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective."  *First English*, 482 U.S. at 321; *see also Dickinson v. United States*, 331 U.S. 745, 751 (1947) (subsequent efforts to reclaim land flooded by a Government project did not "change[] the fact that the land was taken when it was taken and an obligation to pay for it then arose").[19] In its brief in opposition to certiorari in *Arkansas Game*, the Government agreed that temporary

---

[19] *See also, e.g.*, *Navajo Nation v. United States*, 631 F.3d 1268, 1278 (Fed. Cir. 2011) ("Indeed, our precedent requires that temporary reversible takings must be analyzed in the same constitutional framework applied to permanent irreversible takings."); *Skip Kirchdorfer, Inc. v. United States*, 6 F.3d 1573, 1583 (Fed. Cir. 1993) (observing that the "limited duration of [a] taking is relevant to the issue of what compensation is just, and not to the issue of whether a taking has occurred"); Pls.' Opening Post-Trial Br. 108-12.

takings doctrine is fully applicable in cases of government-caused flooding, acknowledging that a property owner could establish a temporary taking if, as happened here, the Government "undert[ook] what was contemplated as a permanent action, but then later reverse[d] course."  Br. for United States in Opposition at 14, *Ark.Game & Fish Comm'n v. United States*, No. 11-597, 2012 WL 691652 (U.S. Mar. 1, 2012); *see also Ark. Game & Fish Comm'n*, 637 F.3d at 1382 (Fed. Cir. 2011) (Newman, J., dissenting) ("[N]o court has held that flooding damage is never compensable if the flooding is eventually stopped, whatever the injury.").  Temporary takings doctrine applies in this case, and at most the Government's construction of the HSDRRS transformed a permanent taking into a temporary taking for which the Government still must pay just compensation.

The Court of Claims' decision in *National By-Products, Inc. v. United States*, 186 Ct. Cl. 546 (1969), is not to the contrary.  *See* U.S. Br. 57-59 (discussing *National By-Products*).  In *National By-Products*, a government levee built on one side of a stream contributed to the overtopping of a private levee on the other side of the stream.  The *National By-Products* court held that the plaintiff could not recover under the Takings Clause because the flooding at issue was brought about by "a particular concatenation of physical conditions" not likely to be repeated, including a historically anomalous flood, an unusually constricted stream, and the plaintiff's own inadequate levee.  186 Ct. Cl. at 578.  Unlike the flooding in this case, much of the flooding that the *National By-Products* plaintiff experienced would have occurred even without the challenged government activity due to these other contributing factors, *id.* at 558, and it was in this context that the court noted that a new non-federal levee built after the flood "insures that such flooding will not inevitably recur," *id.* at 578.  The *National By-Products* court's reference to the new levee goes to the nature and magnitude of the harm the government activity imposed – a marginal

increase in flooding brought about by other unusual circumstances.

The Government's reliance on *National By-Products* is also misplaced because that case predates the development of the modern jurisprudence governing temporary takings, as reflected in the Supreme Court's decision in *First English* and its progeny.  Temporary takings law is much more doctrinally developed today than it was when the Court of Claims decided *National By-Products* in 1969, so it is no surprise that the *National By-Products* court did not have occasion to address the temporary takings issue presented here.  Such cases do not support the Government's contention that, contrary to more recent Supreme Court and Federal Circuit precedent, the United States can avoid liability under the Takings Clause for its past activities by preventing future harms.

### CONCLUSION

The Court should find the Government liable for taking Plaintiffs' property through flooding the MRGO project foreseeably caused.

May 18, 2012                                        Respectfully submitted,


<u>s/Charles J. Cooper</u>
Charles J. Cooper
*Counsel of Record*

COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C.  20036
Telephone: (202) 220-9600
Facsimile:  (202) 220-9601

*Of Counsel:*

Michael W. Kirk
Vincent J. Colatriano
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.

Washington, D.C.  20036
Telephone: (202) 220-9600
Facsimile:  (202) 220-9601

-and-

J. Wayne Mumphrey (LA# 9824)
Carlos A. Zelaya, II (LA# 22900)
MUMPHREY LAW FIRM, LLC
One Canal Place
365 Canal Street, Suite 2280
New Orleans, LA 70130
Telephone: (504) 569-0661
Facsimile: (504) 569-0665

-and-

John H. Musser, IV (LA# 9863)
201 St. Charles Avenue, Suite 2500
2500 New Orleans, LA 70170
Telephone: (504) 599-5964
Facsimile: (504) 566-7185

-and-

Richard A. Tonry (LA# 12859)
Tonry and Ginart, LLC
2114 Paris Road
Chalmette, LA 70043
Phone: 504-271-0471
Fax: 504-271-6293

**Counsel for Plaintiffs**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that by filing the foregoing pleading via the ECF for the United States Court of Federal Claims, a copy of the above and foregoing will be served upon counsel for the United States, pursuant to the E-Noticing System this 18th day of May 2012.


<u>s/Vincent J. Colatriano</u>