# In the United States Court of Federal Claims

No. 05-1119 L

May 4, 2016

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| ST. BERNARD PARISH GOVERNMENT AND OTHER OWNERS OF REAL PROPERTY IN ST. BERNARD PARISH OR THE LOWER NINTH WARD OF THE CITY OF NEW ORLEANS, <br><br> Plaintiffs, <br><br> v. <br><br> THE UNITED STATES, <br><br> Defendant. | Just Compensation Award For A Temporary Takings Claim, U.S. CONST. Amend. V; <br> Rules of the United States Court of Federal Claims ("RCFC") 23(a) Class Action; <br> RCFC 23(b) Class Actions Maintainable; <br> RCFC 23(c) Class Certification Order; <br> RCFC 23(g)(1) (Appointing Class Counsel); <br> RCFC 54(b) Judgment Involving Multiple Parties; <br> RCFC 56 Summary Judgment. |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Charles J. Cooper**, Cooper & Kirk, PLLC, Washington, D.C., Counsel for Plaintiffs.

**William James Shapiro**, Environmental and National Resource Division, United States Department of Justice, Sacramento, California, Counsel for the Government.

### MEMORANDUM OPINION AND PARTIAL FINAL JUDGMENT FOR JUST COMPENSATION, PURSUANT TO RCFC 54(b), AND ORDER REGARDING CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL

**BRADEN**, *Judge*.

On May 1, 2015, the court issued a Memorandum Opinion And Order determining that Plaintiffs established that the Army Corps of Engineers' ("Army Corps") construction, expansions, operation, and failure to maintain the Mississippi River-Gulf Outlet ("MR-GO") caused increased storm surge flooding on Plaintiffs' properties during Hurricane Katrina and subsequent hurricanes and severe storms, effecting a temporary taking under the Fifth Amendment to the United States Constitution. *See St. Bernard Par. Gov't v. United States*, 121 Fed. Cl. 687, 746 (2015) ("Liability Decision").

On May 6, 2015, the court convened a settlement conference in New Orleans, during which the parties discussed mediation or certification of the court's Liability Decision. On October 9, 2015, the Government advised the court that it declined to pursue mediation. Instead, on October

30, 2015, the Government filed a Motion To Certify Interlocutory Appeal of the Liability Decision to the United States Court of Appeals for the Federal Circuit.  On November 16, 2015, Plaintiffs filed a Response In Opposition.   The parties, however, subsequently agreed that the most appropriate procedure to afford appellate review was for the court to enter a final partial judgment, pursuant to Rule 54(b) of the Rules of the United States Court of Federal Claims ("RCFC"), as to Just Compensation due the owners of eleven properties selected by Plaintiffs and the Government ("Trial Properties").  The court does so today, together with an Order Regarding Class Certification And Appointment Of Class Counsel.[1]

To facilitate review of this Memorandum Opinion And Final Partial Judgment, the court has provided the following outline:

I.      RELEVANT BACKGROUND.

II.     THE JUST COMPENSATION DUE FOR THE TEMPORARY TAKING OF THE TRIAL PROPERTIES.

  A.    Expert Testimony On Just Compensation.

    1. Plaintiffs' Expert, The Government's Objections, And The Court's Determination.

    2. The Government's Experts, Plaintiffs' Objections, And The Court's Determination.

        a.   Dr. Joannes J. Westerink, PhD.

        b.   Mr. Steven D. Fitzgerald, P.E.

        c.   James R. Danner, P.E.

        d.   Mr. Jean-Prieur Du Plessis, C.P.E.

        e.   Mr. Michael W. Truax, Sr.

  B.    The Court's Determination.

    1. Governing Precedent.

    2. The Evidence Supporting Just Compensation.

        a.   The Value Of The Underlying Land On August 29, 2005.

        b.   The Cost Of Replacement Improvements On The Non-Governmental Trial Properties.

            3614-16 Fenelon Street (Residential Duplex Rental).

            3024 Lakewood Drive (Residential).

            3209 East Judge Perez Drive (Commercial).

            2316 Florissant Highway (Residential) (Robin).

            6325 Paris Road (Industrial).

---

[1] Accordingly, the Government's October 30, 2015 Motion To Certify is moot.

2414 Deslonde Street (Residential).

   c.  Fair Market Rent Lost By The Owners Of Non-Governmental Property.

      i.  The Land Component.

         3614-16 Fenelon Street.

         3024 Lakewood Drive (Bordelon).

         3209 East Judge Perez Drive.

         2316 Florissant Highway (Robin).

         6325 Paris Road (Port Ship Service, Inc.).

         2414 Deslonde Street (Adams).

      ii.  The Combined Land Component And Cost Of Replacement Improvements Component.

      iii. The Relevant Temporary Taking Period.

      iv. Fair Market Rent Lost.

   d.  Interest.

  3. The Government's Asserted Offsets.

     a.  For Federal Emergency Management Agency Grants.

     b.  For United States Department Of Housing And Urban Development Grants Under The "Road Home Program."

 C.  The Court's Determination Of Just Compensation Due As To Lost Local Real Estate Tax Revenues.

**III.**    THIS CASE IS NOW APPROPRIATE FOR CLASS CERTIFICATION.

 A.  The Requirements Of RCFC 23(a) Have Been Met.

   1. The Class Is So Numerous That Joinder Of All Members Is Impracticable.

   2. There Are Questions Of Law Or Fact Common To The Class.

   3. The Claims Or Defenses Of The Representative Parties Are "Typical" Of The Claims Or Defenses Of The Class.

   4. The Representative Parties Will Fairly And Adequately Protect The Interests Of The Class.

 B.  The Requirements Of RCFC 23(b) Have Been Met.

 C.  The Appointment Of Class Counsel.

**IV.**    CONCLUSION.

## I.     RELEVANT BACKGROUND.

The May 1, 2015 Liability Decision includes a detailed factual background and is necessary to understand the court's findings regarding Just Compensation due in this Memorandum Opinion. *See St. Bernard Par.*, 121 Fed. Cl. at 695–715.

An evidentiary hearing was held in Washington, D.C. from November 18–20, 2013 ("DTR 1–801") to assess the amount of Just Compensation due

> a representative cross-section of the relevant property type in the St. Bernard Polder.  Five of the properties are owned by St. Bernard Parish and the remaining six properties are owned by one or more of the other named [P]laintiffs.  Some of the eleven properties are improved, while others are unimproved.  The properties are devoted to a range and are located both inside and outside the federal and state/local levee systems.  They are also dispersed throughout the developed areas of the [St. Bernard] Polder, including in both the Lower Ninth Ward and major communities of St. Bernard Parish (Arabi, Chalmette, Violet, Meraux, and Yscloskey).

4/25/14 Plaintiffs' Damages Phase Post-Trial Brief ("Pls. DBr.") at 18; *see also* 4/25/14 Government Post-Trial Memorandum Of Contentions Of Fact And Law ("Gov't DMem.") at 8 (wherein the Government agreed that the court first should "proceed with a valuation trial with respect to eleven Trial Properties").

The following chart, prepared by the Government, lists the owners, addresses, and description of each of the Trial Properties.

| Plaintiff | Address | Type of Property |
|---|---|---|
| Tommaseo | 3614-16 Fenelon St., St. Bernard Parish | Residential duplex |
| Bordelon | 3024 Lakewood Dr., St. Bernard Parish | Residential |
| Steve's Mobile Home (Steve's RV) | 3209 E. Judge Perez Hwy., St. Bernard Parish | Commercial |
| Parish Government | 1818 Center St., St. Bernard Parish (StBP #1) | Playground, with community building |
| Parish Government | 4 Acres of Land, St. Bernard Parish (StBP #2) | Playground, with gymnasium |
| Parish Government | Lots 110-115, St. Bernard Parish (StBP #3) | Vacant |
| Parish Government | 6.58 Acres of Land, St. Bernard Parish (StBP #4) | Vacant |
| Parish Government | 4119 E. Judge Perez Dr., St. Bernard Parish (StBP #5) | Fire Station |
| Robin | 2316 Florissant Hwy., St. Bernard Parish (outside the federal levees) | Residential rental |
| PSSI | 6325 Paris Rd., St. Bernard Parish | Industrial |
| Adams | 2414 Deslonde St., Lower Ninth Ward | Residential |

Gov't DMem at 9.

The following maps provide context to the court's findings as to Just Compensation.  The first map shows the location of the MR-GO and the MR-GO's proximity to Lake Pontchartrain, Lake Borgne, and the Mississippi River.



Plaintiffs' Trial Exhibit ("SPX") SPX.0001, at I-31.

The second map shows the location of each of the Trial Properties and their proximity to: the MR-GO Reach 1 that intercepts with the Inter Harbor Navigation Canal ("IHNC") to the east and eventually to the Mississippi River; and the MR-GO Reach 2 that runs adjacent and just west of Lake Borgne for approximately twenty-four miles into the Gulf of Mexico.



Direct Testimony of Steven D. Fitzgerald, P.E. ("Fitzgerald Direct"), ECF No. 240, at 13.

As a 2006 Senate Report on Hurricane Katrina concluded, the MR-GO

> contributed to a potential "funnel" for storm surges emerging from Lake Borgne and the Gulf into the New Orleans area. . . .  Prior to Hurricane Katrina, many warned that the potential funnel would accelerate and intensify storm surges emerging from Lake Borgne and the Gulf into the downtown New Orleans area. The funnel had been described as a "superhighway" for storm surges or the "Crescent City's Trojan Horse" that had the potential to "amplify storm surges by 20 to 40 percent," according to some storm modeling.  Researchers at [Louisiana State University] believed that in creating this funnel, "the US Army Corps of Engineers had inadvertently designed an excellent storm surge delivery system—nothing less—to bring this mass of water with simply tremendous 'load'—potential energy—right into the middle of New Orleans."

SPX692 at 123–24 (footnotes omitted).

## II.    THE JUST COMPENSATION DUE FOR THE TEMPORARY TAKING OF THE TRIAL PROPERTIES.

### A.    Expert Testimony On Just Compensation.

Both parties proffered experts to advise the court about the amount of Just Compensation due for the temporary taking of each of the eleven Trial Properties. The credentials of the parties' experts, the objections of the opposing party, and the court's determination as to their qualifications and their methodology follow.

### 1.    Plaintiffs' Expert, The Government's Objections, And The Court's Determination.

Plaintiffs proffered the testimony of Mr. Andrew Marshall, a Certified General Appraiser with more than 36 years of experience in valuing and appraising residential, commercial, and industrial properties, particularly St. Bernard Parish and the Lower Ninth Ward. 11/11/13 Written Direct Testimony of Andrew J. Marshall, Jr. ("Marshall Direct"), ECF No. 283, at 10–12; DTR 88–100 (Direct Examination of Marshall). Mr. Marshall also had experience in the construction and management fields and lived and worked in St. Bernard Parish for three decades. Marshall Direct at 11.

Mr. Marshall advised the court that appraisers of real property typically use three methods to determine value: a Sales Comparison Approach; a Cost Approach; or an Income Capitalization Approach. Marshall Direct at 25. In this case, Mr. Marshall used the Sales Comparison Approach to estimate the value of land by comparing recently sold properties and considering such factors as "physical [location], economic, and legal characteristics, and condition of the property at the time of sale." Marshall Direct at 25–26. Mr. Marshall also used a Cost Approach to estimate the fair market value of land and improvements by "adding the estimated value of the land to the current cost of constructing a reproduction or replacement for the improvements and then subtracting the amount of depreciation (*i.e.*, deterioration and obsolescence) in the structures from all causes." Marshall Direct at 25–26 (citing APPRAISAL INSTITUTE, THE APPRAISAL OF REAL ESTATE 47 (14th ed. 2013)). Mr. Marshall's Cost Approach also relied on the "Marshall & Swift" cost estimation service.[2] Marshall Direct at 26. Third, Mr. Marshall used an Income Capitalization Approach to estimate the fair market value of a property that produced rental income. Marshall Direct at 26–27. Mr. Marshall utilized one or more of these approaches to estimate the value of the land, improvements, and fair market rent lost for each of the eleven Trial Properties.

The Government objected to Mr. Marshall's qualifications, because he was not a member of the American Institute of Certified Appraisers and "had no prior experience preparing appraisal reports in inverse condemnation cases." Gov't DMem. at 98.[3] The Government also lodged several objections to Mr. Marshall's estimates. First, Mr. Marshall relied on so-called "general

---

[2] The "Marshall & Swift" is an online cost estimating computer program developed by an individual with no relationship to Mr. Andrew Marshall. DTR at 298, 755–56.

[3] At trial, the Government's counsel conceded that "most appraisers are not members of the [American] Appraisal Institute [of Certified Appraisers]." DTR at 177.

data" about trends in the New Orleans real estate market, although there is no record evidence that the "broad, market impacts resulting from passage of Hurricane Katrina over the region" were "directly related to the imposition of a temporary flowage easement over any Trial Property." Gov't DMem. at 101–03. Second, Mr. Marshall did not properly estimate the temporary flowage easement, because Plaintiffs' counsel instructed him to value the fee interest of each of the Trial Properties, as if it were vacant between August 22, 2005 and June 1, 2011, well past the time the temporary flowage easement was abated. Gov't DMem. at 104–05. Third, Mr. Marshall attributed all of the Trial Properties' structural "improvement damage" to the MR-GO and related flooding, failing to consider other causes, including high winds. Gov't DMem. at 106–07.[4] Fourth, Mr. Marshall improperly assumed that all of the improvements on each of the Trial Properties were a total loss, without ascertaining the viability or costs of repair. Gov't DMem. 107–08. And, the Government faulted Mr. Marshall for not considering depreciation in his "Improvement Loss" (Cost Approach) calculations, arguably inflating improvement values.[5] Gov't DMem. at 108–09 (citing Marshall Direct Figure 1); *see also* 1/4/16 Gov't Resp. to Court (EFC No. 295), at 1–4.

The court has determined that Mr. Marshall's credentials and experience qualify him as an expert real estate appraiser, with significant relevant experience in the New Orleans area. The court's criticisms of Mr. Marshall's methodology and the scope of his testimony are discussed in later sections of this Memorandum Opinion.[6]

---

[4] On cross examination, Mr. Marshall pointed out that his damage assessment acknowledged that "some damage" was caused by wind. DTR at 125–26 (Cross Examination of Marshall) (referencing Marshall Direct at 10).

[5] Plaintiffs respond that Mr. Marshall calculated both depreciated and non-depreciated replacement costs for improvements on all of the Trial Properties, except the two properties (Lots 110–115 and 6.58 acres of land) that had no improvements at the time of the taking (August 29, 2005). 1/4/16 Pls. Resp. To Court, ECF No. 294, at 1–2.

[6] The Government also contends that Mr. Marshall's testimony was biased, because he and his wife filed administrative claims in February 2007 against the Army Corps for injury caused by MR-GO related flooding of their property. Gov't DMem. at 99–100 (citing DVX151). At trial, however, Mr. Marshall testified that he would not join in any class action certified by the court, although he could not speak for his wife. DTR at 131–37. The court is satisfied that Mr. Marshall's expert opinion was not influenced by the existence of this administrative claim, since the Army Corps required all potential claimants to make a filing by August 25, 2007. *See* U.S. ARMY CORPS OF ENGINEERS, http://www.mvn.usace.army.mil/About/Offices/OfficeofCounsel.aspx (follow "Claims Information" then follow "Expand All" hyperlink) (last visited April 29, 2016) ("[Hurricane Katrina and Rita] claim[s] against the United States, in particular against the U.S. Army Corps of Engineers, must be presented, in writing, within two years from the date that the cause of action occurred."); *see also id.* ("The U.S. Army Corps of Engineers has taken final action on the administrative claims against the Corps seeking damages related to Hurricanes Katrina and Rita. All claims have been denied.").

### 2. The Government's Experts, Plaintiffs' Objections, And The Court's Determination.

#### a. Dr. Joannes J. Westerink, PhD.

Dr. Westerink was proffered by the Government as an expert in civil engineering, with specialties in hydraulics, coastal engineering, computational hydraulics, and computer modeling. 11/12/13 Westerink Direct ("Westerink Direct") at 1.  The Government engaged Dr. Westerink to study flooding experienced at the Trial Properties by "the surge or specifically surface water elevations that are the *combined effect of the winds, atmospheric pressure, waves, riverine flow, and tides* that occurred during Hurricane Katrina."  Westerink Direct at 5 (emphasis added).  The Government's counsel, however, instructed Dr. Westerink to conduct his analysis, assuming seven scenarios.  Westerink Direct at 9.  The purpose of these scenarios was "to isolate and examine several alleged influences on flooding during Hurricane Katrina, including construction of the MR-GO, changes in the MR-GO's width over time, changes in wetland topography the relative impact of breaches in the IHNC Floodwall and the Reach 2 Levees." Gov't DMem. at 28 (citing Westerink Direct at 8).

The following chart shows each scenario posited, at the direction of the Government's counsel, and the assumptions made by Dr. Westerink.

| Scenario | MRGO Status | Marsh Status | Levee Breaches | Description |
|---|---|---|---|---|
| A1 (Katrina Actual Event Conditions) | 2005 pre-Katrina dimensions | 2005 pre-Katrina conditions | Breaching occurring as during Katrina | Base case: Actual Katrina Hindcast |
| A2 (2005 MRGO/ 2005 Wetlands/ IHNC Breaches Only) | 2005 pre-Katrina dimensions | 2005 pre-Katrina conditions | IHNC Breaches Only | Base case reflecting levee breaches only in the IHNC floodwall |
| B1 (MRGO As-Designed/1956 Wetlands) | MRGO at its authorized dimensions as of completion in 1968 | 1956 Wetland conditions | Breaching occurring as during Katrina | Katrina impact absent bank erosion channel widening/ wetland degradation |
| B2 (MRGO As-Designed/1956 Wetlands/IHNC Breaches Only) | MRGO at its authorized dimensions as of completion in 1968 | 1956 Wetland conditions | IHNC Breaches Only | Katrina impact absent bank erosion channel widening/ wetland degradation reflecting INHC breaches only |
| C (No MRGO/ 1956 Wetlands) | No MRGO | 1956 Wetland conditions | Breaching occurring as during Katrina | Katrina impact without MRGO, and with 1956 wetland topography |
| D (No Federal Levees/2005 MRGO/2005 Wetlands) | 2005 pre-Katrina dimensions | 2005 pre-Katrina conditions | No levees along MRGO Reach 1 and 2 | Katrina impact with MRGO but without levees along MRGO. MRGO and wetlands with 2005 conditions |
| E (No Federal Levees/No MRGO/1956 Wetlands) | No MRGO | 1956 Wetland conditions | No levees along MRGO Reach 1 and 2 | Katrina impact with no federal influence |

Westerink Direct at 9 (Table 2).

The following chart shows the estimated peak water levels (per foot) under Dr. Westerink's scenarios for each of the Trial Properties.

| Location | Scenario A1 | Scenario A2 | Scenario B1 | Scenario B2 | Scenario C | Scenario D | Scenario E |
|---|---|---|---|---|---|---|---|
| Adams | 10.5 | 9.0 | 9.3 | 8.0 | 8.8 | 14.1 | 13.8 |
| SBP #1 | 10.7 | 8.5 | 9.5 | 7.5 | 9.0 | 14.3 | 14.1 |
| SBP #2 | 10.8 | 8.3 | 9.7 | 7.5 | 9.1 | 14.5 | 14.3 |
| Tommaseo | 11.0 | 7.1 | 10.1 | 6.3 | 10.3 | 14.7 | 14.5 |
| SBP #3 | 11.3 | 6.2 | 10.6 | 5.4 | 11.0 | 15.0 | 14.9 |
| SBP #4 | 11.5 | 4.6 | 10.8 | 4.1 | 11.5 | 15.6 | 15.5 |
| Steve's RV | 11.5 | 4.6 | 10.8 | 4.1 | 11.5 | 15.6 | 15.6 |
| SBP #5 | 11.5 | 4.6 | 10.8 | 4.1 | 11.5 | 15.8 | 15.7 |
| Bordelon | 11.6 | 4.6 | 10.9 | 4.1 | 11.5 | 16.8 | 16.6 |
| PSSI | 11.7 | 4.0 | 11.0 | 3.8 | 11.6 | 14.8 | 14.9 |
| Florissant | 17.3 | 17.5 | 17.2 | 17.3 | 17.2 | 17.1 | 16.9 |

Westerink Direct at 17 (Table 3).

Importantly, Dr. Westerink also testified that:

- The IHNC North breach was initiated at 6:00 am on August 29 and developed to the full breach depth over a 30 minute duration.

- The IHNC South breach was initiated at 6:45 am and developed to the full breach depth over a 15 minute duration.

- The MRGO Reach 2 breaches were initiated at 5:45 am and developed to the full breach depths over a 2.5 hour duration[.]

  — As discussed, the timing and duration of the MRGO Reach 2 breaches modeled here are consistent with those adopted by the Plaintiffs' expert Dr. Kok in [*In re Katrina Canal Breaches Consol. Litig.*, 647 F. Supp. 2d 644, 654 (E.D. La. 2009) ("*Robinson*"), *aff'd sub nom. In re Katrina Canal Breaches Litig.*, 673 F.3d 381 (5th Cir. 2012), *opinion withdrawn on reh'g*, 696 F.3d 436 (5th Cir. 2012), *aff'd in part, rev'd in part sub nom. In re Katrina Canal Breaches Litig.*, 696 F.3d 436 (5th Cir. 2012) (*en banc*)], who modeled breaching of the MRGO Reach 2 levees from 5:00 am to 8:30 am on August 29, 2005.

- However, *I am not a geotechnical expert and express no opinion on the precise physical manner in which the Reach 2 levees failed, or upon the MRGO's alleged role in causing those levees to degrade.*

Westerink Direct at 54 (emphasis added); *see also* DTR at 498–99 (Westerink).

The court's determination of Dr. Westerink's testimony is discussed together with that of Mr. Steven D. Fitzgerald, P.E.

### b. Mr. Steven D. Fitzgerald, P.E.

Mr. Fitzgerald was proffered by the Government as an expert in civil engineering, with a specialty in hydraulics, hydrology, and hydraulic and hydrology computer modeling. Fitzgerald Direct at 1. At the Government counsel's request, Mr. Fitzgerald conducted computer modeling to determine how "the [Trial Properties] flooded during Hurricane Katrina and how those properties would have flooded in several hypothetical scenarios," *i.e.*, those proposed by Dr. Westerink. Fitzgerald Direct at 2; DTR at 596 (Cross Examination of Fitzgerald). Based on his computer modeling, Mr. Fitzgerald concluded:

- The model accurately depicted the flooding of the St. Bernard Basin, closely matching the observed data collected after the storm.

- The Inner Harbor Navigation Canal (IHNC) floodwall breaches predominantly influenced the flooding of the Trial Properties located in the Lower Ninth Ward and just east of the Lower Ninth Ward in the portion of St. Bernard Parish west of Paris Road.

- Moving east in the St. Bernard Basin, the overtopping and breaching of the Reach 2 levee has a greater influence on flooding on the Trial Properties. This is particularly true of Trial Properties located east of Paris Road.

- If the Mississippi River Gulf Outlet (MRGO) had never been built, or if the MRGO had remained at its original design dimensions, the flooding of the Trial Properties east of Paris Road would have been virtually identical to the flooding that actually occurred on those properties during Hurricane Katrina. For the Trial Properties located west of Paris Road, the maximum water elevations would have been 1–3 feet lower.

- If the IHNC floodwalls breached during Hurricane Katrina, but the Reach 2 levee had not breached during the storm, the flooding experienced on the Trial Property in the Lower Ninth Ward would have been nearly identical to the flooding that actually occurred.

- The level of flooding on each Trial Property in each scenario depends on the ground and first-floor elevations of each property and the surrounding terrain.

Fitzgerald Direct at 2.

The Government argued that the collective testimony of Dr. Westerink and Mr. Fitzgerald was "indispensable" to the court's damage assessment, because "it is the *only evidence* before the [c]ourt concerning flooding on those properties during Hurricane Katrina and the sole basis upon which this [c]ourt may distinguish between flooding that occurred as a result of the Reach 2 Levee breaches and flooding that occurred as a result of the IHNC Floodwall breach." Gov't DMem. at 56–57 (emphasis in original).

Plaintiffs objected to Dr. Westerink's and Mr. Fitzgerald's testimony, because neither were proffered as witnesses in the liability proceedings. Instead, they were introduced under the guise of damage experts to support "a new causation analysis" that the IHNC Floodwall breaches were the principal cause of flooding in the Lower Ninth Ward and western part of St. Bernard Parish. Pls. DBr. at 6, 42–46.[7]  In addition, their testimony is also contrary to the Government's prior position in *Robinson*, wherein the Government conceded that "[l]evee degradation and breaching along the MRGO Reach 2 created a very large source of water which . . . eventually . . . flooded the entire Chalmette area[,] including the Lower Ninth Ward . . . and *was by far the greatest source of water that entered the [St. Bernard] polder, greatly exceeding all other sources.*" 7/21/09 United States' Proposed Findings Of Fact ("U.S. *Robinson* FOF"), *Robinson*, No. 05-04182 (E.D. La 2009), ECF No. 19139, at ¶ 334 (emphasis added).   And, the Government conceded in *Robinson*, that breaches along the IHNC Floodwall "did not impact the flooding of the St. Bernard basin[.]") U.S. *Robinson* FOF ¶ 347.  In fact, Mr. Fitzgerald concluded in *Robinson* that "[t]he overtopping and breaches along MRGO had a significant effect on the maximum water service elevations compared to the IHNC breaches." SPX2401 at 4; Plaintiffs' April 13, 2012 Proposed Findings Of Fact ("Pls. LFOF"), ECF No. 184-1, at ¶ 259 (citing e-mail from Army Corps).

For these reasons, the court has determined that, although Dr. Westerink and Mr. Fitzgerald are experts in their respective fields, other than Scenario A1—Katrina Actual Event—their testimony was in direct conflict with the Government's prior admissions and testimony in

---

[7] During a November 5, 2013 telephone conference, the court denied Plaintiffs' October 7, 2013 Motion *In Limine* to exclude the testimony of Dr. Westerink and Mr. Fitzgerald in the damages proceedings to allow the Government to make a record that the MR-GO was not responsible for any of the flooding on Plaintiffs' properties. 11/5/13 Telephone Conference, ECF No. 237, at 4–5.  But, as the May 1, 2015 Liability Decision determined, the overwhelming evidence from the Army Corps documents alone established the significant causative role that the MR-GO played in the increased storm surge flooding of Plaintiffs' properties during Hurricane Katrina and "inevitably recurring" flooding during subsequent hurricanes and severe storms.  *See St. Bernard Par.*, 121 Fed. Cl. at 739, 720–23.

*Robinson* and unreliable.[8]  In addition, Dr. Westerink's and Mr. Fitzgerald's opinions were biased by the Government's counsel's instructions that they not consider any scenario where the MR-GO was not built, never expanded, and was properly operated and maintained.  Pls. DBr. at 42 (citing Plaintiffs' 4/25/16 Damages Phase Proposed Findings Of Fact ("Pls. DFOF"), ECF No. 263-2, at ¶¶ 231, 256).  They were also instructed by the Government's counsel not to consider any scenario that removed the effects of the IHNC breaches to isolate the effect of the MR-GO breaches.  DTR at 530 (Cross Examination of Westerink); *see also* Pls. DFOF at ¶ 259.  Moreover, and likely offensive to the property owners in this case, Dr. Westerink was asked by the Government's counsel to posit Scenarios D and E that assumed *no levees* were built by the Army Corps, nominally to establish that Plaintiffs received some "benefit" from the levees that should be considered as an "offset" against Just Compensation due in this case.[9]  In any event, neither Dr. Westerink nor Mr. Fitzgerald posited an opinion as to why the MR-GO Reach 2 levees failed and the economic impact of this fact on the Trial Properties.  Westerink Direct at 54; DTR at 661–62 (Redirect of Fitzgerald); DTR at 595–97 (Cross Examination of Fitzgerald).

### c.  James R. Danner, P.E.

Mr. Danner was a licensed civil and environmental engineer retained by the Government to prepare a scope of work for the eight privately-owned Trial Properties and proffered as an expert in civil engineering, specializing in storm damage assessment.  11/13/13 Direct Testimony of James R. Danner, Jr. ("Danner Direct"), ECF No. 243, at 2–8.  Mr. Danner inspected these Trial Properties in April and May 2013, more than seven years after Hurricane Katrina, but testified that he only identified actual water marks from Hurricane Katrina on two of the Trial Properties.  Danner Direct at 10.  For each building, Mr. Danner "relied upon the analyses of Dr. Westerink and Mr. Fitzgerald for flood depth information" and "developed a likely scope of repair based on each of *those* damage assessments."  Danner Direct at 11 (emphasis added).

Mr. Danner's reliance on the Westerink/Fitzgerald testimony is problematic for the reasons previously discussed.  In addition, Mr. Danner was instructed by the Government's counsel that, if the flooding level reached four feet, he could allow for removal or replacement of improvements up to that level, but not above.  DTR at 703–04 (Cross Examination of Danner).  Although Mr. Danner testified that, when flood water was 3½ feet and above, he "gave the benefit of the doubt

---

[8] *See* Pls. DBr. at 44–46 (listing other issues with Dr. Westerink's and Mr. Fitzgerald's modeling data and methodology).

[9] After the Liability Decision, the Government continued to argue that Plaintiffs must "prove that the United States caused any levees to fail."  DTR at 31.  The court's temporary taking analysis, however, was not premised on the Army Corps' failure to build proper levees, as was the focus in the *Robinson* trial, but instead that the Army Corps' construction, expansions, operation, and failure to maintain the MR-GO caused increased *storm surge* that was exacerbated by a "funnel effect" during Hurricane Katrina and subsequent hurricanes and severe storms, causing flooding on Plaintiffs' properties that was "inevitably recurring."  *St. Bernard Par.*, 121 Fed. Cl. at 731–38, 746.

to the Plaintiffs, but under the A-1 scenario he determined that flooding "never got above 2½ feet on the second floor."  DTR at 708 (Cross Examination of Danner).

On cross examination, Mr. Danner admitted that the Fenelon Street property, as modeled under the A-1 scenario by Westerink/Fitzgerald, showed flooding up to 6½ feet but, based on Mr. Danner's personal observation of residual watermarks, he determined that the actual level was 8 feet.  DTR at 710–11 (Cross Examination of Danner).  The significance of this is that Westerink/Fitzgerald underestimated flooding levels, at least on some properties, that further reduced Mr. Danner's estimated improvement costs. 12/21/15 Oral Argument Transcript ("12/21/15 TR"), ECF No. 291, at 15.

In addition, on cross examination, Mr. Danner was confronted about the difference between his approach and the Gypsum Association's standard "Assessing Water Damage to Gypsum Board" (SPX2511) recommending:  "Gypsum board that has been exposed to sewage or floodwaters must be replaced."  DTR at 706.  Mr. Danner also was shown a Federal Emergency Management Agency ("FEMA") document that recommended: "If the water level was less than 2½ feet, the wall material should be removed to a height of four feet to facilitate reinstallation of full sheets of drywall.  If the water level is greater than 2½ feet, the wall material should be removed to a higher of eight feet or the ceiling junction, whichever is higher."  DTR at 707 (quoting SPX2511).  Therefore, in addition to relying on Westerink/Fitzgerald's unsubstantiated estimated flood levels, Mr. Danner disregarded industry and FEMA standards in preparing his scope of work.

For these reasons, the court has determined that Mr. Danner's testimony was unreliable, subjective, and speculative.

### d.  Mr. Jean-Prieur Du Plessis, C.P.E.

Mr. Du Plessis was a Senior Cost Estimator with the firm of Madsen, Kneppers and Associates and proffered as an expert in construction cost estimating.  11/13/13 Direct Testimony of Jean Prieur Du Plessis, CPE ("Du Plessis Direct"), ECF No. 242, at 1, 6.  Mr. Du Plessis was asked by the Government's counsel to develop estimates of the probable cost to repair only the eight privately-owned Trial Properties and the probable cost to reconstruct three Trial Properties owned by St. Bernard Parish.  Du Plessis Direct at 3.  These estimates included both "hard costs," *i.e.*, labor, materials, and equipment, plus "soft costs," *i.e.* administrative costs.  Du Plessis Direct at 22–23.  Mr. Du Plessis's estimates, however, relied on the scope of work prepared by Mr. Danner, who relied on the Westerink/Fitzgerald opinions.  Du Plessis Direct at 13; DTR at 737 (Du Plessis testifying that he relied on information from Mr. Danner).  Therefore, Mr. Du Plessis's testimony suffered from the deficiencies of the Westerink/Fitzgerald and Danner opinions.

For these reasons, the court has determined that Mr. Du Plessis's testimony was unreliable, subjective, and speculative.

### e.  Mr. Michael W. Truax, Sr.

Mr. Michael W. Truax, Sr. was a licensed appraiser in Louisiana.  11/14/13 Direct Testimony of Michael W. Truax, Sr., MAI, ASA ("Truax Direct"), ECF No. 245, at 5.  Mr. Truax lived in St. Bernard Parish at some point and had twenty-five years of experience appraising numerous types of property in the New Orleans area.  Truax Direct at 9, 11.

Mr. Truax appraised the privately-owned Trial Properties[10] using a "Before and After Methodology," in accordance with the Uniform Appraisal Standards for Federal Land Acquisition. Truax Direct at 13, 15–16; DVX131, at USSBA 000908 (defining "market value").[11]   But, Mr. Truax was instructed by the Government's counsel to assume that the United States had "the right to inundate [all of the] Trial Properties with flood water for the period within which the easement [was] in force," *i.e.*, from August 29, 2005 until September 26, 2005, other than the 2414 Deslonde Street, located in the Lower Ninth Ward, for which the easement terminated on May 8, 2006. Truax Direct at 19–20; *see also* DVX51 at 16.  These dates reflect when the Government contends that local authorities allowed owners to return to their properties after Hurricane Katrina.  DVX144 at TT001118–20.

Mr. Truax's appraisal considered only two of the Westerink/Fitzgerald scenarios.  Scenario A1 concerned the "value impact resulting from the flooding actually experienced."  Truax Direct at 18.  In contrast, Scenario A2 was "*[b]ased on the information . . . provided from other experts*, [so that Mr. Truax's] value analysis, depend[ed] in part, on *what assumptions* [Mr. Truax made] with respect to the reason various levees breached."  Truax Direct at 18 (emphasis added). Scenario A2 also reflected flooding only from the IHNC Floodwall breaches.  Truax Direct at 18. Mr. Truax then deducted Scenario A2's value differential from Scenario A1's value differential to obtain results that reflected "the value impact related exclusively to flooding resulting from the Reach 2 Levee breaches."  Truax Direct at 18–19.

For vacant land and improvements, Mr. Truax used a sales comparable approach, adjusted for "physical features, and geographic, economic, and social factors," reflected in an "adjustment grid."  Truax Direct at 25–26.  The result was a "range of values, usually expressed as a dollar value per square foot."  Truax Direct at 26.[12]   Then, based on "our understanding of the market, our review of all the dates, and our professional judgment, we determine a 'before value' estimate for the subject property."  Truax Direct at 26.

As for "improved institutional-use properties owned by St. Bernard Parish," a "cost approach" was utilized, first estimating the new replacement costs of all existing property improvements from a variety of sources, and then accounting for "total accrued depreciation," primarily by "market extraction, utilizing and breaking down the components of recent sales of comparable improved properties."  Truax Direct at 26–27.  Mr. Truax, however, recognized that the cost approach he used to value such properties as churches, schools, and public buildings,

---

[10] A second appraiser, Mr. Henry W. Tatje, III, MAI, appraised the three Trial Properties owned by St. Bernard Parish.  Truax Direct at 15.   At trial, however, the Government withdrew Mr. Tatje's direct testimony.  DTR at 790.

[11] Mr. Truax was not asked by the Government's counsel to conduct an appraisal, pursuant to the Uniform Appraisal Standards For Federal Acquisition (Dec. 20, 2000) (known as the "Yellow Book").  Pls. DBr. at 62.

[12] Mr. Truax's improvement analysis also relied on Mr. Du Plessis's "estimate[d] cost of structural repairs necessary."  Truax Direct at 21.  But, as previously discussed, Mr. Du Plessis's analysis relied on the Westerink/Fitzgerald and Mr. Danner opinions.

"generally has limited applicability as a primary valuation method due to the limited reliance usually placed upon it by market participants." Truax Direct at 27–28. Therefore, Mr. Truax decided, instead, to use a Gross Income Multiplier Analysis to determine the value of 3614-16 Fenelon, because it was an income producing property "applying (multiplying) a market-derived multiplier [derived from recent past comparable sales] to the market-supported gross rental income that the subject property should produce." Truax Direct at 28.

Mr. Truax's "Before Value" estimate was based on "a correlation, or a final determination . . . weighing the inherent strengths and weaknesses of the methods and data used in each approach to determine which, if any, should be weighted most heavily in the final analysis." Truax Direct at 28. Mr. Truax's "After Value" estimate was determined by the "(1) damage/destruction of improvements as a result of Hurricane Katrina related flooding and (2) loss of use of the property during the easement period." Truax Direct at 29. To ascertain "the actual value of the flood damages done to buildings and improvements on the Trial Properties that had structures on them," Mr. Truax was provided reports by Mr. Danner who "estimated the cost to repair each of the subject properties under different flood damage scenarios." Truax Direct at 29. Included in Mr. Truax's "After Value" estimate was a 20 percent upward adjustment for "entrepreneurial profit," *i.e.*, "the market-recognized profit incentive required by investors and developers to undertake the purchase and repair of such properties." Truax Direct at 29. Nevertheless, Mr. Truax concluded that, for some properties, "cost of repairs plus entrepreneurial profit exceeded the contributory value of the buildings; in others, the repair costs plus entrepreneurial profit [was] less than the contributory value of the buildings." Truax Direct at 30.

As for the fair market rent lost, Mr. Truax determined that it was appropriate to use a rate of 10 percent per annum of the market value of a property *after* flooding, as "multiplied by the portion of a year that the temporary flowage easement was imposed" on an individual property. Truax Direct at 30–31; *see also* 12/21/15 TR at 18–19.

The court has determined that Mr. Truax was an expert in real estate appraisals in the New Orleans area and that his "Before Value" Scenario 1 appraisal was the most useful to compare with that of Mr. Marshall's, as discussed herein, but Mr. Truax's decision to estimate the fair market rent lost *after* August 29, 2005, as instructed by the Government's counsel, was contrary to law that Just Compensation must be determined at the time of the taking.

## B.    The Court's Determination.

### 1.    Governing Precedent.

"Just Compensation" has been defined by the United States Supreme Court as the "value of [private property of which the owner] has been deprived of, and no more." *Bauman v. Ross*, 167 U.S. 548, 574 (1897). Stated differently, the owner of the private property is entitled to be restored to "as good a position pecuniarily as if his property had not been taken. He must be made whole but is not entitled to more." *Olson v. United States*, 292 U.S. 246, 255 (1934); *see also Boston Chamber of Commerce v. City of Boston*, 217 U.S. 189, 195 (1910) ("[The Constitution] merely requires that an owner of property taken should be paid for what is taken from him. It deals with persons, not with tracts of land. And the question is, What has the owner lost? not, What has the taker gained?"). But, "the quantum of damages" must "be shown to a reasonable

approximation," *i.e.*, "estimated with a fair degree of accuracy." *Arkansas Game & Fish Comm'n v. United States*, 736 F.3d 1364, 1379 (Fed. Cir. 2013) (on remand) (internal quotations and citations omitted).

## 2. The Evidence Supporting Just Compensation.

### a. The Value Of The Underlying Land On August 29, 2005.

The court has determined that Plaintiffs' land was not lost nor destroyed as a result of the Army Corps' temporary taking, so that no Just Compensation is due for the fee simple value. *See United States v. Petty Motor Co.*, 327 U.S. 372, 377 (1946) ("[J]ust compensation is the value of the [property] interest taken."); *see also Otay Mesa Prop., L.P. v. United States*, 670 F.3d 1358, 1368 (Fed. Cir. 2012) ("Compensation should be based on an assessment of precisely what the government takes from a landowner.").

It is a matter of public record, as Plaintiffs' expert Mr. Marshall testified, that the value of land in St. Bernard Parish and the Lower Ninth Ward substantially was diminished after Hurricane Katrina and subsequent hurricanes and severe storms, but other factors contributed to that loss—most notably the financial crisis in the housing market that began in 2008.

For these reasons, the court declines to award Plaintiffs compensation for the fee simple value of their land or compensation for the diminished value, as too speculative to be "estimated with a fair degree of certainty." *Arkansas Game & Fish*, 736 F.3d at 1379.

### b. The Cost Of Replacement Improvements On The Non-Governmental Trial Properties.

Plaintiffs' expert, Mr. Marshall, utilized a Cost Approach, Sales Approach, and Income Capitalization Approach to estimate the cost of replacement improvements on the Trial Properties.[13]   Marshall Direct at 65.   Then, he used his professional judgment to reconsider the different estimates.  Marshall Direct at 68.  This approach appeared to the court to be unnecessarily complex and confusing, since Mr. Marshall explained at the beginning of his testimony that the Cost Approach "typically [was] used to value only the improvements to the land."  Marshall Direct at 26.

Mr. Truax used a Cost Approach to estimate "the replacement cost new of all existing property improvements," utilizing "professional cost estimators, actual cost bids from building contractors, published data from other reliable cost services and similar sources."  Truax Direct at

---

[13] The United States Court of Appeals for the Federal Circuit has endorsed the use of all three appraisal methods utilized by the parties' experts in this case, *i.e.*, comparable sales; replacement cost; and income capitalization. *See Seravalli v. United States*, 845 F.2d 1571, 1573–75 (Fed. Cir. 1988) ("We are unwilling to restrict the trial courts to any single basis for determining fair market value."); *see also Snowbank Enters. Inc. v. United States*, 6 Cl. Ct. 476, 486 (1984) ("[U]nder some circumstances, the replacement cost method may be used to establish fair market value, particularly when evidence of comparable sales is lacking and the income capitalization approach is inapplicable.").

22–23. Then, Mr. Truax estimated and deducted total accrued depreciation. Truax Direct at 23. Mr. Truax, however, relied on Mr. Du Plessis's "cost of structural repair necessary under the different hydrological scenarios," and on Mr. Danner, based on assumptions relied on Westerink/Fitzgerald modeling. Truax Direct at 17; 12/21/15 TR 3–16.

Since the court was not satisfied with either of Mr. Marshall's or Mr. Truax's estimates, the court made an effort to harmonize the parties' differing positions and how their experts accounted for depreciation[14] to ascertain a "reasonable approximation" of the cost of improvements on the non-governmental Trial Properties.

### 3614-16 Fenelon Street (Residential Duplex Rental).

Mr. Marshall estimated the "cost approach" value for improvements on 3614-16 Fenelon Street as $114,000. Marshall Direct at 68. Mr. Truax estimated the "before value" cost of improvements on this property as $128,000. Truax Direct at 33.

Since the difference between the $114,000 and $128,000 estimates cannot be readily reconciled, based on the record, the court has determined to split the difference, finding that $121,000 is a "reasonable approximation" of the cost of improvements on 3614-16 Fenelon Street, as of August 29, 2005. *See Arkansas Game & Fish*, 736 F.3d at 1379.

### 3024 Lakewood Drive (Residential).

Mr. Marshall estimated the "cost approach" value of the improvements on 3024 Lakewood Drive as $186,200. Marshall Direct at 69, 71. Mr. Truax estimated the "before value" cost of the improvements on this property as $139,250. Truax Direct at 38.

Since the difference between the $186,200 and $139,250 estimates cannot be readily reconciled, based on the record, the court has determined to split the difference, finding that $162,725 is a "reasonable approximation" of the cost of improvements on 3024 Lakewood Drive, as of August 29, 2005.   *See Arkansas Game & Fish*, 736 F.3d at 1379.

### 3209 East Judge Perez Drive (Commercial).

Mr. Marshall estimated the "cost approach" value of the improvements on 3209 East Judge Perez Drive as $580,500, but $536,000 as depreciated. Marshall Direct at 81. Mr. Truax estimated the "before value" cost of the improvements on the property as $346,000, including both building and site improvements. Truax Direct at 43.

Since the difference between the $536,000 and $346,000 estimates cannot be readily reconciled, based on the record, the court has determined to split the difference, finding that $441,000 is a "reasonable approximation" of the cost of improvements on 3209 East Judge Perez Drive, as of August 29, 2005. *See Arkansas Game & Fish*, 736 F.3d at 1379.

---

[14] *Compare* 1/14/16 Pls. Resp. to Court Inquiries, EFC No. 294, at 1–4, *with* 1/4/16 Gov't Resp. to Court Inquiries, ECF No. 295, at 1–8.

### 2316 Florissant Highway (Residential) (Robin).

Mr. Marshall estimated the "cost approach" value of the improvements on 2316 Florissant Highway, prior to August 29, 2005 as $151,880.  Marshall Direct at 74.  Mr. Truax estimated the "before value" cost of the improvements on 2316 Florissant Highway, based on a sales comparative approach as $55,500.  Truax Direct at 73.

Since the difference between the $151,880 and $55,500 estimates cannot be readily reconciled, based on the record, the court has determined to split the difference, finding that $103,690 is a "reasonable approximation" of the cost of improvements at 2316 Florissant Highway, as of August 29, 2005, particularly since the insurance replacement cost was estimated at approximately $126,840.  SPX2218 at 51; *see also Arkansas Game & Fish*, 736 F.3d at 1379.

### 6325 Paris Road (Industrial).

Mr. Marshall estimated the "cost approach" value of the improvements on 6325 Paris Road, prior to August 29, 2005, as: $154,685 for the front building; $390,804 for the back building; $12,000 for the fence; $30,300 for the boat slip, or approximately $587,700, or as depreciated, $514,000.  Marshall Direct at 85–86.  Mr. Truax estimated the "before value" cost of the improvements on 6325 Paris Road, based on comparable sales that ranged from $11.80 per square foot to $30.86 per square foot, but decided the property should be valued at $30.00 per square foot or $223,000.  Truax Direct at 77–78.  Then, Mr. Truax applied a 50% depreciation to the "estimated replacement costs for site improvements" to arrive at $150,000 value of site contributions.  Truax Direct at 78.  Together, Mr. Truax estimated the total value of improvements as $373,000.  Truax Direct at 78.

Since the difference between the $514,000 and $373,000 estimates cannot be readily reconciled, based on the record, the court has determined to split the difference, finding that $443,500 is a "reasonable approximation" of the cost of improvements at 6325 Paris Road, as of August 29, 2005.  *See Arkansas Game & Fish*, 736 F.3d at 1379.

### 2414 Deslonde Street (Residential).

Mr. Marshall estimated the "cost approach" value of the improvements at 2414 Deslonde Street, prior to August 29, 2005 as $97,935.  Marshall Direct at 75–76.  Mr. Truax estimated "before value" cost improvements as $82,000.  Truax Direct at 83.

Since the difference between $97,935 and $82,000 cannot be readily reconciled, based on the record, the court has determined to split the difference, finding that $89,967.50 is a "reasonable approximation" of the cost of improvements at 2414 Deslonde Street, as of August 29, 2005.  *See Arkansas Game & Fish*, 736 F.3d at 1379.

The following chart summarizes the court's findings as to the cost of replacement improvements on the non-governmental Trial Properties, as of August 29, 2005.

### COURT EXHIBIT A

| Property | Address | Use | Cost of Replacement Improvements on August 29, 2005 |
|---|---|---|---|
| 1. Tommaseo | 3614-16 Fenelon St. | Residential Rental | $121,000 |
| 2. Bordelon | 3024 Lakewood Dr. | Residential | $162,725 |
| 3. Steve's RV | 3209 E. Judge Perez Dr. | Commercial | $441,000 |
| 4. Robin | 2316 Florissant Hwy. | Residential Rental | $103,690[15] |
| 5. PSSI | 6325 Paris Rd. | Industrial | $443,500 |
| 6. Adams | 2414 Deslonde St. | Residential | $89,967.50 |

### c. Fair Market Rent Lost By The Owners Of Non-Governmental Property.

The Government's expert, Mr. Truax, testified that Plaintiffs are entitled to the fair market rent lost during the period of the temporary taking and estimated that 10 percent of a property's net worth was an appropriate metric to calculate an annual fair market rent, based on a return to value that generally runs between 8.5–10 percent for improved properties.   9/17/13 Truax Deposition ("Truax Dep."), ECF No. 316-1, at 61–64.  But, Mr. Truax applied that rate to the value of the property *after* the taking, rather than before.  Truax Direct at 26–27.

Mr. Marshall informed the court that rental value data is "not recorded and retained in the same comprehensive manner as sales data."  Marshall Direct at 66–67.  Therefore, Mr. Marshall considered the fair market rent, as of 2013, for comparables and made additional calculations to ascertain a rental rate, based on the Income Approach.  Marshall Direct at 67.  Then, Mr. Marshall "reconciled" his estimate with a fully developed property "Cost Approach," "Sales Comparison Approach," and "Income Approach."  Marshall Direct at 68.

Again the court was not satisfied with either Mr. Truax's or Mr. Marshall's estimates, but made an effort to harmonize their estimates, based on a land component and the replacement improvements component of only the privately-owned Trial Properties before the temporary taking, *i.e.*, as of August 29, 2005.

---

[15] Independent insurance of the estimates replacement cost of improvements on this property was $126,840.  SPX2218 at 16, 51.

### i.   The Land Component.

### 3614-16 Fenelon Street.

Mr. Marshall estimated that the 2005 land value of 3614-16 Fenelon Street was $52,500, based on "four comparable properties [that] were the most recent verifiable sales that indicated a reliable value date as of 2005." Marshall Direct at 62–63. Mr. Truax, however, relied on three comparable sales between November 2002 and August 2005 yielding a sales range of $1.82–$4.19 per square foot, a value much lower in range than Mr. Marshall's $10.14–$10.82 per square foot estimate, even though this amount included depreciation. *Compare* Truax Direct at 30, *with* Marshall Direct at 62. Mr. Truax made a further qualitative adjustment, based on the location, size, and "other factors," that yielded a $3.40 per square foot or $17,000 land value. Truax Direct at 31.

Since the difference between the $52,500 and $17,000 estimates cannot be readily reconciled, based on the record, the court has determined to split the difference finding that $34,750 is a "reasonable approximation" of the land value for 3614-16 Fenelon Street, as of August 29, 2005. *See Arkansas Game & Fish*, 736 F.3d at 1379.

### 3024 Lakewood Drive (Bordelon).

Mr. Marshall estimated that the land value of 3024 Lakewood Drive, based on the sale price of six vacant lots in 2005, yielded a $3.47 per square foot, or a $25,000 land value. Marshall Direct at 70. In contrast, Mr. Truax considered the sales of the three vacant properties between May 2003 and October 2004, yielding a range of $3.00–$4.17 per square foot, to which he made a "qualitative adjustment," based on location, size, and "other factors," that yielded a $3.44 per square foot or a $24,750 land value amount. Truax Direct at 37.

Since the difference between the $25,000 and $24,750 estimates cannot be readily reconciled, based on the record, the court has determined to split the difference, finding that $24,875 is a "reasonable approximation" of the land value for 3024 Lakewood Drive, as of August 29, 2005. *See Arkansas Game & Fish*, 736 F.3d at 1379.

### 3209 East Judge Perez Drive.

Mr. Marshall estimated that the land value of 3209 East Judge Perez Drive, based on the sale price of six lots in 2005, yielded a $5.00 per square foot or a $599,000 land value. Marshall Direct at 80. In contrast, Mr. Truax evaluated the sale of six lots between July 1999 and December 2003, yielding a range of $3.91–$6.00 per square foot, to which he made a "qualitative adjustment," based on location, size, and "other factors," to find a $5.35 per square foot amount or a $656,000 land value. Truax Direct at 42.

Since the difference between the $599,000 and $656,000 estimates cannot be readily reconciled, based on the record, the court has determined to split the difference, finding that a $627,500 is a "reasonable approximation" of the land value for 3209 East Judge Perez Drive, as of August 29, 2005. *See Arkansas Game & Fish*, 736 F.3d at 1379.

### 2316 Florissant Highway (Robin).

Mr. Marshall evaluated 2316 Florissant Highway, owned by Mr. Brad Robin, based on the price of the sale of three comparable properties, but concluded that the "highest of the three sales prices . . . was atypically high."  Marshall Direct at 73–74.  Mr. Marshall then evaluated the improvements on the property that included "housing facilities typically rented to sport fishermen," and estimated the land value to be $25,000.  Marshall Direct at 74.  Mr. Truax examined three sales of vacant land between May 2002 and August 2004, yielding a range of $0.19–$0.55 per square foot amounts. Truax Direct at 72.  Because these properties included some undeveloped wetlands, Mr. Truax decided to use a "Comparative Metric" reflecting a dollar per square foot frontage, ranging from $239 to $349 per square foot, and utilized a $325 per frontage foot to arrive at a $19,500 land value.  Truax Direct at 72–73.

Since the record does not reflect how Mr. Marshall arrived at his estimate, the court has determined that $19,500 is a "reasonable approximation" of the land value for 2316 Florissant Highway, as of August 29, 2005.  *See Arkansas Game & Fish*, 736 F.3d at 1379.

### 6325 Paris Road (Port Ship Service, Inc.).

Mr. Marshall evaluated 6325 Paris Road, which was a ship repair facility, based on the price of six sales of commercial or industrial property in 2005, yielding a $5.00 per square foot or a $305,000 land value.  Marshall Direct at 84–85.  Mr. Truax examined five sales between May 2000 and May 2004, yielding a range of $2.15–$6.59 per square foot amounts and arrived at a $3.50 per square foot amount, to which he made a "qualitative adjustment," based on location, size, and "other factors," to arrive at a $390,000 land value.  Truax Direct at 77.

Since the difference between the $305,000 and $390,000 estimates cannot be readily reconciled, based on the record, the court has determined to split the difference finding that $347,500 is a "reasonable approximation" of the land value for 6325 Paris Road, as of August 29, 2005.  *See Arkansas Game & Fish*, 736 F.3d at 1379.

### 2414 Deslonde Street (Adams).

Mr. Marshall evaluated 2414 Deslonde Street, owned by Henry and Gwendolyn Adams, based on the price of three sales in 2005, yielding a range of $2.02–$2.80 per square foot amounts, and arrived at a $2.41 per square foot or an $8,800 land value.  Marshall Direct at 75–76.  Mr. Truax examined three sales of vacant land between March 2005 and July 2005, yielding a range of $2.02–$4.86 per square foot, including depreciation, to which he made a "qualitative adjustment," based on location, size, and "other factors," to arrive at a $2.19 per square foot or a $16,000 land value.  Truax Direct at 82.

Since the difference between the $8,800 and $16,000 estimates cannot be readily reconciled, based on the record, the court has determined to split the difference finding that $12,400 is a "reasonable approximation" of the land value for 2414 Deslonde Street, as of August 29, 2005.  *See Arkansas Game & Fish*, 736 F.3d at 1379.

ii.    **The Combined Land Component And Cost Of Replacement Improvements Component.**

The court has determined that Just Compensation does not apply to a fair market rent for St. Bernard Parish since those properties were held and used for public purposes.  Therefore, the following chart summarizes the court's findings as to the land component and the cost of replacement improvements component only for each of the non-governmental Trial Properties, as of August 29, 2005.  To determine the fair market rent, the court added the land component and cost of replacement improvements component together, then multiplied by 8.5 percent to ascertain the market value.[16]  Next, this amount was divided by 12 to obtain the monthly fair market rent.

## COURT EXHIBIT B

| Property | Address | Use | Land Component | The Cost Of Replacement Improvements Component | Monthly Fair Market Rent |
|----------|---------|-----|----------------|-----------------------------------------------|--------------------------|
| Tommaseo | 3614–16 Fenelon St. | Residential Rental | $34,750 | $121,000 | $1,103 |
| Bordelon | 3024 Lakewood Dr. | Residential | $24,875 | $162,725 | $1,329 |
| Steve's RV | 3209 E. Judge Perez Dr. | Commercial | $627,500 | $441,000 | $7,569 |
| Robin | 2316 Florissant Hwy. | Residential Rental | $19,500 | $103,690 | $873 |
| PSSI | 6325 Paris Rd. | Industrial | $347,500 | $443,500 | $5,603 |
| Adams | 2414 Deslonde St. | Residential | $12,400 | $89,967.50 | $725 |

iii.    **The Relevant Temporary Taking Period.**

There also was a significant difference between the parties about the appropriate time period and methodology to determine the fair market rent.

Plaintiffs contend that the relevant time period should be from August 2005 until June 2011, the date when there was substantial completion of the Hurricane and Storm Damage Risk Reduction System.  Pls. DBr. at 83.  The Government contends that the relevant time period was August 29, 2005 to September 26, 2005, for all the Trial Properties, other than 2414 Deslonde Street in the Lower Ninth Ward on which the temporary taking ended on May 8, 2006.  Gov't

---

[16] Mr. Truax and Mr. Tatje "determined that a rate of 10 percent per annum of the market value of the property for a temporary 'loss of use' determination is appropriate."  Truax Direct at 26.  During his deposition, however, Mr. Truax testified that "market rent [is] based upon a return to value, and those generally ranged from the 8 and a half to 10 percent kind of returns."  Truax Dep. at 64.  The court has elected to use the lower 8.5 percent value.

DMem. at 13 (citing Truax Direct at 15, 16 (citing DVX144) (St. Bernard Parish Government Newsletter)).  The court rejected both of these approaches.

On August 29, 2005, St. Bernard Parish and the Lower Ninth Ward of New Orleans were inundated by increased storm surge flooding from breaches *first* from the MR-GO Reach 2 levee at 5:45 a.m. and then the North IHNC levee at 6:00 a.m., followed by the South IHNC levee at 6:45 a.m.  Westerink Direct at 54; *see also St. Bernard Par.*, 121 Fed. Cl. at 710–11.  On September 24, 2005, Hurricane Rita flooded a significant portion of the St. Bernard Parish a second time, as well as properties outside, but adjacent to, what little remained of the federal levee system.  *St. Bernard Par.*, 121 Fed. Cl. at 713.  On September 1, 2008, Hurricane Gustav landed in the New Orleans area, with additional increased storm surge and breaches near the IHNC in the Shell Beach and Delacroix areas.  *Id.* at 714.  Two weeks later, on September 13, 2008, property owners at Delacroix, Yscloskey, and Shell Beach also experienced storm surge flooding during Hurricane Ike.  *Id.*  As a 2008 FEMA study recognized: "[d]amaged levees decimated wetlands, and the still-open MR-GO has left the Parish vulnerable to future storms."  *Id.*  In sum, it was because of "inevitably recurring" flooding after Katrina that the Army Corps decided to close the MR-GO permanently in July 2009.  *Id.* at 714–15.

Although local authorities may have allowed some property owners to visit or return to their properties on September 30, 2005, after Hurricane Katrina, it is inconceivable that there was a rental market for any of these properties, not only because of "inevitably recurring" post-Katrina flooding, but the fact that roads, sewers, utilities, police, and other local governmental services were not restored until the end of 2008[17] and the fact that MR-GO was not closed until six months later on July 1, 2009.  Truax Dep. Ex. 7.

---

[17] On June 2, 2006, although the Army Corps accepted responsibility for the condition of the levees, it reported that New Orleans was still at risk.  Truax Dep. Ex. 7, at TT001121 ("Teaching The Levees" webpage, available at: http://teachingthelevees.org/?page_id=281)).  On March 31, 2007, the *New York Times* reported a delay in the rebuilding of public works damaged and destroyed by Hurricane Katrina, including delays in rebuilding schools, fire stations, public water systems, roads and libraries.  Truax Dep. Ex. 7, at TT001123 ("Teaching The Levees" webpage, available at: http://teachingthelevees.org/?page_id=281); *see also* Leslie Eaton, *Gulf Hits Snags in Rebuilding Public Works*, N.Y. TIMES (Mar. 31, 2007), http://www.nytimes.com/2007/03/31/us/31fema.html?_r=0.

On July 24, 2007, the *New York Times* reported that only three of the seven hospitals in operation prior to Hurricane Katrina were able to restore services.  Truax Dep. Ex. 7, at TT001124 ("Teaching The Levees" webpage, available at: http://teachingthelevees.org/?page_id=281); *see also* Leslie Eaton, *New Orleans Recovery Is Slowed By Closed Hospitals*, N.Y. TIMES (July 24, 2007), http://www.nytimes.com/2007/07/24/us/24orleans.html.

On January 10, 2008, the Governor of the State of Louisiana extended the National Guard presence in New Orleans.  Truax Dep. Ex. 7, at TT001125 ("Teaching The Levees" webpage, available at: http://teachingthelevees.org/?page_id=281).  On June 20, 2008, the Governor announced that at least 200 National Guard would remain in New Orleans through 2008 for law enforcement duties, until the New Orleans Police Department could rebuild.  Truax Dep. Ex. 7, at

For these reasons, the court has determined that an element of Just Compensation due in this case should include the fair market rent lost on private non-governmental property. *See Yuba Nat. Res., Inc. v. United States*, 904 F.2d 1577, 1580–81 (Fed. Cir. 1990) ("In the case of a temporary taking . . . since the property is returned to the owner when the taking ends, the Just Compensation to which the owner is entitled is *the value of the use of* the property during the temporary taking, *i.e.*, the amount which the owner lost as a result of the taking.") (emphasis added). The court also has determined that the fair market rent lost should be calculated from September 1, 2005 until June 30, 2009.[18]

### iv.   Fair Market Rent Lost.

The following chart summarizes the court's findings as to the fair market rent lost by the owners of the non-governmental Trial Properties from September 1, 2005 until June 30, 2009.

### COURT EXHIBIT C

| Property | Address | Use | Monthly Fair Market Rent | Fair Market Rent  Lost For 42 Months |
|---|---|---|---|---|
| Tommaseo | 3614–16 Fenelon St. | Residential Rental | $1,103 | $46,326 |
| Bordelon | 3024 Lakewood Dr. | Residential | $1,329 | $55,818 |
| Steve's RV | 3209 E. Judge Perez Dr. | Commercial | $7,569 | $317,898 |
| Robin | 2316 Florissant Hwy. | Residential Rental | $873 | $36,666 |
| PSSI | 6325 Paris Rd. | Industrial | $5,603 | $235,326 |
| Adams | 2414 Deslonde St. | Residential | $725 | $30,450 |

---

TT001127 ("Teaching The Levees" webpage, available at: http://teachingthelevees.org/?page_id=281).

[18] Although Plaintiffs likely evacuated their property prior to August 29, 2005, the court has decided to use September 1, 2005 as the start date to avoid calculating the relevant time period in days rather than months. As for the end date, the court's Liability Decision determined that the MR-GO was closed by the Army Corps of Engineers in July 2009, based on the Army Corps' website (*see St. Bernard Par.*, 121 Fed. Cl. at 715), but the court subsequently found conflicting evidence in the record that the MR-GO did not close permanently until October 21, 2009. Truax Dep. Ex. 7, at TT 001132 ("Teaching The Levees" webpage, available at: http://teachingthe levees.org/?page_id=281). Nevertheless, the court considers June 30, 2009, as an appropriate end date for the temporary taking.

### d.  Interest.

In *Albrecht v. United States*, 329 U.S. 599 (1947), the United States Supreme Court held:

[S]omething more than fair market value is required to make the property owner whole, to afford him 'just compensation.'  This additional element of compensation has been measured in terms of reasonable interest.  Thus, 'just compensation' in the constitutional sense, has been held, absent a settlement between the parties, to be fair market value at the time of [the] taking plus 'interest' from that date to the date of payment.

*Id*. at 602.

The court has determined that owners of real property zoned and/or lawfully used as residential property and "commercial" and "industrial" real property are entitled to a fair market rental value, as set forth in Court Exhibit B, but since the governmental properties owned by St. Bernard Parish had no rental value, the court has not determined a monthly fair market rental rate for any of the five Trial Properties owned by St. Bernard Parish.

Since the appropriate amount of interest for a Fifth Amendment Takings Clause claim has not been established by statute, the Government suggests that the Declaratory Takings Act, 40 U.S.C. § 3116 ("DTA"), is an appropriate benchmark, because Congress specifically amended the DTA in 1986 to establish a uniform method for calculating compensation in condemnation cases. 5/30/14 Government Response To Plaintiffs' Damages Phase Post-Trial Brief.  That rate calculates interest equal to the "weekly average one-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the beginning of each additional year."  40 U.S.C. § 3116(a)(2).

Plaintiffs counter that the DTA rate is not relevant and where, as here, Just Compensation is not paid until many years after the taking, an award of compounded interest rate is required, such as Moody's Composite Index of Yields in Add Long Term Corporate Bonds ("Moody's rate").  Pls. DBr. at 87–88.  This rate has fluctuated from 3.67% to 5.63% from 2005 to 2013.  Pls. DBr. at 88 n.40.  In the alternative, Plaintiffs suggest that the court adopt the tax overpayment rate, set forth in 26 U.S.C. § 6621(b)(3).  Pls. DBr. at 89 n.42.

Although several cases of the United States Court of Federal Claims have awarded the Moody's rate,[19] since the court has determined that Plaintiffs are entitled to the lost rental value of

---

[19] *See, e.g.*, *Pitcairn v. United States*, 547 F.2d 1106, 1120–24 (Ct. Cl. 1976) (adopting the trial court's use of Moody's interest rates in a Takings Clause case, where "the parties . . . presented sufficient evidence" to the court to enable an "informed and reasoned determination" as to the appropriate amount of Just Compensation); *see also Tektronix, Inc. v. United States*, 575 F.2d 832, 836 (Ct. Cl. 1978) (approving the use of a Moody's interest rate in a patent infringement case, "unless a party affirmatively demonstrates that a different rate should be applied"); *Georgia-Pacific Corp. v. United States*, 640 F.2d 328, 365–67 (Ct. Cl. 1980) (relying on *Tektronix*, in taking judicial notice of Moody's Index in a Takings Clause case, where the facts demonstrated that such use "constitutes just compensation"); *Biery v. United States*, 2012 WL 5914521, at *1–5 (Fed. Cl.

the property for a substantial period of time, the court already has taken the "delayed payment" into consideration.  In addition, it was not until the United States Supreme Court issued its decision in *Arkansas Game & Fish Comm'n v. United* States, 133 S. Ct. 511 (2012), that a temporary taking by flooding definitively was recognized.  Under these circumstances, the court ascertains no reason for requiring an award of interest at a rate other than a compound rate.  *See Arkansas Game & Fish Comm'n v. United States*, 87 Fed. Cl. 594, 647 (2009) (determining that application of compound interest was not necessary "to satisfy the mandate of the Takings Clause," where "Treasury STRIPS" accrued interest daily and were added periodically to the principal).

For these reasons, the court has determined that Plaintiffs are entitled to the U.S. Treasury bill compounded rate of interest from September 1, 2005 until the time of payment.

### 3.    The Government's Asserted Offsets.

### a.  For Federal Emergency Management Agency Grants.

The Stafford Act authorizes FEMA to provide grants to states or local governments to construct or repair "public facility" or "private nonprofit facilities," that have been damaged as a result of major disaster.  *See* 42 U.S.C. §§ 5121–5208; *see also* 44 C.F.R. § 206.226(f).  Gov't DMem. at 21–23.  In this case, FEMA initially made "drive-by or window inspection" estimates to determine whether St. Bernard Parish would be an eligible applicant for public assistance funds. DTR at 48 (Direct Examination of Douglas Landry).  Next, St. Bernard Parish made a decision to "rebuild to preexisting condition" or to "take the funds that are eligible to return that piece of property back to its pre-Katrina condition and function and transfer it over to make improvements on another project."  DTR at 70 (Direct Examination of Landry).  The applicant for the FEMA Stafford Act grants, however, was not the St. Bernard Parish government, but the State of Louisiana; St. Bernard Parish and the Ninth Ward of the City of New Orleans were considered "subgrantees."  DTR at 48, 50 (Direct Examination of Douglas Landry).

On September 26, 2013, the Government filed a Motion for Partial Summary Judgment Regarding Federal Grant Offsets.  9/26/13 Government Motion For Partial Summary Judgment. On April 25, 2014, the Government filed the Post-Trial Memorandum Of Contentions Of Fact And Law, renewed the September 26, 2013 Motion, and included a list of three Trial Properties owned by St. Bernard Parish that received FEMA grants: 1818 Center Street, Playground with Community Center; Four Acres of Land; and 4119 East Judge Perez Drive (Fire Station).  Gov't DMem. at 21–22.

---

Nov. 27, 2012) (applying the Moody's interest rate where the circumstances and evidence showed that use of the DTA's interest rate would be unjust), *rev'd on other grounds*, 753 F.3d 1279, 1282 (Fed. Cir. 2014).  In these cases, plaintiffs proffered evidence supporting the use of the Moody rate.  In this case, Mr. Marshall is not competent to ascertain appropriate interest and, in any event, Mr. Marshall simply adopting Plaintiffs' counsel's instruction that he endorse the use of the Moody rate, does not satisfy Plaintiffs' evidentiary burden.  DTR at 425 (Cross Examination of Marshall).

The following chart prepared by the Government shows that the amount of FEMA grants received by St. Bernard Parish exceeded Plaintiffs' estimate of the cost of replacement improvements.

**Federal Grants to Plaintiff St. Bernard Parish**

| Address | Amount of Federal Grant | FEMA Grant after Insurance Deductions | Plaintiffs' Estimate of Just Compensation |
|---|---|---|---|
| 1818 Center St. (StBP #1) | $1,102,278[38] | $ 923,678[39] | $607,770 |
| Four Acres of Land (StBP #2) | $3,131,895[40] | $ 2,553,052[41] | $1,696,082 |
| 4119 E. Judge Perez Dr. (StBP | $2,184,433[42] | $ 2,048,515[43] | $341,702 |
| **Total** | **$6,418,608** | **$5,525,245** | **$2,645,554** |

[38] DVX-118 at USFEMA001008 shows $1,085,442 granted ($174,553 plus $910,889 which St. Bernard Parish later transferred to the "Val Reiss" project); DVX-119 at USFEMA000977 shows $16,836.77 granted ($15,336.77 plus $1,500 later deducted for insurance).

[39] SPX-1627 at 17, line 19 shows $177,100 deducted from $1,085,442 for insurance proceeds; DVX-119 at USFEMA000977, line 9 shows $1,500 deducted from $16,836.77 for insurance.

[40] DVX-112 at PLTF 04-25-2013 000266-67 shows $756,017 granted ($172,165 plus $583,852 which St. Bernard Parish later transferred to the "Val Reiss" project); DVX-111 at USFEMA003113-14 shows $55,850.99 granted ($53,274.01 plus $2,576.98 later deducted for insurance)); DVX-113 at PLTF 04-25-2013 000293 shows $2,320,028 ($473,666 granted plus $1,846,362 which St. Bernard Parish later transferred to the "Val Reiss" project).

[41] SPX-1627 at 17, lines 5-7, 16 (deducting $576,266.37); DVX-111 at USFEMA003113, line 10 (deducting $2,576.98).

[42] SPX-1615 at 27 shows $2,152,423.22 granted ($2,024,105.22 granted plus $128,318 later deducted for insurance); DVX-117 at 6-7 shows $32,010.41 granted ($24,410.41 plus $7,600 later deducted for insurance).

[43] SPX-1615 at 27, lines 26, 32, shows a deduction of $128,318 ($97,700 plus $30,618); Trial Tr. 60:16-22 (Landry testifying that the total insurance deduction at this property was $128,318); DVX-117 at 6-7, line 13 shows $7,600 deducted.

Gov't DMem. at 116 (Table A).

Plaintiffs counter that any Stafford Act grants received by St. Bernard Parish or Orleans Parish are subject to the collateral source rule. 11/4/13 Plaintiffs' Response To Government's Summary Judgment Motion ("Pls. Resp. to Gov't SJ Mot.") at 20–24. Of course, Plaintiffs are correct that the United States Court of Appeals for the Federal Circuit has recognized that "collateral benefits received by the injured party do not reduce the damages owed the wrongdoer." *LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363, 1372 (Fed. Cir. 2003) ("[C]ollateral benefits received by the injured party do not reduce the damages owed by the wrongdoer. This rule has been applied in connection with breach of contract, when there is a tortious or negligence component to the breach, or when the equitable balance is such that any windfall should not benefit the wrongdoer."). In *LaSalle*, however, where a breach of contract resulted from an Act of Congress, our appellate court followed the black letter principle: "Where

the [Government's] wrong or breach of contract has not only caused damage, but has also conferred a benefit upon plaintiff . . . which [plaintiff] would not otherwise have reaped, the value of this benefit must be credited to [the Government] in assessing the damages." *Id.* (citing Charles T. McCormick, HANDBOOK ON THE LAW OF DAMAGES 146 (1935)). That is what happened in this case. In part, because of the Army Corps' temporary taking, FEMA made grants to the State of Louisiana that, in turn, approved their use by St. Bernard Parish and the City of New Orleans (Ninth Ward) to construct or repair improvements on their properties that they otherwise would not have been entitled to receive.

In the alternative, Plaintiffs argue that St. Bernard Parish is at least entitled to be reimbursed for flood insurance payments that reduced the amount of FEMA grants received. Pls. Resp. to Gov't SJ Mot. at 26–28; DTR at 85–87 (Landry Redirect) (testifying that any insurance proceeds received by St. Bernard Parish or Orleans Parish were offset and reduced the Stafford Act grants). The court agrees that St. Bernard Parish paid consideration for the benefit of insurance and, as a matter of law, the insurance payments received may not reduce "damages owed by the wrongdoer" under the collateral source rule. *See LaSalle*, 317 F.3d at 1372; *cf. Stewart v. Am. Family Mut. Ins. Co.*, No. 06-09884, 2008 WL 440331, at *5 (E.D. La. Feb. 12, 2008) ("The Louisiana Supreme Court held that the collateral source rule prohibits the tortfeasor from benefitting from 'write-offs' by the medical provider, if the plaintiff has paid some consideration for the benefit of the 'written off' amounts."). As to St. Bernard Parish, that amount is $893,363 for the three Trial Properties. Gov't DMem. 116 (Table A) (the potential Stafford Act grants $6,418,608 minus the actual $5,525,245 grant FEMA made, after deducting insurance payments received by St. Bernard Parish).

For these reasons, the court has determined that the FEMA grants received by St. Bernard Parish preclude Just Compensation for the cost of replacement improvements made, but St. Bernard Parish is entitled to $893,363, *i.e.*, the amount of insurance payments received for the three governmental owned Trial Properties that reduced the amount of FEMA grants to which St. Bernard Parish was entitled.

### b. For United States Department Of Housing And Urban Development Grants Under The "Road Home Program."

The Department of Housing and Urban Development's Community Development Block Grant Program provided approximately $4.2 billion in grants after Hurricanes Katrina and Rita to the State of Louisiana that, in turn, made payments to individual property owners, under the "Road Home Program," to pay for up to $150,000 of uninsured losses to repair or reconstruct physical improvements or to pay for relocation expenses. Pls. DFOF ¶¶ 183–96; *see also* Truax Dep. Ex. 7, at TT 001121 ("Teaching The Levees" webpage, available at: http://teachingthelevees.org/?page_id=281).

Recipients of the "Road Home Program," however, were required to assign insurance proceeds received from any "federal agency, arising out of physical damage to the Residence caused by Hurricane Katrina and/or Hurricane Rita" to the State of Louisiana. DVX100 (May 30, 2007 Road Home Agreement between Gwendolyn and Henry Adams, and the State of Louisiana, Division of Administration, Office of Community Development, by First American Title Insurance Company of Louisiana, Inc.); *see also* SPX3008 at 27–29 (10/15/10 Henry and Gwendolyn Adams

Deposition) (explaining that the Adams Plaintiffs received approximately $82,000 under the Road Home Program, in addition to approximately  $7,000 of private insurance payments for wind damage, and $50,000 for flood coverage from a separate insurance policy).[20]  But, unlike the Stafford Act grant recipients, the Road Home Program participants, were required to agree to sign a contract with the State of Louisiana, including such subrogation requirements as:  (1) any Road Home Program grant could be used only for residential purpose for three years; (2) the property owner was required to purchase flood insurance "in perpetuity, or alternatively, for the maximum period by law;" and (3) all *restrictive covenants* in the *Road Home Program contract would run in the future with the land*.  Pls. DBr. at 25–26 (citing DVX100 at 118–19); *see also* Pls. DFOF ¶¶ 185–92.

The Government argued that any grants Plaintiffs may have received under the "Road Home Program" must be deducted from any Just Compensation award in this case.  Gov't DMem. at 116 nn.38–43.  The Government, however, does not have standing in the United States Court of Federal Claims to seek any offset of Road Home Program grants paid by the State of Louisiana to Plaintiffs under contracts to which the Government was not in privity and that were subject to Louisiana State law.  *See Anderson v. United States*, 344 F.3d 1343, 1351 (Fed. Cir. 2003) (holding that "privity is lacking," where a party is not a signatory to the contractual documents).

## C.     The Court's Determination Of Just Compensation Due As To Lost Local Real Estate Tax Revenues.

During these proceedings the court raised the issue of whether lost local real estate tax revenues may be considered private property within the meaning of the Takings Clause of the Fifth Amendment to the United States Constitution.  *See, e.g.*, 1/24/13 Status Conference Transcript, ECF No. 205, at 8; DTR at 85–86; 4/27/15 Government Motion, ECF No. 270, at 3–6; 4/27/15 Telephone Conference Transcript, ECF No. 276, at 5, 7–8.  On January 8, 2016, the court requested that the parties specifically address this issue.  1/8/16 Oral Argument Transcript, ECF No. 297, at 47–48.

Plaintiffs replied that no "applicable precedent . . . directly addresses that question, [however] relevant Fifth Amendment principles strongly support the proposition that tax revenue does indeed constitute property that may be the subject of a taking."  1/22/16 Plaintiffs' Supplemental Class Certification Brief ("Pls. Supp. CC Br.") at 32.  The Government did not respond, but previously argued that "any loss of tax revenues would not be relevant to any issue involved in this case."  4/29/15 Government Response To Court Order, ECF No. 272, at 1–2.  The court disagrees.

---

[20] On July 31, 2007, the Road Home Program application process was terminated; only 20 percent of all applicants received grants thereafter.  Truax Dep. Ex. 7, at TT001124 ("Teaching The Levees" webpage, available at: http://teachingthelevees.org/?page_id=281).  On August 30, 2008, the *New York Times* reported that $3.3 million was spent to date on the Road Home Program, but it had no effect on most of the houses in New Orleans during and after Hurricane Katrina. Truax Dep. Ex. 7, at TT001127 ("Teaching The Levees" webpage, available at: http://teaching thelevees.org/? page_id=281).

In 1984, the United States Supreme Court held in *United States v. 50 Acres of Land*, 469 U.S. 24 (1984) that "'private property' in [the context of] the Takings Clause . . . encompass[es] the property of state and local governments when it is condemned by the United States." *Id*. at 31; *see also Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2426 (2015) ("[The Takings Clause] protects 'private property' without any distinction between different types."). In light of this precedent, the court has determined that local government property tax losses should be considered private property subject to the Takings Clause of the Fifth Amendment and an appropriate element of Just Compensation in this case.

To ascertain the amount of local real estate tax revenue losses experienced by the City of New Orleans (Lower Ninth Ward) and St. Bernard Parish, as a result of the temporary taking in this case, on April 5, 2016, the court issued a Memorandum Opinion And Order requesting Declarations from St. Bernard Parish and the City of New Orleans (Lower Ninth Ward) to verify local property tax record information reflected on their governmental websites or otherwise available to the public. 4/5/16 Memorandum Opinion And Order, ECF No. 308 ("4/5/16 Order").

The following chart reflects the information received from the City of New Orleans as to the Lower Ninth Ward.

| Real Estate Taxes for the Lower Ninth Ward | | |
|---|---|---|
| Year | Amount of Real Estate Taxes Billed | Net (of Refunds) Taxes Paid |
| 2004 | $2,296,699.24 | $2,007,241.79 |
| 2005 | $2,426,640.89 | $2,020,953.93 |
| 2006 | $857,046.78[21] | $686,981.67 |
| 2007 | $1,008,997.40 | $785,840.50 |

The 2005 real estate property taxes for the Lower Ninth Ward, reflected in this chart, "were assessed in January 2005, and a majority was collected in the first half of the year[,]" *i.e.*, prior to Hurricane Katrina. CITY OF NEW ORLEANS, LA., BASIC FINANCIAL STATEMENTS 7 (2005), http://www.nola.gov/accounting/#report.

Therefore, $2,020,953.93, the net real estate taxes paid to the City of New Orleans in 2005 by property owners in the Lower Ninth Ward is an appropriate base from which to measure losses in 2006 and 2007.[22] For 2006, the local real estate tax revenues lost would be $1,333,972.26; for

---

[21] In a March 29, 2016 email to the court, Walter J. O'Brien, Finance Operations Manager, City of New Orleans, indicated that the significant decrease in real estate taxes assessed between 2005 and 2006 "was the effect of reductions in assessment values, and taxes, recognized after the destruction from the flooding of August 29, 2005." 4/5/16 Order, at 4 n.15 (citing Court Order Exhibit L).

[22] Since the impact of the housing crisis in 2008 would be reflected in real estate tax collections for that year, the court has determined that the end of fiscal year 2007 is an appropriate

2007, the real estate tax revenues lost would be $1,235,113.43, both of which are a "reasonable approximation" of an amount of Just Compensation due for the temporary taking in this case. *See Arkansas Game & Fish*, 736 F.3d. at 1379. These losses also are consistent with reports that show 2,595 of 2,975 or 87% of owner-occupied housing and 4,679 of 5,701 or 72% of renters-occupied housing in the Lower Ninth Ward was classified as "Severe/Destroyed." *See St. Bernard Par.*, 121 Fed. Cl. at 712.

In contrast, the following chart reflects the local taxes due St. Bernard Parish for land and improvement taxes and net taxes paid.

| Land and Improvement Taxes for St. Bernard Parish | | |
|---|---|---|
| Year | Taxes Due from Tax Payer | Net Taxes Paid |
| 2004 | $31,458,047.58 | $31,083,543.00 |
| 2005 | $23,867,311.61 | $23,200,000.00 |
| 2006 | $24,594,324.78 | $24,054,378.55 |
| 2007 | $25,179,458.54 | $25,055,113.47 |

Since the local tax revenues received by St. Bernard Parish were not diminished by the temporary taking in this case, no Just Compensation is due for the loss of land and improvement taxes.

## III.   THIS CASE IS NOW APPROPRIATE FOR CLASS CERTIFICATION.

### A.   The Requirements Of RCFC 23(a) Have Been Met.

RCFC 23(a) provides that:

One or more members of a class may sue as representative parties on behalf of all members only if:

(1) the class is so numerous that joinder of all members is impracticable;
(2) there are questions of law or fact common to the class;
(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4) the representative parties will fairly and adequately protect the interests of the class.

RCFC 23(a).

---

juncture to measure local real estate tax revenues lost, attributable to the temporary taking in this case.

For purposes of liability, Plaintiffs request that the court certify the following class:

A class consisting of owners of real property, as of August 28, 2005, located in St. Bernard Parish, Louisiana, and/or the Lower Ninth Ward of the City of New Orleans, Louisiana, who were subject to the temporary taking of such property, as a result of increased storm surge, during Hurricane Katrina and/or "inevitably recurring" flooding during subsequent hurricanes and severe storms, as a result of the United States Army Corps of Engineers' construction, expansions, operation, and failure to maintain the Mississippi River-Gulf Outlet, until it permanently was closed on July 1, 2009.  "Owners of real property" does not include the United States government or agencies or instrumentalities thereof.

Pls. Supp. CC Br. at 24.

For purposes of Just Compensation due, Plaintiffs request that the court certify two subclasses:  owners of residential property; and owners of commercial, industrial, governmental, and all other properties.

**Subclass A.** A class consisting of owners of real property, as of August 28, 2005, that as of that date was zoned and/or lawfully used as residential property in St. Bernard Parish, Louisiana, and/or the Lower Ninth Ward of the City of New Orleans, Louisiana, who were subject to the temporary taking of such property, as a result of increased storm surge, during Hurricane Katrina and/or "inevitably recurring" flooding during subsequent hurricanes and severe storms, as a result of the United States Army Corps of Engineers' construction, expansions, operation, and failure to maintain the Mississippi River-Gulf Outlet, until it permanently was closed on July 1, 2009. "Owners of real property" does not include the United States government or agencies or instrumentalities thereof. "Residential property" does not include multifamily housing (other than duplexes) but does include duplexes and property rented for use for residential purposes.

**Subclass B.** A class consisting of owners, as of August 28, 2005, of commercial, industrial, and governmental real property, and of all other real property not included in Subclass A, located in St. Bernard Parish, Louisiana, and/or the Lower Ninth Ward of the City of New Orleans, Louisiana, who were subject to the temporary taking of such property, as a result of increased storm surge, during Hurricane Katrina and/or "inevitably recurring" flooding during subsequent hurricanes and severe storms, as a result of the United States Army Corps of Engineers' construction, expansions, operation, and failure to maintain the Mississippi River-Gulf Outlet, until it permanently was closed on July 1, 2009. "Owners of commercial, industrial, and governmental real property" does not include the United States government or agencies or instrumentalities thereof.

Pls. Supp. CC Br. at 25.

### 1.    The Class Is So Numerous That Joinder Of All Members Is Impracticable.

In this case, Plaintiffs assert that the numerosity requirement of RCFC 23(a)(1) is met, for purposes of both liability and Just Compensation, because there are "at least" 30,000 property owners that experienced increased storm surge flooding caused by the Army Corps' construction, expansions, operation, and failure to maintain the MR-GO during Hurricane Katrina and subsequent hurricanes and severe storms.  6/22/10 Plaintiffs' Memorandum In Support Of Motion For Class Certification ("Pls. CC Mem.") at 4–5 n.4 (citing 4/7/10 Declaration of Errol G. Williams, Assessor for the Third Municipal District of the Orleans Parish Board of Assessors (stating that as of the last assessment, prior to Hurricane Katrina, there were 7,667 parcels of land in the Lower Ninth Ward); 3/17/10 Declaration of Marlene Vinsanau, Assessor for St. Bernard Parish (stating that as of the last assessment, prior to Hurricane Katrina, there were 27,146 parcels of "immovable property"[23] in St. Bernard Parish)).

The Government does not contest that the numerosity requirement is satisfied in this case.  2/15/13 Government Opposition To Plaintiffs' Motion For Class Certification ("Gov't CC Opp.").

For these reasons, the court has determined that the requirements of RCFC 23(a)(1) are met.

### 2.    There Are Questions Of Law Or Fact Common To The Class.

Plaintiffs argue that the commonality requirement of RCFC 23(a)(2) as to liability and Just Compensation is met, because there are questions of law and fact common to both classes.  Pls. CC Mem. at 6–13.

The Government's objection to class certification centers on the commonality requirement both as to liability (Gov't CC Opp. at 6–20) and Just Compensation due (Gov't CC Opp. 20–28).  As to liability, the Government asserts that the determinative issue is whether the court "can apply a common analysis to resolve the putative class members' claims."  Gov't CC Opp. at 6.  The Government insists that the court must "weigh carefully the relevant factors and circumstances in each case[.]"  Gov't CC Opp. at 13 (quoting *Arkansas Game & Fish*, 133 S. Ct. at 521).  Among those factors, include: "duration;" "intent or foreseeability;" "character of the land;" and "severity of interference."  Gov't CC Opp. at 14.  But, the court's May 1, 2015 Liability Decision considered each of these factors.  *See St. Bernard Par.*, 121 Fed. Cl. at 718–49.  Moreover, the Government misreads *Arkansas Game & Fish* when it argues that case requires a balancing of these factors "with respect to *each* putative class member's property" for the purpose of Just Compensation.  Gov't CC Opp. at 14 (emphasis added).  *Arkansas Game & Fish* imposes no such requirement nor does it discuss class certification at all.  The Government is also misguided when it insists that the commonality element of RCFC 23(a) cannot be established in this case, because "[s]ome properties will have flooded infrequently and others will have proven more vulnerable, and the

---

[23] *See* La. Stat. Ann. § 47:1702 ("'Real estate' or 'immovable property' means and includes not only land, city, town and village lots, but all things thereunto pertaining, and all structures and other appurtenances thereto, as pass to the vendee by the conveyance of the land or lot.").

effects of the MRGO on each may range from significant to negligible." Gov't CC Opp. at 18. Although some of Plaintiffs' properties experienced different levels of increased storm surge flooding during Hurricane Katrina and other subsequent hurricanes and severe storms,[24] Plaintiffs established at trial that *all* their properties experienced increased storm surge flooding as a result of the Army Corps' construction, expansions, operation, and failure to maintain the MR-GO that was both severe and "inevitably recurring" until the MR-GO permanently was closed. *See St. Bernard Par.*, 121 Fed. Cl. at 713–14, 738–39. Perhaps the most persuasive evidence on commonality as to liability and Just Compensation is a 2008 FEMA flood insurance study recognizing that "the still-open MRGO [has] left *the parish* vulnerable to future storms," leading the Army Corps to close the MR-GO permanently in July 2009. *Id.* at 714–15 (emphasis added) (citing SPX.0423 at 3 (citing other risk analyses performed by FEMA and the Army Corps, as described in Plaintiffs' 4/13/12 Proposed Findings Of Fact at ¶¶ 396–406)).

As the United States Supreme Court held in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011), the commonality element of Rule 23(a)(2) of the Federal Rules of Civil Procedure ("FRCP") requires that:

> [The] common contention . . . must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

*Id.* In other words, the common question must be outcome determinative.

In this case, the common question determined by the court was whether the Army Corps' construction, expansions, operation, and failure to maintain the MR-GO caused increased storm surge flooding in St. Bernard Parish and the Lower Ninth Ward during Hurricane Katrina as well as "inevitably recurring" flooding during subsequent hurricanes and severe storms, effecting a

---

[24] The flooding levels discussed at trial varied. *See, e.g.*, DTR at 373, 375 (Cross Examination of Marshall) (describing a 1½ story home completely "washed away"); DTR at 378 (Cross Examination of Marshall) (stating that homes "moved all around from the water"); DTR at 520 (Cross Examination of Westerink) ("For some properties, the difference is about seven feet."); DTR at 546 (Cross Examination of Westerink) (describing how approximately 9 feet of water filled up the Lower Ninth Ward); DTR at 370 (Cross Examination of Marshall) ("Indeed, water reached a height of [28] feet at nearby buildings."); DTR at 640 (Cross Examination of Fitzgerald) (describing 12.4 feet of water at the Deslonde property under Scenario A2; and 10.9 feet of water at 1818 Center Street, when Dr. Westerink describes 8½ feet for the same property); DTR at 641 (Cross Examination of Fitzgerald) (describing 12 feet of water at the Deslonde property under Scenario A1); DTR at 711 (Cross Examination of Danner) (describing 8 feet of water at the Fenelon property). The depth of the flooding discussed by the Government's experts in this case, however, did not account for the movement of the water nor how long floodwater remained on a property. *See, e.g.*, Westerink Direct at 17 (Table 3) (estimating peak water levels during Hurricane Katrina between 10.5 feet–17.3 feet); DTR at 518 (Cross Examination of Westerink); DTR at 675, 680 (Cross Examination of Danner).

temporary taking of Plaintiffs' properties until the MR-GO was permanently closed in July 2009. *See St. Bernard Par.* 121 Fed. Cl. at 698–715, 733–39.

Moreover, it is important to recognize that the United States Supreme Court considered a *pre-trial record* in *Wal-Mart* where the putative class attempted to meet the commonality requirement with statistical and anecdotal evidence that Wal-Mart had a "corporate culture [that] permit[ted] bias against women to infect . . . the discretionary decisionmaking of each one of Wal-Mart's thousands of managers—thereby making every woman at the company the victim of one common discriminatory practice." *Wal-Mart*, 564 U.S. at 345. The Court properly concluded that the nature of that evidence was not sufficient nor reliable to establish that Wal-Mart "operated under a *general policy* of discrimination," since no evidence was introduced demonstrating that all the company managers conducted themselves in a common manner so that each class member suffered a common injury. *Id.* at 354–55 (emphasis added).

In this case, however, the trial record consists almost exclusively of Army Corps and other governmental documents evidencing that that the Army Corps' construction, expansions, operation and failure to maintain the MR-GO caused increased storm surge flooding on Plaintiffs' properties during Hurricane Katrina and subsequent hurricanes and severe storms, effecting a temporary taking of Plaintiffs' properties until the closing of the MR-GO in July 2009. *See St. Bernard Par.*, 121 Fed. Cl. at 739, 720–23; *see also In re Katrina Canal Breaches Litig.*, 696 F.3d 436, 443 (5th Cir. 2012) (determining that the Government's "delay in armoring MRGO allowed wave wash . . . to erode the channel considerably . . . [and] MRGO's expansion thus allowed Hurricane Katrina to generate a peak storm surge capable of breaching the Reach 2 levee and flooding the St. Bernard polder."). In addition, as a Special Report of the Committee on Homeland Security and Governmental Affairs, "Hurricane Katrina, A Nation Still Unprepared," stated in May 2006:

> The building of MRGO and the combined GIWW/MRGO . . . provided a connection between Lake Borgne and Lake Pontchartrain that allowed the much greater surge from Lake Borgne to flow into both New Orleans and Lake Pontchartrain. These channels further increased the speed and flow of the Katrina surge into New Orleans East and the Ninth Ward/St. Bernard Parishes, increasing the destructive force against adjacent levees and contributing to their failure. As a result, MRGO and the combined GIWW/MRGO resulted in increased flooding and greater damage from Hurricane Katrina.

SPX692 at 125. In sum, the sufficiency and reliability of the evidence in the record of this case is distinctly different than that presented in *Wal-Mart*.

Finally, as the Court observed in *Wal-Mart*, "What matters to class certification . . . [is] the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350 (quotation omitted) (emphasis in original). The "common answers" as to whether the Army Corps' construction, expansions, operation, and failure to maintain the MR-GO caused increased storm surge flooding during Hurricane Katrina and subsequent hurricanes and severe storms, effecting a temporary taking of Plaintiffs' properties were provided in *St. Bernard Par.*, 121 Fed. Cl. at 718–46. The "common answers" as to the amount of Just Compensation due has been addressed in this Memorandum Opinion.

For these reasons, the court has determined that the requirements of RCFC 23(a)(2) are met in this case.

### 3. The Claims Or Defenses Of The Representative Parties Are "Typical" Of The Claims Or Defenses Of The Class.

The amount of Just Compensation due does not affect typicality; the key is whether all class members are challenging the same conduct and rely on the same legal theories. *See In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 311 (3d Cir. 1998) ("Commentators have noted that cases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims." (quoting *Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994))).  The Government does not contest the "typicality" requirement of RCFC 23(a)(3).

For these reasons, the court has determined that the requirements of RCFC 23(a)(3) are met in this case.

### 4. The Representative Parties Will Fairly And Adequately Protect The Interests Of The Class.

Among the factors the court must consider in determining whether the representative Plaintiffs will fairly and adequately protect the interests of the class as a whole is to ascertain whether class members do not have opposing interests.  Since this case was filed in 2005, no potential class member has come forward to challenge the interests of the representative Plaintiffs and this matter has received widespread coverage in the New Orleans press and media.  Moreover, the Government does not oppose class certification based on RCFC 23(a)(4).

For these reasons, the court has determined that the requirements of RCFC 23(a)(4) have been met.

### B. The Requirements Of RCFC 23(b) Have Been Met.

If the "prerequisites" of RCFC 23(a) are met, the putative members of the class also must establish under RCFC 23(b) that:

(2) the United States has acted or refused to act on grounds generally applicable to the class; and

(3) the court finds that the questions of law or fact common to class members *predominate over any questions affecting only individual members*, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

    (A) the class members' interests in individually controlling the prosecution of separate actions;

    (B) the extent and nature of any litigation concerning the controversy already begun by class members;

(C) [not used]; and
(D) the likely difficulties in managing a class action.

RCFC 23(b)(2), (3) (emphasis added).

In this case, the Army Corps acted on grounds generally applicable to the class, satisfying RCFC 23(b)(2).  *See St. Bernard Par.*, 121 Fed. Cl. at 720–23.  As to the requirements of RCFC 23(b)(3), in *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013), the United States Supreme Court held that a class action improperly was certified under FRCP 23(b)(3), where the respondent's economic model fell "far short of establishing that damages are capable of measurement on a classwide basis," because the predominance requirement cannot be shown where "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class."  *Id.* at 1433.  As the Court observed, "the first step in a damages study is the translation of the *legal theory of the harmful event* into an analysis of the economic impact *of that event*."  *Id.* at 1435 (quoting FEDERAL JUDICIAL CENTER REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 432 (3d ed. 2011)).

In this case, the "legal theory" adjudicated by the court was whether the Army Corps' construction, expansions, operation, and failure to maintain the MR-GO caused increased storm surge flooding on Plaintiffs' properties during Hurricane Katrina and subsequent hurricanes and severe storms, effecting a temporary taking of Plaintiffs' properties under the Fifth Amendment.  *See St. Bernard Par.*, 121 Fed. Cl. at 718–46.  This legal theory is interrelated to and dependent on facts common to the class members—all of which are property owners in St. Bernard Parish or the Ninth Ward of the City of New Orleans and predominate over any questions affecting any individual members, as discussed above.  And, the "economic impact of that event" has been determined by this Memorandum Opinion And Partial Final Judgment adjudicating Just Compensation due for the Trial Properties.

Nevertheless, the Government contends, even if liability from a temporary taking is established, class treatment is not appropriate, because "[t]he cause and extent of damage to each property are a highly individualized determination that cannot be made on an aggregate basis.  Damage to individual properties attributed to a particular cause varies widely and significantly from property to property.  No two properties are alike."  Gov't CC Opp. at 23 ("[The] 'causes and extent of damages to individual properties from Hurricane Katrina or its aftermath require individual forensic inspection, analysis, and evaluation of each property, including consideration of' eighteen different elements, such as 'damage from wind, rain flying debris, fire, vandalism, theft, . . . [c]ondition of the structures on the site and suitability for repair . . . [and] [c]ondition of the properties in the surrounding area.'" (quoting 2/13/13 Declaration of James R. Danner at 2)) (second, third and fourth alteration in original).  For example, during Hurricane Katrina, wind speed varied with time and location, as a FEMA model shows that estimated 40 to 80 percent of the structures in New Orleans sustained some level of wind damage, irrespective of any flooding.  Gov't CC Opp. at 23–24.  In addition, water entered into the New Orleans area from numerous sources, including twenty-four sources in St. Bernard Parish and the Lower Ninth Ward.  Gov't CC Opp. at 24 (citing 2/12/13 Declaration of R. Lee Wooten, Professional Engineer, at 5, 10–12).

Of course, wind speed[25] and rain[26] contributed to the property damage that Plaintiffs experienced but, as the Government admitted in *Robinson* and Plaintiffs independently established in this case, the predominate injury to Plaintiffs' properties was caused by increased storm surge flooding caused by the Army Corps' construction, expansions, operation, and failure to maintain the MR-GO during Hurricane Katrina, as well as "inevitably recurring" flooding during subsequent hurricanes and severe storms. *See* U.S. *Robinson* FOF ¶ 334 ("Levee degradation and breaching along the MRGO Reach 2 created a very large source of water which . . . was by far the greatest source of water that entered the [St. Bernard] polder, greatly exceeding all other sources."); *see also St. Bernard Par.*, 121 Fed. Cl. at 712 (citing 12/6/11 Kemp Direct at 38) (estimating that flooding damaged 98% of all structures in St. Bernard Parish and the Lower Ninth Ward); *see also id.* at 739–41; DTR at 651 (the Government's expert, Mr. Fitzgerald, testified that 88 percent of the volume of water came through the MR-GO levee breaches). If the standard for predominance required "forensic inspection, analysis, and evaluation of each property," no class could ever be certified for damages. As Circuit Judge Posner recognized, *Comcast* does not require "that every member of the class have identical damages." *Butler v. Sears, Roebuck & Co.*, 727 F. 3d 796, 801 (7th Cir. 2013), *cert. denied*, 134 S. Ct. 1277 (2014). Instead, class certification is appropriate, "[i]f the issues of liability are genuinely common issues" and if "the damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses." *Id.*

Moreover, the "no two properties are alike" argument that the Government advances was rejected by the Advisory Committee that drafted FRCP 23, recognizing that individual damage calculations should not "scuttle" class certification under FRCP 23(b)(3). *See* NEWBERG ON CLASS ACTIONS § 4:54 (5th ed. 2015) (citing Rules Advisory Committee Notes, 39 F.R.D. 69, 103 (1966)). This principle also was affirmed a few weeks ago when the United States Supreme Court, in *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045–49 (2016), held that "representative evidence" can be used to satisfy FRCP 23(a)(3)'s predominance inquiry, rejecting the requirement of "person-specific" evidence of liability. As such, *Tyson Foods* is dispositive of the Government's argument that the predominance inquiry cannot be established in this case since some Plaintiffs' properties may have experienced more MR-GO increased storm surge flooding than others.

---

[25] To the extent that wind damage also was a factor, it did not significantly change how appraisers on the scene determined whether improvements needed to be replaced. For example, the Adams' insurance company paid $7,000 for wind damage, but the Adams' flood insurance company paid them $50,000. SPX3008 at 7; SPX2224 at 1 ("Winds from Hurricane Katrina caused limited damage to [2414 Deslonde.]"). In addition, at Steve's RV the flood damage estimate was $241,000; the wind damage estimate was $23,000. DTR at 712–13; DVX118 at 10 (FEMA Project Worksheet Report for 1818 Center Drive) ("THE FLOOD REPLACEMENT COSTS ARE 98.3% OF THE REPLACEMENT COST."); DVX116 at 5 (FEMA Project Worksheet Report) ("ALL OF THE DAMAGE TO THE BUILDING AND GROUNDS WERE CAUSED BY FLOOD WATERS INUNDATION.").

[26] DTR at 605 (Mr. Fitzgerald testified that the "average contribution of rainfall in the St. Bernard Basin" was "9.3 inches or 0.7 feet.").

In sum, in light of the questions of law and fact common to all owners of affected property in St. Bernard Parish and the Lower Ninth Ward of the City of New Orleans, a class action is a superior procedural vehicle to fairly and efficiently adjudicate the contested issues of fact and law. The mandatory joinder of thousands of individual property owners, particularly at this juncture when both the liability and Just Compensation have been adjudicated as to the Trial Properties, is not necessary. Based on the court's findings today, the parties, a skilled mediator, or the court can use public records to ascertain the square footage of the affected properties and determine Just Compensation with a "reasonable approximation." *Arkansas Game & Fish*, 736 F.3d at 1329; *see also Georgia-Pacific Corp.*, 640 F.2d at 336 (citations omitted) ("[The] concept of just compensation . . . cannot be reduced to a formula, nor can it be confined to inexorable rules.").

For these reasons, the court has determined that RCFC 23(b)(2), (3) have been satisfied.

### C.    The Appointment Of Class Counsel.

In appointing class counsel, the court must consider:

> (i)  the work counsel has done in identifying or investigating potential claims in the action;
>
> (ii)  counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
>
> (iii) counsel's knowledge of the applicable law; and
>
> (iv) the resources that counsel will commit to representing the class[.]

RCFC 23(g)(1)(A).

Charles J. Cooper, a named partner in the firm of Cooper & Kirk, PLLC, of Washington, D.C. has been actively engaged in identifying, investigating, and litigating the claims in this case since July 2, 2009. Mr. Cooper has substantial trial experience before the United States Court of Federal Claims, specific expertise with class actions and complex cases, and has appeared before numerous federal courts of appeals and the United States Supreme Court. In addition, Mr. Cooper has the depth of professional experience and the firm has financial resources to represent the class. 1/22/16 Declaration of Charles J. Cooper, ECF No. 300-1. As such, Mr. Cooper meets the requirements of RCFC 23(g)(1)(A) and is appointed Class Counsel in this case.[27]

## IV.    CONCLUSION.

For these reasons, the court has determined that there is no just reason for delay and enters a partial final judgment, pursuant to RCFC 54(b), determining that the non-governmental Plaintiffs that owned one of the Trial Properties, as of August 29, 2005, are entitled to: (1) the cost of replacement improvements, as of August 29, 2005, as set forth in Court Exhibit A; and (2) fair market rent lost, from September 1, 2005 until July 1, 2009, as set forth in Court Exhibit C.

---

[27] The court has been asked to appoint other New Orleans attorneys as Class Counsel. The court may do so in the future, after further examination and inquiry.

The St. Bernard Parish Government is entitled to recoup insurance proceeds of $893,363 on three of the Trial Properties that reduced the amount of Stafford Act grants received.[28]

The City of New Orleans (Ninth Ward) is entitled to lost real estate taxes for 2006 and 2007.[29]

Plaintiff-owners of the non-governmental Trial Properties are entitled to compound interest on the amount of Just Compensation due from August 29, 2005, until the date such compensation is made.

St. Bernard Parish is entitled to compound interest on the amount of Just Compensation due on the insurance proceeds, referenced herein.[30]

The court emphasizes that none of the Just Compensation that the court has ruled is due the property owners for their losses previously was paid by the *federal government*.

The court also certifies for purposes of liability: A class consisting of owners of real property or "immovable property," under Louisiana State law as of August 28, 2005, located in St. Bernard Parish, Louisiana, and/or the Lower Ninth Ward of the City of New Orleans, Louisiana, subject to the temporary taking of such property, as a result of increased storm surge, during Hurricane Katrina and/or "inevitably recurring" flooding during subsequent hurricanes and severe storms, as a result of the United States Army Corps of Engineers' construction, expansions, operation, and failure to maintain the Mississippi River-Gulf Outlet, until it permanently was closed on July 1, 2009. "Owners of real property" does not include the United States government or agencies or instrumentalities thereof. For purposes of Just Compensation due, the court also certifies two subclasses:

For purposes of Just Compensation due, the court also certifies two subclasses:

**Subclass A.**  A class consisting of owners of real property or "immovable property," under Louisiana State law as of August 28, 2005, that was zoned and/or lawfully used as residential property, located in St. Bernard Parish, Louisiana, and/or the Lower Ninth Ward of the City of

---

[28] At such time as a final judgment is entered, St. Bernard Parish also will be entitled to recoup all other insurance proceeds that reduced the amount of Stafford Act grants received. Likewise, the City of New Orleans will be entitled to recoup all insurance proceeds that reduced the amount of Stafford Act grants received for the Ninth Ward.

[29] The court has no reason to believe the public real estate tax records of the City of New Orleans for the Ninth Ward, showing lost real estate taxes of $2,569,085.69 for 2006 and 2007 are not accurate.  Nevertheless, the parties should conduct whatever additional due diligence they deem appropriate and submit any briefs on or before December 30, 2016, while appellate proceedings in this case proceed.

[30] Likewise, at such time as a final judgment is entered, the City of New Orleans (Ninth Ward) will be entitled to compound interest on the Just Compensation due on the insurance proceeds as well as lost real estate taxes.

New Orleans, Louisiana, subject to the temporary taking of such property, as a result of increased storm surge, during Hurricane Katrina and/or inevitably recurring flooding during subsequent hurricanes and severe storms, as a result of the United States Army Corps of Engineers' construction, expansions, operation, and failure to maintain the Mississippi River-Gulf Outlet, until it permanently was closed on July 1, 2009. "Owners of real property" does not include the United States government or agencies or instrumentalities thereof. "Residential property" does not include multifamily housing (other than duplexes) but does include duplexes and property rented for use for residential purposes.

**Subclass B.**   A class consisting of owners of real property or "immovable property" under Louisiana State law, as of August 28, 2005, that was zoned and/or lawfully used as commercial, industrial, or governmental property, and including all other real property not included in Subclass A, located in St. Bernard Parish, Louisiana, and/or the Lower Ninth Ward of the City of New Orleans, Louisiana, subject to the temporary taking of such property, as a result of increased storm surge, during Hurricane Katrina and/or inevitably recurring flooding during subsequent hurricanes and severe storms, as a result of the United States Army Corps of Engineers' construction, expansions, operation, and failure to maintain the Mississippi River-Gulf Outlet, until it permanently was closed on July 1, 2009. "Owners" does not include the United States government or agencies or instrumentalities thereof.

Mr. Charles J. Cooper, Esquire, of Cooper & Kirk, PLLC, Washington, D.C., is appointed class counsel, pursuant to RCFC 23(g)(1)(A).

**IT IS SO ORDERED.**

s/ Susan G. Braden
**SUSAN G. BRADEN**
**Judge**

Finally, it is important for the public, property owners that are representative Plaintiffs in this case, and members of the certified class action ordered herein to understand why, since this case was filed in 2005, that it has taken over a decade to reach this juncture.

First, the United States Supreme Court requires federal courts *not* to adjudicate constitutional questions, *if* a case can be resolved by a statute or other grounds.  Since over 400 other lawsuits first were filed in the United States District Court in the Eastern District of Louisiana alleging that the Government was liable under the Federal Tort Claims Act and Louisiana state law, those cases had to be finally resolved.  While the federal court proceedings in Louisiana were underway, however, this court adjudicated motions to dismiss filed by the Government in 2007 and 2008 and convened a trial on liability in New Orleans in December 2011, so as not to delay these proceedings, if the trial decision in *Robinson* was not affirmed—but, that occurred on March 12, 2012.

Second, on December 4, 2012, an unanimous United States Supreme Court, issued a landmark opinion in *Arkansas Game & Fish Comm'n v. United States*, 133 S. Ct. 511, 522 (2012),

holding "that governmental-induced flooding temporary in duration gains no automatic exemption from Takings Clause [of the Fifth Amendment to the United States Constitution].").   The significance of that opinion on this case cannot be overstated and initiated a new round of briefs. In November 2013, the court held an evidentiary hearing on Just Compensation in Washington, D.C.   Again, months of briefs, substantive filings from the parties, and hearings followed.

Third, on May 1, 2015, the court issued a Memorandum Opinion And Order determining that the Army Corps' construction, expansions, operation, and failure to maintain the MR-GO caused increased storm surge flooding on private property during Hurricane Katrina and subsequent severe storms, effecting a temporary taking under the Fifth Amendment to the United States Constitution.   The court's subsequent request that the Government mediate the amount of Just Compensation due was rejected.   In the months that followed, once again the court received numerous briefs and substantive filings from the parties and held post trial arguments on December 21, 2015, January 8, 2016, and April 19, 2016 on Just Compensation.

Today, the court has entered a Partial Final Judgment on Just Compensation due only owners of certain "test" Trial Properties, so the United States Court of Appeals for the Federal Circuit may review the court's decisions in this case.   That review likely will take at least another year.   While the appellate process is underway, the court will be issuing a series of Orders to the St. Bernard Parish Government and the City of New Orleans (Lower Ninth Ward) in the near future to obtain public information necessary to finalize the amount of Just Compensation due, so that the court will be in a position to proceed promptly to issue a final money judgment as to all class members, if the appellate court affirms this court's decisions.